Laurence F. Padway, SBN# 83914
Costa Nikoloutsopoulos, SBN# 248905
LAW OFFICES OF LAURENCE F. PADWAY
1516 Oak Street, Suite 109
Alameda, California 94501
Phone: (510) 814-0680
Fax:     (510) 814-0650

Attorneys for plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA BURGESS | CASE NO. C07-05310 JSW |
| Plaintiff, | **LINDA BURGESS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| TOWNSEND AND TOWNSEND AND CREW LLP LONG TERM DISABILITY PLAN | |
| Defendant, | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | |
| Real Party in Interest. | |

# TABLE OF CONTENTS

PAGE

**TABLE OF AUTHORITIES CITED**                                                    **ii**

I.    Summary of the Policy - The Parties Agree Review is *De Novo*.          2

II.   Linda Burgess Demonstrated That She Became Disabled and                 3
      That She Remains Disabled.

III.  Prudential's "Medical" Reports Did Not Consider the Evidence and        8
      Arbitrarily Reject Evidence That Does Not Fit Their Desired Conclusion.

IV.   Mrs. Burgess Credibly Establishes Pain and Disability.                  11

V.    The Court Should Award Benefits Both for "Own Occupation" and "Any      15
      Occupation" Disability.

VI.   The Court should Award Benefits Due to Date.                            18

VII.  Conclusion                                                              19

1

**TABLE OF AUTHORITIES CITED**

2

3    CASES                                                                    PAGE

4    Bilby v. Schweiker                                                       13

5            762 Fed. 2d 716

6    Beauvais v. Citizens Financial Group, Inc.,                             16

7            418 F.Supp.2d 22 (D.R.I, 2006)

8    Calvert v. Firstar Finance, Inc.                                        12

9            409 Fed. 3d 286 (6th Cir. 2005)

10   Day v. Weinberger                                                       13

11           522 Fed. 2d 1154

12   Force v. Ameritech Corp., Inc.                                          12

13           452 Fed. Supp. 2d 744 (E. D. Mich., 2006)

14   Gamer v. Secretary of Health and Human Services                        15

15           815 Fed. 2d 1279 (9th Cir. 1987)

16   Goodwin v. Gardner                                                      13

17           250 Fed. Supp. 454 (N. D., Cal., 1966)

18   Kirwan v. Marriott Corp.                                                12

19           10 F.3d 784 (11th Cir., 1994)

20   Ladd v. ITT Corp.                                                       12

21           148 Fed. 3d 753 (7th Cir., 1998)

22   Light v. Social Security Administration                                 14-15

23           119 Fed. 3d 789

24   Lijoi v. Continental Casualty Co,                                       17

25           414 Fed. Supp. 2d 228 (E.D. N. Y. 2006)

26   Lopes v. Metropolitan Life Insurance Co.                                12

27           332 Fed. 3d 1 (1st Cir. 2003)

28

---

1   <u>Paese v. Hartford Life and Accident Insurance Co.</u>                    12

2          449 Fed. 3d 435

3   <u>Rodriguez v. Bowen</u>                                                   13

4          876 Fed. 2d 759

5   <u>Saffon v. Wells Fargo & Co. Long Term Disability Plan</u>            11-12

6          522 F.3d 863

7   <u>Smith v. CMTA-IAM Pension Trust</u>                                     18

8          746 F.2d 587 (9th Cir.1984).

9   <u>Stewart v. Sullivan</u>                                                  14

10         881 F.2d 740 (9th Cir.,1989).

11  <u>Wible v. Aetna Life Insurance Co.</u>                                   13

12         375 Fed. Supp. 2d 956 (C. D. Cal., 2005)

13

14

15  **FEDERAL AUTHORITIES**

16

17

18  **CALIFORNIA AUTHORITIES**

19  California Insurance Code section 10111.2                                  18

20

21

22  **OTHER AUTHORITIES**

23  DSM IV TR                                                                 5-6

24

25

26

27

28

---

1

**NOTICE OF MOTION AND MOTION**

2

3          Plaintiff Linda Burgess moves for summary judgment on her ERISA regulated

4    long term disability claim that:

5

6          1. She remained disabled even after defendant terminated disability payments

7    to her claiming that she had regained her ability to work on November 14, 2005;

8

9          2.  She remains disabled to the current date from work in her own occupation

10   as a legal secretary, or in any occupation because of the pain and dysfunction associated with

11   fibromyalgia and related conditions.

12

13         3. She is entitled to benefits under the policy, after offsets, of $457.12 per

14   month from November 14, 2005, to July 12, 2006, a total of $3656.96 and monthly net benefits of

15   $2379.98  (4027.98 gross benefit minus 1647. Social Security Disability Benefit)  from July 13, 2006

16   until September 13, 2008 (anticipated date of judgment) in the sum of $61,879.48, for a total past

17   benefit due of $65,536.44.

18

19         4.  She is entitled to prejudgment interest on the above sum, at the rate of 10%

20   per annum under the California Insurance Code section 10111.2 of $896. on the $3656.96 benefits

21   past due and $6701.55 on the $61,879.48 past due for a total prejudgment interest due of $7597.55.

22

23         5.  She is entitled to be placed back on claim for the duration of her disability

24   and to receive monthly payments of $2379.98 per month as long as she remains disabled, and the

25   matter should be remanded to the plan to make those payments and to determine any end to her

26   continuing eligibility.

27

28         6.  She is entitled to her attorneys' fees and costs of suit to be set by

---

1   memorandum and motion following the ruling on this motion in accordance with the usual practice.

2

3        7.  In summary, Mrs. Burgess is entitled to judgment in the amount of

4   $61,879.48 past benefits, plus prejudgment interest of $5917.55 (through September 13, 2008), plus

5   ongoing benefits of $2379.98 per month for as long as she remains disabled or until she reaches the

6   age of 65, plus her costs and attorneys' fees.

7

8        Dated:  August 8, 2008

9

10                    /s/_____
                       Laurence F. Padway
                       Attorney for plaintiff

11

12

13

14        **MEMORANDUM OF POINTS AND AUTHORITIES**

15

16        **1.  Summary of the Policy–The Parties Agree Review is *De Novo*.**

17

18        Prudential insures the Townsend, Townsend and Crew Employee Long Term

19   Disability Plan, which is subject to ERISA.  The parties agree that review of the Prudential decision

20   is *de novo.* (See Defendant's Opposition to Motion to Allow Discovery filed June 5, 2008 at page 5).

21

22        The Plan has a 90 day elimination period and then pays benefits for 24 months

23   when the beneficiary cannot work in "your regular occupation," extending benefits up to age 65 if

24   the beneficiary then remains unable to work in "any gainful occupation for which you are reasonably

25   fitted by education, training or experience."  Pru 632.

26

27        The essential disputed issue between the parties is whether or not Mrs.

28   Burgess is disabled.

---

1    The parties agree that Mrs. Burgess became disabled on July 13, 2005, and

2    remained disabled throughout the 90 day elimination period.  Benefits were paid from the end of that

3    time (October 13, 2005) through November 14, 2005, when Prudential pronounced Mrs. Burgess

4    recovered.  Mrs. Burgess denies that she ever recovered, and she remained on state disability and

5    later social security disability until the present time.  Because her disability would preclude her from

6    working in any occupation, she requests the Court to award disability through the present date, and

7    not merely to the end of the "regular occupation" time period, which would be October 13, 2007.

8

9    **II. Linda Burgess Demonstrated That She Became Disabled and**
     **That She Remains Disabled.**

10

11    Linda Burgess, now 56 years old, worked for Townsend, Townsend and Crew

12    as a legal secretary.  She has a 20 year history of fibromyalgia which worsened in 1994 after she

13    participated in a weight reduction program and her mother passed away. PRU 26.  An excellent and

14    comprehensive report documenting her disability was written by Dr. James Davis, rheumatologist

15    and signed both by him and Dr. Alan J. Noble, primary care physician and appears at PRU 25.

16    These physicians, who have had a long history with Mrs. Burgess, not only prepared this twelve page

17    detailed report, but they attached significant medical literature to it to support their medical

18    judgment.  PRU 25-57. Importantly, and unlike the Prudential consultant, these doctors considered

19    *all the evidence*, including the subjective complaints of Mrs. Burgess, which any competent medical

20    report must do.  They explain that over time fibromyalgia caused Mrs. Burgess intermittent, but

21    increasingly progressive, periods of temporary disability.  Indeed, Mrs. Burgess was referred to and

22    treated by a chronic pain specialist as early as 1999. PRU 28.  Nonetheless, she recovered somewhat

23    from these flareups and returned to work.

24

25    In 2004, Mrs. Burgess underwent a sleep study to determine the cause of

26    daytime sleepiness.   She had reduced sleep efficiency with her oxygen saturation dropping to 59%,

27    and this was treated with CPAP, a machine which delivers air at pressure into a mask at night.  PRU

28    28.  Dr. Davis points out that this frequently occurs with fibromyalgia patients who sleep enough

1  hours "but it tends to be a light, unrefreshing sleep.  There is not enough of a form of deep sleep

2  called Stage IV, non rapid eye movement sleep."  PRU 28.

3

4          Mrs. Burgess left work on July 13, 2005 to undergo foot surgery for bilateral

5  neuromas[1] and hammertoe, a painful deformity.  The normal recovery time for this surgery would

6  have kept Mrs. Burgess off work until November 14, 2005, and defendant paid disability benefits

7  through that date.  Unfortunately, her recovery was not "normal."

8

9          After surgery, Mrs. Burgess began to suffer from post-exertional fatigue–she

10  became exhausted two days after exercising.  Dr. Davis notes that "Post-exertional malaise is a

11  hallmark of fibromyalgia."  PRU 29.

12

13          Mrs.Burgess also continued to have foot pain.  EMG and NCV of the foot

14  were abnormal showing loss of function of the large nerves to the feet[2].  Dr. Steinmets, neurologist,

15  was unable to differentiate peripheral neuropathy versus tarsal tunnel syndrome, but either way, the

16  feet remain painful, and the pain is aggravated by weight bearing and wearing shoes.  Because the

17  diagnosis cannot be isolated, treatment of this condition is problematic.  Dr. Steinmetz noted,

18  however, that "[t]his may cause her foot pain and be a cause of her fatigue."  PRU 29.

19

20          These increased symptoms made it so difficult for Mrs. Burgess to travel to

21  San Francisco for medical appointments that  she transferred her care to the East Bay, where she

22  began seeing Dr. Brian Kaye, a well-known rheumatologist, and Dr. Sue, a psychiatrist.  They

23  prescribed Cymbalta, a selective seratonin and norepinephrine reuptake inhibitor which has been

24  useful for both neuropathy and depression.  Dr. Kaye also prescribed Lyrica, which is now the only

25  drug approved by the FDA for treatment of fibromyalgia.  The Lyrica was generally effective, but it

26  _____

27          [1] Neuromas are tumors or growths on nerves.

28          [2]These studies do not measure the condition of the smaller nerves.

1    causes some cognitive issues leaving Mrs. Burgess the Hobson's choice of increased pain or less

2    pain but cognitive incapacity, which we discuss below.

3

4              Dr. Sue diagnosed a "Major Depressive Disorder, recurrent," which relates to

5    a chemical imbalance in the brain, in this case thought to be due to low levels of Seratonin, a

6    neurotransmitter. PRU 30. Cymbalta was prescribed to reduce the removal of Seratonin and

7    Norepinephrine and cause the levels of those neurotransmitters to rise, hopefully improving the

8    chemical balance in the brain and reducing the depression.  Essentially, the drug "controls the

9    volume" of pain messages received by the brain.  PRU 30. Dr. Sue's diagnosis included a GAF

10   "Global Assessment of Functioning" score of 55.  According to DSM IV-TR, a GAF of 51-60

11   indicates

12

13              "**Moderate symptoms** (e.g., flat affect and
              circumstantial speech, occasional panic attacks) **OR**

14            **moderate difficulty in social, occupational or school
              functioning** (e.g., few friends, conflicts with peers and

15            co-workers)."

16
     The depression is secondary to pain, and Dr. Sue noted that even large doses of narcotics "only takes

17   the edge off" of Mrs. Burgess' pain. PRU 30-31.

18

19              In October, 2006, Mrs. Burgess began seeing Dr. Michael Pinkney for chronic

20   pain management.  At that time, Mrs. Burgess was taking *ten different prescription medications,*

21   *eight of them for Fibromyalgia or Peripheral Neuropathy.*  Dr. Pinkney diagnosed Fibromyalgia,

22   Peripheral Neuropathy, Trochanteric Bursitis and Sacroiliac Joint Dysfunction.  These produced

23   symptoms of generalized achiness, tightness and tenderness, with paresthesias, numbness and

24   tingling in the feet, and occasional shooting pain into the feet.  Mrs. Burgess experienced constant

25   pain, made worse by walking, sitting and standing.  Dr. Pinkney tried some facet injections in the

26

27

28

1   lower part of the low back[3], which helped somewhat, and increased Mrs. Burgess' ability to walk.

2   PRU 31.  The administrative record stops in the early part of Dr. Pinkney's treatment.

3

4          Drs. Davis and Noble, at PRU 32,  note that  based upon Dr. Davis'

5   examination at about this same time:

6

7               The important point here is that **Linda was taking a
    **total of 9 narcotic class pills daily--and still did not**
    **have her pain controlled.**  All of these medications can

8               impair cognitive function and cause fatigue.

9   Dr. Davis also noted Linda's increased weight[4] as a problem likely to "exacerbate small anomalies in

10  musculoskeletal balance," and she had "an increased Q angle of both knees, which tends to cause the

11  patella, or kneecap, to become unstable, which would contribute to the leg pain she reports.  She also

12  had symmetrical hyperreflexia of both her upper and lower extremities, which indicate motor neuron

13  disease, but which also may be caused as a side effect of some of the medications Mrs. Burgess was

14  prescribed.

15

16         In addition to this fairly exhaustive medical workup, Mrs. Burgess provided a

17  lengthy and detailed statement in support of her claim. The administrative record includes the

18  transmittal letter of December 12, 2006 identifying five sets of enclosed medical records and

19  "6. Statement of Linda Burgess." PRU 410.  What became of this statement we do not know, but it

20  does not appear in the administrative record.  Since it was submitted to Prudential, however, we

21  attach a copy of this statement to the Declaration of L. Padway filed herewith as it provides a

22  detailed review by Mrs. Burgess of the extent of her disability.  Mrs. Burgess advises that since her

23  hammertoe surgery she has "constant burning sensation" in both feet.  By taking Lyrica, she gets

24  enough pain relief that she can walk around the block.  Even with this medication, she still has the

25  ───────────────

26      [3]This targets referred pain. A pinched nerve in the back can cause pain in the leg.

27      [4]Prudential had a psychiatric consultant review Dr. Sue's records.  This consultant noted the lack
    of "objective" evidence of depression.  Of the nine criteria assessed in diagnosing depression, the only
28  one which is "objective" is weight loss or gain of at least 5%.  DSM IV TR at page 356.

"constant burning sensation in the balls of [her] feet," but it is improved.  Mrs. Burgess, in a five page, single spaced, statement, provides exquisite, highly credible detail concerning her desire to work, and her inability to work at any job:

>   My typical day begins at 7:30 a.m... I wake up with a lot of pain.  I wonder: "where's the truck that hit me."  I get out of bed because it is uncomfortable to stay in bed...When I wake up, I have pain in my neck, shoulders, arms, legs – all of the "large muscles."  My feet also hurt.

>   The only place I can be comfortable for any length of time is sitting on a particular ergonomically designed chair which I have, with my feet at hip level.  So I will sit in the chair and watch television until 10:00 a.m. or so.  If I have a medical appointment, I go out to it.  I have medical appointments about once a week on average.  Otherwise, I may run a short errand or go to the store, about a half mile away, and do light shopping.  Chester does the heavy shopping.  Otherwise, I usually stay home.

>   I straighten the house a little.  Most housekeeping tasks increase my pain so I do not do them.  Vacuuming and sweeping, anything that requires bending, hurts my back, neck and shoulders.  Any bending or pulling, such as loading and unloading the dishwasher, causes back pain, neck pain and shoulder pain...

>   ***

>   "Most housekeeping tasks increase my pain so I do not do them.  Vacuuming and sweeping, anything that requires bending, huts my back, neck and shoulders.  Any bending or pulling, such as loading and unloading the dishwasher, causes back pain, neck pain and shoulder pain."

>   "Mostly, I watch television during the day.  I used to knit, but I stopped because my fingers hurt.  I am afraid to do most things because they might cause a flareup.  Being excited and happy, even though its fun, may cause a flareup.  As can most social situations.  Because of this, I have lost my ambition, and I really do not try to do too much anymore.  I spend my day at home because my feet hurt.  I fall easily.  I lose my balance doing simple things such as putting on my clothes.  The claims adjuster knows I spend my day at home because I am always there when she calls.

>   ***

1

> We used to entertain friends with dinner parties or a bar b que. I would invite friends, cook and cleanup. Now, these events are infrequent, perhaps twice a year and Chester does all the work.

2

3

> My illness has affected my marriage. Chester has taken on the housekeeping, cooking and laundry, which I used to do. Our sex life ended because I have too much pain during sex.

4

5

6     Mrs. Burgess has a long history of fibromyalgia with intermittent time off

7  work, progressively worsening. She has numerous objective findings which would be expected to

8  cause her substantial chronic pain. Her medical history and examinations are consistent with her

9  subjective reports. No one accuses her of malingering.

10

11     Mrs. Burgess cannot work as a legal secretary because of pain, fatigue, the

12  need to keep her feet elevated as well as secondary depression and cognitive dysfunction. Not only

13  can she not work in her occupation, clearly she cannot work in any other occupation either. She has a

14  long work history, and shows a gradual and progressive downward progression. She worked until she

15  was 56 years old, and in the absence of some miraculous recovery, she has reached the end of her

16  working life.

17

18        **III. Prudential's "Medical" Reports Did Not Consider the Evidence and Arbitrarily Reject Evidence That Does Not Fit Their Desired Conclusion.**

19

20     Prudential referred the case out for review to Dr. Paul Howard in Arizona. Dr.

21  Howard's bias in the case is not known, since the Court denied discovery on the point. But we do

22  know that while every doctor who has actually seen Mrs. Burgess agrees that she is disabled, Dr.

23  Howard has never examined her, and so he starts out at a substantial deficit. Further, *Prudential*

24  *failed to provide Dr. Howard* the five page, single spaced typewritten statement of Mrs. Burgess

25  from which we cite above. The quality of a review depends upon the material which was reviewed.

26  Prudential made it impossible for Dr. Howard to perform a competent review by withholding Mrs.

27  Burgess' statement.

28

---

1          Not only did Dr. Howard not examine Mrs. Burgess, his "report" does not meet

2   any standard medical protocol.  It is labeled an "Independent Peer Review."  But since he neither

3   challenges nor comments upon the appropriateness of the diagnosis and treatment provided Mrs.

4   Burgess by her physicians, this label is not accurate.  Nor would the report qualify as a medical

5   consultation since it arbitrarily eliminates consideration of any "subjective" data, and therefore cannot

6   appropriately make a diagnosis or recommend any treatment.  Instead, Dr. Howard has undertaken to

7   compile a hodgepodge of things which are not recognized as a legitimate type of product in the

8   medical literature– essentially he attempts to create a list of minimum impairments which must be

9   inferred based upon the diagnoses while cherry picking the evidence.  So, if Dr. Sue notes that there

10  are no side effects from medication, that conclusion is credited conclusively, even if based upon a

11  report from Mrs. Burgess, but if Mrs. Burgess reports she can only stand for three minutes, that report

12  is challenged because no one reports having timed her.  In such a system of analysis, how would Dr.

13  Howard be expected to assess, in his second hand analysis, such things as pain, fatigue and cognitive

14  impairment?  What standards does he use?  What medical literature describes the processes of his

15  report?

16

17          Furthermore, Dr. Howard would require disabled insureds to prove their

18  disability by means of *nonexistent objective findings*.  He states, for instance, that "[t]he presence of

19  widespread tender points does not translate, in and of itself, into any functional impairment in the

20  absence of other corresponding findings of functional loss." PRU 9. It is true enough that the tender

21  points are not impairing.  They are, instead, the markers that prove the fibromyalgia, and the

22  functional impairment is the *pain and fatigue of fibromyalgia*. Dr. Howard *agrees* that Mrs. Burgess

23  has fibromyalgia, and peripheral neuropathy, and paresthesias over the arches of her feet.  PRU 9..

24  There is no objective means of measuring pain and fatigue directly, so that Prudential's effort at

25  requiring its insured to prove pain and fatigue by objective measurement is simply a fraudulent device

26  to avoid the payment of legitimate claims.

27

28          Similarly, Dr. Howard dismisses Mrs. Burgess' need to elevate her feet for

1  comfort by claiming that "[e]levation of feet is not a treatment for peripheral neuropathy in the

2  absence of edema." PRU 9.  But Mrs. Burgess does not elevate her feet to treat her peripheral

3  neuropathy–she does it because it minimizes discomfort.

4

5          The biggest error in Dr. Howard's report is his total disregard of anything

6  reported by Mrs. Burgess.  When she complains that she has difficulty standing more than three

7  minutes, he writes, at PRU 10: "There is no measurement of her ability to stand, rendering her

8  inability to stand for more than three minutes self-reported, and not documented or supported by any

9  other evidence in the medical records."

10

11         Dr. Howard concedes that Mrs. Burgess is impaired and he states at PRU 10 :

12 "Specifically walking would be restricted to an occasional frequency, up to 30 minutes at a time, two

13 hours cumulative total in any 8 hour time period."  Why 30 minutes?  What makes this estimate,

14 which Dr. Howard pulls out of thin air, better than what Mrs. Burgess reports she can really do?  Has

15 anyone seen her walk for 30 minutes?  Did Prudential, as it so often does, obtain surveillance which

16 shows that Mrs. Burgess actually can do more than she says?  Did it request a functional capacity

17 evaluation?

18

19         Dr. Howard opines, at the end of PRU 10, that Mrs. Burgess has "permanent"

20 restrictions in standing and walking due to her peripheral neuropathy.  But he never even mentions the

21 trochanteric bursitis or sacroiliac joint dysfunction diagnosed by Dr. Pinkney.  He necessarily will

22 underreport her limitations if he does not consider all of her impairing conditions.

23

24         Dr. Howard rejects the idea that Mrs. Burgess had any cognitive or fatigue

25 attributable to her medications because her psychiatrist, Dr. Sue, wrote that she reported no side

26 effects to medication.  But the last note in Dr. Sue's chart was in November of 2006.  This was just at

27 the beginning of the Lyrica, which was not prescribed until the end of September, 2006, by Dr. Kaye,

28 and it was initially started at a low dose and then gradually increased.  Accordingly, there is no

---

1  inconsistency between Dr. Sue's chart and Dr. Davis's opinion – they are simply reflecting different

2  times.

3

4              It appears that Dr. Howard, while acknowledging that Mrs. Burgess has all of

5  the diseases that her physicians have diagnosed, and that she is substantially and permanently

6  impaired by them, would like her to be just functional enough so that Prudential doesn't have to pay,

7  and so he discredits arbitrarily just enough of the "subjective" complaints of pain and fatigue to

8  accomplish that purpose.  But he gives no basis for disbelieving Mrs. Burgess' reports.  Surely she

9  knows if she is tired or hurting.  Surely she knows better than he does, given the presence of these

10 medical impairments, and the absence of any medical examination by Dr. Howard, whether or not she

11 can work.

12

13              **IV.  Mrs. Burgess Credibly Establishes Pain and Disability.**

14

15              The evaluation of pain and similar subjective dysfunction is undergoing critical

16 reevaluation in ERISA cases.   Justice Kozinski wrote:

17

18          In this regard we note our case law in Social Security
            disability cases, *e.g., Cotton v. Bowen,* 799 F.2d 1403,
19          1407 (9th Cir.1986) (per curiam), where we have noted
            that individual reactions to pain are subjective and not
20          easily determined by reference to objective
            measurements. *See also Bunnell v. Sullivan,* 947 F.2d
21          341, 348 (9th Cir.1991) (en banc) (affirming *Cotton* );
            *Fair v. Bowen,* 885 F.2d 597, 601 (9th Cir.1989)
22          ("[P]ain is a completely subjective phenomenon" and
            "cannot be objectively verified or measured.").[FN2] If
23          MetLife is turning down Saffon's application for benefits
            based on Saffon's failure to produce evidence that simply
24          is not available, that too may bear on the degree of
            deference the district court shall accord MetLife's
25          decision and on its ultimate determination as to whether
            Saffon is disabled.

26

27          FN2. While the rules and presumptions of our Social
            Security case law do not apply to ERISA benefits
28          determinations, *see Black & Decker Disability Plan v.*

1
2
3

> *Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034
> (2003), our Social Security precedents are relevant for
> the factual observation that disabling pain cannot always
> be measured objectively-which is as true for ERISA
> beneficiaries as it is for Social Security claimants.

4
5

> *Saffon v. Wells Fargo & Co. Long Term Disability Plan*
> 522 F.3d 863, 872-873 (9th Cir., 2008).

6       Following the compilation of the administrative record in this case, the Social

7   Security Administration granted disability benefits to Mrs. Burgess, which is relevant evidence

8   in support of her disability.  The Social Security Administration decision is based on the more

9   stringent "any occupation" standard as opposed to the "own occupation " standard which

10  Prudential used here, but clearly Mrs. Burgess cannot do any job.  Disability decisions by the

11  Social Security Administration are relevant evidence of disability in ERISA cases, and they

12  should be considered both by Plan Administrators (*Calvert v. Firstar Finance, Inc.*, 409 Fed. 3d

13  286, 294 (6th Cir. 2005), *Ladd v. ITT Corp.*, 148 Fed. 3d 753, 756 (7th Cir., 1998), *Wible v.*

14  *Aetna Life Insurance Co.*, 375 Fed. Supp. 2d 956, 971 (C. D. Cal., 2005),  and by Courts

15  reviewing ERISA Plan decisions. *Kirwan v. Marriott Corp.,* 10 F.3d 784, 790 (11th Cir., 1994),

16  *Lopes v. Metropolitan Life Insurance Co.,* 332 Fed. 3d 1, 6 n.9 (1st Cir. 2003), *Paese v. Hartford*

17  *Life and Accident Insurance Co.,* 449 Fed. 3d 435, 442-443 (2nd Cir., 2006).  The Social

18  Security administration's disability decision, particularly where based upon the same criteria as

19  used by the Plan, "is highly relevant."  *Force v. Ameritech Corp., Inc.,* 452 Fed. Supp. 2d 744,

20  750 (E. D. Mich., 2006).

21      Courts accept disability determinations by the Social Security Administration as

22  relevant because:

23

24
25

> "SSA benefits are not given to malingerers or people who suffer from a
> few aches and pains; they are reserved for seriously disabled workers."

26

> *Force v. Ameritech Corp., Inc.,* 452 Fed. Supp. 2d 744, 750-751 (E. D.
> Mich., 2006).

27
28

Justice Kozinski, in *Saffon*, takes the next step and looks to the Social Security

---

1    analytic paradigm to analyze pain in ERISA cases. Accordingly, we review briefly how Social

2    Security would discern whether or not Mrs. Burgess suffered from disabling pain.

3

4          In order to qualify for social security disability benefits, a claimant must
           establish that a medically determinable physical or mental impairment
5          prevents him from engaging in substantial gainful activity. Perry v.
           Heckler, 722 F.2d 461, 464 (9th Cir.1983); 42 U.S.C. § 423(d)(1)(A)
6          (1982). The impairment must result from abnormalities that are
           demonstrable by medically acceptable clinical or laboratory diagnostic
7          techniques. 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C) (1982).

8          Bilby v. Schweiker, 762 Fed. 2d 716, 718 (9th Cir. 1985).

9

10         "Disability may be proved by medically-acceptable clinical diagnoses, as
           well as by objective laboratory findings."

11         Day v. Weinberger, 522 Fed. 2d 1154, 1156 (9th Cir., 1975), quoted in
           Rodriguez v. Bowen, 876 Fed. 2d 759, 762 (9th Cir. 1989).

12

13         "The question of a disability claimant's right to relief because of
           subjective complaints of pain, when those complaints are not sustained
14         by objective findings, has been the subject of considerable review in
           recent years. Out of the judicial attention the problem has received, some
15         basic guidelines have begun to emerge. The case of Butler v. Flemming,
           288 F.2d 591 (5th Cir. 1961), enunciated the proposition that a claimant
16         has shown disability within the meaning of the Act when he shows that to
           work causes him great pain. 'Congress has in effect stated that if a person
17         is unable except under great pain to engage in any substantial gainful
           activity in which he might be employable, taking into consideration his
18         age, training, work experience and physical and mental capacities, he
           shall be deemed to be disabled for the purposes of this Act.' 288 F.2d at
19         595. In so holding the court rejected an alternative standard that would
           deem a claimant not disabled by pain unless the pain, in addition to
20         causing him discomfort, also aggravated his physical or mental
           impairment. See Theberge v. United States, 87 F.2d 697 (2d Cir. 1937).

21
           "In Hayes v. Celebrezze, 311 F.2d 648 (5th Cir. 1963), the court was
22         confronted with a situation very much like the one at bar. The claimant's
           complaints of pain were not well substantiated objectively, and the
23         hearing examiner had denied the claim. The court remanded with
           instructions that the examiner make specific findings on the issue of
24         claimant's credibility and the genuineness of his complaints of pain. To
           the Secretary's argument that subjective pain is insignificant unless
25         supported by objective findings, the court responded as follows:

26         'But the statute does not require that disability or its cause be
           'substantiated objectively.' Of course it must be 'by reason of any
27         medically determinable physical or mental impairment.' But modern
           medicine is neither so scientific nor so helpless today that it either does,

28

1    or must, evaluate only objective factors.' 311 F.2d at 654.

2        *Goodwin v. Gardner*, 250 Fed. Supp. 454, 457 (N. D., Cal., 1966).

3  We apply the analytic methods of Social Security disability law to the present case.  Mrs.

4  Burgess has medical impairments which are demonstrated by objective medical evidence,

5  namely (1) fibromyalgia (2)  peripheral neuropathy (3) trochanteric bursitis and (4) sacroiliac

6  joint dysfunction.

7

8        We next turn to whether or not Mrs. Burgess' testimony concerning her pain and

9  dysfunction is credible, an issue Prudential ignored, and on which the evidence is entirely

10  without dispute.  Prudential simply disregarded whatever Mrs. Burgess said, and failed to share

11  her statment with its consultants.  But under Justice Kozinski's analysis, we turn back to the

12  Social Security disability case law:

13

14        The ALJ may discount a claimant's pain testimony when the claimant
       fails to submit objective medical findings that establish a medical
15       impairment that would normally produce the claimed pain. Cotton v.
       Bowen, 799 F.2d 1403, 1407 (9th Cir.1986); 42 U.S.C. § 423(d)(5)(A).
16       However, **if there are objective medical findings which establish a
       medical impairment that would normally produce some amount of
17       pain, but the claimant testifies that she suffers more pain than would
       be expected ("excess pain"), the ALJ may discount the testimony
18       only by making specific and justifiable findings to support his
       decision**. Varney v. Secretary of Health & Human Services, 859 F.2d
19       1396, 1399 (9th Cir.1988) ( Varney II ); see also Cotton, 799 F.2d at
       1407. **In those findings, the ALJ must "convincingly justify his
20       rejection" of the claimant's excess pain testimony**. Bellamy v.
       Secretary of Health & Human Services, 755 F.2d 1380, 1382 (9th Cir.1985).
21       [Emphasis added]

22        *Stewart v. Sullivan*, 881 F.2d 740, 743 (9th Cir.,1989).

23

24  The leading case of *Light v. Social Security Administration*, 119 Fed. 3d 789, 792-793, explains

25  the process:

26        Pain of sufficient severity caused by a medically diagnosed "anatomical,

27       physiological, or psychological abnormalit[y]" may provide the basis for
       determining that a claimant is disabled. 42 U.S.C. § 423(d)(5)(A); see
28       Bunnell v. Sullivan, 947 F.2d 341, 344-45 (9th Cir.1991) (en banc). If a

claimant produces evidence that he suffers from an ailment that could cause pain, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir.1996). **Because the government concedes that Light suffers from infirmities that could cause pain, he "need not present medical evidence to support the severity of the pain.**" Chavez v. Department of Health and Human Serv., 103 F.3d 849, 853 (9th Cir.1996).

"The ALJ rejected Light's pain testimony because he "found [Light's] testimony not credible." In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. Smolen, 80 F.3d at 1284; Moncada v. Chater, 60 F.3d 521, 524 (9th Cir.1995) (quoting Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir.1995)); 20 C.F.R. § 404.1529(c). An ALJ's finding that a claimant generally lacked credibility is a permissible basis to reject excess pain testimony. **But, because a claimant need not present clinical or diagnostic evidence to support the severity of his pain, Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir.1990) (stating that "it is the very nature of excess pain to be out of proportion to the medical evidence"), a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain.** Lester v. Chater, 81 F.3d 821, 834 (9th Cir.1995); Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir.1986) (" **'Excess pain' is, by definition, pain that is unsupported by objective medical findings.**"). "In this case, the ALJ disbelieved Light because no objective medical evidence supported Light's testimony regarding the severity of subjective symptoms from which he suffers, particularly pain. An ALJ may not discredit a claimant's subjective testimony on that basis. To find the claimant not credible the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct, or on internal contradictions in that testimony. Because the ALJ failed to articulate an acceptable reason either for disbelieving Light's testimony in general or for discrediting his pain testimony specifically, this case must be remanded to the ALJ to make adequate findings. [Emphasis added]

*Light v. Social Sec. Admin*. 119 F.3d 789, 792 -793 (9th Cir., 1997).

In short, as the Ninth Circuit held in *Gamer v. Secretary of Health and Human Services*, 815 Fed. 2d 1279 (9th Cir. 1987), Prudential erred because:

"it is improper as a matter of law to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings."

---

1   For these reasons, the District Court is required to credit Mrs. Burgess' statement of her

2   limitations, even if it is in excess of that which would ordinarily be expected and find her

3   disabled.

4

5   **V.  The Court Should Award Benefits Both for "Regular Occupation" and**
    **"Any Occupation" Disability.**

6

7           The Plan provides for a 90 day elimination period, followed by two years of benefits

8   if Mrs. Burgess is disabled from working in her "regular occupation" followed by additional

9   benefits if she remains disabled from working in "any occupation" for which she is qualified by

10  reason of her education, training and experience.  PRU 632, 633.  Because her disability started

11  in July, 2005, the two year "regular occupation" period expired in October, 2007.  The Court,

12  therefore, has a choice, of either awarding benefits to that point, and remanding to the Plan to

13  consider "any occupation" disability, or simply awarding benefits up to the time of trial:

14

15          When disability benefits have been denied unreasonably, a reviewing
            court has "considerable discretion" to fashion an appropriate remedy.
16          *Buffonge v. Prudential Ins. Co. of America,* 426 F.3d 20, 31 (1st
            Cir.2005) (quoting *Cook v. Liberty Life Assurance Co.,* 320 F.3d 11, 24
            (1st Cir.2003)).  Ordinarily, the court either will remand the case to the
17          administrator for reevaluation or will make a retroactive award of
            benefits. 29 U.S.C. § 1132(a)(1)(B); *Cook,* 320 F.3d at 24. Generally,
18          remand is appropriate where an award of retroactive benefits would result
            in an economic windfall to the claimant because it appears that the
19          claimant's disability ended at some time in the past. *Id.* (remand
            appropriate "if there were good reason to doubt that a reassessment
20          would justify benefits for some or all of the past period."); *Quinn v. Blue*
            *Cross & Blue Shield Ass'n,* 161 F.3d 472, 478 (7th Cir.1998)(award of
21          retroactive benefits inappropriate where it might provide plaintiff "with
            an economic windfall should she be determined not disabled upon a
22          proper reconsideration."). Conversely, where it appears likely that the
            claimant's disability continues, a retroactive award of benefits is
23          appropriate. *Cook,* 320 F.3d at 24 (in the absence of evidence supporting
            a termination or where such termination was arbitrary and capricious,
24          employee was entitled to retroactive reinstatement of benefits.) If the
            matter were simply remanded to the administrator for reconsideration, the
25          further delay would unjustly penalize the claimant for the administrator's
            unreasonable denial of benefits and the administrator would have no
26          incentive to refrain from unreasonably denying claims in the future. . . .

27          *Beauvais v. Citizens Financial Group, Inc.*,
            418 F.Supp.2d 22 (D.R.I, 2006).

28

---

1   Whether a Court should award back benefits despite a change in the definition of disability or

2   remand to the Plan administrator is based upon the particular facts of the case.   The presence of

3   an administrative law judge finding of disability, as has now occurred here, is a potent fact

4   favoring a decision by the Court in awarding "any occupation" benefits despite the absence of

5   an administrative action by the insurer that specifically addresses that issue.  *Lijoi v. Continental*

6   *Casualty Co.,* 414 Fed. Supp. 2d 228, 247 (E.D. N. Y. 2006). *Lijoi* distinguished cases

7   remanding to the Plan for determination of any occupation benefits:

8

9
10              Neither of the cases addressed the propriety of a district court
                granting declaratory judgment when it finds, as this Court finds,
11              that (1) as a result of the administrator's improper denial of
                benefits, (2) the plaintiff has been prevented from receiving a
12              determination on his eligibility for permanent disability benefits
                for several years, and that (3) the record clearly demonstrates that
13              any subsequent denial of benefits under the Any Occupation
                phase would have constituted an abuse of the administrator's
14              discretion.

15              *Lijoi v. Continental Cas. Co.,* 414 F.Supp.2d 228, 248
                (E.D.N.Y.,2006).
16

17          In this case, the Court should award both "regular occupation" and "any

18   occupation" benefits up until the time of judgment because:

19          1. Mrs. Burgess health has been declining progressively for many years as a

20   result of her fibromyalgia;

21          2. Even Prudential's physician agrees that the impairments she has are

22   "permanent," and while he does not agree that they are as substantial as the other professionals,

23   they are, even in his opinion, quite substantial.

24          3. There is no evidence of improvement.

25
26          4. Accepting the better evidence of the treating physicians, and crediting the

27   testimony of Mrs. Burgess, clearly there is no occupation at which she can work on a regular

28   and continuous basis.

5.  Prudential made no effort to perform any type of vocational analysis and there is nothing either in the record or outside the record which provides a reasonable basis for believing that an "any occupation" review would serve any purpose.

6.  The Social Security Administrative finding that Mrs. Burgess cannot work in "any occupation" provides substantial evidence that she cannot work in "any occupation."

## VI.  The Court should Award Benefits Due To Date.

Prudential found that Mrs. Burgess was disabled as of July 12, 2005, and following the 90 day elimination period, benefits were paid from October 11, 2005 through November 13, 2005, based upon a monthly salary of $6,041.66, ressulting in a monthly gross disability benefit due of $4,027.79.  During these nine months of benefit payments, Mrs. Burgess would still be receiving California State Disability benefits, which were $3,570.67 per month, PRU 618, leaving a net due, after offsets, of $457.12.00 per month from November 14, 2005, to July 12, 2006, for a total of $3656.96.  From July 13, 2006 forward, she is due monthly net benefits (4027.98 gross benefit minus 1647. Social Security Disability Benefit) of $2379. 98 until September 13, 2008 (anticipated date of judgment) in the sum of 61,879.48, for a total past benefit due of $65,536.44.

Mrs. Burgess also is entitled to prejudgment interest on the above sum.  The *rate* of prejudgment interest should be chosen by the court to "compensate" the beneficiary for the losses incurred.  *Dishman v. Unum Life Insurance Co. of America*, 269 Fed. 3d 974, 988 (9th Cir. 2001).  We suggest that the statutory 10% per annum set under California Insurance Code section 10111.2 for late payment of disability insurance claims sets the appropriate rate for prejudgment interest in this case.  At that rate, Mrs. Burgess should be awarded $896. on the $3656.96 benefits past due and $6701.55 on the $61,879.48 past due for a total prejudgment

interest due of $7597.55.

Mrs. Burgess is entitled to be placed back on claim for the duration of her disability and to receive monthly payments of $2379.98 per month as long as she remains disabled, or until she reaches the age of 65, and the matter should be remanded to the plan to make those payments and to determine any end to her continuing eligibility.

Finally, Mrs. Burgess is entitled to her attorneys' fees and costs of suit to be set by memorandum and motion following the ruling on this motion in accordance with the usual practice.  *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 590 (9th Cir.1984).

**VII.  Conclusion.**

Mrs. Burgess has remained disabled even though Prudential stopped paying her claim three years ago.  The Court should enforce Mrs. Burgess' "safety net," and order Prudential to act as a fiduciary should act, and pay the claim.

Dated:  August 8, 2008

/s/_____
Laurence F. Padway
Attorney for Linda Burgess