Laurence F. Padway, SBN# 83914
LAW OFFICES OF LAURENCE F. PADWAY
1516 Oak Street, Suite 109
Alameda, California 94501
Phone:  (510) 814-0680
Fax:     (510) 814-0650

Attorneys for plaintiff

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA BURGESS | CASE NO. C07-05310 JSW |
| Plaintiff, | **DECLARATION OF LAURENCE F. PADWAY IN SUPPORT OF LINDA BURGESS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| TOWNSEND AND TOWNSEND AND CREW LLP LONG TERM DISABILITY PLAN | |
| Defendant, | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | |
| Real Party in Interest. | |

1    I, Laurence F. Padway, hereby declare under penalty of perjury that:

2

3        1.  I am the attorney for plaintiff.

4

5        2.  I attach as exhibit 1 a true copy of the deposition of Sharon Walkaus taken

6    on September 27, 2005.  I received the depo of Sharon Walkaus from MLS National Medical

7    Evaluations pursuant to a subpoena which I had served upon it in another case.

8

9        3.  I attach as exhibit 2 a true copy of the deposition of Dr. Mark Schroeder

10   taken on May 4, 2006.  I am informed and believe it is a true and correct transcript.

11

12       4.  I attach as exhibit 3 an article entitled Depression and pain.  The article

13   was first printed in the September 2004 issue of the Harvard Mental Health Letter and can now be

14   found online through Harvard Health Publications at

15   www.health.harvard.edu/newsweek/Depression_and_pain.htm.

16

17       Executed this 8th day of September, 2008, at Alameda, California.

18

19                    /s/_____
20                    Laurence F. Padway

21

22

23

24

25

26

27

28

# Exhibit 1

Sharon Walkaus
September 27, 2005

Page 1

1              IN THE DISTRICT COURT OF THE UNITED STATES

2              FOR THE EASTERN DISTRICT OF KENTUCKY

3                        LEXINGTON DIVISION

4

5    TERRY HALL,

6                          Plaintiff,

7         -vs-                          CIVIL ACTION

8                                       NO. 05-185-JBC

9    MLS NATIONAL MEDICAL

10   EVALUATIONS, INC.,

11                        Defendant.

12   _____ /

13

14   PAGES 01 - 25

15

16         The Deposition of SHARON WALKAUS,

17   Taken at Hanson/Renaissance Court Reporters,

18   400 Renaissance Center,

19   Suite 2160,

20   Detroit, Michigan,

21   Commencing at 1:00 p.m.,

22   Tuesday, September 27, 2005,

23   Before Anne Chilton, RPR, CSR 3669.

24

25

HANSON RENAISSANCE COURT REPORTERS
(313) 567-8100 www.hansonreporting.com

Sharon Walkaus
September 27, 2005

Page 2

1    APPEARANCES:

2    M. AUSTIN MEHR, ESQ.

3    Austin Mehr Law Offices, P.S.C.

4    145 West Main Street

5    Suite 300

6    Lexington, Kentucky   40507

7    (859) 225-3731

8        Appearing on behalf of the Plaintiff.

9

10   ABRAHAM SINGER, ESQ.

11   Pepper Hamilton, LLP

12   100 Renaissance Center

13   36th Floor

14   Detroit, Michigan   48243-1157

15   (313) 393-7382

16       Appearing on behalf of the Defendant.

17

18   ALSO PRESENT:

19   JOSEPH SCHIMIZZI

20

21

22

23

24

25

Sharon Walkaus
September 27, 2005

Page 3

1   Detroit, Michigan

2   September 27, 2005

3   About 1:00 p.m.

4       DEPOSITION EXHIBIT NOS. 1 - 8

5       WERE MARKED BY THE ATTORNEY

6       FOR IDENTIFICATION

7                   SHARON WALKAUS,

8   having first been duly sworn, was examined and

9   testified on her oath as follows:

10  EXAMINATION BY MR. MEHR:

11      Q.   Would tell us your name, please?

12      A.   **Sharon Walkaus.**

13      Q.   And can you give me your business address,

14  please?

15      A.   **29792 -- 29792 Southfield Road -- Telegraph**

16  **Road, Southfield, Michigan.**

17      Q.   All right.

18      A.   **48034.  Sorry.**

19      Q.   And the name of your employer?

20      A.   **The company name is MLS.**

21      Q.   All right.  How long have you worked for

22  MLS?

23      A.   **Three years.  Four years.**

24      Q.   What's your position there, Miss Walhaus?

25      A.   **Walkaus.**

Sharon Walkaus
September 27, 2005

Page 4

```
 1                    I schedule IMEs.  I'm a scheduler.

 2        Q.    Okay.  Did I mispronounce your name?

 3        A.    That's okay.

 4        Q.    How is it pronounced?

 5        A.    Walkaus.

 6        Q.    Is there a K in it?

 7        A.    Um-hum.

 8        Q.    I had an H, and I'm sorry.

 9        A.    Yeah.  Everyone does.

10        Q.    All right.  So you were a scheduler with

11   MLS?

12        A.    Um-hum.

13        Q.    And what does that involve, being a

14   scheduler?

15        A.    We -- we receive referrals from different

16   insurance companies, which are claimants that they need

17   to have scheduled for IMEs in the area -- surrounding

18   areas where they live.  So we find the doctors, and

19   some of them are in our database, and if they're not in

20   our database, then we have to locate a doctor that does

21   IMEs.

22        Q.    Does MLS do business in all 50 states?

23        A.    Yes.

24        Q.    How many employees does MLS have currently?

25                    MR. SINGER:  I'll caution the
```

Sharon Walkaus
September 27, 2005

Page 5

1    witness.  Don't guess.  If you know, you know.  If you

2    --

3                    THE WITNESS:  I'd have to sit here

4    and count them.  I would have to count them.

5    BY MR. MEHR:

6        Q.    Well, more than 100?

7        **A.    Oh, no.**

8        Q.    No.  More than ten?

9        **A.    Yes.**

10       Q.    Are all of the employees of MLS working at

11    the same location?

12       **A.    Yes.**

13       Q.    Okay.  And that is the address that you gave

14    us earlier.

15       **A.    Um-hum.  Yes, it is.**

16       Q.    In addition to scheduling IMEs, do they also

17    schedule other types of examinations such as functional

18    capacity exams?

19       **A.    Yes, we do.**

20       Q.    What other types of exams in addition to

21    independent medical and functional capacity

22    examinations do you schedule?

23       **A.    That'd be the psychological testing and**

24    **neuropsychological testing.  IMEs.**

25       Q.    Well, you --

Sharon Walkaus
September 27, 2005

Page 6

1      A.      They're still considered IMEs.

2      Q.      All right.  So underneath the umbrella of

3  independent medical exams there's psychiatric exams

4  that you arrange as well.

5      A.      Yes.

6      Q.      Okay.  How --

7              Do you also get involved in

8  recruiting doctors to do IMEs?

9      A.      Yes, I do.

10     Q.      Okay.  That's part of your function as a

11  scheduler.

12     A.      Yes.

13     Q.      How do you go about recruiting doctors to do

14  these examinations?

15     A.      Well, first off, we have a zip code from

16  where the claimant lives.  We have a program where we

17  punch in the zip code, and we have up to a 150-mile

18  radius to look for doctors, which we only go usually

19  under 50.  Okay.

20              If there is not one in our

21  database -- that specialty in our database, then I get

22  on the inter- -- I start checking on the internet.  I

23  call hospitals for physician referrals trying to locate

24  a doctor.  I -- and I call and I just ask if they --

25  any of the doctors do IMEs, and I have to make sure

Sharon Walkaus
September 27, 2005

Page 7

1    **that they're board certified.**

2        Q.    All right.  Do you have any rating system

3    for the physicians that you utilize?

4        **A.    We do now.  We have the last few -- the last**

5    **few years.**

6        Q.    All right.

7        **A.    We rate them.  We rate the reports.**

8                   **I don't -- I -- excuse me.  I**

9    **personally don't rate them, so I can't say.**

10       Q.    All right.  All right.  What criteria is

11   used to rate the physicians?

12                  MR. SINGER:  She just said --

13                  THE WITNESS:  That I don't know

14   because I just -- I schedule.  I don't rate the

15   doctors.  Their rating is put into our system, but I

16   don't -- I do not rate them.

17       BY MR. MEHR:

18       Q.    Okay.

19       **A.    Because that means I do not read the**

20   **reports.**

21       Q.    Okay.  And I understand you don't rate them.

22       **A.    Um-hum.**

23       Q.    Do you know from talking to other people

24   about how you go about rating the doctors?  Tell me

25   what you know.

Sharon Walkaus
September 27, 2005

Page 8

1      A.      The only thing that I know is when they are

2   put in -- when a doctor is put into our system -- like

3   if I was to find a doctor and put this doctor into our

4   system, the next time I have something in that area, I

5   have a -- you know, an IME I need to schedule in that

6   area, if I see a doctor that has good ratings, then I

7   will go to that doctor versus the doctor that doesn't

8   have ratings.  So that's how I know about the ratings.

9      Q.      All right.  Is it a rating on a scale?

10     A.      Yes.

11     Q.      A numerical scale?

12     A.      Yes, it is.

13     Q.      And what is the high and low numbers of that

14  scale?

15     A.      One to five.

16     Q.      Is five better?

17     A.      Best.  Um-hum.

18     Q.      Best.

19     A.      Yes.

20     Q.      Had Dr. James Templin done IMEs for MLS

21  prior to this occasion with Terry Hall?

22     A.      I don't remember.  I don't remember that at

23  all.

24     Q.      Have you spent some time preparing for your

25  deposition in reviewing the file here on Terry Hall?

Sharon Walkaus
September 27, 2005

Page 9

1        **A.    No, I --**

2        Q.    No, you haven't.

3        **A.    No.**

4        Q.    Do you know what your involvement was in

5    this Terry Hall IME?

6        **A.    I -- I scheduled the appointment, yes.**

7        Q.    All right.  Did you have any further

8    involvement after the scheduling?

9        **A.    Not -- no.**

10       Q.    Okay.  You were not involved, Miss

11   Walkhaus -- Walkaus.

12       **A.    Walkaus.  That's okay.**

13       Q.    Sorry -- after the report was issued by Mr.

14   Templin?

15                        MR. SINGER:  You mean Dr. Templin.

16                        MR. MEHR:  Or Dr. Templin.

17                        THE WITNESS:  Dr. Templin.

18                        Oh, you're asking me?

19   BY MR. MEHR:

20       Q.    Yes, I'm asking you that.

21       **A.    I'm sorry.  Did I have any involvement --**

22       Q.    Um-hum.

23       **A.    -- in the report?**

24                        **Once it leaves me from scheduling,**

25   **I'm pretty much done with all charts -- all charts.**

Sharon Walkaus
September 27, 2005

```
 1        Q.    Do you recall having any phone conversations

 2   with a Miss Prepeg -- Prebeg -- Lorraine Prebeg?

 3        A.    I used to talk with Lorraine quite

 4   frequently, but I can't -- because I -- you know.

 5        Q.    Do you recall speaking to Lorraine -- and I

 6   think her name is Prebeg, P-r-e-b-e-g.

 7        A.    Okay.

 8        Q.    Do you recall speaking to her on about

 9   December 16th, 2003 about some issues involving this

10   particular physician's IME report on Mr. Hall?

11        A.    No, I do not.

12        Q.    Do you have any knowledge about how MLS is

13   compensated for the people that hire MLS?

14        A.    No.

15                   MR. MEHR:   I'm going to attach as an

16   exhibit -- we'll probably use the same exhibits for

17   each deposition, so we'll just call these MLS

18   deposition exhibits, but here's -- I'm going to show

19   you Deposition Exhibit 7, which are the disclosures,

20   Abe, that were made in this case --

21                   MR. SINGER:   Okay.

22                   MR. MEHR:   -- by MLS, and I made a

23   copy.

24                   Do you have a copy of the Bates

25   stamp numbers with you?
```

Sharon Walkaus
September 27, 2005

Page 11

1                  MR. SINGER:  No.

2         BY MR. MEHR:

3         Q.    Now, you'll need your reading glasses, I

4    guess, because I'm going to ask you about the very last

5    page, and this might refresh your memory.

6                  Can you look at the last page, which

7    is Bates numbered MLS 000118?  Do you see that page?

8         **A.    Yes, I do.  Um-hum.**

9         Q.    Do you recognize this as an e-mail that was

10    either sent or received by you?

11        **A.    Well, I do remember seeing this.**

12        Q.    Okay.  When was the last time you saw this?

13        **A.    Probably on January 6, 2004.**

14        Q.    All right.  Do you remember --

15                  Does this refresh your memory that

16    you had a conversation with Lorraine Prebeg?

17        **A.    No.**

18        Q.    Do you recall generally there being an issue

19    being raised by Mr. Hall that he had a different IME

20    report than what MLS had sent to Wausau?

21        **A.    No.**

22        Q.    You don't have any memory whatsoever of

23    that.

24        **A.    No, I don't.  I do not, no.**

25        Q.    Do you have any recollection of Mr. Hall

Sharon Walkaus
September 27, 2005

Page 12

1   threatening legal action as you -- as --

2   **A.    No.**

3   Q.    -- was placed in this e-mail?  No?

4   **A.    (Witness shook head.)**

5   Q.    Do you know what you did once you received

6   this e-mail?  Did you discuss with anyone else in the

7   company this matter?

8   **A.    This, no, I don't -- I do not remember**

9   **discussing.**

10   Q.    How is it you know Lorraine Prebeg?

11   **A.    Just from her using us to schedule IMEs.**

12   Q.    How often does Wausau schedule IMEs through

13   MLS?

14   **A.    That fluctuates.**

15   Q.    Okay.

16   **A.    We could get -- we could get one a week.  We**

17   **could get a couple a week, or there could be a month**

18   **where we wouldn't --**

19   Q.    Um-hum.  Do you know how many over a

20   given -- over a year you approximately average doing

21   both IMEs and FCEs and other exams on behalf of Wausau?

22                MR. MEHR:  I just caution --

23                THE WITNESS:  I can't -- I can't --

24   no, I don't -- I don't keep count of those.

25   BY MR. MEHR:

Sharon Walkaus
September 27, 2005

Page 13

1    Q.    Okay.

2    **A.    Okay.**

3    Q.    How many different companies would you say

4    that you schedule on behalf of?

5    **A.    I would say five.**

6    Q.    Okay.  And who are those five?

7    **A.    I --**

8              THE WITNESS:  Is that like

9    privileged information?  Is that something that I can

10   do?

11             MR. SINGER:  I'm sorry.  What's the

12   question?

13             THE WITNESS:  The names of the

14   companies.

15             MR. MEHR:  The names of the other

16   companies that they work for.

17             MR. SINGER:  There's an issue over

18   whether there is a confidentiality clause with the

19   company.

20             We haven't sat down and looked

21   through every one of the contracts.  So at this point

22   I'm going to instruct the witness not to answer.

23             MR. MEHR:  Okay.  I mean, I'm only

24   asking for the identity at this point of the companies

25   they do business with, which would certainly be public.

Sharon Walkaus
September 27, 2005

Page 14

1    The physicians and the patients would know they're

2    being set up to do an examination through MLS.

3                    MR. SINGER:  Yeah, they would.  They

4    would because they would have a relationship with the

5    employer and/or the insurance company depending on

6    whether there's an administrator or an insurance

7    company, but why don't you give me a second.  Let me

8    just --

9                    MR. MEHR:  Okay.  We'll go off the

10   video.

11                   MR. SINGER:  We'll withdraw the

12   objection.

13                   MR. MEHR:  Okay.  Thanks.

14                   MR. SINGER:  You can answer.

15                   THE WITNESS:  I can answer?

16   BY MR. MEHR:

17       Q.   Okay.  If you could, please, give me the

18   names of those five companies.

19       A.   **Liberty Mutual.**

20       Q.   All right.

21       A.   **Of course, Wausau.  Proctor & Gamble.**

22       Q.   Okay.

23       A.   **Gates McDonald**

24       Q.   You said Gates?

25       A.   **Gates McDonald.**

Sharon Walkaus
September 27, 2005

Page 15

1    Q.    Is that an employer rather than an insurance

2   company?

3    A.    They're the insurance company.

4    Q.    Okay.

5    A.    I'm trying to think of the other --

6              IDR.

7    Q.    Okay.  Do you know whether Dr. Templin has

8   been used by MLS after Mr. Hall's IME?

9    A.    I do not.

10    Q.    Okay.  Do you recall scheduling with Dr.

11   Templin anyone after Mr. Hall?

12    A.    I do not remember.

13    Q.    Okay.  Do you recall or do you know or

14   was -- let me strike all that.

15              Did anyone give you a directive at

16   any time not to use Dr. Templin?

17    A.    No.

18    Q.    What other physicians have you scheduled

19   FCEs or IMEs with in Kentucky?

20    A.    I -- there's an awful -- there's quite a few

21   doctors, and I can't pull anyone right out of my head

22   right now.

23    Q.    Well, if you can't remember any, I'll just

24   accept that as your answer.

25    A.    Okay.  I can't remember.  Sorry.

Sharon Walkaus
September 27, 2005

Page 16

```
 1      Q.    At this point you can't remember any.

 2      A.    Um-hum.

 3      Q.    Is there a database, I assume, of where

 4   you -- you mentioned earlier you could look up --

 5      A.    Right.

 6      Q.    -- and see what doctors you've utilized in

 7   the past; is that correct?

 8      A.    Yes.

 9      Q.    So that's something that if I ask, could be

10   printed off and we would know the doctors that had been

11   used in the past; correct?

12      A.    Yes.

13      Q.    All right.  Do you know what the name of

14   that software is that's utilized to keep that database?

15      A.    No, I do not, no.

16      Q.    Were you alerted at any time to the fact

17   that there was an issue that arose with the

18   transcription by MLS of Dr. Templin's report?

19      A.    Not that I remember.

20      Q.    Okay.  Do you have any knowledge about the

21   free dictation service that MLS offers?

22      A.    Yes.

23      Q.    Okay.  Tell me about that.

24      A.    I do not know how it works.  All I know is

25   we do offer the free dictation to the doctors.
```

Sharon Walkaus
September 27, 2005

Page 17

1      Q.     Okay.

2      **A.     And we let them know that.**

3      Q.     Are the transcriptionists that transcribe

4  the dictation employees of MLS?

5      **A.     Yes.**

6      Q.     Okay.  They work there in the same office

7  with you.

8      **A.     Yes.**

9      Q.     Okay.  Do you know the names of the

10  transcriptionists that work for MLS?

11      **A.     Yes.**

12      Q.     Okay.  Tell me their names, please.

13      **A.     One is Sandy.  I don't -- I do not know**

14  **their last names.  The other one is Denise, and there's**

15  **a new one that just started and I can't remember her**

16  **name.**

17      Q.     Okay.  Do you know if there's been any

18  transcriptionist who worked in 2003, particularly

19  December, November of 2003, for MLS who don't work for

20  MLS at this present time?

21                What I'm asking is --

22      **A.     I don't remember.**

23      Q.     -- in addition to Sandy and Denise and the

24  other person, were there any transcriptionists that

25  worked for MLS back in 2003 that have since quit or

Sharon Walkaus
September 27, 2005

Page 18

1  don't work there anymore?

2      **A.    No.**

3      Q.    Okay.  So you think Sandy and Denise and

4  this new person -- strike that.

5                    Sandy and Denise, were they working

6  for MLS in 2003?

7      **A.    I don't know.  I don't remember when they**

8  **started.**

9      Q.    Okay.  Tell me how MLS goes about creating

10  the document when they offer the free dictation

11  service.

12      **A.    That I don't know.**

13                    MR. SINGER:  I'm going to object

14  to -- okay.

15                    THE WITNESS:  I'm -- I'm a

16  scheduler.  I don't know how that works at all.

17      BY MR. MEHR:

18      Q.    Okay.  Tell me --

19                    Do you know when the service is

20  offered to doctors?  Is it offered initially when you

21  hire the doctors?

22      **A.    We let them know that there is a free dic-**

23  **-- there is a dictation service, yes, um-hum.**

24      Q.    Okay.  Is that -- do you know when that's

25  utilized or when it's not utilized or you just schedule

Sharon Walkaus
September 27, 2005

Page 19

1  it and send the information out?

2      **A.     Um-hum.   I schedule it and send the**

3  **information out.**

4      Q.     And has that always been offered since you

5  started work for MLS about three or four years ago?

6      **A.     Yes.   Um-hum.**

7                      MR. MEHR:   Go off the record just

8  for a second.

9                      MR. SINGER:   Sure.

10                     (Recess)

11     BY MR. MEHR:

12     Q.     On the Exhibit 7 that I gave to you, there

13  is a page, MLS 68, I wanted to ask you something about.

14  The numbers are at the bottom right-hand corner.

15                     You have it?   68.

16     **A.     Yeah.**

17     Q.     You got it?

18     **A.     Um-hum.**

19     Q.     All right.   Is this -- it's sort of a group

20  of 67 and 68 and 69 that were sent to Dr. Templin.

21                     Would you have sent this information

22  to Dr. Templin?

23     **A.     Yep.   Yes, I did.**

24     Q.     Okay.   And I noted that the examination was

25  dated or scheduled for December the 5th, 2003, and it

Sharon Walkaus
September 27, 2005

Page 20

1    says, Report due by: 12-12-03.

2                        Now, are you the one that decides

3    when the report is due by?

4        A.    Yes.

5        Q.    And at the --

6                        How do you arrive at that?  Do you

7    just add usually a week from that exam date?

8        A.    **We always ask the doctor's office what is**

9    **the doctor's turnaround time for reports, and if they**

10   **say seven business days, we count seven business days**

11   **and then we get that date.  We might go a day or two --**

12   **give them an extra day or two, but that's how we come**

13   **to that.  It's not -- well, okay.**

14       Q.    Did you have any conversations with Dr.

15   Templin as to how he would go about doing the

16   examination or what his procedures were?

17       A.    **Not -- not with the doctors personally.**

18   **Most of the time it's usually with the girls that**

19   **schedule the appointments.**

20       Q.    All right.  Do you have any recollection of

21   speaking to the employees of Dr. Templin's office?

22       A.    **No.**

23       Q.    Okay.  The page 68, which has Disability

24   Evaluation.  I'm speaking of MLS 68.  Is this a

25   standard form that is sent to all independent medical

Sharon Walkaus
September 27, 2005

Page 21

1  examiners?

2      **A.    Yes.**

3      Q.    Is it still used today?

4      **A.    Yes.**

5      Q.    When I say "standard form," this is a

6  standard form that MLS uses, not one that Wausau uses;

7  is that correct?

8      **A.    Yes.**

9      Q.    Okay.  And, again, I'm speaking of page MLS

10  68.

11      **A.    Sixty-eight.**

12      Q.    Because, obviously, 69 was -- page 69 was

13  something that Wausau forwarded to you to forward to

14  the IME doctor.

15      **A.    Yes.**

16      Q.    What's your education background?

17      **A.    I have a GED, which I obtained in '72.**

18      Q.    Okay.  And prior to working at MLS, where

19  did you work?

20      **A.    I worked for Wayne Oakland.  They were**

21  **another IME company.**

22      Q.    Okay.  Can you tell me the name again?

23      **A.    Wayne Oakland.**

24      Q.    Wayne Oakland?

25      **A.    Um-hum.**

Sharon Walkaus
September 27, 2005

Page 22

1      Q.      Where are they located?

2      **A.      They closed their doors in '96.  So they**

3  **were in Troy.**

4      Q.      They were in Detroit?

5      **A.      Troy.**

6      Q.      Troy.

7              Can you tell me why they went out of

8  business?

9      **A.      They didn't pay their bills.**

10     Q.      Did they not collect enough money to pay

11  their bills or was there some other event like some

12  embezzlement or indictments --

13     **A.      No.**

14     Q.      -- or anything like that?

15     **A.      They just didn't pay their bills.**

16     Q.      Are any of the employees of MLS former

17  employees of Wayne Oakland --

18     **A.      No.**

19     Q.      -- besides you?

20     **A.      No.**

21     Q.      Okay.  How long did you work at Wayne

22  Oakland?

23     **A.      Four years.**

24     Q.      And where did you work before you worked at

25  Wayne Oakland?

Sharon Walkaus
September 27, 2005

Page 23

1    **A.    I did day care.**

2    Q.    All right.  A good thing to do.

3          How long did you --

4    **A.    Day care, about three years.  Going on three**

5    **years.**

6                    MR. MEHR:  All right, Miss Walkaus.

7                    THE WITNESS:  Um-hum.

8                    MR. MEHR:  Did I say that right?

9                    THE WITNESS:  That's fine.

10                   MR. MEHR:  That's all the questions

11   I have for you.  Thank you.

12                   THE WITNESS:  Thank you.

13                   MR. SINGER:  Just for purposes of

14   the record before we close the record, I just want to

15   state that I may object to the use of any of the video.

16   If, in fact, it seeks to be utilized in further

17   proceedings in the case, I just reserve my right to do

18   so.

19                   MR. MEHR:  Okay.  All right.  We're

20   off the video.  We're off the record.

21      (The deposition was concluded at 1:26 p.m.

22   Signature of the witness was not requested by counsel

23   for the respective parties hereto)

24

25

1                           CERTIFICATE OF NOTARY

2

3        STATE OF MICHIGAN         )

4                                  ) SS

5        COUNTY OF WAYNE           )

6            I, Anne Chilton, Certified Shorthand Reporter, a

7        Notary Public in and for the above county and state,

8        do hereby certify that the above examination under

9        oath was taken before me at the time and place

10       hereinbefore set forth; that the witness was by me

11       first duly sworn to testify to the truth, and nothing

12       but the truth, that the foregoing questions asked and

13       answers made by the witness were duly recorded by me

14       stenographically and reduced to computer

15       transcription; that this is a true, full and correct

16       transcript of my stenographic notes so taken; and that

17       I am not related to, nor of counsel to either party

18       nor interested in the event of this cause.

19

20

21       _____

22                Anne Chilton

23                CSR 3669, Notary Public,

24                Wayne County, Michigan

25       My Commission expires: August 9, 2007

Sharon Walkaus
September 27, 2005

Page 25

```
 1                    INDEX TO EXAMINATIONS

 2

 3   Witness                              Page

 4   SHARON WALKAUS

 5

 6   EXAMINATION BY MR. MEHR:                3

 7

 8                    INDEX TO EXHIBITS

 9

10   Exhibit                              Page

11

12   (Exhibits attached to transcript)

13

14   DEPOSITION EXHIBIT NOS. 1 - 8          3

15   1 - Plaintiff's Amended 30(b)(6) Notice

16       Of Videotaped Depositions

17   2 - Fax, 17 pages, 12/16/2003

18   3 - January 5, 2004 letter & IME report

19   4 - Fax Cover/Message Sheet

20   5 - 12-05-03 medical report

21   6 - January 12, 2004 letter

22   7 - Defendant's Rule 26(a)(1) Initial

23       Disclosures

24   8 - Fax, 4 pages

25
```

Sharon Walkaus
September 27, 2005

---

**A**

Abe 10:20
about 3:3 6:13
  7:24,24 8:8
  10:8,9,12
  11:4 16:20
  16:23 18:9
  19:5,13
  20:15 23:4
above 24:6,7
ABRAHAM 1:23
accept 15:24
action 1:7
  12:1
add 20:7
addition 5:16
  5:20 17:23
address 3:13
  5:13
administrator
  14:6
after 9:8,13
  15:8,11
again 21:9,22
ago 19:5
alerted 16:16
always 19:4
  20:8
Amended 25:15
and/or 14:5
Anne 1:23 24:5
  24:21
another 21:21
answer 13:22
  14:14,15
  15:24
answers 24:11
anymore 18:1
anyone 12:6
  15:11,15,21
anything 22:14
APPEARANCES
  2:1
Appearing 2:8
  2:16
appointment
  9:6
appointments
  20:19
approximately
  12:20
area 4:17 8:4
  8:6
areas 4:18
arose 16:17
arrange 6:4
arrive 20:6
asked 24:11
asking 9:18,20
  13:24 17:21
assume 16:3

**B**

attach 10:15
attached 25:12
ATTORNEY 3:5
August 24:24
Austin 2:2,3
average 12:20
awful 15:20

**B**

back 17:25
background
  21:16
Bates 10:24
  11:7
before 1:23
  22:24 23:14
  24:8
behalf 2:8,16
  12:21 13:4
being 4:13
  11:18,19
  14:2
besides 22:19
Best 8:17,18
better 8:16
bills 22:9,11
  22:15
board 7:1
both 12:21
bottom 19:14
business 3:13
  4:22 13:25
  20:10,10
  22:8

**C**

call 6:23,24
  10:17
capacity 5:18
  5:21
care 23:1,4
case 10:20
  23:17
cause 24:17
caution 4:25
  12:22
Center 1:18
  2:12
certainly
  13:25
CERTIFICATE
  24:1
certified 7:1
  24:5
certify 24:7
charts 9:25,25
checking 6:22
Chilton 1:23
  24:5,21
CIVIL 1:7
claimant 6:16

claimants 4:16
clause 13:18
close 23:14
closed 22:2
code 6:15,17
collect 22:10
come 20:12
Commencing
  1:21
Commission
  24:24
companies 4:16
  13:3,14,16
  13:24 14:18
company 3:20
  12:7 13:19
  14:5,7 15:2
  15:3 21:21
compensated
  10:13
computer 24:13
concluded
  23:21
confidentia...
  13:18
considered 6:1
contracts
  13:21
conversation
  11:16
conversations
  10:1 20:14
copy 10:23,24
corner 19:14
correct 16:7
  16:11 21:7
  24:14
counsel 23:22
  24:15
count 5:4,4
  12:24 20:10
county 24:4,6
  24:23
couple 12:17
course 14:21
Court 1:1,17
Cover/Message
  25:19
creating 18:9
criteria 7:10
CSR 1:23 24:21
currently 4:24

**D**

database 4:19
  4:20 6:21,21
  16:3,14
date 20:7,11
dated 19:25
day 20:11,12
  23:1,4

days 20:10,10
December 10:9
  17:19 19:25
decides 20:2
Defendant 1:11
  2:16
Defendant's
  25:22
Denise 17:14
  17:23 18:3,5
depending 14:5
deposition
  1:16 3:4
  8:25 10:17
  10:18,19
  23:21 24:7
  25:14
Depositions
  25:16
Detroit 1:20
  2:14 3:1
  22:4
dic 18:22
dictation
  16:21,25
  17:4 18:10
  18:23
different 4:15
  11:19 13:3
directive
  15:15
Disability
  20:23
disclosures
  10:19 25:23
discuss 12:6
discussing
  12:9
DISTRICT 1:1,2
DIVISION 1:3
doctor 4:20
  6:24 8:2,3,3
  8:6,7,7
  21:14
doctors 4:18
  6:8,13,18,25
  7:15,24
  15:21 16:6
  16:10,25
  18:20,21
  20:17
doctor's 20:8
  20:9
document 18:10
doing 12:20
  20:15
done 8:20 9:25
doors 22:2
down 13:20
Dr 8:20 9:15
  9:16,17 15:7

  15:10,16
  16:18 19:20
  19:22 20:14
  20:21
due 20:1,3
duly 3:8 24:9
  24:12

**E**

each 10:17
earlier 5:14
  16:4
EASTERN 1:2
education
  21:16
either 11:10
  24:16
embezzlement
  22:12
employees 4:24
  5:10 17:4
  20:21 22:16
  22:17
employer 3:19
  14:5 15:1
enough 22:10
ESQ 2:2,10
Evaluation
  20:24
EVALUATIONS
  1:10
event 22:11
  24:16
every 13:21
Everyone 4:9
exam 20:7
examination
  3:10 14:2
  19:24 20:16
  25:6
examinations
  5:17,22 6:14
  25:1
examined 3:8
examiners 21:1
exams 5:18,20
  6:3,3 12:21
excuse 7:8
exhibit 3:4
  10:16,19
  19:12 25:10
  25:14
exhibits 10:16
  10:18 25:8
  25:12
expires 24:24
extra 20:12
e-mail 11:9
  12:3,6

**F**

---

Sharon Walkaus
September 27, 2005

fact 16:16
23:16
Fax 25:17,19
25:24
FCEs 12:21
15:19
few 7:4,5
15:20
file 8:25
find 4:18 8:3
fine 23:9
first 3:8 6:15
24:9
five 8:15,16
13:5,6 14:18
Floor 2:13
fluctuates
12:14
follows 3:9
foregoing
24:11
form 20:25
21:5,6
former 22:16
forth 24:8
forward 21:13
forwarded
21:13
four 3:23 19:5
22:23
free 16:21,25
18:10,22
frequently
10:4
from 4:15 6:15
7:23 9:24
12:11 20:7
full 24:14
function 6:10
functional
5:17,21
further 9:7
23:16

**G**

Gamble 14:21
Gates 14:23,24
14:25
gave 5:13
19:12
GED 21:17
generally
11:18
girls 20:18
give 3:13 14:7
14:17 15:15
20:12
given 12:20
glasses 11:3
go 6:13,18
7:24 8:7

14:9 19:7
20:11,15
goes 18:9
going 10:15,18
11:4 13:22
18:13 23:4
good 8:6 23:2
group 19:19
guess 5:1 11:4

**H**

H 4:8
Hall 1:5 8:21
8:25 9:5
10:10 11:19
11:25 15:11
Hall's 15:8
Hamilton 2:11
Hanson/Rena...
1:17
having 3:8
10:1
head 12:4
15:21
her 3:9 10:6,8
12:11 17:15
hereinbefore
24:8
hereto 23:23
high 8:13
hire 10:13
18:21
hospitals 6:23

**I**

IDENTIFICATION
3:6
identity 13:24
IDR 15:6
IME 8:5 9:5
10:10 11:19
15:8 21:14
21:21 25:18
IMEs 1:4,17,21
5:16,24 6:1
6:8,25 8:20
12:11,12,21
15:19
INC 1:10
independent
5:21 6:3
20:25
INDEX 25:1,8
indictments
22:12
information
13:9 19:1,3
19:21
Initial 25:22
initially
18:20

instruct 13:22
insurance 4:16
14:5,6 15:1
15:3
inter 6:24
interested
24:16
internet 6:22
involve 4:13
involved 6:7
9:10
involvement
9:4,8,21
involving 10:9
issue 11:18
13:17 16:17
issued 9:13
issues 10:9

**J**

James 8:20
January 11:13
25:18,21
JOSEPH 2:19
just 6:24 7:12
7:14 10:17
12:11,22
14:8 15:23
17:15 18:25
19:7 20:7
22:15 23:13
23:14,17

**K**

K 4:6
keep 12:24
16:14
Kentucky 1:2
2:6 15:19
know 5:1,1
7:13,23,25
8:1,5,8 9:4
10:4 12:5,10
12:19 14:1
15:7,13
16:10,13,24
16:24 17:2,9
17:13,17
18:7,12,16
18:19,22,24
knowledge
10:12 16:20

**L**

last 7:4,4
11:4,6,12
17:14
Law 2:3
leaves 9:24
legal 12:1
let 14:7 15:14

17:2 18:22
letter 25:18
25:21
Lexington 1:3
2:6
Liberty 14:19
like 8:2 13:8
22:11,14
live 4:18
lives 5:16
LLP 2:11
locate 4:20
6:23
located 22:1
location 5:11
long 3:21
22:21 23:3
look 6:18 11:6
16:4
looked 13:20
Lorraine 10:2
10:3,5 11:16
12:10
low 8:13

**M**

M 2:2
made 10:20,22
24:11
Main 2:4
make 6:25
many 4:24
12:19 13:3
MARKED 3:5
matter 12:7
may 23:15
McDonald 14:23
14:25
mean 9:15
13:23
means 7:19
medical 1:9
5:21 6:3
20:25 25:20
Mehr 2:2,3
3:10 5:5
7:17 9:16,19
10:15,22
11:2 12:22
12:25 13:15
13:23 14:9
14:13,16
18:17 19:7
19:11 23:6,8
23:10,19
25:6
memory 11:5,15
11:22
mentioned 16:4
Michigan 1:20
2:14 3:1,16

24:2,23
might 11:5
20:11
mispronounce
4:2
Miss 3:24 9:10
10:2 23:6
MLS 1:9 3:20
3:22 4:11,22
4:24 5:10
8:20 10:12
10:13,17,22
11:7,20
12:13 14:2
15:8 16:18
16:21 17:4
17:10,19,20
17:25 18:6,9
19:5,13
20:24 21:6,9
21:18 22:16
money 22:10
month 12:17
more 5:6,8
Most 20:18
much 9:25
Mutual 14:19

**N**

name 3:11,19
3:20 4:2
10:6 16:13
17:16 21:22
names 13:13,15
14:18 17:9
17:12,14
NATIONAL 1:9
need 4:16 8:5
11:3
neuropsycho...
5:24
new 17:15 18:4
next 8:4
NOS 3:4 25:14
Notary 24:1,6
24:22
noted 19:24
notes 24:14
nothing 24:10
Notice 25:15
November 17:19
numbered 11:7
numbers 8:13
10:25 19:14
numerical 8:11

**O**

Oakland 21:20
21:23,24
22:17,22,25
oath 3:9

Sharon Walkaus
September 27, 2005

object 18:13
 23:15
objection
 14:12
obtained 21:17
obviously
 21:12
occasion 8:21
off 6:15 14:9
 16:10 19:7
 23:20,20
offer 16:25
 18:10
offered 18:20
 18:20 19:4
offers 16:21
office 17:6
 20:8,21
Offices 2:3
often 12:12
Oh 5:7 9:18
okay 4:2,3
 5:13 6:6,10
 6:19 7:18,21
 9:10,12 10:7
 10:21 11:12
 12:15 13:1,2
 13:6,23 14:9
 14:13,17,22
 15:4,7,10,13
 15:25 16:20
 16:23 17:1,6
 17:9,12,17
 18:3,9,14,18
 18:24 19:24
 20:13,23
 21:9,18,22
 22:21 23:19
once 9:24 12:5
one 6:20 8:15
 12:16 13:21
 17:13,14,15
 20:2 21:6
only 6:18 8:1
 13:23
other 5:17,20
 7:23 12:21
 13:15 15:5
 15:18 17:14
 17:24 22:11
out 15:21 19:1
 19:3 22:7
over 12:19,20
 13:17

_____ P _____
page 11:5,6,7
 19:13 20:23
 21:9,12 25:3
 25:10
pages 1:14

25:17,24
part 6:10
particular
 10:10
particularly
 17:18
parties 23:23
party 24:16
past 16:7,11
patients 14:1
pay 22:9,10,15
people 7:23
 10:13
Pepper 2:11
person 17:24
 18:4
personally 7:9
 20:17
phone 10:1
physician 6:23
physicians 7:3
 7:11 14:1
 15:18
physician's
 10:10
place 24:8
placed 12:3
Plaintiff 1:6
 2:8
Plaintiff's
 25:15
please 3:11,14
 14:17 17:12
point 13:21,24
 16:1
position 3:24
Prebeg 10:2,2
 10:6 11:16
 12:10
preparing 8:24
Prepeg 10:2
present 2:18
 17:20
pretty 9:25
printed 16:10
prior 8:21
 21:18
privileged
 13:9
probably 10:16
 11:13
procedures
 20:16
proceedings
 23:17
Proctor 14:21
program 6:16
pronounced 4:4
psychiatric
 6:3
psychological

5:23
public 13:25
 24:6,22
pull 15:21
punch 6:17
purposes 23:13
put 7:15 8:2,2
 8:3
P-r-e-b-e-g
 10:6
p.m 1:21 3:3
 23:21
P.S.C 2:3

_____ Q _____
question 13:12
questions
 23:10 24:11
quit 17:25
quite 10:3
 15:20

_____ R _____
radius 6:18
raised 11:19
rate 7:7,7,9
 7:11,14,16
 7:21
rather 15:1
rating 7:2,15
 7:24 8:9
ratings 8:6,8
 8:8
read 7:19
reading 11:3
recall 10:1,5
 10:8 11:18
 15:10,13
receive 4:15
received 11:10
 12:5
Recess 19:10
recognize 11:9
recollection
 11:25 20:20
record 19:7
 23:14,14,20
recorded 24:12
recruiting 6:8
 6:13
reduced 24:13
referrals 4:15
 6:23
refresh 11:5
 11:15
related 24:15
relationship
 14:4
remember 8:22
 8:22 11:11
 11:14 12:8

15:12,23,25
 16:1,19
 17:15,22
 18:7
Renaissance
 1:18 2:12
report 9:13,23
 10:10 11:20
 16:18 20:1,3
 25:18,20
Reporter 24:5
Reporters 1:17
reports 7:7,20
 20:9
requested
 23:22
reserve 23:17
respective
 23:23
reviewing 8:25
right 3:17,21
 4:10 6:2 7:2
 7:6,10,10
 8:9 9:7
 11:14 14:20
 15:21,22
 16:5,13
 19:19 20:20
 23:2,6,8,17
 23:19
right-hand
 19:14
Road 3:15,16
RPR 1:23 24:21
Rule 25:22

_____ S _____
same 5:11
 10:16 17:6
Sandy 17:13,23
 18:3,5
sat 13:20
saw 11:12
says 20:1
scale 8:9,11
 8:14
schedule 4:1
 5:17,22 7:14
 8:5 12:11,12
 13:4 18:25
 19:2 20:19
scheduled 4:17
 9:6 15:18
 19:25
scheduler 4:1
 4:10,14 6:11
 18:16
scheduling
 5:16 9:8,24
 15:10
SCHIMIZZI 2:19

second 14:7
 19:8
see 8:6 11:7
 16:6
seeing 11:11
seeks 23:16
send 19:1,2
sent 11:10,20
 19:20,21
 20:25
September 1:22
 3:2
service 16:21
 18:11,19,23
set 14:2 24:8
seven 20:10,10
Sharon 1:16
 3:7,12 25:4
Sheet 25:19
shook 12:4
Shorthand 24:5
show 10:18
Signature
 23:22
since 17:25
 19:4
SINGER 2:10
 4:25 7:12
 9:15 10:21
 11:1 13:11
 13:17 14:3
 14:11,14
 18:13 19:9
 23:13
sit 5:3
Sixty-eight
 21:11
software 16:14
some 4:19 8:24
 10:9 22:11
 22:11
something 8:4
 13:9 16:9
 19:13 21:13
sorry 3:18 4:8
 9:13,21
 13:11 15:25
sort 19:19
Southfield
 3:15,16
speaking 10:5
 10:8 20:21
 20:24 21:9
specialty 6:21
spent 8:24
SS 24:3
stamp 10:25
standard 20:25
 21:5,6
start 6:22
started 17:15

HANSON RENAISSANCE COURT REPORTERS
(313) 567-8100 www.hansonreporting.com

Sharon Walkaus
September 27, 2005

18:8 19:5
state 23:15
  24:2, 6
states 1:1
  4:22
stenographic
  24:14
stenographi...
  24:12
still 6:1 21:3
Street 2:4
strike 15:14
  18:4
Suite 1:19 2:5
sure 6:25 19:9
surrounding
  4:17
sworn 3:8 24:9
system 7:2, 15
  8:2, 4

**T**

taken 1:17
  24:7, 15
talk 10:3
talking 7:23
Telegraph 3:15
tell 3:11 7:24
  16:23 17:12
  18:9, 18
  21:22 22:7
Templin 8:20
  9:14, 15, 16
  9:17 15:7, 11
  15:16 19:20
  19:22 20:15
Templin's
  16:18 20:21
ten 5:8
Terry 1:5 8:21
  8:25 9:5
testified 3:9
testify 24:9
testing 5:23
  5:24
Thank 23:11, 12
Thanks 14:13
That'd 5:23
their 7:15
  17:12, 14
  22:2, 9, 11, 15
thing 8:1 23:2
think 10:6
  15:5 18:3
threatening
  12:1
three 3:23
  19:5 23:4, 4
through 12:12
  13:21 14:2
time 8:4, 24

11:12 15:16
16:16 17:20
20:9, 18 24:8
today 21:3
transcribe
  17:3
transcript
  24:14 25:12
transcription
  16:18 24:13
transcripti...
  17:18
transcripti...
  17:3, 10, 24
Troy 22:3, 5, 6
true 24:13
truth 24:10, 10
trying 6:23
  15:5
Tuesday 1:22
turnaround
  20:9
two 20:11, 12
types 5:17, 20

**U**

umbrella 6:2
um-hum 4:7, 12
  5:15 7:22
  8:17 9:22
  11:8 12:19
  16:2 18:23
  19:2, 6, 18
  21:25 23:7
under 6:19
underneath 6:2
understand
  7:21
UNITED 1:1
use 10:16
  15:16 23:15
used 7:11 10:3
  15:8 16:11
  21:3
uses 21:6, 6
using 12:11
usually 6:18
  20:7, 18
utilize 7:3
utilized 16:6
  16:14 18:25
  18:25 23:16

**V**

versus 8:7
very 11:4
video 14:10
  23:15, 20
Videotaped
  25:16
vs 1:7

**W**

Walhaus 3:24
Walkaus 1:16
  3:7, 12, 25
  4:5 9:11, 12
  23:6 25:4
Walkhaus 9:11
want 23:14
wanted 19:13
Wausau 11:20
  12:12, 21
  14:21 21:6
  21:13
Wayne 21:20, 23
  21:24 22:17
  22:21, 25
  24:4, 23
week 12:16, 17
  20:7
well 5:6, 25
  6:4, 15 11:11
  15:23 20:13
went 22:7
were 3:5 4:10
  9:10 10:20
  16:16 17:24
  18:5 19:20
  20:16 21:20
  22:3, 4 24:12
West 2:4
we'll 10:16, 17
  14:9, 11
We're 23:19, 20
whatsoever
  11:22
withdraw 14:11
witness 5:1, 3
  7:13 9:17
  12:4, 23 13:8
  13:13, 22
  14:15 18:15
  23:7, 9, 12, 22
  24:9, 12 25:3
work 13:16
  17:6, 10, 19
  18:1 19:5
  21:19 22:21
  22:24
worked 3:21
  17:18, 25
  21:20 22:24
working 5:10
  18:5 21:18
works 16:24
  18:16
wouldn't 12:18

**Y**

Yeah 4:9 14:3
  19:16

year 12:20
years 3:23, 23
  7:5 19:5
  22:23 23:4, 5
Yep 19:23

**Z**

zip 6:15, 17

**0**

000118 11:7
01 1:14
05-185-JBC 1:8
09 24:24

**1**

1 3:4 25:14, 15
1:00 1:21 3:3
1:26 23:21
100 2:12 5:6
12 25:21
12-05-03 25:20
12-12-03 20:1
12/16/2003
  25:17
145 2:4
150-mile 6:17
16th 10:9
17 25:17

**2**

2 25:17
2003 10:9
  17:18, 19, 25
  18:6 19:25
2004 11:13
  25:18, 21
2005 1:22 3:2
2007 24:24
2160 1:19
225-3731 2:7
25 1:14
26(a)(1) 25:22
27 1:22 3:2
29792 3:15, 15

**3**

3 25:6, 14, 18
30(b)(6) 25:15
300 2:5
313 2:15
36th 2:13
3669 1:23
  24:21
393-7382 2:15

**4**

4 25:19, 24
400 1:18
40507 2:6

48034 3:18
48243-1157
  2:14

**5**

5 25:18, 20
5th 19:25
50 4:22 6:19

**6**

6 11:13 25:21
67 19:20
68 19:13, 15, 20
  20:23, 24
  21:10
69 19:20 21:12
  21:12

**7**

7 10:19 19:12
  25:22
72 21:17

**8**

8 3:4 25:14, 24
859 2:7

**9**

96 22:2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CIVIL ACTION NO. 05-185-JBC

TERRY HALL                                                    PLAINTIFF

vs.  **PLAINTIFF'S AMENDED 30(b)(6) NOTICE OF VIDEOTAPED DEPOSITIONS**

MLS NATIONAL MEDICAL EVALUATIONS, INC.                    DEFENDANT

** ** ** ** ** ** ** ** ** ** ** **

At the request of Defendants, the Plaintiff does hereby give amended 30(b)(6) notice of videotaped depositions and individual depositions. These depositions will start at 1:00 p.m. on September 27, 2005 and will continue on September 28, 2005 until completed.

The location of these depositions will be at Hanson-Renaissance Court Reporters, 400 Renaissance Centre Suite 2160, Detroit, MI 48243.

M. AUSTIN MEHR
TIMOTHY E. GEERTZ
Attorneys for Plaintiff
**Austin Mehr Law Offices, P.S.C.**
145 West Main Street, Suite 300
Lexington, Kentucky 40507
Telephone:  859-225-3731
Facsimile:  859-225-3830
Email:  amehr@austinmehr.com

DEPOSITION
EXHIBIT  MLS
1
9-27-05  AC

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was mailed, first class postage prepaid to the following on this 16th day of September 2005:

J. Clarke Keller
Alex Scutchfield
Stites & Harbison
250 West Main Street
2300 Lexington Financial Center
Lexington, KY 40507

Abraham Singer
36th Floor
100 Renaissance Center
Detroit, MI 48243-1157

M. AUSTIN MEHR
TIMOTHY E. GEERTZ
Attorneys for Plaintiff
**Austin Mehr Law Offices, P.S.C.**
145 West Main Street, Suite 300
Lexington, Kentucky 40507
Telephone:  859-225-3731
Facsimile:  859-225-3830
Email:  amehr@austinmehr.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CIVIL ACTION NO. 05-185-JBC
*Electronically filed*

TERRY HALL                                                    PLAINTIFF

vs.  **PLAINTIFF'S AMENDED 30(b)(6) NOTICE OF VIDEOTAPED DEPOSITIONS**

MLS NATIONAL MEDICAL EVALUATIONS, INC.               DEFENDANT

\*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\*

Comes the Plaintiff and does hereby amend his previous notice to include the location of the below listed videotaped depositions.

1.    Sharon Wallhaus on September 27, 2005 beginning at 8:30 a.m.

2.    Wendy Smith on September 27, 2005 beginning at 10:00 a.m.

3.    Joseph Schimizzi on September 27, 2005 beginning at 11:30 a.m

4.    Anne Walkuski, on September 27, 2005 beginning at 1:00 p.m.

Pursuant to Federal Rules of Civil Procedure 30(b)(6), the Plaintiff also hereby gives notice that he will proceed to take depositions of those individuals designated by the Defendants to testify as to the following matters.

1.    The person who signed page MLS 000001.

2.    The transcriptionist of the exhibit 1 to the complaint.

3.    The person who is described as "td" on said exhibit 1.

These depositions will begin immediately after the conclusion of Anne Walkuski's deposition.

Pursuant to Federal Rules of Civil Procedure 30(b)(6), the Plaintiff further gives notice that he will proceed to take depositions of those individuals designated by the Defendants to

testify as to the following areas of inquiry:

1.      The process of typing reports by the dictation method used in this case with Dr. Templin

and why it is done that way.

2.      Any other claims against MLS for similar mistyping or mistranscribing documents.

        These depositions will begin immediately after the conclusion of above deposition(s).

        The above-mentioned depositions will begin on September 27, 2005 at 8:30 a.m.

prevailing local time and will continue day by day until completed.

        The location of these depositions will be at Hanson-Renaissance Court Reporters, 400

Renaissance Centre Suite 2160, Detroit, MI 48243.

                                s/M. AUSTIN MEHR
                                M. AUSTIN MEHR
                                TIMOTHY E. GEERTZ
                                ATTORNEY FOR:  PLAINTIFF
                                Austin Mehr Law Offices, P.S.C.
                                145 West Main Street, Suite 300
                                Lexington, Kentucky 40507
                                Telephone:  859-225-3731
                                Facsimile:  859-225-3830
                                amehr@austinmehr.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

- **Timothy Elijah Geertz**
  teg@austinmehr.com
- **M. Austin Mehr**
  amehr@austinmehr.com layfield@iglou.com
- **Alex L. Scutchfield**
  ascutchfield@stites.com kohair@stites.com

I further certify that the foregoing documents and the notice of electronic filing was mailed, first class, postage prepaid to the following non-CM-ECF participants:

J. Clarke Keller
Stites & Harbison
250 W. Main Street
2300 Lexington Financial Center
Lexington, KY 40507

Abraham Singer
36th Floor
100 Renaissance Center
Detroit, MI 48243-1157

/M. AUSTIN MEHR
M. AUSTIN MEHR
TIMOTHY E. GEERTZ
ATTORNEY FOR: PLAINTIFF
AUSTIN MEHR LAW OFFICES, P.S.C.
145 West Main Street, Suite 300
Lexington, Kentucky 40507
Telephone: 859-225-3731
Facsimile: 859-225-3830
amehr@austinmehr.com

Please put this in the chart. Thanks, Joe

**F A X**

**MLS National Medical Evaluation Services, Inc.**
25899 West Twelve Mile Rd.
Suite 200
Southfield, MI 48034

To: Templin, James, M.D.
Fax number: 9-1-859-226-7079

From: Reports
Fax number: 248-356-6757
Business phone: 248-945-9001
Home phone:

Date & Time: 12/16/2003 2:25:05 PM
Pages: 17
Re: Report to review-Terry Hall

Doctor:

Please review the attached report. If there are any corrections, please fax us back the pages with corrections and we will make them. Please fax us back the last page with your signature. Our fax number is (248) 356-6757. If you have any questions, please call Wendy or Joe at (248) 945-9001. Thank you.



DEPOSITION EXHIBIT 2 HLS 9-21-05 QC

**EXHIBIT** 2

MLS 000032

December 11, 2003


Re:   TERRY HALL                    400-04-
      Social Security Number    :   XXX-XX-8401


To Whom It May Concern:


I had the opportunity of interviewing and examining Mr. Terry Hall for MLS National Medical Evaluation Services on December 5, 2003 for the purpose of an independent medical evaluation.  This examination was carried out for evaluation only.  It did not constitute a doctor/patient relationship and no treatment recommendations were given.  No medications were prescribed.  The nature of the interview and examination was explained to the examinee and the examinee understood the facts.


If more information becomes available at a later date, an additional service report consideration may be requested.  Such information may or may not change the opinion rendered in this evaluation.  This opinion does not constitute per se a recommendation for specific claims or administrative functions to be made.


**MLS 000033**

12/16/2003 2:25 PM  FROM:    'S National Medical Evaluation Services, )      PAGE: 003 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 2

Prior to the onset of the physical examination, the examinee was informed to notify me of any pain, discomfort, numbness, or symptomatology produced by the maneuver.

HISTORY OF PRESENT ILLNESS

Mr. Hall is a 39-year-old male who complains of chronic low back pain. The pain is said to radiate into the hips and legs bilaterally. He also complains of bilateral foot pain. Mr. Hall said his symptoms started when he was a teenager. At that time, Mr. Hall said he was doing some exercises when he developed low back pain. He was initially seen by Dr. Wheeler on April 29, 1980. At that time, Mr. Hall was diagnosed with mild scoliosis. X-rays obtained at that time showed some S-shaped curvature with maximum deformity in the lumbar spine. Dr. Wheeler diagnosed probable mild scoliosis. Scoliosis was felt to be primarily due to an abnormally shaped L-5 vertebral body. Mr. Hall said he was given some exercises to do at home. He followed up with Dr. Wheeler on October 29, 1980. At that time, Dr. Wheeler said he was clinically looking good and, therefore, he did not anticipate any additional problems. Mr. Hall was then released from his care.

MLS 000034

01/05/2004 MON 13:14  [TX/RX NO 5743]  ☑003

01/05/04  13:24 FAX 608 226 7078    SAM PAIN CARE    004/017

12/16/2003 2:25 PM  FROM: 1    National Medical Evaluation Services, 1    PAGE: 004 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 3

Mr. Hall entered the Army in February of 1984.  In 1986 he was doing some physical

therapy exercises when he began to experience low back pain.  This time the pain was

radiating into the right leg.  Mr. Hall was seen, treated, and was recommended for a

medical discharge.  He wanted to continue in the service if possible and, therefore, was

sent for additional medical care.  He received an epidural block, which significantly

reduced his symptoms.  Mr. Hall stayed in the Army until 1992.  At that time, he

received an honorable discharge.

On December 27, 1996, Mr. Hall said he was an employee of Rathion working in an

engineering position.  His work position required him to primarily sit at a desk.  Mr. Hall

said he was sitting at the desk when he suddenly developed a sharp pain in his lower

back.  This pain also radiated into the right leg.  At the time of this incident, Mr. Hall

was residing in New Mexico.  He, therefore, was seen by Dr. Garcia, his local medical

physician.  Dr. Garcia then referred Mr. Hall for an MRI scan of the lumbar spine.  This

study was obtained on 12/27/96 showing degenerative disc and degenerative facet

changes in multiples with encroachment of both the L5 and the S1 foramina.  This

encroachment was noted to be greater on the right than the left side and was felt to be

primarily due to facet hypertrophy.  There was also spondylolisthesis at L5 relative to

S1.  Additionally, there was facet hypertrophy together with a small posterior disc

MLS 000035

01/05/2004 MON 12:14  [TX/RX NO 5743]  004

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 4

herniation.    Disc space narrowing was noted at L2-L3, L4-L5, and L5-S1.  The spondylolisthesis was graded as a Grade I.  With the radicular symptoms, Mr. Hall was referred to Dr. Lenardo Svarzbein, neurologist.  Dr. Svarzbein ordered an EMG-NCV study.  This study was obtained showing a peripheral neuropathy with bilateral tarsal tunnel slowing on the NCV together with a probable lumbosacral radiculopathy.  A myelogram and post-myelogram CAT scan were also ordered and obtained on January 30, 1997.  These studies showed equivocal impingement of the right L5 nerve root with a Grade I spondylo thesis at L5 together with degenerative lumbar spondylosis.  The lumbar spondylosis  severely involved the right L5 facet joint.  The post myelogram CT scan showed bilateral L5 spondylosis with a Grade I spondylolisthesis with severe degenerative facet arthropathy at the L5-S1 level.  This arthropathy was noted to be greater on the right side then the left and showed narrowing of the upper portion of the L5-S1 neural foramina.  There was impingement of the lateral portion of the L5 nerve root within the neural foramina due to a combination of diffuse posterior disc protrusion at L5-S1 together with facet arthropathy.    There was mild midline posterior disc protrusion at L4-L5 slightly abutting the anterior dural sac.  With these findings, Dr. Svarzbein recommended surgery.  Mr. Hall agreed and on 03/19/97 underwent bilateral laminotomies at L5-S1 with facetectomies and foraminotomies together with a discectomy at L5-S1.  Mr. Hall underwent interbody fixation at L5-S1 level with using

MLS 000036

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 5

threaded fusion cage (TRS fusion cage device) x2 at L5-S1 with an internal stabilization and fixation. Additionally, there was an arthrodesis at L5-S1 level with bone obtained from the lamina and spinous processes.

Dr. Svarzbein released Mr. Hall to return to work on light-duty capacity on 6/11/97. Mr. Hall was given restriction where he was to sit in an orthopedically correct chair. He was restricted to changing positions frequently from the sitting to standing position or even lying down occasionally, as well as, no stooping, bending, crawling, or positioning in a cramped or uneven position. Lifting, pushing, and pulling were limited to no more than 10 pounds. Mr. Hall was limited to a 4-hour workday, which would be slowly, progressively advanced as tolerated. Mr. Hall worked at Rathion for approximately one year. A lay off was thus coming and he, therefore, began to look for a new employment position. Fortunately, he was able to find such a position in Cerestar in Hammond, Indiana.

Mr. Hall said the pain never completely resolved. In fact, Mr. Hall said his pain seemed to slowly but progressively worsen. When he got to Indiana he was seen at the Cymed Surgery Center by Dr. Toyama, who performed a caudal steroid injection under fluoroscopy. Mr. Hall was diagnosed with failed back syndrome at L5-S1. He was also

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 6

seen by Dr. Kim and on 02/17/99 underwent a second a caudal epidural steroid injection.  The first caudal block proved effective in providing approximately a 20% reduction in symptomatology.  When Mr. Hall made the move to Indiana he moved to an area which was much colder in temperature than the Mexican weather.  Mr. Hall said he found the coldness affecting his pain condition and resulting in increased pain.  When Mr. Hall's pain persisted, an MRI scan with and without contrast was obtained.

Mr. Hall said the MRI scan showed a laminectomy and fusion at L4-L5 with left pericentral chronic herniation with enhancing scar tissue at T11-T12 compressing thecal sac and cord as well as a left neural foramina.  There was a 5-mm spondylolisthesis at L5 with respect to L4.  There were also endplate changes to L2, L3, and L4.  Mr. Hall in an attempt to move to a warmer weather area, moved to Winchester, Kentucky and obtained an employment position with Sonoco Products Company.  There he obtained an employment position as a maintenance manager.  Mr. Hall relocated to Winchester, Kentucky in October 1999.  His work position required him to work on a hard concrete surface approximately ten hours a day 5 to 6 days per week.

Mr. Hall began to develop neck pain around 1999.  His symptoms slowly but progressively worsened.   X-rays of the cervical spine were obtained with neural

MLS 000038

01/05/04  13:26 FAX 606 226 7079       SAM. PAIN CARE                        ☐008/017

12/16/2003 2:25 PM  FROM:      National Medical Evaluation Services,      PAGE: 008 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 7

foramina narrowing noted at C3-C4, C4-C5, and to the right at C2-C3, C3-C4, and C4-C5. It was recommended that he undergo an MRI scan. The MRI scan was obtained on 05/18/00 showing degenerative disc disease with osteophytes at C4-C5 and C6-C7. He was then diagnosed with degenerative cervical disc disease. Mr. Hall said the pain, including the neck and lower back, was becoming so severe that he was having difficulty with sleep together with concentration. He also complained of easy fatigability. This was affecting his productivity and work schedule. Finally, by 05/11/01 Mr. Hall said the overall effects of his pain condition had reached the point where he no longer able to perform his function job duties. He then terminated his work position. At that time, Mr. Hall was seeing Dr. Laramore at the VA Hospital. It was Dr. Laramore who placed him off of work due to the chronic pain condition. Dr. Laramore was also treating Mr. Hall for a post-traumatic stress disorder and depression. Mr. Hall said these conditions did impact his general lifestyle but the primary reason why he could no longer perform his function job duties involved his chronic pain condition.

Mr. Hall said that since terminating his work position, he has been able to obtain some improvement in his condition. Both Mr. Hall and his wife agree that probably the primary reason for this improvement relation to rest he is able to get and his reduced pressure from his regular schedule. Anytime Mr. Hall attempts to do any extensive

MLS 000039

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 8

activities involving prolonged standing, walking, bending, stooping, kneeling, pushing, pulling, etc., the pain quickly resurfaces and Mr. Hall says he needs a cane for ambulation.   When he was unable to return to work, Mr. Hall applied for and is currently receiving Social Security Disability Benefits.  He also has been declared 100% disabled by the VA based on post-traumatic stress disorder together with his chronic low back pain condition and depression.   He is also now applying for a long-term disability under company policy.   The company is now challenging his disability as whether it is related to the back condition or to an emotional condition.


CURRENT PAIN STATUS


Mr. Hall complains of a constant dull, achy pain in the low back with radiation of pain to the hips and legs bilaterally.  He also complains about left foot pain.  The pain is said to be increased with any prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding on vibratory vehicles for an extended amount of time.

MLS 000040

12/16/2003 2:25 PM  FROM:      'S National Medical Evaluation Services,          PAGE: 010 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 9

## PAST MEDICAL HISTORY

Illnesses:   Post-traumatic stress disorder, depression, degenerative lumbar disc

disease, lumbar spondylolisthesis, degenerative cervical disc disease, history of left side

rotator cuff tear, and right inguinal hernia.

Surgeries:   Lumbar spinal fusion, tonsillectomy, and right inguinal hernia repair.

Allergies:   No known drug allergies.

Medicines:   Vertab, Robaxin, extra-strength Tylenol, Prozac, Buspar, and Restoril.

## FAMILY HISTORY

Positive for myocardial infarction (grandfather and father), cerebrovascular accident

(grandfather), hypertension (father and grandfather), cancer (grandfather), and

diabetes mellitus (aunt).

MLS 000041

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 10

## SOCIAL HISTORY

No smoking.  No alcohol use.  Married with 3 children.  College graduate.

## OCCUPATIONAL HISTORY

Sonoco Products Company (1 ½ years).

Scerestar (1 year).

Rathion (3 years).

US Army (2 years).

## REVIEW OF SYSTEMS

Wears glasses, myopia.  Decreased hearing in the left ear.  Colitis.  Rectal bleeding.

Irritable bowel syndrome.  Post-traumatic stress disorder.  Depression.  Right shoulder

rotator cuff tear.  Right inguinal hernia.  Nose fracture.  Finger fracture.  Rib fractures.

History of spontaneous pneumothorax.  Otherwise, noncontributory.

MLS 000042

12/16/2003 2:25 PM FROM:    's National Medical Evaluation Services,    ____    PAGE: 012 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 11

PHYSICAL EXAMINATION

Vital signs:   Height 69 inches.   Weight 201 pounds.   Blood pressure 151/88.   Pulse 76.   Respirations 12.

General:   Alert, friendly white male in no apparent distress.

HEENT:   Normocephalic.   PERLA, EOMI, fundi benign.   TM's clear.   Throat clear. Midline trachea.   Neck supple.   No thyromegaly.   No adenopathy.   There is mild tenderness over the posterior aspect cervical spine.

Chest:   Clear to auscultation and percussion.

Heart:   Regular, rate, and rhythm.   No murmurs, rubs, heaves, or gallops.

Abdomen:   Normal bowel sounds.   Supple.   No tenderness.   No guarding.   No organomegaly.

GU:   Normal male.   No hernias present.

Extremities:  No clubbing, cyanosis, or edema.  Good strength.  Full range of motion.

Neurologic:   Oriented x3.   Cranial nerves II through XII intact.   No motor, sensory, or cerebellar abnormalities noted.

Back:   Shows a well-healed midline surgical scar.   There is tenderness over the midline and lower lumbar spine.   There is decreased range of motion of the dorsal lumbar spine with forward flexion of 45 degrees, sacral flexion angle 30 degrees, sacral

MLS 000043

01/05/04  13:29 FAX 606 226 7079        SAM. PAIN CARE                      ☑013/017

12/16/2003 2:25 PM  FROM: 1    } National Medical Evaluation Services, }      PAGE: 013 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 12

extension angle 8 degrees, extension 12 degrees, right lateral flexion 16 degrees, and

left lateral flexion 14 degrees.   No tenderness over sciatic notch bilaterally.  Toe

standing  Plantar flexion              .                 reflexes are

Babinski        toes          .  Motor.  Plantar flexion, ankles are

extension is          .  Flexion          .  Sensation to pinprick with decreased

sensation left leg dermatoma pattern consistent with L5.  Straight leg raise positive on

right at 52 degrees and 41 degrees on the left.  Mild hamstring tightness noted right.

Range of motion of the hips shows internal-external rotation reduced bilaterally.  Hip

flexion strength reduced bilaterally.  Passive extension of hips produced increased back

pain.  Abduction of hips produced increased back pain.  Deep knee bends were not

performed due to poor balance        .  Pulse strong and  equal bilaterally.


ASSESSMENT


1.  Chronic low back pain syndrome.

2.  History of lumbar disc herniation L4-L5 and L5-S1.

3.  Status post laminotomy with fusion at L4-L5 and L5-S1.

4.  Degenerative lumbar disc disease.

5.  Degenerative cervical disc disease.


MLS 000044

01/05/04  13:29 FAX  606 226 7079        SAM. PAIN CARE                    ☑014/017

12/16/2003 2:25 PM  FROM: F___ S National Medical Evaluation Services, I____  PAGE: 014 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 13

6. Post-traumatic stress disorder.

7. Depression.

CONCLUSION

In the letter of November 4, 2003 I was requested to respond to five questions concerning the medical condition of Mr. Hall. I will answer the questions in the order as directed.

1. *What are the subjective complaints?*

1. Chronic low back pain.

2. Bilateral hip and leg pain.

3. Bilateral foot pain.

4. Left leg numbness and weakness.

5. Difficulty with sleep.

6. Difficulty with concentration.

7. ~~capability.~~ EAsy & EARly fatigability.

MLS 000045

12/16/2003 2:25 PM  FROM: F _ 'S National Medical Evaluation Services, I ___  PAGE: 015 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 14

2.  *What are your objective findings from your physical exam?*


Objective findings from physical examination include decreased range of motion

of dorsal lumbar spine when measured by the inclinometer and measured on

three separate occasions with the measurements being within 5 degrees of each

other meets the criteria set forth in the AMA Guides. Decreased sensation to

pinprick in the left leg noted with dermatomal pattern consistent with L5.


3.  *Do you feel this employee's physical condition warrants him totally disabled from*

*any occupation or employment? Please give rational as to why.*


Mr. Hall has restrictions that would involve engaging in activities that would

require prolonged sitting, standing and walking. He would be restricted from

performing frequent bending, stooping, kneeling, crouching, lifting, carrying,

climbing, and riding in vibratory vehicles for any extended period of time. Mr.

Hall would not be considered totally disabled from any occupational employment

as long as it is within the restrictions as listed above.


MLS 000046

HALL, TERRY
Dr. James Templin
December 11, 2003
Page  15

It should be noted that Mr. Hall's chronic pain condition does affect his sleep, his ability to concentrate, as well as his stamina.  These factors could substantially impact his work activities that Mr. Hall would engage in.

4.  *If Mr. Hall is not totally disabled, what type of work could he currently perform? Would there be any restrictions? Please be specific with any restrictions.*

As stated above, Mr. Hall would be capable of performing work within the restrictions as outlined above.  Mr. Hall would be unable to engage in any activity that would require prolonged walking or standing.  He would be unable to walk for periods greater than 20 to 30 minutes at a particular time per one and a half hour time frame.  He is unable to sit for periods greater than 45 to 60 minutes at a particular time throughout the course of an eight-hour day with the opportunity to stand as necessary.  Mr. Hall would be unable to lift items weighing greater than 20 pounds from waist level or carry this weight for any extended period of time.  He is unable to lift items weighing greater than ten pounds from floor level or engage in any repetitive lifting from floor level.  He is unable to engage in activities requiring repetitive use of foot controls.  He should avoid activities requiring any vibratory vehicles for any extended periods of time, which would

MLS 000047

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 16

include 30 minutes at a particular time.  He should avoid activities requiring frequent bending, stooping, kneeling, squatting, crouching, lifting or carrying.  It would recommend that Mr. Hall be limited from working in cold or damp environments.  In addition, I would limit Mr. Hall from performing pushing or pulling items up inclined areas or over rough, uneven terrain.  Mr. Hall would be most suitable for sedentary work.

5. *What is the medical prognosis for Mr. Hall?*

Mr. Hall's chronic pain condition is permanent.  I would not anticipate any symptom improvement or change in his condition in the foreseeable future. Consideration could be given to a morphine pump placement or to a spinal cord stimulator.  I would leave this decision up to Mr. Hall and the pain specialist who works in this area.

James Templin, M.D.
Board Certified
Physiatry

JT/td

MLS 000048

# MLS National Medical Evaluations, Inc.

Corporate Office
25899 West Twelve Mile Road, Suite 200
Southfield, Michigan 48034

Tel: 248-945-9001          www.mls-ime.com
Fax: 248-356-6757          info@mls-ime.com

January 5, 2004

Lorraine Prebeg, R.N.
Wausau Benefits, Inc.
Disability Unit
P.O. Box 8015
Wausau, WI 54402

Re: Hall, Terry
Social Security Number: ***-**-8401

Dear Ms. Prebeg:

Enclosed is the Independent Medical Evaluation Report rendered by

James Templin, MD, regarding Terry Hall, per your request. If we can be

of any further assistance, please do not hesitate to contact us.

Sincerely,



MLS National Medical Evaluation Services, Inc.

c: File

Enclosures

**EXHIBIT**

DEPOSITION
EXHIBIT
3  MLS
9-27-05  QC

MLS 000001

JAN 05 2004 15:08                    248 356 6757          PAGE 02

# MLS National Medical Evaluations, Inc.

Corporate Office
25899 West Twelve Mile Road, Suite 200
Southfield, Michigan 48034

Tel: 248-945-9001
Fax: 248-356-6757

www.mls-ime.com
info@mls-ime.com

December 11, 2003

Re:    TERRY HALL
       Social Security Number          XXX-XX-8401

To Whom It May Concern:

I had the opportunity of interviewing and examining Mr. Terry Hall for MLS National Medical Evaluation Services on December 5, 2003 for the purpose of an independent medical evaluation. This examination was carried out for evaluation only. It did not constitute a doctor/patient relationship and no treatment recommendations were given. No medications were prescribed. The nature of the interview and examination was explained to the examinee and the examinee understood the facts.

If more information becomes available at a later date, an additional service report consideration may be requested. Such information may or may not change the opinion rendered in this evaluation. This opinion does not constitute per se a recommendation for specific claims or administrative functions to be made.

MLS 000002

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 2

Prior to the onset of the physical examination, the examinee was informed to notify me of any pain, discomfort, numbness, or symptomatology produced by the maneuver.

HISTORY OF PRESENT ILLNESS

Mr. Hall is a 39-year-old male who complains of chronic low back pain. The pain is said to radiate into the hips and legs bilaterally. He also complains of bilateral foot pain. Mr. Hall said his symptoms started when he was a teenager. At that time, Mr. Hall said he was doing some exercises when he developed low back pain. He was initially seen by Dr. Wheeler on April 29, 1980. At that time, Mr. Hall was diagnosed with mild scoliosis. X-rays obtained at that time showed some S-shaped curvature with maximum deformity in the lumbar spine. Dr. Wheeler diagnosed probable mild scoliosis. Scoliosis was felt to be primarily due to an abnormally shaped L-5 vertebral body. Mr. Hall said he was given some exercises to do at home. He followed up with Dr. Wheeler on October 29, 1980. At that time, Dr. Wheeler said he was clinically looking good and, therefore, he did not anticipate any additional problems. Mr. Hall was then released from his care.

MLS 000003

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 3

Mr. Hall entered the Army in February of 1984. In 1986 he was doing some physical therapy exercises when he began to experience low back pain. This time the pain was radiating into the right leg. Mr. Hall was seen, treated, and was recommended for a medical discharge. He wanted to continue in the service if possible and, therefore, was sent for additional medical care. He received an epidural block, which significantly reduced his symptoms. Mr. Hall stayed in the Army until 1992. At that time, he received an honorable discharge.

On December 27, 1996, Mr. Hall said he was an employee of Rathion working in an engineering position. His work position required him to primarily sit at a desk. Mr. Hall said he was sitting at the desk when he suddenly developed a sharp pain in his lower back. This pain also radiated into the right leg. At the time of this incident, Mr. Hall was residing in New Mexico. He, therefore, was seen by Dr. Garcia, his local medical physician. Dr. Garcia then referred Mr. Hall for an MRI scan of the lumbar spine. This study was obtained on 12/27/96 showing degenerative disc and degenerative facet changes in multiples with encroachment of both the L5 and the S1 foramina. This encroachment was noted to be greater on the right than the left side and was felt to be primarily due to facet hypertrophy. There was also spondylolisthesis at L5 relative to S1. Additionally, there was facet hypertrophy together with a small posterior disc

MLS 000004

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 4

herniation.   Disc space narrowing was noted at L2-L3, L4-L5, and L5-S1.   The spondylolisthesis was graded as a Grade I.  With the radicular symptoms, Mr. Hall was referred to Dr. Lenardo Svarzbein, neurologist.   Dr. Svarzbein ordered an EMG-NCV study.  This study was obtained showing a peripheral neuropathy with bilateral tarsal tunnel slowing on the NCV together with a probable lumbosacral radiculopathy.  A myelogram and post-myelogram CAT scan were also ordered and obtained on January 30, 1997. These studies showed equivocal impingement of the right L5 nerve root with a Grade I spondylo thesis at L5 together with degenerative lumbar spondylosis.  The lumbar spondylosis  severely involved the right L5 facet joint.  The post myelogram CT scan showed bilateral L5 spondylosis with a Grade I spondylolisthesis with severe degenerative facet arthropathy at the L5-S1 level.  This arthropathy was noted to be greater on the right side then the left and showed narrowing of the upper portion of the L5-S1 neural foramina.  There was impingement of the lateral portion of the L5 nerve root within the neural foramina due to a combination of diffuse posterior disc protrusion at L5-S1 together with facet arthropathy.  There was mild midline posterior disc protrusion at L4-L5 slightly abutting the anterior dural sac.  With these findings, Dr. Svarzbein recommended surgery. Mr. Hall agreed and on 03/19/97 underwent bilateral laminotomies at L5-S1 with facetectomies and foraminotomies together with a discectomy at L5-S1.  Mr. Hall underwent interbody fixation at L5-S1 level with using

MLS 000005

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 5

threaded fusion cage (TRS fusion cage device) x2 at L5-S1 with an internal stabilization and fixation. Additionally, there was an arthrodesis at L5-S1 level with bone obtained from the lamina and spinous processes.

Dr. Svarzbein released Mr. Hall to return to work on light-duty capacity on 6/11/97. Mr. Hall was given restriction where he was to sit in an orthopedically correct chair. He was restricted to changing positions frequently from the sitting to standing position or even lying down occasionally, as well as, no stooping, bending, crawling, or positioning in a cramped or uneven position. Lifting, pushing, and pulling were limited to no more than 10 pounds. Mr. Hall was limited to a 4-hour workday, which would be slowly, progressively advanced as tolerated. Mr. Hall worked at Rathion for approximately one year. A lay off was thus coming and he, therefore, began to look for a new employment position. Fortunately, he was able to find such a position in Cerestar in Hammond, Indiana.

Mr. Hall said the pain never completely resolved. In fact, Mr. Hall said his pain seemed to slowly but progressively worsen. When he got to Indiana he was seen at the Cymed Surgery Center by Dr. Toyama, who performed a caudal steroid injection under fluoroscopy. Mr. Hall was diagnosed with failed back syndrome at L5-S1. He was also

MLS 000006

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 6

seen by Dr. Kim and on 02/17/99 underwent a second a caudal epidural steroid injection. The first caudal block proved effective in providing approximately a 20% reduction in symptomatology. When Mr. Hall made the move to Indiana he moved to an area which was much colder in temperature than the Mexican weather. Mr. Hall said he found the coldness affecting his pain condition and resulting in increased pain. When Mr. Hall's pain persisted, an MRI scan with and without contrast was obtained.

Mr. Hall said the MRI scan showed a laminectomy and fusion at L4-L5 with left pericentral chronic herniation with enhancing scar tissue at T11-T12 compressing thecal sac and cord as well as a left neural foramina. There was a 5-mm spondylolisthesis at L5 with respect to L4. There were also endplate changes to L2, L3, and L4. Mr. Hall in an attempt to move to a warmer weather area, moved to Winchester, Kentucky and obtained an employment position with Sonoco Products Company. There he obtained an employment position as a maintenance manager. Mr. Hall relocated to Winchester, Kentucky in October 1999. His work position required him to work on a hard concrete surface approximately ten hours a day 5 to 6 days per week.

Mr. Hall began to develop neck pain around 1999. His symptoms slowly but progressively worsened. X-rays of the cervical spine were obtained with neural

MLS 000007

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 7

foramina narrowing noted at C3-C4, C4-C5, and to the right at C2-C3, C3-C4, and C4-C5. It was recommended that he undergo an MRI scan. The MRI scan was obtained on 05/18/00 showing degenerative disc disease with osteophytes at C4-C5 and C6-C7. He was then diagnosed with degenerative cervical disc disease. Mr. Hall said the pain, including the neck and lower back, was becoming so severe that he was having difficulty with sleep together with concentration. He also complained of easy and early fatigability. This was affecting his productivity and work schedule. Finally, by 05/11/01 Mr. Hall said the overall effects of his pain condition had reached the point where he no longer able to perform his function job duties. He then terminated his work position. At that time, Mr. Hall was seeing Dr. Laramore at the VA Hospital. It was Dr. Laramore who placed him off of work due to the chronic pain condition. Dr. Laramore was also treating Mr. Hall for a post-traumatic stress disorder and depression. Mr. Hall said these conditions did impact his general lifestyle but the primary reason why he could no longer perform his function job duties involved his chronic pain condition.

Mr. Hall said that since terminating his work position, he has been able to obtain some improvement in his condition. Both Mr. Hall and his wife agree that probably the primary reason for this improvement relation to rest he is able to get and his reduced pressure from his regular schedule. Anytime Mr. Hall attempts to do any extensive

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 8

activities involving prolonged standing, walking, bending, stooping, kneeling, pushing, pulling, etc., the pain quickly resurfaces and Mr. Hall says he needs a cane for ambulation. When he was unable to return to work, Mr. Hall applied for and is currently receiving Social Security Disability Benefits. He also has been declared 100% disabled by the VA based on post-traumatic stress disorder together with his chronic low back pain condition and depression. He is also now applying for a long-term disability under company policy. The company is now challenging his disability as whether it is related to the back condition or to an emotional condition.

## CURRENT PAIN STATUS

Mr. Hall complains of a constant dull, achy pain in the low back with radiation of pain to the hips and legs bilaterally. He also complains about left foot pain. The pain is said to be increased with any prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding on vibratory vehicles for an extended amount of time.

MLS 000009

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 9

## PAST MEDICAL HISTORY

Illnesses:   Post-traumatic stress disorder, depression, degenerative lumbar disc disease, lumbar spondylolisthesis, degenerative cervical disc disease, history of left side rotator cuff tear, and right inguinal hernia.

Surgeries:   Lumbar spinal fusion, tonsillectomy, and right inguinal hernia repair.

Allergies:   No known drug allergies.

Medicines:   Vertab, Robaxin, extra-strength Tylenol, Prozac, Buspar, and Restoril.

## FAMILY HISTORY

Positive for myocardial infarction (grandfather and father), cerebrovascular accident (grandfather), hypertension (father and grandfather), cancer (grandfather), and diabetes mellitus (aunt).

MLS 000010

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 10

## SOCIAL HISTORY

No smoking. No alcohol use. Married with 3 children. College graduate.

## OCCUPATIONAL HISTORY

Sonoco Products Company (1 ½ years).

Scerestar (1 year).

Rathion (3 years).

US Army (2 years).

## REVIEW OF SYSTEMS

Wears glasses, myopia. Decreased hearing in the left ear. Colitis. Rectal bleeding. Irritable bowel syndrome. Post-traumatic stress disorder. Depression. Right shoulder rotator cuff tear. Right inguinal hernia. Nose fracture. Finger fracture. Rib fractures. History of spontaneous pneumothorax. Otherwise, noncontributory.

MLS 000011

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 11


PHYSICAL EXAMINATION


Vital signs:   Height 69 inches.  Weight 201 pounds.   Blood pressure 151/88.  Pulse 76.  Respirations 12.

General:     Alert, friendly white male in no apparent distress.

HEENT:     Normocephalic.  PERLA, EOMI, fundi benign.  TM's clear.  Throat clear. Midline trachea.  Neck supple.  No thyromegaly.  No adenopathy.  There is mild tenderness over the posterior aspect cervical spine.

Chest:      Clear to auscultation and percussion.

Heart:      Regular, rate, and rhythm.  No murmurs, rubs, heaves, or gallops.

Abdomen:     Normal bowel sounds.  Supple.  No tenderness.  No guarding.  No organomegaly.

GU:      Normal male.  No hernias present.

Extremities:  No clubbing, cyanosis, or edema.  Good strength.  Full range of motion.

Neurologic:   Oriented x3.  Cranial nerves II through XII intact.  No motor, sensory, or cerebellar abnormalities noted.

Back:      Shows a well-healed midline surgical scar.  There is tenderness over the midline and lower lumbar spine.  There is decreased range of motion of the dorsal lumbar spine with forward flexion of 45 degrees, sacral flexion angle 30 degrees, sacral

MLS 000012

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 12

extension angle 8 degrees, extension 12 degrees, right lateral flexion 16 degrees, and left lateral flexion 14 degrees. No tenderness over the sciatic notch bilaterally. Toe standing and plantar flexion are normal and equal bilaterally. Achilles and patellar reflexes are strong and equal bilaterally. Babinski slower dorsiflexion of great toes bilaterally. Motor exam. Plantar flexions of the ankles are normal bilaterally. Knee extension is normal bilaterally. Flexion of the knee is normal bilaterally. Sensation to pinprick with decreased sensation left leg dermatoma pattern consistent with L5. Straight leg raise positive on right at 52 degrees and 41 degrees on the left. Mild hamstring tightness noted right. Range of motion of the hips shows internal-external rotation reduced bilaterally. Hip flexion strength reduced bilaterally. Passive extension of hips produced increased back pain. Bilateral abduction of hips produced increased back pain. Deep knee bends were not performed due to poor balance. Pulse are strong and equal bilaterally.

ASSESSMENT

1. Chronic low back pain syndrome.

2. History of lumbar disc herniation L4-L5 and L5-S1.

3. Status post laminotomy with fusion at L4-L5 and L5-S1.

MLS 000013

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 13

4. Degenerative lumbar disc disease.

5. Degenerative cervical disc disease.

6. Post-traumatic stress disorder.

7. Depression.


## CONCLUSION


In the letter of November 4, 2003 I was requested to respond to five questions concerning the medical condition of Mr. Hall. I will answer the questions in the order as directed.


1. *What are the subjective complaints?*


1. Chronic low back pain.

2. Bilateral hip and leg pain.

3. Bilateral foot pain.

4. Left leg numbness and weakness.

5. Difficulty with sleep.

6. Difficulty with concentration.

MLS 000014

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 14

  7. Easy and Early Fatigability.

2. *What are your objective findings from your physical exam?*

Objective findings from physical examination include decreased range of motion of dorsal lumbar spine when measured by the inclinometer and measured on three separate occasions with the measurements being within 5 degrees of each other meets the criteria set forth in the AMA Guides. Decreased sensation to pinprick in the left leg noted with dermatomal pattern consistent with L5.

3. *Do you feel this employee's physical condition warrants him totally disabled from any occupation or employment? Please give rational as to why.*

Mr. Hall has restrictions that would involve engaging in activities that would require prolonged sitting, standing and walking. He would be restricted from performing frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, and riding in vibratory vehicles for any extended period of time. Mr. Hall would not be considered totally disabled from any occupational employment as long as it is within the restrictions as listed above.

**MLS 000015**

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 15

It should be noted that Mr. Hall's chronic pain condition does affect his sleep, his ability to concentrate, as well as his stamina. These factors could substantially impact his work activities that Mr. Hall would engage in.

4. *If Mr. Hall is not totally disabled, what type of work could he currently perform? Would there be any restrictions? Please be specific with any restrictions.*

As stated above, Mr. Hall would be capable of performing work within the restrictions as outlined above. Mr. Hall would be unable to engage in any activity that would require prolonged walking or standing. He would be unable to walk for periods greater than 20 to 30 minutes at a particular time per one and a half hour time frame. He is unable to sit for periods greater than 45 to 60 minutes at a particular time throughout the course of an eight-hour day with the opportunity to stand as necessary. Mr. Hall would be unable to lift items weighing greater than 20 pounds from waist level or carry this weight for any extended period of time. He is unable to lift items weighing greater than ten pounds from floor level or engage in any repetitive lifting from floor level. He is unable to engage in activities requiring repetitive use of foot controls. He should avoid activities

MLS 000016

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 16

requiring any vibratory vehicles for any extended periods of time, which would include 30 minutes at a particular time. He should avoid activities requiring frequent bending, stooping, kneeling, squatting, crouching, lifting or carrying. I would recommend that Mr. Hall be limited from working in cold or damp environments. In addition, I would limit Mr. Hall from performing pushing or pulling items up inclined areas or over rough, uneven terrain. Mr. Hall would be most suitable for sedentary work.

5. *What is the medical prognosis for Mr. Hall?*

Mr. Hall's chronic pain condition is permanent. I would not anticipate any symptom improvement or change in his condition in the foreseeable future. Consideration could be given to a morphine pump placement or to a spinal cord stimulator. I would leave this decision up to Mr. Hall and the pain specialist who works in this area.

James Templin, M.D.
Board Certified
Physiatry

JT/td

MLS 000017

```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO              0347
CONNECTION TEL                918592267079
CONNECTION ID        SAM. PAIN CARE
ST. TIME             01/05 15:49
USAGE T              03'44
PGS. SENT             17
RESULT               OK
```

# EXHIBIT 4

# MLS NATIONAL MEDICAL EVALUATIONS, INC.
## 25899 West 12 Mile Road
## Suite 220
## Southfield, Michigan   48034
## (248) 945-9001

# FAX NUMBER:  (248) 356-6757

## FAX COVER/MESSAGE SHEET

MESSAGE TO:    _Dr. James Templin MD_

COMPANY:    _1_

RE:    _Hall, Terry_

# OF PAGES :    _17_

FROM:    _Anne_

MESSAGE:    _FINAL REPORT_

**DEPOSITION EXHIBIT**
4   MLS
9-27-05   AC

**IF YOU DO NOT RECEIVE ALL PAGES OR HAVE PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL US AT (248) 945-9001**

******HIPPA Confidentiality Notice******          MLS 000064

THE DOCUMENTS INSIDE THIS ELECTRONIC TRANSMISSION CONTAINS CONFIDENTIAL
INFORMATION BELONGING TO THE SENDER THAT IS LEGALLY PRIVILEGED.   THIS
INFORMATION IS INTENDED ONLY FOR THE USE OF

# James W. Templin M.D.
## Occupational Medicine and Chronic Pain Management

Samaritan Hospital
Pain Care Center
310 South Limestone
Lexington, Kentucky 40508
Phone-(859) 252-6612
Fax-(859) 226-7079


DEPOSITION
EXHIBIT
5    MLS
9-27-05    QC

EXHIBIT 5

HISTORY AND PHYSICAL
TERRY HALL
06210
12-05-03

**HISTORY:**

Mr. Hall is a 39 year old white male who complains of chronic low back pain, with radiation of pain into the hips and legs bilaterally. He also complains of bilateral foot pain. He said his symptoms started when he was a teenager. At that time, Mr. Hall said he was doing some exercises when he developed low back pain. He was seen by Dr. Wheeler on 04-29-80, at which time, he was diagnosed with mild scoliosis. X-rays obtained at that time showed some S-shaped curvature with maximum deformity in the lumbar spine. Dr. Wheeler diagnosed probable mild scoliosis. The scoliosis was felt to be primarily due to an abnormally shaped L5 vertebral body. Mr. Hall said he was given some exercises to do. He followed up with Dr. Wheeler, on 10-29-80, at which time, Dr. Wheeler said he was clinically looking good and he therefore did not anticipate any additional problems. Mr. .Hall was therefore released from his care. Mr. Hall entered the Army in February of 1984. In 1986, he was doing a physical therapy exercise. At this time, he was complaining of low back pain with radiation of pain into the right leg. He was seen and treated and was recommended for a medical discharge. Mr. Hall said he received an epidural block and the symptoms significantly improved. He therefore stayed in the Army until 1992, at which time, he was honorably discharged.

On 12-27-96, Mr. Hall said he was an employee of Raytheon working in an engineering position. He primarily sat at a desk. Mr. Hall said he was sitting at the desk when he suddenly developed a sharp pain in the back radiating into the right leg. At that time, Mr. Hall was living in New Mexico. He was seen by Dr. Garcia, his local medical physician. He was then referred for an MRI scan of the lumbar spine which was obtained on 12-27-96 showing degenerative disc and facet changes at multiple levels with encroachment of both the L5 and S1 foramina, noted to be greater on the right than the left side primarily due to facet hypertrophy. There was also spondylolisthesis at L5 relative to S1, with secondary to facet hypertrophy together with a small posterior disc herniation. There was disc space narrowing noted at L4-L5, L2-L3, and L5-S1. The spondylolisthesis was graded as a Grade I. With the radicular symptoms, Mr. Hall was referred to Dr. Leonardo Svarzbein, a Neurologist, for an EMG/NCV study. This study was obtained showing a peripheral neuropathy, with bilateral tarsal tunnel slowing on the NCV's together with probable lumbosacral radiculopathy.

A myelogram and post-myelogram CAT scan were obtained on 01-30-97. These studies showed equivocal impingement of the right L5 nerve root, with a Grade 1 spondylolisthesis at L5 together with degenerative lumbar spondylosis which is severely involving the right L5 facet joint. The post-myelogram CT scan showed bilateral L5 spondylosis, with a Grade 1 spondylolisthesis, with severe degenerative facet arthropathy at the L5-S1 level more on the right side, with narrowing of the upper

MLS 000025

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 2

portion of the L5-S1 neural foramina. There was impingement of the lateral portion of the L5 nerve root within the neural foramina due to a combination of diffuse posterior disc protrusion at the L5-S1 level and facet arthropathy. There was mild midline posterior disc protrusion at L4-L5, slightly abutting the anterior dural sac. With these findings, Dr. Svarzbein recommended surgery. Mr. Hall agreed and 03-19-97 underwent bilateral laminectomies at L5-S1, with facetectomies and foraminotomies together with a discectomy at L5-S1. There was interbody fixation at the L5-S1 level with threaded fusion cage (TRS fusion cage device) times 2 at L5-S1 level for internal stabilization and fixation. Also, there was arthrodesis at L5-S1 level, with bone obtained from the lamina and spinous process.

On 06-11-97, Dr. Svarzbein released Mr. Hall to return to work in a light duty capacity with the following restrictions. He was restricted to having an orthopedically correct chair. He was also restricted to change positions frequently from the sitting to the standing or perhaps even lying down occasionally, as well as, no stooping, bending, crawling, or positioning in a cramped or uneven position. Lifting, pushing, and pulling should be limited to be no more than 10 pounds. Mr. Hall was limited to a four hour workday and to advance as tolerated. Mr. Hall worked at Raytheon for approximately one year. A lay-off was upcoming and he therefore began to look for new employment and was able to find an employment position at Cerestar, in Hammond, Indiana.

Mr. Hall said the pain never went away and slowly but progressively worsened. When he got to Indiana, he was seen at the Calumet Surgery Center where Dr. Toyama performed caudal steroid injections under fluoroscopy. He diagnosed a failed back syndrome at L5-S1. He also was seen by Dr. Kim and on 02-17-99 underwent a second caudal epidural steroid injection. The first caudal block proved effective in providing approximately a 20% reduction in symptomatology. When Mr. Hall made the move to Indiana, he moved to an area, which was much colder in temperature than the Mexico weather. He found the coldness resulted in increased pain. When the pain persisted, an MRI scan with and without contrast was obtained. This study showed a laminectomy and fusion at L4-L5, with left para central chronic herniation, with enhancing scar tissue at T11-T12 compressing the thecal sac and cord, as well as, the left neural foramina. There was 5 mm. spondylolisthesis at L5 with respect to L4. There were also endplate changes at L2, L3, and L4. Mr. Hall, in an attempt to move to a warmer weather area, moved to Winchester, Kentucky and obtained an employment position with Sonoco Products Company. There he obtained an employment position as a maintenance manager. Mr. Hall moved to the Winchester, Kentucky, in October of 1999. His work position required him to walk on a hard concrete surface approximately 10 hours a day, 5 to 6 days per week.

Mr. Hall began to develop neck pain around 1999. These symptoms slowly but progressively worsened. X-rays of the cervical spine were obtained with neural foramina narrowing noted at C3-C4, C4-C5, and to the right at C2-C3, C3-C4, and C4-C5. It was recommended that he undergo an MRI scan. The MRI scan was obtained on 05-18-00 showing degenerative disc disease, with osteophytes at C4-C5 and C6-C7. He was then diagnosed with degenerative cervical disc disease. Mr. Hall said his pain including the neck and the lower back was becoming so severe that he was having difficulty with sleep together with concentration, and easy and early fatigability. This was

MLS 000026

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 3

affecting his productivity and work schedule. Finally, by 05-11-01, Mr. Hall said the overall effects of his pain condition had reached the point where he was no longer able to perform his functional job duties. He then terminated his work position. At that time, Mr. Hall was seeing Dr. Larimore at the VA Hospital. It was Dr. Larimore who placed him off work due to his chronic pain condition. Dr. Larimore was also treating Mr. Hall for a post-traumatic stress disorder and depression. Mr. Hall said these conditions did impact his general life style but the primary reason why he could no longer perform his functional job duties involved his chronic pain condition.

Mr. Hall said since terminating his work position, he has been able to see some improvement in his condition. Both Mr. Hall and his wife agree that probably the primary reason for this improvement relates to the rest he is able to get and his reduce pressure from a regular schedule. Any time Mr. Hall attempts to do any extensive activities involving prolonged standing, walking, bending, stooping, kneeling, pushing, pulling, etc., the pain quickly resurfaces to the point where Ms. Hall said Mr. Hall will need a cane to help in ambulation. When he was unable to return to work, Mr. Hall applied for and is currently receiving his Social Security Disability benefits. He has also been declared 100% disabled by the VA based on PTSD together with his chronic low back pain condition and depression. He is also now applying for his long-term disability under a company policy. The company is now challenging his disability as to whether it is related to his back condition or to an emotional condition.

CURRENT PAIN STATUS:

Mr. Hall complains of constant dull aching pain in the low back, with radiation of pain into the hips and legs bilaterally. He also complains of bilateral foot pain. The pain is said to be increased with any prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding in or on vibratory vehicles for any extended distance or time.

PAST MEDICAL HISTORY:

Illnesses: Post-traumatic stress disorder, depression, degenerative lumbar disc disease, lumbar spondylolisthesis, degenerative cervical disc disease, history of left sided rotator cuff tear, right inguinal hernia.
Surgeries: Lumbar spinal fusion, tonsillectomy, right inguinal hernia repair.
Allergies: NKDA.
Medicines: Lortab, Robaxin, Extra-Strength Tylenol, Prozac, Buspar, and Restoril.

FAMILY HISTORY:

Positive for Myocardial Infarction (grandfather, father), CVA (grandfather), Hypertension (father, grandfather), Cancer (grandfather), Diabetes Mellitus (aunt).

MLS 000027

SOCIAL HISTORY:

No Smoking. No alcohol use. Married with 3 children. College Graduate.

WORK HISTORY:

Sonoco Products Company (1 ½ years).
Cerestar (1 year).
Raytheon (3 years).
U.S. Army (10 years).

REVIEW OF SYSTEMS:

Wears glasses for Myopia, decreased hearing in the left ear, colitis, rectal bleeding, irritable bowel
syndrome, post-traumatic stress disorder, depression, right shoulder rotator cuff tear, right inguinal
hernia, nose fractures, finger fractures, rib fractures, history of spontaneous pneumothorax,
otherwise noncontributory.

PHYSICAL EXAMINATION:

VITAL SIGNS: Height 69", Weight 201 pounds, BP 151/88, Pulse 76, Respirations 12.
GENERAL: Alert, friendly white male in no apparent distress. HEENT: Normal cephalic with
PERRLA, EOMS full and equal, Fundi- benign, TM- clear, Throat- clear, Mid-line trachea. NECK-
supple, no thyromegaly, no adenopathy. There is mild tenderness over the posterior aspect of the
cervical spine. CHEST: Clear to auscultation and percussion. HEART: Regular rate and rhythm with
no murmurs, thrills, heaves, or gallops. ABDOMEN: Normal bowel sounds, supple, no tenderness,
no guarding, no organomegaly. GENITALIA: Normal male, no hernias present. EXTREMITIES: No
clubbing, no edema or cyanosis noted, good strength, FROM. NEUROLOGICAL: Oriented x 3,
cranial nerves 2 through 12 intact bilaterally, no motor sensory cerebella abnormalities noted.

EXAMINATION OF BACK: Shows a well-healed midline surgical scar. There is tenderness over the
midline of the lower lumbar spine. There is decreased ROM of the dorsal lumbar spine with forward
flexion of 45°, with sacral hip flexion angle of 30°, sacral hip extension angle of 8°, with extension of
12°, with right lateral flexion of 16°, with left lateral flexion of 14°. No tenderness over the sciatic
notch bilaterally. Toe standing and plantar flexion are normal and equal bilaterally. REFLEXES:
Achilles and patella reflexes are equal and strong bilaterally. Babinski shows dorsiflexion of the toes
bilaterally. MOTOR EXAM: Plantar flexion of the ankles is normal bilaterally. Knee extension is
normal bilaterally. Flexion of the knee is normal bilaterally. Sensation to pinprick shows decreased

MLS 000028

Apr. 12. 2005 3:04PM  WAUSAU BENEFITS                    No. 2981  P. 6
JAN-05-2004  13:19      CBH WEST        Document 54    Filed 09/08/2008   Page 77 of 149        P. 06/09

Case 3:07-cv-05310-JSW    Document 54    Filed 09/08/2008    Page 77 of 149
8592606641

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 5

sensation in the left leg in a dermatomal pattern consistent with L5. Straight leg raise is positive on the right at 52° and 41° on the left. Mild hamstring tightness noted bilaterally. Range of the hips shows internal and external rotation to be reduced bilaterally. Hip flexion strength is good bilaterally. Passive extension of the hips produced increased back pain. Bilateral abduction of the hips produced increased back pain bilaterally. Deep knee bends were not performed due to poor balance. Pedal pulses equal and strong bilaterally.

IMPRESSION:

1. Chronic low back pain syndrome.
2. History of lumbar disc herniation at L4-L5, L5-S1.
3. S/P laminotomy with fusion at L4-L5, L5-S1.
4. Degenerative lumbar disc disease.
5. Degenerative cervical disc disease.
6. Post-traumatic stress disorder.
7. Depression.

PLAN:

1. In your letter, dated 11-04-03, I was asked to respond to five questions concerning the medical condition of Mr. Hall. I will answer the questions in the order directed.

    1. What are the subjective complaints?

        1. Chronic low back pain syndrome.
        2. Bilateral hip and leg pain.
        3. Bilateral foot pain.
        4. Left leg numbness and weakness.
        5. Difficulty with sleep, difficulty with concentration, and easy and early fatigability.

    2. What are your objective findings on your physical exam?

        Decreased ROM of the dorsal lumbar spine when measured by an inclinometer and measured on three separate occasions with the measurements being within 5 degrees of each other meeting the validity criteria set forth in the AMA Guides. Decreased sensation to pinprick in the left leg noted in a dermatomal pattern consistent with L5.

    3. Do you feel this employee's physical condition warrants him totally disabled from any occupation or employment?

        Mr. Hall is unable to engage in activities requiring prolonged sitting, standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding in or on vibratory vehicles for any extended distances or time. These would be the functional activities

MLS 000029

which Mr. Hall is unable to engage in. If the functional job duties of the work position questioned and involved these particular activities, then Mr. Hall is unable to perform those activities on a competitive basis. It is important to realize, that Mr. Hall's chronic pain condition also affects his sleep, his concentration, and his stamina. These factors would substantially impact any work activity Mr. Hall were to engage in. Based on his back pain condition, the previously noted restrictions would be applicable and any particular job or work position identified would need to have functional job duties outside of these restrictions for Mr. Hall to be able to perform those duties on a competitive basis. I imagine there are work positions where the functional job duties would be consistent and compatible with the work restrictions, although, I am unsure as to whether Mr. Hall would qualify for those particular positions based on his educational background and training. I would be happy to evaluate any specific work position identified and relate Mr. Hall's work capability based on his back condition to the functional job duties identified. I am unable at this time based on Mr. Hall's presentation and examination to identify any work position, which I believe he could return to.

If Mr. Hall is not totally disabled, what type of work could he currently perform?

I believe this question was appropriately addressed in the previous response.

4. Would there be any restrictions?

Yes. The restrictions have been appropriately itemized and listed in question #3.

Please be specific with any restrictions.

Mr. Hall is unable to engage in any activity requiring prolonged walking or standing. He is unable to walk or stand for periods greater than 20 to 30 minutes at one time or 1 ½ hours per 8 hour time frame. He is unable to sit for periods greater than 45 to 60 minutes at one time or 4 hours per 8 hour time frame. He is unable to lift items weighing greater than 20 pounds from waist level or carry this weight for any extended distance or time. He is unable to lift items weighing greater than 10 pounds from floor level or engage in any repetitive lifting from floor level. He is unable to engage in activities requiring repetitive use of foot controls. He should avoid activities requiring riding in or on vibratory vehicles for any extended distance or time. He should avoid activities requiring frequent bending, stooping, kneeling, squatting, crouching, lifting, and carrying. He should avoid working in cold, damp environments. He should avoid pushing and pulling items up inclined areas or over rough and uneven terrain.

**MLS 000030**

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 7

5. What is the medical prognosis for Mr. Hall?

   Mr. Hall's chronic pain condition is permanent. I would not anticipate any significant
   improvement or change in his condition in the foreseeable future. Consideration could be
   given to a morphine pump placement or to a spinal cord stimulator. I would leave this
   decision up to Mr. Hall and a pain specialist who works in this area.

James Templin, M.D.

JT/mrh
(d) 12-05-03
(t) 12-06-03

MLS 000031



# MLS National Medical Evaluations, Inc.

**Corporate Office**
25899 West Twelve Mile Road, Suite 200
Southfield, Michigan 48034

Tel: 248-945-9001
Fax: 248-356-6757

www.mls-ime.com
info@mls-ime.com

January 12, 2004

Lorraine Prebeg, R.N.
Wausau Benefits, Inc.
Disability Unit
P.O. Box 8015
Wausau, WI 54402

Re: Hall, Terry
Social Security Number: ***-**-8401

Dear Ms. Prebeg:

Enclosed is the Independent Medical Evaluation Report rendered by

James Templin, MD, regarding Terry Hall, per your request. If we can be

of any further assistance, please do not hesitate to contact us.

Sincerely,

MLS National Medical Evaluation Services, Inc.

c: File

Enclosures



DEPOSITION
EXHIBIT
6  MLS
9-27-05  QC

EXHIBIT 6

MLS 000049

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION



JUN 1 4 2005

TERRY HALL

      PLAINTIFF

v.

MLS NATIONAL MEDICAL
EVALUATIONS, INC.

      DEFENDANT

CIVIL ACTION NO. 05-185-JBC

*See Subfolder
for A disclosure*

## DEFENDANT'S RULE 26(a)(1) INITIAL DISCLOSURES

Comes the Defendant, MLS National Medical Evaluations, Inc., and provides the following information and documents pursuant to the Court's Order and FRCP 26(a)(1):

    A.    Individuals likely to have discoverable information that MLS may use to support its defenses:

    (1)    Sharon Walkhaus – MLS National Medical Evaluations, Inc., 25899 West Twelve Mile Road, Suite 220, Southfield, Michigan 48034. Tel: 248-945-9001. Ms. Walkhaus arranged for the independent medical evaluation with Dr. Templin's office;

    (2)    Wendy Smith – MLS National Medical Evaluations, Inc., 25899 West Twelve Mile Road, Suite 220, Southfield, Michigan 48034. Tel: 248-945-9001. Ms. Smith reviewed Dr. Templin's dictation;

    (3)    Joseph Schimizzi – MLS National Medical Evaluations, Inc., 25899 West Twelve Mile Road, Suite 220, Southfield, Michigan 48034. Tel: 248-945-9001. Mr. Schimizzi has general knowledge of MLS' procedures and its dealings with Dr. Templin and Wausau Benefits, Inc.;

DEPOSITION
EXHIBIT
7   HLS
9-27-05   ac

(4)    Ms. Lorraine Prebeg, R.N. – Wausau Benefits, Inc. Disability Unit, P.O.

Box 8015, Wausau, Wisconsin 54402.  Ms. Prebeg was MLS' contact at Wausau Benefits who

requested the independent medical evaluation of Mr. Hall; and

(5)    James W. Templin, M.D. – Occupational Medicine and Chronic Pain

Management, Samaritan Hospital Pain Care Center, 310 South Limestone, Lexington, Kentucky

40508.  Tel: 859-252-6612.  Dr. Templin conducted the independent medical evaluation of Mr.

Hall which is the subject of this litigation.

B.    Copies of documents numbered MLS 000001 through 000118 are attached hereto.

C.    N/A

D.    There is no known insurance coverage at this time.

Respectfully submitted,

J. Clarke Keller
Alex L. Scutchfield
STITES & HARBISON, PLLC
250 West Main Street, Suite 2300
Lexington, Kentucky  40507
Telephone:  (859) 226-2300
COUNSEL FOR DEFENDANT MLS
NATIONAL MEDICAL EVALUATIONS,
INC.

Of Counsel
Abraham Singer
PEPPER HAMILTON, LLP
36th Floor
100 Renaissance Center
Detroit, MI 48243-1157

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by hand delivery on this 14th day of June, 2005, upon the following:

M. Austin Mehr
AUSTIN MEHR LAW OFFICES, P.S.C.
145 West Main Street
Suite 300
Lexington, KY  40507

_____
J. Clarke Keller

CT19:38322:203118:1:LEXINGTON

-3-

# MLS National Medical
# Evaluations, Inc.

Corporate Office
25899 West Twelve Mile Road, Suite 200
Southfield, Michigan 48034

Tel: 248-945-9001
Fax: 248-356-6757

www.mls-ime.com
info@mls-ime.com

January 5, 2004

Lorraine Prebeg, R.N.
Wausau Benefits, Inc.
Disability Unit
P.O. Box 8015
Wausau, WI 54402

Re: Hall, Terry
Social Security Number: ***-**-8401

Dear Ms. Prebeg:

Enclosed is the Independent Medical Evaluation Report rendered by

James Templin, MD, regarding Terry Hall, per your request. If we can be

of any further assistance, please do not hesitate to contact us.

Sincerely,



MLS National Medical Evaluation Services, Inc.

c: File

Enclosures

**EXHIBIT**

MLS 000001



**MLS National Medical Evaluations, Inc.**

Corporate Office
25899 West Twelve Mile Road, Suite 200
Southfield, Michigan 48034

Tel: 248-945-9001
Fax: 248-356-6757

www.mls-ime.com
info@mls-ime.com

December 11, 2003

Re:   TERRY HALL
      Social Security Number        XXX-XX-8401

To Whom It May Concern:

I had the opportunity of interviewing and examining Mr. Terry Hall for MLS National

Medical Evaluation Services on December 5, 2003 for the purpose of an independent

medical evaluation. This examination was carried out for evaluation only. It did not

constitute a doctor/patient relationship and no treatment recommendations were given.

No medications were prescribed. The nature of the interview and examination was

explained to the examinee and the examinee understood the facts.

If more information becomes available at a later date, an additional service report

consideration may be requested. Such information may or may not change the opinion

rendered in this evaluation. This opinion does not constitute per se a recommendation

for specific claims or administrative functions to be made.

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 2

Prior to the onset of the physical examination, the examinee was informed to notify me of any pain, discomfort, numbness, or symptomatology produced by the maneuver.

## HISTORY OF PRESENT ILLNESS

Mr. Hall is a 39-year-old male who complains of chronic low back pain. The pain is said to radiate into the hips and legs bilaterally. He also complains of bilateral foot pain. Mr. Hall said his symptoms started when he was a teenager. At that time, Mr. Hall said he was doing some exercises when he developed low back pain. He was initially seen by Dr. Wheeler on April 29, 1980. At that time, Mr. Hall was diagnosed with mild scoliosis. X-rays obtained at that time showed some S-shaped curvature with maximum deformity in the lumbar spine. Dr. Wheeler diagnosed probable mild scoliosis. Scoliosis was felt to be primarily due to an abnormally shaped L-5 vertebral body. Mr. Hall said he was given some exercises to do at home. He followed up with Dr. Wheeler on October 29, 1980. At that time, Dr. Wheeler said he was clinically looking good and, therefore, he did not anticipate any additional problems. Mr. Hall was then released from his care.

MLS 000003

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 3

Mr. Hall entered the Army in February of 1984. In 1986 he was doing some physical

therapy exercises when he began to experience low back pain. This time the pain was

radiating into the right leg. Mr. Hall was seen, treated, and was recommended for a

medical discharge. He wanted to continue in the service if possible and, therefore, was

sent for additional medical care. He received an epidural block, which significantly

reduced his symptoms. Mr. Hall stayed in the Army until 1992. At that time, he

received an honorable discharge.

On December 27, 1996, Mr. Hall said he was an employee of Rathion working in an

engineering position. His work position required him to primarily sit at a desk. Mr. Hall

said he was sitting at the desk when he suddenly developed a sharp pain in his lower

back. This pain also radiated into the right leg. At the time of this incident, Mr. Hall

was residing in New Mexico. He, therefore, was seen by Dr. Garcia, his local medical

physician. Dr. Garcia then referred Mr. Hall for an MRI scan of the lumbar spine. This

study was obtained on 12/27/96 showing degenerative disc and degenerative facet

changes in multiples with encroachment of both the L5 and the S1 foramina. This

encroachment was noted to be greater on the right than the left side and was felt to be

primarily due to facet hypertrophy. There was also spondylolisthesis at L5 relative to

S1. Additionally, there was facet hypertrophy together with a small posterior disc

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 4

herniation.   Disc space narrowing was noted at L2-L3, L4-L5, and L5-S1.   The

spondylolisthesis was graded as a Grade I.  With the radicular symptoms, Mr. Hall was

referred to Dr. Lenardo Svarzbein, neurologist.   Dr. Svarzbein ordered an EMG-NCV

study.  This study was obtained showing a peripheral neuropathy with bilateral tarsal

tunnel slowing on the NCV together with a probable lumbosacral radiculopathy.   A

myelogram and post-myelogram CAT scan were also ordered and obtained on January

30, 1997.  These studies showed equivocal impingement of the right L5 nerve root with

a Grade I spondylo thesis at L5 together with degenerative lumbar spondylosis.  The

lumbar spondylosis  severely involved the right L5 facet joint.  The post myelogram CT

scan showed bilateral L5 spondylosis with a Grade I spondylolisthesis with severe

degenerative facet arthropathy at the L5-S1 level.  This arthropathy was noted to be

greater on the right side then the left and showed narrowing of the upper portion of the

L5-S1 neural foramina.  There was impingement of the lateral portion of the L5 nerve

root within the neural foramina due to a combination of diffuse posterior disc protrusion

at L5-S1 together with facet arthropathy.   There was mild midline posterior disc

protrusion at L4-L5 slightly abutting the anterior dural sac.  With these findings, Dr.

Svarzbein recommended surgery.  Mr. Hall agreed and on 03/19/97 underwent bilateral

laminotomies at L5-S1 with facetectomies and foraminotomies together with a

discectomy at L5-S1.  Mr. Hall underwent interbody fixation at L5-S1 level with using

MLS 000005

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 5

threaded fusion cage (TRS fusion cage device) x2 at L5-S1 with an internal stabilization and fixation. Additionally, there was an arthrodesis at L5-S1 level with bone obtained from the lamina and spinous processes.

Dr. Svarzbein released Mr. Hall to return to work on light-duty capacity on 6/11/97. Mr. Hall was given restriction where he was to sit in an orthopedically correct chair. He was restricted to changing positions frequently from the sitting to standing position or even lying down occasionally, as well as, no stooping, bending, crawling, or positioning in a cramped or uneven position. Lifting, pushing, and pulling were limited to no more than 10 pounds. Mr. Hall was limited to a 4-hour workday, which would be slowly, progressively advanced as tolerated. Mr. Hall worked at Rathion for approximately one year. A lay off was thus coming and he, therefore, began to look for a new employment position. Fortunately, he was able to find such a position in Cerestar in Hammond, Indiana.

Mr. Hall said the pain never completely resolved. In fact, Mr. Hall said his pain seemed to slowly but progressively worsen. When he got to Indiana he was seen at the Cymed Surgery Center by Dr. Toyama, who performed a caudal steroid injection under fluoroscopy. Mr. Hall was diagnosed with failed back syndrome at L5-S1. He was also

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 6

seen by Dr. Kim and on 02/17/99 underwent a second a caudal epidural steroid injection.  The first caudal block proved effective in providing approximately a 20% reduction in symptomatology.  When Mr. Hall made the move to Indiana he moved to an area which was much colder in temperature than the Mexican weather.  Mr. Hall said he found the coldness affecting his pain condition and resulting in increased pain. When Mr. Hall's pain persisted, an MRI scan with and without contrast was obtained.

Mr. Hall said the MRI scan showed a laminectomy and fusion at L4-L5 with left pericentral chronic herniation with enhancing scar tissue at T11-T12 compressing thecal sac and cord as well as a left neural foramina.  There was a 5-mm spondylolisthesis at L5 with respect to L4.  There were also endplate changes to L2, L3, and L4.  Mr. Hall in an attempt to move to a warmer weather area, moved to Winchester, Kentucky and obtained an employment position with Sonoco Products Company.  There he obtained an employment position as a maintenance manager.  Mr. Hall relocated to Winchester, Kentucky in October 1999.  His work position required him to work on a hard concrete surface approximately ten hours a day 5 to 6 days per week.

Mr. Hall began to develop neck pain around 1999.  His symptoms slowly but progressively worsened.  X-rays of the cervical spine were obtained with neural

MLS 000007

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 7

foramina narrowing noted at C3-C4, C4-C5, and to the right at C2-C3, C3-C4, and C4-C5. It was recommended that he undergo an MRI scan. The MRI scan was obtained on 05/18/00 showing degenerative disc disease with osteophytes at C4-C5 and C6-C7. He was then diagnosed with degenerative cervical disc disease. Mr. Hall said the pain, including the neck and lower back, was becoming so severe that he was having difficulty with sleep together with concentration. He also complained of easy and early fatigability. This was affecting his productivity and work schedule. Finally, by 05/11/01 Mr. Hall said the overall effects of his pain condition had reached the point where he no longer able to perform his function job duties. He then terminated his work position. At that time, Mr. Hall was seeing Dr. Laramore at the VA Hospital. It was Dr. Laramore who placed him off of work due to the chronic pain condition. Dr. Laramore was also treating Mr. Hall for a post-traumatic stress disorder and depression. Mr. Hall said these conditions did impact his general lifestyle but the primary reason why he could no longer perform his function job duties involved his chronic pain condition.

Mr. Hall said that since terminating his work position, he has been able to obtain some improvement in his condition. Both Mr. Hall and his wife agree that probably the primary reason for this improvement relation to rest he is able to get and his reduced pressure from his regular schedule. Anytime Mr. Hall attempts to do any extensive

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 8

activities involving prolonged standing, walking, bending, stooping, kneeling, pushing, pulling, etc., the pain quickly resurfaces and Mr. Hall says he needs a cane for ambulation. When he was unable to return to work, Mr. Hall applied for and is currently receiving Social Security Disability Benefits. He also has been declared 100% disabled by the VA based on post-traumatic stress disorder together with his chronic low back pain condition and depression. He is also now applying for a long-term disability under company policy. The company is now challenging his disability as whether it is related to the back condition or to an emotional condition.

## CURRENT PAIN STATUS

Mr. Hall complains of a constant dull, achy pain in the low back with radiation of pain to the hips and legs bilaterally. He also complains about left foot pain. The pain is said to be increased with any prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding on vibratory vehicles for an extended amount of time.

MLS 000009

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 9

## PAST MEDICAL HISTORY

Illnesses:    Post-traumatic stress disorder, depression, degenerative lumbar disc disease, lumbar spondylolisthesis, degenerative cervical disc disease, history of left side rotator cuff tear, and right inguinal hernia.

Surgeries:    Lumbar spinal fusion, tonsillectomy, and right inguinal hernia repair.

Allergies:    No known drug allergies.

Medicines:    Vertab, Robaxin, extra-strength Tylenol, Prozac, Buspar, and Restoril.

## FAMILY HISTORY

Positive for myocardial infarction (grandfather and father), cerebrovascular accident (grandfather), hypertension (father and grandfather), cancer (grandfather), and diabetes mellitus (aunt).

MLS 000010

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 10

## SOCIAL HISTORY

No smoking.  No alcohol use.  Married with 3 children.  College graduate.

## OCCUPATIONAL HISTORY

Sonoco Products Company (1 ½ years).

Scerestar (1 year).

Rathion (3 years).

US Army (2 years).

## REVIEW OF SYSTEMS

Wears glasses, myopia.  Decreased hearing in the left ear.  Colitis.  Rectal bleeding. Irritable bowel syndrome.  Post-traumatic stress disorder.  Depression.  Right shoulder rotator cuff tear.  Right inguinal hernia.  Nose fracture.  Finger fracture.  Rib fractures. History of spontaneous pneumothorax.  Otherwise, noncontributory.

MLS 000011

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 11

## PHYSICAL EXAMINATION

Vital signs:   Height 69 inches.   Weight 201 pounds.    Blood pressure 151/88.   Pulse

76.   Respirations 12.

General:      Alert, friendly white male in no apparent distress.

HEENT:       Normocephalic.   PERLA, EOMI, fundi benign.   TM's clear.   Throat clear.

Midline trachea.   Neck supple.   No thyromegaly.   No adenopathy.   There is mild

tenderness over the posterior aspect cervical spine.

Chest:        Clear to auscultation and percussion.

Heart:        Regular, rate, and rhythm.   No murmurs, rubs, heaves, or gallops.

Abdomen:     Normal bowel sounds.   Supple.   No tenderness.   No guarding.    No

organomegaly.

GU:           Normal male.   No hernias present.

Extremities:  No clubbing, cyanosis, or edema.   Good strength.   Full range of motion.

Neurologic:   Oriented x3.   Cranial nerves II through XII intact.   No motor, sensory, or

cerebellar abnormalities noted.

Back:         Shows a well-healed midline surgical scar.   There is tenderness over the

midline and lower lumbar spine.   There is decreased range of motion of the dorsal

lumbar spine with forward flexion of 45 degrees, sacral flexion angle 30 degrees, sacral

**MLS 000012**

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 12

extension angle 8 degrees, extension 12 degrees, right lateral flexion 16 degrees, and left lateral flexion 14 degrees. No tenderness over the sciatic notch bilaterally. Toe standing and plantar flexion are normal and equal bilaterally. Achilles and patellar reflexes are strong and equal bilaterally. Babinski slower dorsiflexion of great toes bilaterally. Motor exam. Plantar flexions of the ankles are normal bilaterally. Knee extension is normal bilaterally. Flexion of the knee is normal bilaterally. Sensation to pinprick with decreased sensation left leg dermatoma pattern consistent with L5. Straight leg raise positive on right at 52 degrees and 41 degrees on the left. Mild hamstring tightness noted right. Range of motion of the hips shows internal-external rotation reduced bilaterally. Hip flexion strength reduced bilaterally. Passive extension of hips produced increased back pain. Bilateral abduction of hips produced increased back pain. Deep knee bends were not performed due to poor balance. Pulse are strong and equal bilaterally.

ASSESSMENT

1. Chronic low back pain syndrome.

2. History of lumbar disc herniation L4-L5 and L5-S1.

3. Status post laminotomy with fusion at L4-L5 and L5-S1.

MLS 000013

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 13

4. Degenerative lumbar disc disease.

5. Degenerative cervical disc disease.

6. Post-traumatic stress disorder.

7. Depression.


CONCLUSION


In the letter of November 4, 2003 I was requested to respond to five questions concerning the medical condition of Mr. Hall. I will answer the questions in the order as directed.


1. *What are the subjective complaints?*

1. Chronic low back pain.

2. Bilateral hip and leg pain.

3. Bilateral foot pain.

4. Left leg numbness and weakness.

5. Difficulty with sleep.

6. Difficulty with concentration.


MLS 000014

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 14

7. Easy and Early Fatigability.

2. *What are your objective findings from your physical exam?*

Objective findings from physical examination include decreased range of motion of dorsal lumbar spine when measured by the inclinometer and measured on three separate occasions with the measurements being within 5 degrees of each other meets the criteria set forth in the AMA Guides. Decreased sensation to pinprick in the left leg noted with dermatomal pattern consistent with L5.

3. *Do you feel this employee's physical condition warrants him totally disabled from any occupation or employment? Please give rational as to why.*

Mr. Hall has restrictions that would involve engaging in activities that would require prolonged sitting, standing and walking. He would be restricted from performing frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, and riding in vibratory vehicles for any extended period of time. Mr. Hall would not be considered totally disabled from any occupational employment as long as it is within the restrictions as listed above.

MLS 000015

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 15

It should be noted that Mr. Hall's chronic pain condition does affect his sleep, his ability to concentrate, as well as his stamina. These factors could substantially impact his work activities that Mr. Hall would engage in.

4. *If Mr. Hall is not totally disabled, what type of work could he currently perform? Would there be any restrictions? Please be specific with any restrictions.*

As stated above, Mr. Hall would be capable of performing work within the restrictions as outlined above. Mr. Hall would be unable to engage in any activity that would require prolonged walking or standing. He would be unable to walk for periods greater than 20 to 30 minutes at a particular time per one and a half hour time frame. He is unable to sit for periods greater than 45 to 60 minutes at a particular time throughout the course of an eight-hour day with the opportunity to stand as necessary. Mr. Hall would be unable to lift items weighing greater than 20 pounds from waist level or carry this weight for any extended period of time. He is unable to lift items weighing greater than ten pounds from floor level or engage in any repetitive lifting from floor level. He is unable to engage in activities requiring repetitive use of foot controls. He should avoid activities

MLS 000016

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 16

requiring any vibratory vehicles for any extended periods of time, which would include 30 minutes at a particular time. He should avoid activities requiring frequent bending, stooping, kneeling, squatting, crouching, lifting or carrying. I would recommend that Mr. Hall be limited from working in cold or damp environments. In addition, I would limit Mr. Hall from performing pushing or pulling items up inclined areas or over rough, uneven terrain. Mr. Hall would be most suitable for sedentary work.

5. *What is the medical prognosis for Mr. Hall?*

Mr. Hall's chronic pain condition is permanent. I would not anticipate any symptom improvement or change in his condition in the foreseeable future. Consideration could be given to a morphine pump placement or to a spinal cord stimulator. I would leave this decision up to Mr. Hall and the pain specialist who works in this area.

James Templin, M.D.
Board Certified
Physiatry

JT/td

# James W. Templin M.D.
## Occupational Medicine and Chronic Pain Management

Samaritan Hospital
Pain Care Center
310 South Limestone
Lexington, Kentucky 40508
Phone-(859) 252-6612
Fax-(859) 226-7079

HISTORY AND PHYSICAL
TERRY HALL
06210
12-05-03



## HISTORY:

Mr. Hall is a 39 year old white male who complains of chronic low back pain, with radiation of pain into the hips and legs bilaterally. He also complains of bilateral foot pain. He said his symptoms started when he was a teenager. At that time, Mr. Hall said he was doing some exercises when he developed low back pain. He was seen by Dr. Wheeler on 04-29-80, at which time, he was diagnosed with mild scoliosis. X-rays obtained at that time showed some S-shaped curvature with maximum deformity in the lumbar spine. Dr. Wheeler diagnosed probable mild scoliosis. The scoliosis was felt to be primarily due to an abnormally shaped L5 vertebral body. Mr. Hall said he was given some exercises to do. He followed up with Dr. Wheeler, on 10-29-80, at which time, Dr. Wheeler said he was clinically looking good and he therefore did not anticipate any additional problems. Mr. .Hall was therefore released from his care. Mr. Hall entered the Army in February of 1984. In 1986, he was doing a physical therapy exercise. At this time, he was complaining of low back pain with radiation of pain into the right leg. He was seen and treated and was recommended for a medical discharge. Mr. Hall said he received an epidural block and the symptoms significantly improved. He therefore stayed in the Army until 1992, at which time, he was honorably discharged.

On 12-27-96, Mr. Hall said he was an employee of Raytheon working in an engineering position. He primarily sat at a desk. Mr. Hall said he was sitting at the desk when he suddenly developed a sharp pain in the back radiating into the right leg. At that time, Mr. Hall was living in New Mexico. He was seen by Dr. Garcia, his local medical physician. He was then referred for an MRI scan of the lumbar spine which was obtained on 12-27-96 showing degenerative disc and facet changes at multiple levels with encroachment of both the L5 and S1 foramina, noted to be greater on the right than the left side primarily due to facet hypertrophy. There was also spondylolisthesis at L5 relative to S1, with secondary to facet hypertrophy together with a small posterior disc herniation. There was disc space narrowing noted at L4-L5, L2-L3, and L5-S1. The spondylolisthesis was graded as a Grade I. With the radicular symptoms, Mr. Hall was referred to Dr. Leonardo Svarzbein, a Neurologist, for an EMG/NCV study. This study was obtained showing a peripheral neuropathy, with bilateral tarsal tunnel slowing on the NCV's together with probable lumbosacral radiculopathy.

A myelogram and post-myelogram CAT scan were obtained on 01-30-97. These studies showed equivocal impingement of the right L5 nerve root, with a Grade 1 spondylolisthesis at L5 together with degenerative lumbar spondylosis which is severely involving the right L5 facet joint. The post-myelogram CT scan showed bilateral L5 spondylosis, with a Grade 1 spondylolisthesis, with severe degenerative facet arthropathy at the L5-S1 level more on the right side, with narrowing of the upper

MLS 000018

portion of the L5-S1 neural foramina. There was impingement of the lateral portion of the L5 nerve root within the neural foramina due to a combination of diffuse posterior disc protrusion at the L5-S1 level and facet arthropathy. There was mild midline posterior disc protrusion at L4-L5, slightly abutting the anterior dural sac. With these findings, Dr. Svarzbein recommended surgery. Mr. Hall agreed and 03-19-97 underwent bilateral laminectomies at L5-S1, with facetectomies and foraminotomies together with a discectomy at L5-S1. There was interbody fixation at the L5-S1 level with threaded fusion cage (TRS fusion cage device) times 2 at L5-S1 level for internal stabilization and fixation. Also, there was arthrodesis at L5-S1 level, with bone obtained from the lamina and spinous process.

On 06-11-97, Dr. Svarzbein released Mr. Hall to return to work in a light duty capacity with the following restrictions. He was restricted to having an orthopedically correct chair. He was also restricted to change positions frequently from the sitting to the standing or perhaps even lying down occasionally, as well as, no stooping, bending, crawling, or positioning in a cramped or uneven position. Lifting, pushing, and pulling should be limited to be no more than 10 pounds. Mr. Hall was limited to a four hour workday and to advance as tolerated. Mr. Hall worked at Raytheon for approximately one year. A lay-off was upcoming and he therefore began to look for new employment and was able to find an employment position at Cerestar, in Hammond, Indiana.

Mr. Hall said the pain never went away and slowly but progressively worsened. When he got to Indiana, he was seen at the Calumet Surgery Center where Dr. Toyama performed caudal steroid injections under fluoroscopy. He diagnosed a failed back syndrome at L5-S1. He also was seen by Dr. Kim and on 02-17-99 underwent a second caudal epidural steroid injection. The first caudal block proved effective in providing approximately a 20% reduction in symptomatology. When Mr. Hall made the move to Indiana, he moved to an area, which was much colder in temperature than the Mexico weather. He found the coldness resulted in increased pain. When the pain persisted, an MRI scan with and without contrast was obtained. This study showed a laminectomy and fusion at L4-L5, with left para central chronic herniation, with enhancing scar tissue at T11-T12 compressing the thecal sac and cord, as well as, the left neural foramina. There was 5 mm. spondylolisthesis at L5 with respect to L4. There were also endplate changes at L2, L3, and L4. Mr. Hall, in an attempt to move to a warmer weather area, moved to Winchester, Kentucky and obtained an employment position with Sonoco Products Company. There he obtained an employment position as a maintenance manager. Mr. Hall moved to the Winchester, Kentucky, in October of 1999. His work position required him to walk on a hard concrete surface approximately 10 hours a day, 5 to 6 days per week.

Mr. Hall began to develop neck pain around 1999. These symptoms slowly but progressively worsened. X-rays of the cervical spine were obtained with neural foramina narrowing noted at C3-C4, C4-C5, and to the right at C2-C3, C3-C4, and C4-C5. It was recommended that he undergo an MRI scan. The MRI scan was obtained on 05-18-00 showing degenerative disc disease, with osteophytes at C4-C5 and C6-C7. He was then diagnosed with degenerative cervical disc disease. Mr. Hall said his pain including the neck and the lower back was becoming so severe that he was having difficulty with sleep together with concentration, and easy and early fatigability. This was

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 3

affecting his productivity and work schedule. Finally, by 05-11-01, Mr. Hall said the overall effects of his pain condition had reached the point where he was no longer able to perform his functional job duties. He then terminated his work position. At that time, Mr. Hall was seeing Dr. Larimore at the VA Hospital. It was Dr. Larimore who placed him off work due to his chronic pain condition. Dr. Larimore was also treating Mr. Hall for a post-traumatic stress disorder and depression. Mr. Hall said these conditions did impact his general life style but the primary reason why he could no longer perform his functional job duties involved his chronic pain condition.

Mr. Hall said since terminating his work position, he has been able to see some improvement in his condition. Both Mr. Hall and his wife agree that probably the primary reason for this improvement relates to the rest he is able to get and his reduce pressure from a regular schedule. Any time Mr. Hall attempts to do any extensive activities involving prolonged standing, walking, bending, stooping, kneeling, pushing, pulling, etc., the pain quickly resurfaces to the point where Ms. Hall said Mr. Hall will need a cane to help in ambulation. When he was unable to return to work, Mr. Hall applied for and is currently receiving his Social Security Disability benefits. He has also been declared 100% disabled by the VA based on PTSD together with his chronic low back pain condition and depression. He is also now applying for his long-term disability under a company policy. The company is now challenging his disability as to whether it is related to his back condition or to an emotional condition.

CURRENT PAIN STATUS:

Mr. Hall complains of constant dull aching pain in the low back, with radiation of pain into the hips and legs bilaterally. He also complains of bilateral foot pain. The pain is said to be increased with any prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding in or on vibratory vehicles for any extended distance or time.

PAST MEDICAL HISTORY:

Illnesses: Post-traumatic stress disorder, depression, degenerative lumbar disc disease, lumbar spondylolisthesis, degenerative cervical disc disease, history of left sided rotator cuff tear, right inguinal hernia.
Surgeries: Lumbar spinal fusion, tonsillectomy, right inguinal hernia repair.
Allergies: NKDA.
Medicines: Lortab, Robaxin, Extra-Strength Tylenol, Prozac, Buspar, and Restoril.

FAMILY HISTORY:

Positive for Myocardial Infarction (grandfather, father), CVA (grandfather), Hypertension (father, grandfather), Cancer (grandfather), Diabetes Mellitus (aunt).

MLS 000020

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 4

## SOCIAL HISTORY:

No Smoking. No alcohol use. Married with 3 children. College Graduate.

## WORK HISTORY:

Sonoco Products Company (1 ½ years).
Cerestar (1 year).
Raytheon (3 years).
U.S. Army (10 years).

## REVIEW OF SYSTEMS:

Wears glasses for Myopia, decreased hearing in the left ear, colitis, rectal bleeding, irritable bowel syndrome, post-traumatic stress disorder, depression, right shoulder rotator cuff tear, right inguinal hernia, nose fractures, finger fractures, rib fractures, history of spontaneous pneumothorax, otherwise noncontributory.

## PHYSICAL EXAMINATION:

VITAL SIGNS: Height 69", Weight 201 pounds, BP 151/88, Pulse 76, Respirations 12. GENERAL: Alert, friendly white male in no apparent distress. HEENT: Normal cephalic with PERRLA, EOMS full and equal, Fundi- benign, TM- clear, Throat- clear, Mid-line trachea. NECK- supple, no thyromegaly, no adenopathy. There is mild tenderness over the posterior aspect of the cervical spine. CHEST: Clear to auscultation and percussion. HEART: Regular rate and rhythm with no murmurs, thrills, heaves, or gallops. ABDOMEN: Normal bowel sounds, supple, no tenderness, no guarding, no organomegaly. GENITALIA: Normal male, no hernias present. EXTREMITIES: No clubbing, no edema or cyanosis noted, good strength, FROM. NEUROLOGICAL: Oriented x 3, cranial nerves 2 through 12 intact bilaterally, no motor sensory cerebella abnormalities noted.

EXAMINATION OF BACK: Shows a well-healed midline surgical scar. There is tenderness over the midline of the lower lumbar spine. There is decreased ROM of the dorsal lumbar spine with forward flexion of 45°, with sacral hip flexion angle of 30°, sacral hip extension angle of 8°, with extension of 12°, with right lateral flexion of 16°, with left lateral flexion of 14°. No tenderness over the sciatic notch bilaterally. Toe standing and plantar flexion are normal and equal bilaterally. REFLEXES: Achilles and patella reflexes are equal and strong bilaterally. Babinski shows dorsiflexion of the toes bilaterally. MOTOR EXAM: Plantar flexion of the ankles is normal bilaterally. Knee extension is normal bilaterally. Flexion of the knee is normal bilaterally. Sensation to pinprick shows decreased

MLS 000021

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 5

sensation in the left leg in a dermatomal pattern consistent with L5. Straight leg raise is positive on the right at 52° and 41° on the left. Mild hamstring tightness noted bilaterally. Range of the hips shows internal and external rotation to be reduced bilaterally. Hip flexion strength is good bilaterally. Passive extension of the hips produced increased back pain. Bilateral abduction of the hips produced increased back pain bilaterally. Deep knee bends were not performed due to poor balance. Pedal pulses equal and strong bilaterally.

IMPRESSION:

1. Chronic low back pain syndrome.
2. History of lumbar disc herniation at L4-L5, L5-S1.
3. S/P laminotomy with fusion at L4-L5, L5-S1.
4. Degenerative lumbar disc disease.
5. Degenerative cervical disc disease.
6. Post-traumatic stress disorder.
7. Depression.

PLAN:

1. In your letter, dated 11-04-03, I was asked to respond to five questions concerning the medical condition of Mr. Hall. I will answer the questions in the order directed.

   1. What are the subjective complaints?

      1. Chronic low back pain syndrome.
      2. Bilateral hip and leg pain.
      3. Bilateral foot pain.
      4. Left leg numbness and weakness.
      5. Difficulty with sleep, difficulty with concentration, and easy and early fatigability.

   2. What are your objective findings on your physical exam?

      Decreased ROM of the dorsal lumbar spine when measured by an inclinometer and measured on three separate occasions with the measurements being within 5 degrees of each other meeting the validity criteria set forth in the AMA Guides. Decreased sensation to pinprick in the left leg noted in a dermatomal pattern consistent with L5.

   3. Do you feel this employee's physical condition warrants him totally disabled from any occupation or employment?

      Mr. Hall is unable to engage in activities requiring prolonged sitting, standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding in or on vibratory vehicles for any extended distances or time. These would be the functional activities

which Mr. Hall is unable to engage in. If the functional job duties of the work position questioned and involved these particular activities, then Mr. Hall is unable to perform those activities on a competitive basis. It is important to realize, that Mr. Hall's chronic pain condition also affects his sleep, his concentration, and his stamina. These factors would substantially impact any work activity Mr. Hall were to engage in. Based on his back pain condition, the previously noted restrictions would be applicable and any particular job or work position identified would need to have functional job duties outside of these restrictions for Mr Hall to be able to perform those duties on a competitive basis. I imagine there are work positions where the functional job duties would be consistent and compatible with the work restrictions, although, I am unsure as to whether Mr. Hall would qualify for those particular positions based on his educational background and training. I would be happy to evaluate any specific work position identified and relate Mr. Hall's work capability based on his back condition to the functional job duties identified. I am unable at this time based on Mr. Hall's presentation and examination to identify any work position, which I believe he could return to.

If Mr. Hall is not totally disabled, what type of work could he currently perform?

I believe this question was appropriately addressed in the previous response.

4. Would there be any restrictions?

Yes. The restrictions have been appropriately itemized and listed in question #3.

Please be specific with any restrictions.

Mr. Hall is unable to engage in any activity requiring prolonged walking or standing. He is unable to walk or stand for periods greater than 20 to 30 minutes at one time or 1 ½ hours per 8 hour time frame. He is unable to sit for periods greater than 45 to 60 minutes at one time or 4 hours per 8 hour time frame. He is unable to lift items weighing greater than 20 pounds from waist level or carry this weight for any extended distance or time. He is unable to lift items weighing greater than 10 pounds from floor level or engage in any repetitive lifting from floor level. He is unable to engage in activities requiring repetitive use of foot controls. He should avoid activities requiring riding in or on vibratory vehicles for any extended distance or time. He should avoid activities requiring frequent bending, stooping, kneeling, squatting, crouching, lifting, and carrying. He should avoid working in cold, damp environments. He should avoid pushing and pulling items up inclined areas or over rough and uneven terrain.

MLS 000023

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 7

5.  What is the medical prognosis for Mr. Hall?

Mr. Hall's chronic pain condition is permanent.  I would not anticipate any significant improvement or change in his condition in the foreseeable future.  Consideration could be given to a morphine pump placement or to a spinal cord stimulator.  I would leave this decision up to Mr. Hall and a pain specialist who works in this area.


James Templin, M.D.


JT/mrh
(d) 12-05-03
(t) 12-06-03

MLS 000024

# James W. Templin M.D.
## Occupational Medicine and Chronic Pain Management

Samaritan Hospital
Pain Care Center
310 South Limestone
Lexington, Kentucky 40508
Phone-(859) 252-6612
Fax-(859) 226-7079

HISTORY AND PHYSICAL
TERRY HALL
06210
12-05-03

## HISTORY:

Mr. Hall is a 39 year old white male who complains of chronic low back pain, with radiation of pain into the hips and legs bilaterally. He also complains of bilateral foot pain. He said his symptoms started when he was a teenager. At that time, Mr. Hall said he was doing some exercises when he developed low back pain. He was seen by Dr. Wheeler on 04-29-80, at which time, he was diagnosed with mild scoliosis. X-rays obtained at that time showed some S-shaped curvature with maximum deformity in the lumbar spine. Dr. Wheeler diagnosed probable mild scoliosis. The scoliosis was felt to be primarily due to an abnormally shaped L5 vertebral body. Mr. Hall said he was given some exercises to do. He followed up with Dr. Wheeler, on 10-29-80, at which time, Dr. Wheeler said he was clinically looking good and he therefore did not anticipate any additional problems. Mr. .Hall was therefore released from his care. Mr. Hall entered the Army in February of 1984. In 1986, he was doing a physical therapy exercise. At this time, he was complaining of low back pain with radiation of pain into the right leg. He was seen and treated and was recommended for a medical discharge. Mr. Hall said he received an epidural block and the symptoms significantly improved. He therefore stayed in the Army until 1992, at which time, he was honorably discharged.

On 12-27-96, Mr. Hall said he was an employee of Raytheon working in an engineering position. He primarily sat at a desk. Mr. Hall said he was sitting at the desk when he suddenly developed a sharp pain in the back radiating into the right leg. At that time, Mr. Hall was living in New Mexico. He was seen by Dr. Garcia, his local medical physician. He was then referred for an MRI scan of the lumbar spine which was obtained on 12-27-96 showing degenerative disc and facet changes at multiple levels with encroachment of both the L5 and S1 foramina, noted to be greater on the right than the left side primarily due to facet hypertrophy. There was also spondylolisthesis at L5 relative to S1, with secondary to facet hypertrophy together with a small posterior disc herniation. There was disc space narrowing noted at L4-L5, L2-L3, and L5-S1. The spondylolisthesis was graded as a Grade I. With the radicular symptoms, Mr. Hall was referred to Dr. Leonardo Svarzbein, a Neurologist, for an EMG/NCV study. This study was obtained showing a peripheral neuropathy, with bilateral tarsal tunnel slowing on the NCV's together with probable lumbosacral radiculopathy.

A myelogram and post-myelogram CAT scan were obtained on 01-30-97. These studies showed equivocal impingement of the right L5 nerve root, with a Grade 1 spondylolisthesis at L5 together with degenerative lumbar spondylosis which is severely involving the right L5 facet joint. The post-myelogram CT scan showed bilateral L5 spondylosis, with a Grade 1 spondylolisthesis, with severe degenerative facet arthropathy at the L5-S1 level more on the right side, with narrowing of the upper

MLS 000025

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 2

portion of the L5-S1 neural foramina. There was impingement of the lateral portion of the L5 nerve root within the neural foramina due to a combination of diffuse posterior disc protrusion at the L5-S1 level and facet arthropathy. There was mild midline posterior disc protrusion at L4-L5, slightly abutting the anterior dural sac. With these findings, Dr. Svarzbein recommended surgery. Mr. Hall agreed and 03-19-97 underwent bilateral laminectomies at L5-S1, with facetectomies and foraminotomies together with a discectomy at L5-S1. There was interbody fixation at the L5-S1 level with threaded fusion cage (TRS fusion cage device) times 2 at L5-S1 level for internal stabilization and fixation. Also, there was arthrodesis at L5-S1 level, with bone obtained from the lamina and spinous process.

On 06-11-97, Dr. Svarzbein released Mr. Hall to return to work in a light duty capacity with the following restrictions. He was restricted to having an orthopedically correct chair. He was also restricted to change positions frequently from the sitting to the standing or perhaps even lying down occasionally, as well as, no stooping, bending, crawling, or positioning in a cramped or uneven position. Lifting, pushing, and pulling should be limited to be no more than 10 pounds. Mr. Hall was limited to a four hour workday and to advance as tolerated. Mr. Hall worked at Raytheon for approximately one year. A lay-off was upcoming and he therefore began to look for new employment and was able to find an employment position at Cerestar, in Hammond, Indiana.

Mr. Hall said the pain never went away and slowly but progressively worsened. When he got to Indiana, he was seen at the Calumet Surgery Center where Dr. Toyama performed caudal steroid injections under fluoroscopy. He diagnosed a failed back syndrome at L5-S1. He also was seen by Dr. Kim and on 02-17-99 underwent a second caudal epidural steroid injection. The first caudal block proved effective in providing approximately a 20% reduction in symptomatology. When Mr. Hall made the move to Indiana, he moved to an area, which was much colder in temperature than the Mexico weather. He found the coldness resulted in increased pain. When the pain persisted, an MRI scan with and without contrast was obtained. This study showed a laminectomy and fusion at L4-L5, with left para central chronic herniation, with enhancing scar tissue at T11-T12 compressing the thecal sac and cord, as well as, the left neural foramina. There was 5 mm. spondylolisthesis at L5 with respect to L4. There were also endplate changes at L2, L3, and L4. Mr. Hall, in an attempt to move to a warmer weather area, moved to Winchester, Kentucky and obtained an employment position with Sonoco Products Company. There he obtained an employment position as a maintenance manager. Mr. Hall moved to the Winchester, Kentucky, in October of 1999. His work position required him to walk on a hard concrete surface approximately 10 hours a day, 5 to 6 days per week.

Mr. Hall began to develop neck pain around 1999. These symptoms slowly but progressively worsened. X-rays of the cervical spine were obtained with neural foramina narrowing noted at C3-C4, C4-C5, and to the right at C2-C3, C3-C4, and C4-C5. It was recommended that he undergo an MRI scan. The MRI scan was obtained on 05-18-00 showing degenerative disc disease, with osteophytes at C4-C5 and C6-C7. He was then diagnosed with degenerative cervical disc disease. Mr. Hall said his pain including the neck and the lower back was becoming so severe that he was having difficulty with sleep together with concentration, and easy and early fatigability. This was

MLS 000026

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 3

affecting his productivity and work schedule. Finally, by 05-11-01, Mr. Hall said the overall effects of his pain condition had reached the point where he was no longer able to perform his functional job duties. He then terminated his work position. At that time, Mr. Hall was seeing Dr. Larimore at the VA Hospital. It was Dr. Larimore who placed him off work due to his chronic pain condition. Dr. Larimore was also treating Mr. Hall for a post-traumatic stress disorder and depression. Mr. Hall said these conditions did impact his general life style but the primary reason why he could no longer perform his functional job duties involved his chronic pain condition.

Mr. Hall said since terminating his work position, he has been able to see some improvement in his condition. Both Mr. Hall and his wife agree that probably the primary reason for this improvement relates to the rest he is able to get and his reduce pressure from a regular schedule. Any time Mr. Hall attempts to do any extensive activities involving prolonged standing, walking, bending, stooping, kneeling, pushing, pulling, etc., the pain quickly resurfaces to the point where Ms. Hall said Mr. Hall will need a cane to help in ambulation. When he was unable to return to work, Mr. Hall applied for and is currently receiving his Social Security Disability benefits. He has also been declared 100% disabled by the VA based on PTSD together with his chronic low back pain condition and depression. He is also now applying for his long-term disability under a company policy. The company is now challenging his disability as to whether it is related to his back condition or to an emotional condition.

CURRENT PAIN STATUS:

Mr. Hall complains of constant dull aching pain in the low back, with radiation of pain into the hips and legs bilaterally. He also complains of bilateral foot pain. The pain is said to be increased with any prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding in or on vibratory vehicles for any extended distance or time.

PAST MEDICAL HISTORY:

Illnesses: Post-traumatic stress disorder, depression, degenerative lumbar disc disease, lumbar spondylolisthesis, degenerative cervical disc disease, history of left sided rotator cuff tear, right inguinal hernia.
Surgeries: Lumbar spinal fusion, tonsillectomy, right inguinal hernia repair.
Allergies: NKDA.
Medicines: Lortab, Robaxin, Extra-Strength Tylenol, Prozac, Buspar, and Restoril.

FAMILY HISTORY:

Positive for Myocardial Infarction (grandfather, father), CVA (grandfather), Hypertension (father, grandfather), Cancer (grandfather), Diabetes Mellitus (aunt).

MLS 000027

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
.06210
12-05-03
Page 4

## SOCIAL HISTORY:

No Smoking. No alcohol use. Married with 3 children. College Graduate.

## WORK HISTORY:

Sonoco Products Company (1 ½ years).
Carestar (1 year).
Raytheon (3 years).
U.S. Army (10 years).

## REVIEW OF SYSTEMS:

Wears glasses for Myopia, decreased hearing in the left ear, colitis, rectal bleeding, irritable bowel
syndrome, post-traumatic stress disorder, depression, right shoulder rotator cuff tear, right inguinal
hernia, nose fractures, finger fractures, rib fractures, history of spontaneous pneumothorax,
otherwise noncontributory.

## PHYSICAL EXAMINATION:

VITAL SIGNS: Height 69", Weight 201 pounds, BP 151/88, Pulse 76, Respirations 12.
GENERAL: Alert, friendly white male in no apparent distress. HEENT: Normal cephalic with
PERRLA, EOMS full and equal, Fundi- benign, TM- clear, Throat- clear, Mid-line trachea. NECK-
supple, no thyromegaly, no adenopathy. There is mild tenderness over the posterior aspect of the
cervical spine. CHEST: Clear to auscultation and percussion. HEART: Regular rate and rhythm with
no murmurs, thrills, heaves, or gallops. ABDOMEN: Normal bowel sounds, supple, no tenderness,
no guarding, no organomegaly. GENITALIA: Normal male, no hernias present. EXTREMITIES: No
clubbing, no edema or cyanosis noted, good strength, FROM. NEUROLOGICAL: Oriented x 3,
cranial nerves 2 through 12 intact bilaterally, no motor sensory cerebella abnormalities noted.

EXAMINATION OF BACK: Shows a well-healed midline surgical scar. There is tenderness over the
midline of the lower lumbar spine. There is decreased ROM of the dorsal lumbar spine with forward
flexion of 45°, with sacral hip flexion angle of 30°, sacral hip extension angle of 8°, with extension of
12°, with right lateral flexion of 16°, with left lateral flexion of 14°. No tenderness over the sciatic
notch bilaterally. Toe standing and plantar flexion are normal and equal bilaterally. REFLEXES:
Achilles and patella reflexes are equal and strong bilaterally. Babinski shows dorsiflexion of the toes
bilaterally. MOTOR EXAM: Plantar flexion of the ankles is normal bilaterally. Knee extension is
normal bilaterally. Flexion of the knee is normal bilaterally. Sensation to pinprick shows decreased

MLS 000028

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 5

sensation in the left leg in a dermatomal pattern consistent with L5. Straight leg raise is positive on the right at 52° and 41° on the left. Mild hamstring tightness noted bilaterally. Range of the hips shows internal and external rotation to be reduced bilaterally. Hip flexion strength is good bilaterally. Passive extension of the hips produced increased back pain. Bilateral abduction of the hips produced increased back pain bilaterally. Deep knee bends were not performed due to poor balance. Pedal pulses equal and strong bilaterally.

IMPRESSION:

1. Chronic low back pain syndrome.
2. History of lumbar disc herniation at L4-L5, L5-S1.
3. S/P laminotomy with fusion at L4-L5, L5-S1.
4. Degenerative lumbar disc disease.
5. Degenerative cervical disc disease.
6. Post-traumatic stress disorder.
7. Depression.

PLAN:

1. In your letter, dated 11-04-03, I was asked to respond to five questions concerning the medical condition of Mr. Hall. I will answer the questions in the order directed.

    1. What are the subjective complaints?

        1. Chronic low back pain syndrome.
        2. Bilateral hip and leg pain.
        3. Bilateral foot pain.
        4. Left leg numbness and weakness.
        5. Difficulty with sleep, difficulty with concentration, and easy and early fatigability.

    2. What are your objective findings on your physical exam?

        Decreased ROM of the dorsal lumbar spine when measured by an inclinometer and measured on three separate occasions with the measurements being within 5 degrees of each other meeting the validity criteria set forth in the AMA Guides. Decreased sensation to pinprick in the left leg noted in a dermatomal pattern consistent with L5.

    3. Do you feel this employee's physical condition warrants him totally disabled from any occupation or employment?

        Mr. Hall is unable to engage in activities requiring prolonged sitting, standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding in or on vibratory vehicles for any extended distances or time. These would be the functional activities

**MLS 000029**

Apr.12. 2005 3:07PM WAUSAU BENEFITS No.2981 P. 7
Case 3:07-cv-05053-RJB Document 54 Filed 09/08/2008 Page 114 of 149
JAN-06-2004 13:19 CBH 3WEST
06210
12-05-03
Page 6

which Mr. Hall is unable to engage in. If the functional job duties of the work position questioned and involved these particular activities, then Mr. Hall is unable to perform those activities on a competitive basis. It is important to realize, that Mr. Hall's chronic pain condition also affects his sleep, his concentration, and his stamina. These factors would substantially impact any work activity Mr. Hall were to engage in. Based on his back pain condition, the previously noted restrictions would be applicable and any particular job or work position identified would need to have functional job duties outside of these restrictions for Mr. Hall to be able to perform those duties on a competitive basis. I imagine there are work positions where the functional job duties would be consistent and compatible with the work restrictions, although, I am unsure as to whether Mr. Hall would qualify for those particular positions based on his educational background and training. I would be happy to evaluate any specific work position identified and relate Mr. Hall's work capability based on his back condition to the functional job duties identified. I am unable at this time based on Mr. Hall's presentation and examination to identify any work position, which I believe he could return to.


If Mr. Hall is not totally disabled, what type of work could he currently perform?

I believe this question was appropriately addressed in the previous response.


4. Would there be any restrictions?

Yes. The restrictions have been appropriately itemized and listed in question #3.


Please be specific with any restrictions.

Mr. Hall is unable to engage in any activity requiring prolonged walking or standing. He is unable to walk or stand for periods greater than 20 to 30 minutes at one time or 1 ½ hours per 8 hour time frame. He is unable to sit for periods greater than 45 to 60 minutes at one time or 4 hours per 8 hour time frame. He is unable to lift items weighing greater than 20 pounds from waist level or carry this weight for any extended distance or time. He is unable to lift items weighing greater than 10 pounds from floor level or engage in any repetitive lifting from floor level. He is unable to engage in activities requiring repetitive use of foot controls. He should avoid activities requiring riding in or on vibratory vehicles for any extended distance or time. He should avoid activities requiring frequent bending, stooping, kneeling, squatting, crouching, lifting, and carrying. He should avoid working in cold, damp environments. He should avoid pushing and pulling items up inclined areas or over rough and uneven terrain.


**MLS 000030**

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 7

5. What is the medical prognosis for Mr. Hall?

Mr. Hall's chronic pain condition is permanent. I would not anticipate any significant improvement or change in his condition in the foreseeable future. Consideration could be given to a morphine pump placement or to a spinal cord stimulator. I would leave this decision up to Mr. Hall and a pain specialist who works in this area.

James Templin, M.D.

JT/mrh
(d) 12-05-03
(t) 12-06-03

MLS 000031

Please put this in
the chart.
Thanks,

# F A X

**MLS National Medical Evaluation Services, Inc.**

25899 West Twelve Mile Rd.
Suite 200
Southfield, MI 48034

| | |
|---|---|
| **To:** | Templin, James, M.D. |
| **Fax number:** | 9-1-859-226-7079 |
| | |
| **From:** | Reports |
| **Fax number:** | 248-356-6757 |
| **Business phone:** | 248-945-9001 |
| **Home phone:** | |
| | |
| **Date & Time:** | 12/16/2003 2:25:05 PM |
| **Pages:** | 17 |
| **Re:** | Report to review-Terry Hall |

Doctor:

Please review the attached report. If there are any corrections, please fax us back the pages with corrections and we will make them. Please fax us back the last page with your signature. Our fax number is (248) 356-6757. If you have any questions, please call Wendy or Joe at (248) 945-9001. Thank you.

Elizabeth Allen
Albert Kingery

MLS 000032

December 11, 2003


Re:    TERRY HALL
       Social Security Number    :    XXX-XX-8401


To Whom It May Concern:


I had the opportunity of interviewing and examining Mr. Terry Hall for MLS National

Medical Evaluation Services on December 5, 2003 for the purpose of an independent

medical evaluation.   This examination was carried out for evaluation only.   It did not

constitute a doctor/patient relationship and no treatment recommendations were given.

No medications were prescribed.   The nature of the interview and examination was

explained to the examinee and the examinee understood the facts.


If more information becomes available at a later date, an additional service report

consideration may be requested.   Such information may or may not change the opinion

rendered in this evaluation.   This opinion does not constitute per se a recommendation

for specific claims or administrative functions to be made.


MLS 000033

01/05/04  13:23 FAX 606 226 7079        SAM. PAIN CARE                    003/017
12/18/2003 2:29 PM  FROM      3 National Medical Evaluation Services, I.      PAGE: 003 OF 017

Case 3:07-cv-05310-JSW    Document 54    Filed 09/08/2008    Page 118 of 149

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 2

Prior to the onset of the physical examination, the examinee was informed to notify me
of any pain, discomfort, numbness, or symptomatology produced by the maneuver.

## HISTORY OF PRESENT ILLNESS

Mr. Hall is a 39-year-old male who complains of chronic low back pain. The pain is said
to radiate into the hips and legs bilaterally. He also complains of bilateral foot pain.
Mr. Hall said his symptoms started when he was a teenager. At that time, Mr. Hall said
he was doing some exercises when he developed low back pain. He was initially seen
by Dr. Wheeler on April 29, 1980. At that time, Mr. Hall was diagnosed with mild
scoliosis. X-rays obtained at that time showed some S-shaped curvature with maximum
deformity in the lumbar spine. Dr. Wheeler diagnosed probable mild scoliosis. Scoliosis
was felt to be primarily due to an abnormally shaped L-5 vertebral body. Mr. Hall said
he was given some exercises to do at home. He followed up with Dr. Wheeler on
October 29, 1980. At that time, Dr. Wheeler said he was clinically looking good and,
therefore, he did not anticipate any additional problems. Mr. Hall was then released
from his care.

MLS 000034

01/05/04  13:24 FAX 606 226 7079          SAM. PAIN CARE                    @004/017

Case 3:07-cv-05310-JSW    Document 54    Filed 09/08/2008    Page 119 of 149
12/16/2003 2:25 PM  FROM: 1    ' National Medical Evaluation Services, 1    PAGE: 004 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 3

Mr. Hall entered the Army in February of 1984. In 1986 he was doing some physical therapy exercises when he began to experience low back pain. This time the pain was radiating into the right leg. Mr. Hall was seen, treated, and was recommended for a medical discharge. He wanted to continue in the service if possible and, therefore, was sent for additional medical care. He received an epidural block, which significantly reduced his symptoms. Mr. Hall stayed in the Army until 1992. At that time, he received an honorable discharge.

On December 27, 1996, Mr. Hall said he was an employee of Rathion working in an engineering position. His work position required him to primarily sit at a desk. Mr. Hall said he was sitting at the desk when he suddenly developed a sharp pain in his lower back. This pain also radiated into the right leg. At the time of this incident, Mr. Hall was residing in New Mexico. He, therefore, was seen by Dr. Garcia, his local medical physician. Dr. Garcia then referred Mr. Hall for an MRI scan of the lumbar spine. This study was obtained on 12/27/96 showing degenerative disc and degenerative facet changes in multiples with encroachment of both the L5 and the S1 foramina. This encroachment was noted to be greater on the right than the left side and was felt to be primarily due to facet hypertrophy. There was also spondylolisthesis at L5 relative to S1. Additionally, there was facet hypertrophy together with a small posterior disc

MLS 000035

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 4

herniation.    Disc space narrowing was noted at L2-L3, L4-L5, and L5-S1.    The spondylolisthesis was graded as a Grade I.  With the radicular symptoms, Mr. Hall was referred to Dr. Lenardo Svarzbein, neurologist.  Dr. Svarzbein ordered an EMG-NCV study.  This study was obtained showing a peripheral neuropathy with bilateral tarsal tunnel slowing on the NCV together with a probable lumbosacral radiculopathy.  A myelogram and post-myelogram CAT scan were also ordered and obtained on January 30, 1997.  These studies showed equivocal impingement of the right L5 nerve root with a Grade I spondylo thesis at L5 together with degenerative lumbar spondylosis.  The lumbar spondylosis  severely involved the right L5 facet joint.  The post myelogram CT scan showed bilateral L5 spondylosis with a Grade I spondylolisthesis with severe degenerative facet arthropathy at the L5-S1 level.  This arthropathy was noted to be greater on the right side then the left and showed narrowing of the upper portion of the L5-S1 neural foramina.  There was impingement of the lateral portion of the L5 nerve root within the neural foramina due to a combination of diffuse posterior disc protrusion at L5-S1 together with facet arthropathy.    There was mild midline posterior disc protrusion at L4-L5 slightly abutting the anterior dural sac.  With these findings, Dr. Svarzbein recommended surgery.  Mr. Hall agreed and on 03/19/97 underwent bilateral laminotomies at L5-S1 with facetectomies and foraminotomies together with a discectomy at L5-S1.  Mr. Hall underwent interbody fixation at L5-S1 level with using

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 5


threaded fusion cage (TRS fusion cage device) x2 at L5-S1 with an internal stabilization and fixation. Additionally, there was an arthrodesis at L5-S1 level with bone obtained from the lamina and spinous processes.


Dr. Svarzbein released Mr. Hall to return to work on light-duty capacity on 6/11/97. Mr. Hall was given restriction where he was to sit in an orthopedically correct chair. He was restricted to changing positions frequently from the sitting to standing position or even lying down occasionally, as well as, no stooping, bending, crawling, or positioning in a cramped or uneven position. Lifting, pushing, and pulling were limited to no more than 10 pounds. Mr. Hall was limited to a 4-hour workday, which would be slowly, progressively advanced as tolerated. Mr. Hall worked at Rathion for approximately one year. A lay off was thus coming and he, therefore, began to look for a new employment position. Fortunately, he was able to find such a position in Cerestar in Hammond, Indiana.


Mr. Hall said the pain never completely resolved. In fact, Mr. Hall said his pain seemed to slowly but progressively worsen. When he got to Indiana he was seen at the Cymed Surgery Center by Dr. Toyama, who performed a caudal steroid injection under fluoroscopy. Mr. Hall was diagnosed with failed back syndrome at L5-S1. He was also

MLS 000037

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 6

seen by Dr. Kim and on 02/17/99 underwent a second a caudal epidural steroid injection. The first caudal block proved effective in providing approximately a 20% reduction in symptomatology. When Mr. Hall made the move to Indiana he moved to an area which was much colder in temperature than the Mexican weather. Mr. Hall said he found the coldness affecting his pain condition and resulting in increased pain. When Mr. Hall's pain persisted, an MRI scan with and without contrast was obtained.

Mr. Hall said the MRI scan showed a laminectomy and fusion at L4-L5 with left pericentral chronic herniation with enhancing scar tissue at T11-T12 compressing thecal sac and cord as well as a left neural foramina. There was a 5-mm spondylolisthesis at L5 with respect to L4. There were also endplate changes to L2, L3, and L4. Mr. Hall in an attempt to move to a warmer weather area, moved to Winchester, Kentucky and obtained an employment position with Sonoco Products Company. There he obtained an employment position as a maintenance manager. Mr. Hall relocated to Winchester, Kentucky in October 1999. His work position required him to work on a hard concrete surface approximately ten hours a day 5 to 6 days per week.

Mr. Hall began to develop neck pain around 1999. His symptoms slowly but progressively worsened. X-rays of the cervical spine were obtained with neural

MLS 000038

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 7

foramina narrowing noted at C3-C4, C4-C5, and to the right at C2-C3, C3-C4, and C4-C5. It was recommended that he undergo an MRI scan. The MRI scan was obtained on 05/18/00 showing degenerative disc disease with osteophytes at C4-C5 and C6-C7. He was then diagnosed with degenerative cervical disc disease. Mr. Hall said the pain, including the neck and lower back, was becoming so severe that he was having difficulty with sleep together with concentration. He also complained of easy, early fatigability/stability. This was affecting his productivity and work schedule. Finally, by 05/11/01 Mr. Hall said the overall effects of his pain condition had reached the point where he no longer able to perform his function job duties. He then terminated his work position. At that time, Mr. Hall was seeing Dr. Laramore at the VA Hospital. It was Dr. Laramore who placed him off of work due to the chronic pain condition. Dr. Laramore was also treating Mr. Hall for a post-traumatic stress disorder and depression. Mr. Hall said these conditions did impact his general lifestyle but the primary reason why he could no longer perform his function job duties involved his chronic pain condition.

Mr. Hall said that since terminating his work position, he has been able to obtain some improvement in his condition. Both Mr. Hall and his wife agree that probably the primary reason for this improvement relation to rest he is able to get and his reduced pressure from his regular schedule. Anytime Mr. Hall attempts to do any extensive

MLS 000039

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 8

activities involving prolonged standing, walking, bending, stooping, kneeling, pushing, pulling, etc., the pain quickly resurfaces and Mr. Hall says he needs a cane for ambulation.  When he was unable to return to work, Mr. Hall applied for and is currently receiving Social Security Disability Benefits.  He also has been declared 100% disabled by the VA based on post-traumatic stress disorder together with his chronic low back pain condition and depression.  He is also now applying for a long-term disability under company policy.  The company is now challenging his disability as whether it is related to the back condition or to an emotional condition.

CURRENT PAIN STATUS

Mr. Hall complains of a constant dull, achy pain in the low back with radiation of pain to the hips and legs bilaterally.  He also complains about left foot pain.  The pain is said to be increased with any prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding on vibratory vehicles for an extended amount of time.

MLS 000040

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 9

## PAST MEDICAL HISTORY

**Illnesses:** Post-traumatic stress disorder, depression, degenerative lumbar disc disease, lumbar spondylolisthesis, degenerative cervical disc disease, history of left side rotator cuff tear, and right inguinal hernia.

**Surgeries:** Lumbar spinal fusion, tonsillectomy, and right inguinal hernia repair.

**Allergies:** No known drug allergies.

**Medicines:** Vertab, Robaxin, extra-strength Tylenol, Prozac, Buspar, and Restoril.

## FAMILY HISTORY

Positive for myocardial infarction (grandfather and father), cerebrovascular accident (grandfather), hypertension (father and grandfather), cancer (grandfather), and diabetes mellitus (aunt).

MLS 000041

HALL, TERRY
Dr. James Templin
December 11, 2003
Page  10


SOCIAL HISTORY


No smoking.  No alcohol use.  Married with 3 children.  College graduate.


OCCUPATIONAL HISTORY


Sonoco Products Company (1 ½ years).

Scerestar (1 year).

Rathion (3 years).

US Army (2 years).


REVIEW OF SYSTEMS


Wears glasses, myopia.  Decreased hearing in the left ear.  Colitis.  Rectal bleeding.
Irritable bowel syndrome.  Post-traumatic stress disorder.  Depression.  Right shoulder
rotator cuff tear.  Right inguinal hernia.  Nose fracture.  Finger fracture.  Rib fractures.
History of spontaneous pneumothorax.  Otherwise, noncontributory.

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 11

## PHYSICAL EXAMINATION

Vital signs:    Height 69 inches.    Weight 201 pounds.    Blood pressure 151/88.    Pulse 76.    Respirations 12.

General:    Alert, friendly white male in no apparent distress.

HEENT:    Normocephalic.    PERLA, EOMI, fundi benign.    TM's clear.    Throat clear. Midline trachea.    Neck supple.    No thyromegaly.    No adenopathy.    There is mild tenderness over the posterior aspect cervical spine.

Chest:    Clear to auscultation and percussion.

Heart:    Regular, rate, and rhythm.    No murmurs, rubs, heaves, or gallops.

Abdomen:    Normal bowel sounds.    Supple.    No tenderness.    No guarding.    No organomegaly.

GU:    Normal male.    No hernias present.

Extremities:    No clubbing, cyanosis, or edema.    Good strength.    Full range of motion.

Neurologic:    Oriented x3.    Cranial nerves II through XII intact.    No motor, sensory, or cerebellar abnormalities noted.

Back:    Shows a well-healed midline surgical scar.    There is tenderness over the midline and lower lumbar spine.    There is decreased range of motion of the dorsal lumbar spine with forward flexion of 45 degrees, sacral flexion angle 30 degrees, sacral

MLS 000043

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 12

extension angle 8 degrees, extension 12 degrees, right lateral flexion 16 degrees, and left lateral flexion 14 degrees. No tenderness over the sciatic notch bilaterally. Toe standing & Plantar flexion _normal & equal bilaterally_. Achilles & patellar reflexes are _strong & equal bilaterally_. Babinski _shows dorsiflexion great toes bilaterally_. Motor: Plantar flexion cross of the ankles are _normal bilaterally_ extension is _normal bilaterally_. Flexion of the Knee is _normal bilaterally_. Sensation to pinprick with decreased sensation left leg dermatoma pattern consistent with L5. Straight leg raise positive on right at 52 degrees and 41 degrees on the left. Mild hamstring tightness noted right. Range of motion of the hips shows internal-external rotation reduced bilaterally. Hip flexion strength reduced _bilaterally_. Passive extension of hips produced increased back pain. Abduction of hips produced increased back pain. Deep knee bends _were not performed due to poor balance_. Pulse strong and _equal bilaterally_.

## ASSESSMENT

1. Chronic low back pain syndrome.

2. History of lumbar disc herniation L4-L5 and L5-S1.

3. Status post laminotomy with fusion at L4-L5 and L5-S1.

4. Degenerative lumbar disc disease.

5. Degenerative cervical disc disease.

MLS 000044

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 13

     6. Post-traumatic stress disorder.

     7. Depression.


## CONCLUSION


In the letter of November 4, 2003 I was requested to respond to five questions concerning the medical condition of Mr. Hall. I will answer the questions in the order as directed.


     1. *What are the subjective complaints?*


        1. Chronic low back pain.

        2. Bilateral hip and leg pain.

        3. Bilateral foot pain.

        4. Left leg numbness and weakness.

        5. Difficulty with sleep.

        6. Difficulty with concentration.

        7. ~~_____ capability.~~ *EAsy & EARly fatiguability.*

MLS 000045

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 14

2. *What are your objective findings from your physical exam?*

Objective findings from physical examination include decreased range of motion of dorsal lumbar spine when measured by the inclinometer and measured on three separate occasions with the measurements being within 5 degrees of each other meets the criteria set forth in the AMA Guides. Decreased sensation to pinprick in the left leg noted with dermatomal pattern consistent with L5.

3. *Do you feel this employee's physical condition warrants him totally disabled from any occupation or employment? Please give rational as to why.*

Mr. Hall has restrictions that would involve engaging in activities that would require prolonged sitting, standing and walking. He would be restricted from performing frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, and riding in vibratory vehicles for any extended period of time. Mr. Hall would not be considered totally disabled from any occupational employment as long as it is within the restrictions as listed above.

**MLS 000046**

01/05/04  13:30 FAX 606 226 7079          SAM. PAIN CARE                              Ø016/017

Case 3:07-cv-05310-JSW     Document 54     Filed 09/08/2008     Page 131 of 149
12/16/2003 2:25 PM  FROM: F.___ 's National Medical Evaluation Services, I___     PAGE: 016 OF 017

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 15

It should be noted that Mr. Hall's chronic pain condition does affect his sleep, his ability to concentrate, as well as his stamina. These factors could substantially impact his work activities that Mr. Hall would engage in.

4. *If Mr. Hall is not totally disabled, what type of work could he currently perform? Would there be any restrictions? Please be specific with any restrictions.*

As stated above, Mr. Hall would be capable of performing work within the restrictions as outlined above. Mr. Hall would be unable to engage in any activity that would require prolonged walking or standing. He would be unable to walk for periods greater than 20 to 30 minutes at a particular time per one and a half hour time frame. He is unable to sit for periods greater than 45 to 60 minutes at a particular time throughout the course of an eight-hour day with the opportunity to stand as necessary. Mr. Hall would be unable to lift items weighing greater than 20 pounds from waist level or carry this weight for any extended period of time. He is unable to lift items weighing greater than ten pounds from floor level or engage in any repetitive lifting from floor level. He is unable to engage in activities requiring repetitive use of foot controls. He should avoid activities requiring any vibratory vehicles for any extended periods of time, which would

MLS 000047

HALL, TERRY
Dr. James Templin
December 11, 2003
Page 16

include 30 minutes at a particular time. He should avoid activities requiring frequent bending, stooping, kneeling, squatting, crouching, lifting or carrying. It would recommend that Mr. Hall be limited from working in cold or damp environments. In addition, I would limit Mr. Hall from performing pushing or pulling items up inclined areas or over rough, uneven terrain. Mr. Hall would be most suitable for sedentary work.

5. *What is the medical prognosis for Mr. Hall?*

Mr. Hall's chronic pain condition is permanent. I would not anticipate any symptom improvement or change in his condition in the foreseeable future. Consideration could be given to a morphine pump placement or to a spinal cord stimulator. I would leave this decision up to Mr. Hall and the pain specialist who works in this area.

James Templin, M.D.
Board Certified
Physiatry

JT/td

MLS 000048



# MLS National Medical Evaluations, Inc.

Corporate Office
25899 West Twelve Mile Road, Suite 200
Southfield, Michigan 48034

Tel: 248-945-9001     www.mls-ime.com
Fax: 248-356-6757     info@mls-ime.com

January 12, 2004

Lorraine Prebeg, R.N.
Wausau Benefits, Inc.
Disability Unit
P.O. Box 8015
Wausau, WI 54402

Re: Hall, Terry
Social Security Number: ***-**-8401

Dear Ms. Prebeg:

Enclosed is the Independent Medical Evaluation Report rendered by

James Templin, MD, regarding Terry Hall, per your request. If we can be

of any further assistance, please do not hesitate to contact us.

Sincerely,

MLS National Medical Evaluation Services, Inc.

c: File

Enclosures

MLS 000049



# MLS National Medical Evaluations, Inc.

Corporate Office
25899 West Twelve Mile Road, Suite 200
Southfield, Michigan 48034

Tel: 248-945-9001
Fax: 248-356-6757

www.mls-ime.com
info@mls-ime.com

HISTORY AND PHYSICAL
TERRY HALL
06210
12-05-03

## HISTORY:

Mr. Hall is a 39 year old white male who complains of chronic low back pain, with radiation of pain into the hips and legs bilaterally. He also complains of bilateral foot pain. He said his symptoms started when he was a teenager. At that time, Mr. Hall said he was doing some exercises when he developed low back pain. He was seen by Dr. Wheeler on 04-29-80, at which time, he was diagnosed with mild scoliosis. X-rays obtained at that time showed some S-shaped curvature with maximum deformity in the lumbar spine. Dr. Wheeler diagnosed probable mild scoliosis. The scoliosis was felt to be primarily due to an abnormally shaped L5 vertebral body. Mr. Hall said he was given some exercises to do. He followed up with Dr. Wheeler, on 10-29-80, at which time, Dr. Wheeler said he was clinically looking good and he therefore did not anticipate any additional problems. Mr. .Hall was therefore released from his care. Mr. Hall entered the Army in February of 1984. In 1986, he was doing a physical therapy exercise. At this time, he was complaining of low back pain with radiation of pain into the right leg. He was seen and treated and was recommended for a medical discharge. Mr. Hall said he received an epidural block and the symptoms significantly improved. He therefore stayed in the Army until 1992, at which time, he was honorably discharged.

On 12-27-96, Mr. Hall said he was an employee of Raytheon working in an engineering position. He primarily sat at a desk. Mr. Hall said he was sitting at the desk when he suddenly developed a sharp pain in the back radiating into the right leg. At that time, Mr. Hall was living in New Mexico. He was seen by Dr. Garcia, his local medical physician. He was then referred for an MRI scan of the lumbar spine which was obtained on 12-27-96 showing degenerative disc and facet changes at multiple levels with encroachment of both the L5 and S1 foramina, noted to be greater on the right than the left side primarily due to facet hypertrophy. There was also spondylolisthesis at L5 relative to S1, with secondary to facet hypertrophy together with a small posterior disc herniation. There was disc space narrowing noted at L4-L5, L2-L3, and L5-S1. The spondylolisthesis was graded as a Grade I. With the radicular symptoms, Mr. Hall was referred to Dr. Leonardo Svarzbein, a Neurologist, for an EMG/NCV study. This study was obtained showing a peripheral neuropathy, with bilateral tarsal tunnel slowing on the NCV's together with probable lumbosacral radiculopathy.

A myelogram and post-myelogram CAT scan were obtained on 01-30-97. These studies showed equivocal impingement of the right L5 nerve root, with a Grade 1 spondylolisthesis at L5 together with degenerative lumbar spondylosis which is severely involving the right L5 facet joint. The post-myelogram CT scan showed bilateral L5 spondylosis, with a Grade 1 spondylolisthesis, with severe degenerative facet arthropathy at the L5-S1 level more on the right side, with narrowing of the upper

MLS 000050

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 2

portion of the L5-S1 neural foramina. There was impingement of the lateral portion of the L5 nerve root within the neural foramina due to a combination of diffuse posterior disc protrusion at the L5-S1 level and facet arthropathy. There was mild midline posterior disc protrusion at L4-L5, slightly abutting the anterior dural sac. With these findings, Dr. Svarzbein recommended surgery. Mr. Hall agreed and 03-19-97 underwent bilateral laminectomies at L5-S1, with facetectomies and foraminotomies together with a discectomy at L5-S1. There was interbody fixation at the L5-S1 level with threaded fusion cage (TRS fusion cage device) times 2 at L5-S1 level for internal stabilization and fixation. Also, there was arthrodesis at L5-S1 level, with bone obtained from the lamina and spinous process.

On 06-11-97, Dr. Svarzbein released Mr. Hall to return to work in a light duty capacity with the following restrictions. He was restricted to having an orthopedically correct chair. He was also restricted to change positions frequently from the sitting to the standing or perhaps even lying down occasionally, as well as, no stooping, bending, crawling, or positioning in a cramped or uneven position. Lifting, pushing, and pulling should be limited to be no more than 10 pounds. Mr. Hall was limited to a four hour workday and to advance as tolerated. Mr. Hall worked at Raytheon for approximately one year. A lay-off was upcoming and he therefore began to look for new employment and was able to find an employment position at Cerestar, in Hammond, Indiana.

Mr. Hall said the pain never went away and slowly but progressively worsened. When he got to Indiana, he was seen at the Calumet Surgery Center where Dr. Toyama performed caudal steroid injections under fluoroscopy. He diagnosed a failed back syndrome at L5-S1. He also was seen by Dr. Kim and on 02-17-99 underwent a second caudal epidural steroid injection. The first caudal block proved effective in providing approximately a 20% reduction in symptomatology. When Mr. Hall made the move to Indiana, he moved to an area, which was much colder in temperature than the Mexico weather. He found the coldness resulted in increased pain. When the pain persisted, an MRI scan with and without contrast was obtained. This study showed a laminectomy and fusion at L4-L5, with left para central chronic herniation, with enhancing scar tissue at T11-T12 compressing the thecal sac and cord, as well as, the left neural foramina. There was 5 mm. spondylolisthesis at L5 with respect to L4. There were also endplate changes at L2, L3, and L4. Mr. Hall, in an attempt to move to a warmer weather area, moved to Winchester, Kentucky and obtained an employment position with Sonoco Products Company. There he obtained an employment position as a maintenance manager. Mr. Hall moved to the Winchester, Kentucky, in October of 1999. His work position required him to walk on a hard concrete surface approximately 10 hours a day, 5 to 6 days per week.

Mr. Hall began to develop neck pain around 1999. These symptoms slowly but progressively worsened. X-rays of the cervical spine were obtained with neural foramina narrowing noted at C3-C4, C4-C5, and to the right at C2-C3, C3-C4, and C4-C5. It was recommended that he undergo an MRI scan. The MRI scan was obtained on 05-18-00 showing degenerative disc disease, with osteophytes at C4-C5 and C6-C7. He was then diagnosed with degenerative cervical disc disease. Mr. Hall said his pain including the neck and the lower back was becoming so severe that he was having difficulty with sleep together with concentration, and easy and early fatigability. This was

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 3

affecting his productivity and work schedule. Finally, by 05-11-01, Mr. Hall said the overall effects of his pain condition had reached the point where he was no longer able to perform his functional job duties. He then terminated his work position. At that time, Mr. Hall was seeing Dr. Larimore at the VA Hospital. It was Dr. Larimore who placed him off work due to his chronic pain condition. Dr. Larimore was also treating Mr. Hall for a post-traumatic stress disorder and depression. Mr. Hall said these conditions did impact his general life style but the primary reason why he could no longer perform his functional job duties involved his chronic pain condition.

Mr. Hall said since terminating his work position, he has been able to see some improvement in his condition. Both Mr. Hall and his wife agree that probably the primary reason for this improvement relates to the rest he is able to get and his reduce pressure from a regular schedule. Any time Mr. Hall attempts to do any extensive activities involving prolonged standing, walking, bending, stooping, kneeling, pushing, pulling, etc., the pain quickly resurfaces to the point where Ms. Hall said Mr. Hall will need a cane to help in ambulation. When he was unable to return to work, Mr. Hall applied for and is currently receiving his Social Security Disability benefits. He has also been declared 100% disabled by the VA based on PTSD together with his chronic low back pain condition and depression. He is also now applying for his long-term disability under a company policy. The company is now challenging his disability as to whether it is related to his back condition or to an emotional condition.

CURRENT PAIN STATUS:

Mr. Hall complains of constant dull aching pain in the low back, with radiation of pain into the hips and legs bilaterally. He also complains of bilateral foot pain. The pain is said to be increased with any prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding in or on vibratory vehicles for any extended distance or time.

PAST MEDICAL HISTORY:

Illnesses: Post-traumatic stress disorder, depression, degenerative lumbar disc disease, lumbar spondylolisthesis, degenerative cervical disc disease, history of left sided rotator cuff tear, right inguinal hernia.
Surgeries: Lumbar spinal fusion, tonsillectomy, right inguinal hernia repair.
Allergies: NKDA.
Medicines: Lortab, Robaxin, Extra-Strength Tylenol, Prozac, Buspar, and Restoril.

FAMILY HISTORY:

Positive for Myocardial Infarction (grandfather, father), CVA (grandfather), Hypertension (father, grandfather), Cancer (grandfather), Diabetes Mellitus (aunt).

MLS 000052

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 4


## SOCIAL HISTORY:

No Smoking. No alcohol use. Married with 3 children. College Graduate.


## WORK HISTORY:

Sonoco Products Company (1 ½ years).
Cerestar (1 year).
Raytheon (3 years).
U.S. Army (10 years).


## REVIEW OF SYSTEMS:

Wears glasses for Myopia, decreased hearing in the left ear, colitis, rectal bleeding, irritable bowel syndrome, post-traumatic stress disorder, depression, right shoulder rotator cuff tear, right inguinal hernia, nose fractures, finger fractures, rib fractures, history of spontaneous pneumothorax, otherwise noncontributory.


## PHYSICAL EXAMINATION:

VITAL SIGNS: Height 69", Weight 201 pounds, BP 151/88, Pulse 76, Respirations 12.
GENERAL: Alert, friendly white male in no apparent distress. HEENT: Normal cephalic with PERRLA, EOMS full and equal, Fundi- benign, TM- clear, Throat- clear, Mid-line trachea. NECK- supple, no thyromegaly, no adenopathy. There is mild tenderness over the posterior aspect of the cervical spine. CHEST: Clear to auscultation and percussion. HEART: Regular rate and rhythm with no murmurs, thrills, heaves, or gallops. ABDOMEN: Normal bowel sounds, supple, no tenderness, no guarding, no organomegaly. GENITALIA: Normal male, no hernias present. EXTREMITIES: No clubbing, no edema or cyanosis noted, good strength, FROM. NEUROLOGICAL: Oriented x 3, cranial nerves 2 through 12 intact bilaterally, no motor sensory cerebella abnormalities noted.

EXAMINATION OF BACK: Shows a well-healed midline surgical scar. There is tenderness over the midline of the lower lumbar spine. There is decreased ROM of the dorsal lumbar spine with forward flexion of 45°, with sacral hip flexion angle of 30°, sacral hip extension angle of 8°, with extension of 12°, with right lateral flexion of 16°, with left lateral flexion of 14°. No tenderness over the sciatic notch bilaterally. Toe standing and plantar flexion are normal and equal bilaterally. REFLEXES: Achilles and patella reflexes are equal and strong bilaterally. Babinski shows dorsiflexion of the toes bilaterally. MOTOR EXAM: Plantar flexion of the ankles is normal bilaterally. Knee extension is normal bilaterally. Flexion of the knee is normal bilaterally. Sensation to pinprick shows decreased

MLS 000053

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 5

sensation in the left leg in a dermatomal pattern consistent with L5. Straight leg raise is positive on the right at 52° and 41° on the left. Mild hamstring tightness noted bilaterally. Range of the hips shows internal and external rotation to be reduced bilaterally. Hip flexion strength is good bilaterally. Passive extension of the hips produced increased back pain. Bilateral abduction of the hips produced increased back pain bilaterally. Deep knee bends were not performed due to poor balance. Pedal pulses equal and strong bilaterally.

IMPRESSION:

1. Chronic low back pain syndrome.
2. History of lumbar disc herniation at L4-L5, L5-S1.
3. S/P laminotomy with fusion at L4-L5, L5-S1.
4. Degenerative lumbar disc disease.
5. Degenerative cervical disc disease.
6. Post-traumatic stress disorder.
7. Depression.

PLAN:

1. In your letter, dated 11-04-03, I was asked to respond to five questions concerning the medical condition of Mr. Hall. I will answer the questions in the order directed.

    1. What are the subjective complaints?

        1. Chronic low back pain syndrome.
        2. Bilateral hip and leg pain.
        3. Bilateral foot pain.
        4. Left leg numbness and weakness.
        5. Difficulty with sleep, difficulty with concentration, and easy and early fatigability.

    2. What are your objective findings on your physical exam?

        Decreased ROM of the dorsal lumbar spine when measured by an inclinometer and measured on three separate occasions with the measurements being within 5 degrees of each other meeting the validity criteria set forth in the AMA Guides. Decreased sensation to pinprick in the left leg noted in a dermatomal pattern consistent with L5.

    3. Do you feel this employee's physical condition warrants him totally disabled from any occupation or employment?

        Mr. Hall is unable to engage in activities requiring prolonged sitting, standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding in or on vibratory vehicles for any extended distances or time. These would be the functional activities

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
Q6210
12-05-03
Page 6

which Mr. Hall is unable to engage in. If the functional job duties of the work position
questioned and involved these particular activities, then Mr. Hall is unable to perform those
activities on a competitive basis. It is important to realize, that Mr. Hall's chronic pain
condition also affects his sleep, his concentration, and his stamina. These factors would
substantially impact any work activity Mr. Hall were to engage in. Based on his back pain
condition, the previously noted restrictions would be applicable and any particular job or work
position identified would need to have functional job duties outside of these restrictions for Mr.
Hall to be able to perform those duties on a competitive basis. I imagine there are work
positions where the functional job duties would be consistent and compatible with the work
restrictions, although, I am unsure as to whether Mr. Hall would qualify for those particular
positions based on his educational background and training. I would be happy to evaluate
any specific work position identified and relate Mr. Hall's work capability based on his back
condition to the functional job duties identified. I am unable at this time based on Mr. Hall's
presentation and examination to identify any work position, which I believe he could return to.

If Mr. Hall is not totally disabled, what type of work could he currently perform?

I believe this question was appropriately addressed in the previous response.

4. Would there be any restrictions?

Yes. The restrictions have been appropriately itemized and listed in question #3.

Please be specific with any restrictions.

Mr. Hall is unable to engage in any activity requiring prolonged walking or standing. He is
unable to walk or stand for periods greater than 20 to 30 minutes at one time or 1 ½ hours per
8 hour time frame. He is unable to sit for periods greater than 45 to 60 minutes at one time or
4 hours per 8 hour time frame. He is unable to lift items weighing greater than 20 pounds from
waist level or carry this weight for any extended distance or time. He is unable to lift items
weighing greater than 10 pounds from floor level or engage in any repetitive lifting from floor
level. He is unable to engage in activities requiring repetitive use of foot controls. He should
avoid activities requiring riding in or on vibratory vehicles for any extended distance or time.
He should avoid activities requiring frequent bending, stooping, kneeling, squatting,
crouching, lifting, and carrying. He should avoid working in cold, damp environments. He
should avoid pushing and pulling items up inclined areas or over rough and uneven terrain.

MLS 000055

HISTORY AND PHYSICAL EXAMINATION
TERRY HALL
06210
12-05-03
Page 7

5.  What is the medical prognosis for Mr. Hall?

Mr. Hall's chronic pain condition is permanent.  I would not anticipate any significant improvement or change in his condition in the foreseeable future.  Consideration could be given to a morphine pump placement or to a spinal cord stimulator.  I would leave this decision up to Mr. Hall and a pain specialist who works in this area.


James Templin, M.D.


JT/mrh
(d) 12-05-03
(t)  12-06-03

MLS 000056

December 10, 2004

James Templin, M.D.

Re:    Terry Hall
       Social Security Number:  XXX-XX-8401

Dear Dr. Templin:

Per our discussion on Friday, December 10, 2004 in order to clarify an issue regarding "disability" in regards to the Independent Medical Evaluation you performed on Terry Hall on December 5, 2003.  I have re-enclosed your Independent Medical Evaluation report and ask that you please issue an addendum report clarifying your opinion as it relates to Mr. Hall's disability status.

As outlined in your report, you state that Mr. Hall would be unable to engage in "activities requiring prolonged sitting, standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing or riding in or on vibratory vehicles for any extended distances or time.  These would be the functional activities which Mr. Hall is unable to engage in.  If the functional job duties of the work position questioned and involved these particular activities, then Mr. Hall is unable to perform those activities on a competitive basis."  You went on to state that, "Based on his back pain condition, the previously noted restrictions would be applicable and any particular job or work position identified would need to have functional job duties outside of these restrictions for Mr. Hall to be able to perform those duties on a competitive basis.  I imagine there are work positions where the functional job duties would be consistent and compatible with the work restrictions, although, I am unsure as to whether Mr. Hall would qualify for those particular positions based on his educational background and training."

MLS 000057

James Templin, M.D.
Re: Terry Hall
December 10, 2004
Page 2

This was interpreted by the employer that if a job description was found within the restrictions as outlined in your report, that Mr. Hall would be capable of returning to work. Therefore, it was assumed that Mr. Hall would not be considered "totally disabled" for that reason. You also stated in your report that you do not feel that he would qualify for those positions based on his educational background and training. The purpose of your evaluation was to assess Mr. Hall's ability to return to "any type of gainful occupation" as requested.

Therefore, there is some confusion on your opinion as it relates to Mr. Hall's total disability. Can you please issue an addendum report on whether or not you feel Mr. Hall is "totally disabled from any type of gainful occupation."

If you have any questions or if I can be of any further assistance, please do not hesitate to contact me at any time.

I have enclosed dictation instructions for our free in-house dictation service, if you choose to utilize it.

JS/dc

MLS 000058

# MLS National Medical Evaluations, Inc.

**Corporate Office**

25899 West Twelve Mile Road, Suite 220

Southfield, Michigan 48034

Tel: 248-945-9001

Fax: 248-356-6757

December 22, 2004

Lorraine Prebeg, R.N.
Wausau Benefits, Inc.
Disability Unit
P.O. Box 8015
Wausau, WI 54402

Re: Hall, Terry
Social Security Number: ***-**-8401
Your Claim/File Number:  not available

Dear Ms. Prebeg:

Enclosed is the Addendum Report rendered by James Templin, MD, regarding

Mr. Terry Hall, per your request. If we can be of any further assistance, please

do not hesitate to contact us.

Sincerely,

MLS National Medical Evaluation Services, Inc.

c:  File

Enclosures

MLS 000059

# MLS National Medical
# Evaluations, Inc.

Corporate Office

25899 West Twelve Mile Road, Suite 220

Southfield, Michigan 48034

**Tel: 248-945-9001**

**Fax: 248-356-6757**

December 22, 2004

RE:   TERRY HALL
      SOCIAL SECURITY  :     XXX-XX-8401

ADDENDUM

To Whom It May Concern:

I am writing in response to your letter of December 10, 2004.  In your letter, you requested a clarification concerning Mr. Terry Hall's ability to return to work.  Based on my experience as an occupational physician, I believe Mr. Hall is totally disabled.  Mr. Hall is unable to engage in activities requiring prolonged standing, walking, frequent bending, stooping, kneeling, crouching, lifting, carrying, climbing, or riding on a vibratory vehicle for an extended distances at a time.  He is unable to engage in activities requiring extensive and repetitive use of his arms, pushing, pulling, lifting, twisting, turning, grasping, holding, carrying, or activities above shoulder level.  Due to his chronic pain condition, he has difficulty with sleeping, difficulty with concentration and experiences easy and early fatigability.

MLS 000060

Terry Hall
James Templin, M.D.
December 22, 2004
Addendum – Page 2

Mr. Hall is unable to engage in the activities required with prolonged walking or standing. He is unable to walk or stand for periods greater than 20 to 30 minutes at one time or one-half hours out of an eight-hour time frame. He is unable to sit for periods greater than 45 to 60 minutes, or four hours per eight-hour time frame. He is unable to lift items weighing greater than 20 pounds from waist level and carry this weight for any extended distance or time. He is unable to lift items weighing greater than 10 pounds from floor level or engage in any repetitive lifting from floor level. He is unable to engage in activities requiring repetitive use of foot controls. He also should avoid riding in or on any vibratory vehicles for any extended distance or time. Mr. Hall should avoid activities requiring frequent bending, stooping, kneeling, squatting, crouching, lifting or carrying. He should avoid working in cold, damp environments. He should avoid pushing and pulling items up inclined areas or over rough and uneven terrain. He should also avoid engaging in activities requiring repetitive use of his arms for pushing, pulling, twisting, turning, lifting, carrying, or any activity above shoulder level.

With Mr. Hall's chronic pain condition, he is unable to engage in activities on any sustained basis. He would need to take frequent breaks. He should rest at least for 15 minutes every two hours. He would also need to have access to a bed or couch where he could lie down when his pain level reaches a certain intensity level. These periods

MLS 000061

Terry Hall
James Templin, M.D.
December 22, 2004
Addendum – Page 3


requiring him to lie down would occur at least once every four hours and would require

a rest for a period of 20 to 60 minutes at a time.


Based upon the significant restrictions as outlined above as well as outlined in my

original report that impact Mr. Hall's functional capacity, he would be considered totally

disabled and unable to perform any type of meaningful, gainful employment.


If there are any questions concerning this matter, please feel free to contact me.


Sincerely,

James Templin, M.D.
Board Certified Physiatry

JT:sr

MLS 000062

# Patient Bookkeeping Data

Staff    Sharon
Pre-Pay

## Patient Info

| | |
|---|---|
| ID | 8390 |
| Name | Hall, Terry |
| DOB | 9/19/64 |
| SSN | 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 |
| Phone | 859-296-9962 |
| Address | 293 Meadow Valley Road |
| | Lexington, KY 40511 |
| | |
| Employer | Sonoco |
| Allegation/ Diagnosis | |
| Comments | |

| Activities | Date | Day | Notes |
|---|---|---|---|
| DateCalledIn | 11/5/03 | Wed | |
| DateInfoProvided | 11/7/03 | Fri | |
| DateConfirmed | 11/7/03 | Fri | |
| DateDoctorReportArrived | | | |
| DateDelivered | | | |
| DateRecordsReceived | 11/5/03 | Wed | |
| DateDoctorReportExpecte | 12/12/03 | Fri | |

| Appointments | Time | Status | Notes |
|---|---|---|---|
| Fri  12/5/03 | 3:30 PM | Sched | |

## Doctor Info

| | |
|---|---|
| ID | 16965 |
| Name | Templin, James MD |
| Facility | Samaritan Hospital |
| Specialty | Physiatry |
| TaxID | Cert ☑  W9 ☐ |
| Contact | Angela |
| Phone/Fax | 859-226-7080    859-226-7079 |
| Address | 310 South Limestone, Pain Care Center, 4th Fl |
| | Lexington, KY 40508 |

| | |
|---|---|
| Lead Time | 1 month |
| Turn-Around Time | 2-4 days |
| IME Fee | $400.00 + $32.25 fac fee |
| Pre-Pay Amt | 0.00 |
| Cancellation Policy | 3 business days |
| No-Show Fee | $100.00 |
| References | |
| Notes | |

## Client Info

| | |
|---|---|
| ID | 115 |
| Name | Wausau Benefits, Inc. |
| Phone/Fax | (888) 459-3013    (715) 842-6512 |
| Address | Disability Unit |
| | P.O. Box 8015 |
| | Wausau, WI 54402 |
| Claim No | |

| | |
|---|---|
| Adjuster | Lorraine Prebeg, R.N. |
| Position | |
| Phone/Ext | |
| Email | LORRAINE.PREBEG@WAUSAUBENEFITS.COM |
| Notes | |
| Client Notes | |

## Attorney Info

| Defense | | Plaintiff | |
|---|---|---|---|
| Phone/Fax | | Phone/Fax | |
| Address | | Address | |

MLS 000063

```
***********************
***   TX REPORT   ***
***********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 0347 |
| CONNECTION TEL | 918592267079 |
| CONNECTION ID | SAM. PAIN CARE |
| ST. TIME | 01/05 15:49 |
| USAGE T | 03'44 |
| PGS. SENT | 17 |
| RESULT | OK |

# MLS NATIONAL MEDICAL EVALUATIONS, INC.
## 25899 West 12 Mile Road
## Suite 220
## Southfield, Michigan  48034
## (248) 945-9001

## FAX NUMBER:  (248) 356-6757

### FAX COVER/MESSAGE SHEET

MESSAGE TO: _Dr. James Templin MD_

COMPANY: _1_

RE: _Hall, Terry_

# OF PAGES : _17_

FROM: _Anne_

MESSAGE: _FINAL REPORT_

**IF YOU DO NOT RECEIVE ALL PAGES OR HAVE PROBLEMS WITH THIS
TRANSMISSION, PLEASE CALL US AT (248) 945-9001**

******HIPPA Confidentiality Notice******  MLS 000064

THE DOCUMENTS INSIDE THIS ELECTRONIC TRANSMISSION CONTAINS CONFIDENTIAL
INFORMATION BELONGING TO THE SENDER THAT IS LEGALLY PRIVILEGED.   THIS
INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR



Date: November 4, 2003

Employee: Terry Hall
Social Security Number: 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
Employer: Sonoco Products Company

Mr. Hall was also on disability for mental disorder but his plan benefit has a maximum
benefit of 24 months for mental disorder.   Mr. Hall is indicating he is disabled from
any occupation due to back pain.  An IME has been requested to determine if Mr. Hall
is disabled from any occupation from a physical stand- point.

IME Questions:

1. What are the subjective complaints?

2. What are your objective findings from your physical exam?

3. Do you feel this employee's physical condition warrants him totally disabled from
   any occupation or employment?   Please give rational as to why.

4. If Mr. Hall is not totally disabled, what type of work could he currently
   perform?  Would there be any restrictions?  Please be specific with any restrictions.

5. What is the medical prognosis for Mr. Hall?

**MLS 000065**

## WAUSAU BENEFITS℠

115 W. Wausau Ave. • Wausau, WI 54401-2875
Mailing Address PO Box 8015 Wausau WI. 54402-8015
(800) 826-9781
www.wausaubenefits.com
715.841.2000 • fax 715.841.7040