# MLS NATIONAL EVALUATION SERVICES, INC.

25899 West 12 Mile Road
Suite 200
Southfield, Michigan 48034
248-352-6747

## FAX NUMBER: (248) 352-2761

## FAX COVER/MESSAGE SHEET

**Message to:**  Dr. Templin

**From:**  Sharon

**Re:**  Terry Hall (IME)

**# of Pages:**  medical to follow

- **PLEASE FILL OUT THE W-9 FORM, SIGN THE POLICY CONFIRMATION, AND FAX BOTH BACK TO MY ATTENTION, AS SOON AS POSSIBLE.**
  **THANK YOU**

IF YOU DO NOT RECEIVE ALL PAGES OR HAVE PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL US AT (248) 352-6747.

THE PAGES ACCOMPANYING THIS FACSIMILE TRANSMISSION CONTAINS INFORMATION FROM MEDICOLEGAL SERVICES WHICH IS CONFIDENTIAL AND/OR INDIVIDUAL(S) OR ENTITY(IES) NAMED ON THIS COVER SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT, BE AWARE THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR USE OF THE CONTENTS OF THIS INFORMATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY AND RETURN THE ORIGINAL DOCUMENT TO US BY REGULAR MAIL.

# PLEASE FAX BACK ASAP

MLS 000066

# M LS
**National Medical Evaluation Services**

25899 West Twelve Mile Road • Suite 200 • Southfield, MI 48034
Office: 248-352-6747 • Fax: 248-352-2761

# Independent Medical Evaluation

## *Policy Confirmation for*

### Dr. Templin

Claimant: Terry Hall            Exam Date:12-05-03 @ 3:30 pm

Price:$400.00 + $32.25 facility Fee

Canc. Policy:3 business days, $100.00

> ALL BILLS ARE TO BE DIRECTED TO:
>
> MLS NATIONAL MEDICAL EVALUATION
> 25899 WEST 12 MILE ROAD, SUITE 200
> SOUTHFIELD, MI 48034

> *Report due by\*:12-12-03*

- Please be advised that our client will withhold payment unless we answer each attached question separately.

- An Examination Worksheet has been attached/will be forwarded to assist you in the format of your report.

- If further diagnostic testing is needed to complete your examination, please call MLS to obtain authorization. No treatment is authorized.

- If possible, please forward your report via email to wendy@mls-ime.com.

_____

**Authorized Signature of Physician or Representative**

*Directions for our FREE "In-house Dictation Service" has been provided for your convenience

MLS 000067

# DISABILITY EVALUATION

In as much as this is an independent medical examination and not for purposes of treatment, we request that you do not communicate your opinion or any recommendations regarding treatment to the patient. **Please do not comment outside your area of expertise. This is an evaluation for Disability Leave, not for Workers' Compensation. Please DO NOT address causation or permanency rating in your report.**

## EXAMINATION WORKSHEET

**FOR SAKE OF COMPLETENESS, PLEASE DICTATE YOUR REPORT IN THE FOLLOWING MANNER AND <u>ONLY</u> ADDRESS THOSE ISSUES THAT ARE SPECIFICALLY ASKED.**

### Patient History

Include patients personal history including age, sex, weight, etc.

### Employment History

Include description of duties. Describe any previous employment.

### History of Present Illness

Detailed description of incident resulting in injury (if applicable)

Describe associated course of treatment as well as treating physicians and hospital contacts.

Medications.

### Past Medical History

Include history of prior medical history and pre-existing conditions, no matter how insignificant.

### Current Medical Complaints

Subjective complaints.

### Physical Examination

Full examination of all related complaints (please include all range of motions).

### Medical Records

Please list and comment on the medical records reviewed.

### Diagnosis

Please list the diagnoses as they relate to your specialty

### Conclusion

Attached is a list of questions for you to address in the conclusion portion of this report. Please *ONLY* respond to those questions asked in the following page. Please list the question and question # with your response. Please remember to base your opinion/recommendations on the *OBJECTIVE* findings from the physical exam, medical records, and diagnostic testing (if applicable).

THE SPECIFIC QUESTIONS FOR YOU TO ADDRESS IN THIS SECTION ARE ON THE
FOLLOWING PAGE.

MLS 000068

Employee: Terry Hall
Social Security Number: 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
Employer: Sonoco Products Company

Mr. Hall was also on disability for mental disorder but his plan benefit has a maximum benefit of 24 months for mental disorder.   Mr. Hall is indicating he is disabled from any occupation due to back pain.  An IME has been requested to determine if Mr. Hall is disabled from any occupation from a physical stand- point.

IME Questions:

1. What are the subjective complaints?

2. What are your objective findings from your physical exam?

3. Do you feel this employee's physical condition warrants him totally disabled from any occupation or employment?   Please give rational as to why.

4. If Mr. Hall is not totally disabled, what type of work could he currently perform?  Would there be any restrictions?  Please be specific with any restrictions.

5. What is the medical prognosis for Mr. Hall?

MLS 000069

# MLS National Medical Evaluations, Inc.

**Corporate Office**
25899 West Twelve Mile Road, Suite 200
Southfield, Michigan 48034

Tel: 248-945-9001    www.mls-ime.com
Fax: 248-356-6757    info@mls-ime.com

November 10, 2003

Mr. Terry Hall
293 Meadow Valley Road
Lexington, KY  40511

Re:  Independent Medical Examination

Dear Mr. Hall:

Per the request of Wausau Benefits, Inc, an independent medical evaluation has been scheduled with

| | |
|---|---|
| **DOCTOR:** | **James Templin, M.D.**<br>**310 South Limestone Street**<br>**Lexington, KY  40508**<br>**(859) 226-7080** |
| **DATE:** | **Friday, December 5, 2003** |
| **TIME:** | **3:30 p.m.** |

Please bring any diagnostic tests and x-rays with you to the examination.

IF YOU NEED TO RESCHEDULE YOUR APPOINTMENT, PLEASE DO NOT CALL THE DOCTORS OFFICE.  THEY WILL NOT BE ABLE TO CHANGE YOUR APPOINTMENT.

If you need directions, call the number listed above.

**FAILURE TO ATTEND THE ABOVE SCHEDULED EXAMINATION OR CANCELLATION WITHIN THREE BUSINESS DAYS WILL RESULT IN THE SUSPENSION OF YOUR MONTHLY BENEFIT.**

If you have any questions or you are unable to keep this appointment, please contact your insurance carrier's disability unit.

Sincerely,

MLS National Medical Evaluation Services

c:    Wausau Benefits, Lorraine Prebeg, RN
      File

MLS 000070

# F3 Cite Request Form

Date of Request **11-4-03**

MLS to do notification to claimant: ☒YES ☐NO  Attorney: ☐YES ☐NO

Services Requested (☒Full Service) ☐Medical Records Review  ☐Locate and make appt. (National Only)  ☐FCE Testing

## PATIENT INFORMATION (Please Print)

Name **Terry Hall**  Phone # **859-296-9962**

Address **293 Meadow Valley Rd** City **Lexington**  State **Ky** Zip **40511**

Soc.Sec. **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**  D.O.B. **9-19-1964**  D.O.I. **5-11-01**

Claim No. ___  Employer **Sonoco Products Company**

Attending Physician(s) **Julie Ann Martin — (Fin Lamore - VA Hospital)**

## TYPE OF DOCTOR REQUESTED

Specific Doctor or Specialty Requested (ortho, neuro, etc.) **Physical med - Rehab**

Allegations ___

## TYPE OF EVALUATION

☐Short Term Disability ☐Auto PIP ☐Work Comp Open ☐Waiver of Premium
(☒Long Term Disability) ☐General Liability ☐Work Comp Litigated ☐Other ___

## REFERRAL INFORMATION    VERBAL REQUEST    ☐Yes  ☐No – Comments ___

## REPORT AND BILL TO:

Company **Wausau Benefits**  Contact **Lorraine Prebeg RN**

Address **PO Box 8015**  City **Wausau**  State **WI** Zip **54402**

Phone **800-343-2737 Ext. 7176**  Fax **715-841-7040**

## COPY OF REPORT TO (if applicable):

Company ___  Contact ___

Address ___  City ___  State ___ Zip ___

Phone ___  Fax ___

## ATTORNEY INFORMATION (if applicable)

Defense Attorney ___  Law Firm ___

Address ___  City ___  State ___ Zip ___

Phone ___  Fax ___

Plaintiff Attorney ___  Law Firm ___

Address ___  City ___  State ___ Zip ___

Phone ___  Fax ___



## National Medical Evaluation Services
25899 West Twelve Mile Road • Suite 200 • Southfield, MI 48034
Office: 248-352-6747 • Fax: 248-352-2761

MLS 000071

QUOTED PRICE:_____

QUOTED CX POLICY:_____

QUOTED NS FEE:_____

PATIENT'S NAME: *Hall, Terry*            # *8390*

| DATE | ACTIVITY |
|------|----------|
| *11/5/03* | RECEIVED REQUEST |
|  | *faxed info to Dr #16965* |
| *11-7-03* | *12.5.03 @ 3:30pm* |
| *11-18-* | *mailed meds to Dr* |

Scheduler *Sharon*

Client *Nausau*
Acct. Rep:_____

MLS 000072



# EMPLOYEE QUESTIONNAIRE



**EMPLOYER:**    **Sonoco Products Company**
**EMPLOYEE:**    **Terry Hall**
**SOCIAL SECURITY NUMBER:**    **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**
**PLAN NUMBER:**    **7671-09-140051**

**Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.**

Your file indicates that additional information would be helpful to us at this time. Please complete and return this questionnaire to provide us with a clear picture of your current status and outlook on the future. Receipt of this information will enable us to better manage your Long Term Disability claim.

## I. DISABILITY/ACTIVITIES OF DAILY LIVING/MEDICAL

1. Do you consider yourself fully or partially disabled from all work including your own occupation? _Yes_ If yes, please explain and list any current restrictions/limitations. _See physician statements for details about limitations + objective diagnosis_

2. Please describe a typical day. What time do you get up? What do you do during the day and what time do you retire in the evening? _6:30 Am, do various things throughout the day including read, rest, physical exercise, take Kids to school + pick them up, watch TV, occasional meal preparation, 11:00 pm_

3. Please list medications currently being taken including dosages and frequencies. _Buspar, prozac, Temazapam, Hydrocodone, methocarbomol, Tylenol_

4. Do you drive? _Yes_    Do you have your own transportation? _Yes_

1

MLS 000073

# II. VOCATIONAL

1. Are you currently working? _NO_____ Part time?_____ Full time?_____
   If yes, what is your current job? _____

2. What are your specific plans for the future? _?_____
   _____

3. Have you contacted or worked with any vocational rehabilitation agencies? _NO___ If yes,
   please provide names, addresses and details of work/programs. _____
   _____
   _____

4. Circle highest grade of education completed.  1  2  3  4  5  6  7  8  9  10  11  **12**
   Did you attend college? YES _X_____ NO _____ Degree obtained _BA_____

5. Have you received any training or schooling since you started Long Term Disability? _No_
   If yes, please list any classes or training you have received. _____
   _____

6. Are you interested in training for a job that is within your doctor's recommended restrictions?
   YES _sure_ NO _____
   _but there Are none_

7. Are you receiving any other income besides your long term disability benefit? _____ If yes,
   please specify. _Social Security + VA Benefits_

   List the name(s) and date(s) of birth of any dependents:

   _Vickie Hall_         _7/17/70_         _Matthew_         _12/20/98_
   (Name)                (DOB)             (Name)            (DOB)

   _Ian Hall_            _12/9/95_         _____         _/  /_
   (Name)                (DOB)             (Name)            (DOB)

   _____    Relationship to employee
   Name of person completing form
   (if other than employee)

   _J. D. Hall_                        _Oct 15, 2003_
   Employee Signature                  Date

   **What is your current phone number?**   _509_ - _296  9962_
                                         Area Code    Phone Number

2

## ATTENDING PHYSICIAN STATEMENT / DISABILITY

**TO BE COMPLETED BY EMPLOYEE:**

Name: **Terry Hall**     SS#: **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**     Date of Birth: **9-19-64**

### Authorization for Release of Information

I hereby authorize the attending physician to release the information requested below to Wausau Benefits, Inc.

Signature: X _Terry D Hall_     X Date: **9-10-03**

**TO BE COMPLETED BY TREATING PHYSICIAN:**

IMPORTANT: Determination of your patient's disability benefits depends on receipt of accurate and timely information from you.

1. **Diagnosis** _Post surgical lumbar herniated Disc, spondylolisthesis_
   _Cervical, Thoracic, & lumbar subluxations L5/S1_     (ICD-9 Code) _739.1, 784.0, 739.2,_
   _722.1, 782.3_
   Hospitalization / dates  _8/97_     Surgery type / date  _3/19/97_     _2/17/99_
   _11/27/99_

2. **Disability Onset**
   Last day worked due to disability  _5/11/01_     Anticipated return to work date  _Never_
   Is condition work related?  ☐ Yes  ☑ No   Is patient totally disabled from  ☐ Own Job  ☑ Any Job
   Not totally disabled _____     **(please see restrictions in #9)**

3. **Objective clinical findings** (x-ray, MRI, CT, labs, etc.) _spina bifida occulta S1   spondylosis_
   _HNP TV12, L4/5, L5/S1, with spondylolisthesis_
   _✓ Lumbar ROM w/pain in all directions_     _osteopenia, lumbar L5/S1_
   _Degenerative Disc, facet hypertrophy_
   Height  _5'8"_     Weight  _200 lbs_     Blood Pressure  _120/80?_

4. **Subjective findings** _Head, neck, low back pain. Bilateral leg pain, numbness & tingling. Left foot PNT_
   _Feet cramp and tighten up intermittently_

5. **Treatment follow up**
   Date of first visit  _9/7/01_     Date of most recent visit  _9/8/03_     Date of next visit  _9/10/03_

6. **Treatment Plan** Specific treatment, frequency and duration (therapies, medications, etc.)
   _There is no treatment plan at this time because he has no insurance._

7. **Supportive Service – Other treating providers**
   Name  _VA Hospital (Dr. Kawash)_     Telephone #  _(859) 281-386C_
   Name  _Dr. Laramore / VA_     Telephone #  _(859) 281-3948_

8. **Job Capabilities** – Patient may return to work capable of performing the degree of any work checked below with the following limitations:     Degree -

   ☐ **Sedentary Work** Exerting up to 10 pounds of force occasionally. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.
   ☐ **Light Work** Exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently, and/or negligible amount of force constantly to move objects. Light Work usually requires walking or standing to a significant degree.
   ☐ **Medium Work** Exerting up to 50 pounds of force occasionally, and/or up to 20 pounds of force frequently, and/or up to 10 pounds of force constantly to move objects.
   ☐ **Heavy Work** Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds of force frequently, and/or up to 20 pounds of force constantly to move objects.
   ☐ **Very Heavy Work** Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects.
   ☑ **Incapable of Sedentary Work**

**WAUSAU BENEFITS℠**

115 W. Wausau Ave. • Wausau, WI 54401-2875
Mailing Address PO Box 8015 Wausau WI 54402-8015
(800) 218.0792 www.wausaubenefits.com
715.841.2000 • fax 715.841.7040

MLS 000075

**9.  Limitations**

A.  In an 8 to 12 hour work day patient may:

1. Stand/Walk  ☐ None  ☑ 1-4 Hours  ☐ 4-6 Hours  ☐ 6-8 Hours  ☐ 8-10 Hours  ☐ 10-12 Hours

2. Sit  ☐ None  ☑ 1-4 Hours  ☐ 4-6 Hours  ☐ 6-8 Hours  ☐ 8-10 Hours  ☐ 10-12 Hours

3. Drive  ☐ None  ☑ 1-4 Hours  ☐ 4-6 Hours  ☐ 6-8 Hours  ☐ 8-10 Hours  ☐ 10-12 Hours

B.  Patient may **not** use hands for repetitive:  ☐ Right  ☐ Left  ☐ Both

☐ Single Grasping  ☐ Pushing & Pulling  ☐ Fine Manipulation

C.  Patient **may** use feet for repetitive movement as in operating foot controls:  ☑ Yes  ☐ No

D.  Patient is able to:

| | Frequently | Occasionally | Not At All |
|---|---|---|---|
| Bend | ☐ | ☐ | ☑ |
| Squat | ☐ | ☐ | ☑ |
| Climb | ☐ | ☐ | ☑ |
| Twist | ☐ | ☑ | ☐ |
| Balance | ☐ | ☑ | ☐ |
| Stoop | ☐ | ☐ | ☑ |

E.  Patient uses adaptive equipment:  ☑ Cane  ☐ Walker  ☐ Wheelchair  ☐ Other

**10.  Psych – Mental/Nervous Impairments (If applicable)**

☐ Class 1 – Patient is able to function under stress and engage in interpersonal relations (no limitations).

☐ Class 2 – Patient is able to function in most stress situations and engage in only limited interpersonal relations (slight limitations).

☐ Class 3 – Patient is able to engage in only limited stress situations and engage in only limited interpersonal relations (moderate limitations).

☑ Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations).

☐ Class 5 – Patient has significant loss of psychological, physiological, personal and social adjustment (severe limitations).

Remarks:  _Px is taking buspar and prozac._

**11.  Rehabilitation**

A. Is patient a candidate for rehab services?  ☑ No  ☐ Yes, what type?

B. Is patient a candidate for vocational retraining/counseling?  ☑ No  ☐ Yes

C. Is patient currently working at another job?  ☑ No  ☐ Yes

Remarks:  _____

Name (MD)  _Julie Ann Martin_  Specialty  _Chiropractic_  Telephone #  _(859) 268-2273_  Fax #  _859-266-0478_

Street Address  _2909 Richmond Rd., Suite 130_  City  _Lexington_  State  _KY_  Zip  _40509_

Signature of MD completing form  _Julie Ann Martin - D.C._  Date  _9/10/03_

Name of individual completing form, if other than MD  _Julie Ann Martin_  Title  _Doctor of Chiropractic_

MLS 000076

# CLINICAL EVALUATION - SUMMARY

**Patient:**       Mr. Terry Hall
**Sex/Age:**      Male/36
**Doctor:**        Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.
**Exam Date:**   09/17/2001

## PHYSICAL EXAMINATION

**Pulse**
- 70bpm/regular

**Blood Pressure**
- 120/80 on left

## NEUROLOGICAL ASSESSMENT

**Cerebrovascular Function**
- Carotid Bruit: absent bilaterally

**Cerebellar Function**
- Gait: normal
- Rapidly Alternating Movements: quickly/accurately on right and on left

**Deep Tendon Reflexes**
- Biceps: +2 and symmetric
- Triceps: +2 and symmetric
- Brachioradialis: +2 and symmetric

**Motor Examination**
Upper Extremity
- Shoulder Abduction: 5/5 bilaterally
- Wrist Extension: 5/5 bilaterally
- Wrist Flexion: 5/5 bilaterally
- Finger Extension: 5/5 bilaterally
- Finger Flexion: 5/5 bilaterally
- Finger Abduction: 5/5 bilaterally
- Finger Adduction: 5/5 bilaterally

**Sensory Pinwheel Testing**
- No Sensory Deficit: upper and lower extremities

## ORTHOPEDIC EXAMINATION

**Cervical Spine**
Range-Of-Motion
- Flexion: mildly restricted with pain
- Extension: normal with pain

03296-804448

MLS 000077

Re: Mr. Terry Hall - Exam Date: 09/17/2001
Clinical Evaluation - Summary

- Right Lateral Flexion: severely restricted with pain
- Left Lateral Flexion: moderately restricted with pain
- Right Rotation: moderately restricted with pain
- Left Rotation: moderately restricted with pain

Compression Test
- Neutral: normal
- Flexion: normal
- Extension: neck pain
- Right Lateral Flexion: normal
- Left Lateral Flexion: neck pain

Valsalva: (+)
Distraction: (-)

## CLINICAL EXAMINATION

**Spasm**
- On Right at: C1, C2, C3, C4, C5, C6, C7, T1, T2, and T3
- On Left at: C1, C2, C3, C4, C5, C6, C7, T1, T2, and T3

**Tenderness**
- On Right at: C4, C5, and C6
- On Midline at: C2 and C3
- On Left at: C5 and C6

**Articular Fixation**
- At: C4, C5, C6, C7, and T1

**Malposition**
- On Midline at: C1, C2, C3, C4, C5, C6, C7, T1, T2, T3, T4, T5, and T6

## ASSESSMENT & PLAN

**Clinical Impression**
Cervical Area
- 723.2    Cervicocranial Syndrome
- 739.1    Segmental Dysfunction/Subluxation

Thoracic Area
- 739.2    Segmental Dysfunction/Subluxation

**Recommended Management**
Specific Spinal Adjustments
- Cervical
- Thoracic

Adjunctive Physical Modalities
- Moist Heat Thermotherapy
- Mechanical traction
- Massage
- Ultrasound

Page - 2

MLS 000078

Re: Mr. Terry Hall - Exam Date: 09/17/2001
Clinical Evaluation - Summary

- Interferential stimulation

Estimated Office Visit Schedule

Supportive Exercise Program
- Spinal Rehabilitation: See Attached

All general measures associated with condition have been reviewed with the patient.
Potential risks have been described and the patient has acknowledged their understanding
them.

03296-80448

MLS 000079

Re: Mr. Terry Hall
Daily Progress And Procedural Notes

**September 19, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.**

Terry complains at his appointment today he has pain together with stiffness in both sides of his neck and numbness in the right upper extremity. Also he is experiencing pain plus stiffness in both sides of his lower back and pain in both buttocks and both lower extremities. The patient states that the pain plus stiffness is worsening in both sides of his neck. The numbness in the right upper extremity is displaying some improvement. There is no change in the pain together with stiffness in both sides of his lower back. There is no change to the pain in both buttocks and both lower extremities. He indicates there has been no new provocative incident. We discussed lifting, reaching, posture, and sleeping patterns. He did not take muscle relaxants last night. Palpation of the cervical spine reveals the following: Spasm overlying the middle cervical region. Spasm and tenderness overlying the lower cervical region. Malposition of all cervical motor units is evident. Examination of the thoracic spine reveals spastic and tender deep paraspinal musculature overlying the upper and middle range. Malposition of the upper and middle thoracic motor units is apparent. Palpation of the lumbosacral spine reveals spasm overlying the middle and lower range. Malposition of all lumbosacral motor units is present. There is no difference in the original assessment. His symptomatology is somewhat worse. The initial treatment protocol is to remain as first outlined. All general measures have been reviewed with the patient and he has expressed his understanding of them. The patient tolerated today's treatment satisfactorily.

**September 21, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.**

Terry complains on his visit today he has pain plus stiffness in both sides of his neck, both sides of his upper back, and both sides of his lower back. The patient reports that some improvement has been shown in the pain with stiffness in both sides of his neck and both sides of his upper back. The pain with stiffness in the right and left lower back remain constant. He indicates there has been no new provocative incident. There is spasm overlying the middle and lower cervical spine. Malposition of the middle and lower cervical motor units is discernible. Examination of the thoracic spine reveals spastic deep paraspinal musculature overlying the upper and middle region. Malposition of the upper thoracic motor units is evident. The preliminary assessment is unchanged. His symptoms are demonstrating improvement. There is no modification of the initial treatment protocol. All general measures have been reviewed with the patient and he has verified his knowledge of them. Mr. Hall tolerated the protocol satisfactorily.

**September 24, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.**

At today's appointment the patient indicates he has pain in the right and left sides of his head. Terry Hall furthermore notes pain together with stiffness in the left side of his neck; pain, tingling, and stiffness in the right side of his neck; and numbness in both upper extremities. Also he is having pain together with stiffness in both sides of his lower back and pain in both buttocks and both lower extremities. The patient states that the pain in both sides of his head and pain plus stiffness in the left side of his neck is improving. The pain, tingling, and stiffness seems to be worsening in the right side of his neck. The numbness in the right and left upper extremities is improving. There is a worsening of the pain plus stiffness in the right and left lower back. There is a worsening of the pain in both buttocks and both lower extremities. He indicates there

Pg. 1

03296-804448

MLS 000080

Re: Mr. Terry Hall
Daily Progress And Procedural Notes

has been no new provocative incident. Palpation of the cervical spine reveals spasm overlying the middle and lower range. Malposition of the middle and lower cervical motor units is present. There is spasm overlying the upper thoracic spine. Malposition of the upper and middle thoracic motor units is apparent. The initial assessment is unchanged, however, his symptoms have displayed relative improvement. The initial treatment protocol is to remain the same as previously designated. The patient has communicated his complete knowledge of all general measures. Terry tolerated the protocol satisfactorily.

---

**September 26, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.**

Today Mr. Hall indicates he is feeling pain with stiffness in both sides of his neck and both sides of his lower back. The patient reports that some improvement has been shown in the pain together with stiffness in both sides of his neck and both sides of his lower back. He indicates there has been no new provocative incident. There is spasm overlying the middle and lower cervical spine. Malposition of the lower cervical motor units is discernible. There is spasm overlying the upper thoracic range. Malposition of the upper thoracic motor units is apparent. The initial assessment has not changed, however, his symptoms are improving favorably. There is no change in the preliminary treatment protocol. All general measures have been explained to the patient and he has communicated his knowledge of them. Mr. Hall tolerated the protocol satisfactorily.

---

**September 28, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.**

Today the patient states he is having pain plus stiffness in both sides of his neck and both sides of his upper back. In addition he has pain accompanied by stiffness in both sides of his lower back and pain in both buttocks and both lower extremities. The patient reports that some improvement has been shown in the pain plus stiffness in both sides of his neck and both sides of his upper back. Examination of the cervical spine reveals spastic deep paraspinal musculature overlying the lower range. Malposition of the middle and lower cervical motor units is present. Palpation of the thoracic spine reveals spasm overlying the upper and middle range. Malposition of the upper and middle thoracic motor units is evident. Malposition of the middle and lower lumbosacral motor units is present. There is no modification of the patient's preliminary assessment, but his condition is displaying measurable improvement. The initial treatment plan is to remain the same. The patient has communicated his complete understanding of all general measures. Terry Hall tolerated the procedure satisfactorily.

---

**October 1, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.**

At today's appointment Terry Hall relates he is suffering from pain in both sides of his head. He also notes pain together with stiffness in both sides of his neck and pain plus numbness in the right upper extremity. In addition the patient is experiencing pain with stiffness in both sides of his lower back and pain in both lower extremities. He says that some improvement has been shown in the condition of the following: pain in both sides of his head, pain with stiffness in both sides of his neck, pain plus numbness in the right upper extremity, pain together with stiffness in both sides of his lower back, and pain in both lower extremities. He indicates there has been no

Pg. 2

Re: Mr. Terry Hall
Daily Progress And Procedural Notes

new provocative incident. Examination of the cervical spine reveals spastic deep paraspinal musculature overlying the middle and lower range. Articular fixation is apparent in the middle and lower cervical range. Malposition of the lower cervical motor units is discernible. Examination of the thoracic spine indicates spastic deep paraspinal musculature overlying the entire region. Articular fixation is evident in the upper thoracic spine. Malposition of the upper and middle thoracic motor units is evident. Examination of the lumbosacral spine indicates spastic deep paraspinal musculature overlying the middle and lower region. Malposition of all lumbosacral motor units is evident. The patient's preliminary assessment remains unchanged, but his symptomatology has exhibited comparative improvement. The preliminary treatment plan is to remain consistent. The patient has verified his complete knowledge of all general measures. Terry Hall tolerated the program satisfactorily.

## October 3, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.

The patient reports at his appointment today he has pain in both sides of his head. Terry Hall additionally notes pain plus stiffness in both sides of his neck. In addition he is having pain in both sides of his lower back. The patient states that the pain in both sides of his head and pain plus stiffness in both sides of his neck is improving. In both sides of his lower back the pain has not changed. Examination of the cervical spine indicates spastic deep paraspinal musculature overlying the middle and lower range. Malposition of the middle and lower cervical motor units is discernible. There is spasm overlying the upper thoracic spine. Malposition of the upper thoracic motor units is apparent. There is spasm overlying the entire lumbosacral range. Malposition of all lumbosacral motor units is present. The initial assessment and symptomatology have not changed. The initial treatment plan is to remain as first outlined. The patient has expressed his full knowledge of all general measures. Terry Hall tolerated today's treatment satisfactorily.

## October 10, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.

On today's visit Terry Hall relates he is having pain in both sides of his head. The patient additionally reports pain with stiffness in both sides of his neck and numbness in the right upper extremity. In addition he is experiencing pain plus stiffness in both sides of his lower back and pain in both buttocks and both lower extremities. The patient notes that some improvement has been shown in the condition of the following: pain in both sides of his head, pain together with stiffness in both sides of his neck, and numbness in the right upper extremity. There is no change in the pain with stiffness in both sides of his lower back. There is no change to the pain in both buttocks and both lower extremities. Palpation of the cervical spine indicates spasm overlying the middle and lower spine. Malposition of the middle and lower cervical motor units is evident. Examination of the thoracic spine indicates spastic deep paraspinal musculature overlying the upper and middle spine. Malposition of the upper and middle thoracic motor units is evident. There is spasm overlying the middle and lower lumbosacral region. Malposition of the middle and lower lumbosacral motor units is discernible. There is no difference in the original assessment, yet his symptomatology has demonstrated comparative improvement. The preliminary treatment plan is to remain the same as first stated. The patient has confirmed his full understanding of all general measures. Terry Hall tolerated the procedure satisfactorily.

03296-80448

MLS 000082

Pg. 3

October 30, 2001 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.

Re: Mr. Terry Hall
Daily Progress And Procedural Notes

---

**September 8, 2003 - Attending Physician: Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.**
Terry Hall relates today he is having pain in the right and left sides of his head. He additionally indicates pain together with stiffness in the right and left sides of his neck. In addition the patient is suffering from pain plus stiffness in both sides of his lower back; and pain, numbness, and tingling in the left buttock and left lower extremity. He indicates that the pain in the right and left sides of his head remains constant. The pain plus stiffness is improving in both sides of his neck and is worse in both sides of his lower back. There is a worsening of the pain, numbness, and tingling in the left buttock and left lower extremity. He has had two surgeries on his low back since I last saw him. Palpation of the cervical spine reveals spasm overlying the middle and lower region. Malposition of the middle and lower cervical motor units is discernible. There is spasm overlying the upper and lower thoracic range. Malposition of the middle and lower thoracic motor units is evident. There is spasm overlying the entire lumbosacral spine. Malposition of all lumbosacral motor units is apparent. In my assessment the patient, at this time, is afflicted by 784.0, 739.2, 739.3, 722.1, 722.52. There is a worsening in his condition. The treatment plan is modified to the following: Not set. The patient has verified his full comprehension of all general measures. Mr. Hall tolerated the procedure satisfactorily.

---

03296-804448

# *RE-EVALUATION - SUMMARY*

| | |
|---|---|
| **Patient:** | Mr. Terry Hall |
| **Sex/Age:** | Male/38 |
| **Doctor:** | Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S. |
| **Exam Dates:** | Current: 09/08/2003  Last: 09/17/2001  Initial: 09/17/2001 |

## PATIENT SECTION/UPDATED SUBJECTIVE COMPLAINTS

**Percentage Of Original Symptoms Reported By Patient**
- 80%

**Present Chief Complaints**
- Head: pain
- Neck: pain
- Upper Back: pain
- Low Back: pain
- Right Buttock: pain
- Left Buttock: pain
- Right Leg: pain
- Left Leg: pain, numbness, and tingling
- Right Foot: pain
- Left Foot: pain, numbness, and tingling

**Symptoms Are Currently Aggravated By**
- Coughing
- Sneezing
- Straining at stool
- Neck movement
- Reaching
- Lifting
- Bending
- Sitting
- Standing

**Since Last Examination On 09/08/2003, The Patient Has Had**
- Treatments or examinations elsewhere
- Two low back surgeries: 1/27/99 and 2/17/99

## Neurological Assessment

**Deep Tendon Reflexes**
- Biceps: +2 and symmetric
- Triceps: +2 and symmetric
- Brachioradialis: +2 and symmetric
- Patella: +2 and symmetric

Page - 1

MLS 000085

Re: Mr. Terry Hall - Exam Date: 09/08/2003
Re-evaluation - Summary

- Achilles Tendons: +2 and symmetric

**Motor Examination**
Upper Extremity
- Shoulder Abduction: 5/5 bilaterally
- Wrist Extension: 5/5 bilaterally
- Wrist Flexion: 5/5 bilaterally
- Finger Extension: 5/5 bilaterally
- Finger Flexion: 5/5 bilaterally
- Finger Abduction: 5/5 bilaterally
- Finger Adduction: 5/5 bilaterally
Lower Extremity
- Hip Flexion: 5/5 bilaterally
- Leg Extension: 5/5 bilaterally
- Foot Dorsi-Flexion: 5/5 bilaterally
- Great Toe Dorsi-Flexion: 5/5 bilaterally
- Foot Plantar-Flexion: 5/5 bilaterally
- Great Toe Plantar-Flexion: 5/5 bilaterally
- Foot Eversion: 5/5 bilaterally
- Heel Walk: (-) bilaterally
- Toe Walk: (-) bilaterally

**Sensory Pinwheel Testing**
Sensory Deficit
- Hyposensitivity On the Left at: L5 and S1

**Plantar Response**
- downgoing on right and absent on left

**<u>Orthopedic Examination</u>**

**Cervical Spine**
Range-Of-Motion
- Flexion: mildly restricted with pain
- Extension: normal with pain
- Right Lateral Flexion: moderately restricted with pain
- Left Lateral Flexion: normal
- Right Rotation: normal
- Left Rotation: normal
Compression Test
- Neutral: normal
- Flexion: normal
- Extension: normal
- Right Lateral Flexion: neck pain
- Left Lateral Flexion: neck pain
Valsalva: (-)
Distraction: (-)

US296-804448                                    MLS 000086

Re: Mr. Terry Hall - Exam Date: 09/08/2003
Re-evaluation - Summary

## Lumbar Spine
Range-Of-Motion
- Flexion: normal with pain
- Extension: normal with pain
- Right Lateral Flexion: moderately restricted with pain
- Left Lateral Flexion: moderately restricted with pain
- Right Rotation: mildly restricted with pain
- Left Rotation: mildly restricted with pain

Root Tension Signs
Straight Leg Raise
- Left: back pain at 60 degrees

Braggard's: (L)(+)
Well Leg Raise: (R)(+)
Lindner: (+)
Valsalva: (+)
Kemp's
- To Right: (+) back pain
- To Left: (+) back pain
FABERE Patrick: (R)(+) and (L)(-)
Dorsolumbar Postural Signs
- Minor's: (+)
- Antalgia: flexion

## Clinical Examination

**Spasm**
- On Right at: OCC, C1, C3, C4, C5, T2, T3, T11, T12, L1, L2, L3, L4, L5, SAC, and SI
- On Left at: OCC, C1, C3, C4, T2, T3, T11, T12, L1, L2, L3, L4, L5, and SAC

**Malposition**
- On Midline at: C1, C2, C3, C4, C5, C6, C7, T3, T4, T5, T11, T12, L1, L2, L3, L4, L5, and SAC

## Assessment & Plan

**Clinical Impression**
Cervical Area
- 739.1    Segmental Dysfunction/Subluxation
- 784.0 Headaches

Thoracic Area
- 739.2    Segmental Dysfunction/Subluxation

Lumbosacral Area
- 722.10  Disc Displacement/Herniation
- 722.52  Disc Degeneration
- 739.3   Segmental Dysfunction/Subluxation

03296-80448

MLS 000087

Re: Mr. Terry Hall - Exam Date: 09/08/2003
Re-evaluation - Summary

Patient's Progress

**Recommended Management**
Specific Spinal Adjustments
- Cervical
- Thoracic
- Sacroiliac

Adjunctive Physical Modalities
- Moist Heat Thermotherapy
- Spinalator
- Mechanical traction
- Massage
- Interferential stimulation

Estimated Office Visit Schedule

Supportive Exercise Program
- Spinal Rehabilitation: Post surgical conditioning

All general measures associated with condition have been reviewed with the patient.
Potential risks have been described and the patient has acknowledged their understanding
them.

03296-804448

MLS 000088

# *RADIOGRAPHIC EVALUATION - SUMMARY*

**Patient:**     Mr. Terry Hall
**Sex/Age:**     Male/38
**Doctor:**      Julie Ann Martin, D.C., D.A.C.R.B., C.S.C.S.
**Exam Date:**   09/08/2003

## <u>LUMBOSACRAL/PELVIC SPINE</u>

**Area Examined**
- Lumbopelvic spine

**Projections**
- A-P and lateral

**Osseous Structures**
- No osseous or periosteal injury apparent
- Generalized Osteoporosis: mild
- Lytic/Blastic Changes: absent

**Biomechanical Assessment**
- Scoliosis: moderate, to left, and apex at L3 level

**Of Additional Note**
- Artifact at L5/S1 from previous surgery. Subluxations of L1 through L5. Rotation of pelvis.



V 03296-804448

MLS 000089

KIM LARMORE, MD                                    December 11, 2002
ATTENTION:  MEDICAL RECORDS
VAMC MHC 2250 LEESTOWN ROAD
LEXINGTON KY  40511


Re:    Terry Hall
ID#:   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
DOB:  09-19-1964


Dear Dr. Larmore:

We find it necessary to contact you for additional information to continue the management of
Cheryl Ligon's disability claim.  Please send all medical records, including any diagnostic
testing, for the patient referenced above from May 1, 2002 to the present date. Attached is a
Release of Information signed by the patient.

Thank you for your time and attention with this request.  Please forward all medical
information to:

                          Lorraine Prebeg, RN
                          Claims Services Disability Unit
                          Wausau Benefits, Inc.
                          PO Box 8015
                          Wausau WI  54402-8015
                          800-343-2737 Extension 7176

Sincerely,

*Lorraine Prebeg*

Lorraine Prebeg, RN,CCM
Disability Case Manager
Claims Services Disability Unit

Enclosure:  Release of Information

                                              **MLS 000090**

                                       **WAUSAU BENEFITS℠**

115 W. Wausau Ave. • Wausau, WI 54401-2875
PO Box 8015 Wausau WI 54402-8015
(800) 343-2737
www.wausaubenefits.com
715.841.3167• fax 715.841.7040

```
-------------------------------------------------------------------
EDICAL RECORD                                          Progress Notes
-------------------------------------------------------------------
OTE DATED: 06/07/2002 15:12   PC GREEN PROVIDER PROGRESS NOTE
ISIT: 06/07/2002 15:20 PC GREEN/ROBERTS/LD
D:  37 yo MALE
C:  f/u DJD
PI:  Pt presents to clinic for f/u.  He states that he has started an
xercise program that has been aiding in relieving his neck and back pain.
e states that he only has to take the tylenol #3 periodically and has
one days w/o using anything due to the pain being relieved by exercise
lone.  He is otherwise w/o complaints.
E:
       VS:  Temperature:  97.9 F [36.6 C] (06/07/2002 14:31)
            Pulse:  68 (06/07/2002 14:31)
            Resp:  20 (06/07/2002 14:31)
            BP:  115/62 (06/07/2002 14:31)
            Ht:  68 in [172.7 cm] (06/07/2002 14:31)
            Wt:  204 lb [92.7 kg] (06/07/2002 14:31)
            Pain:  3 (06/07/2002 14:31)
       Gen:  Alert and oriented MALE in NAD
       Chest:  CTAB.  No G/F/R.
       CV:  RRR w/o M, R, G
       Abd:  Soft, NT, ND, BS+, No HSM.
       Ext:  No C/C/E

abs:  LDL 116 and P5 wnl.
ssessment:  1.  Chronic low back pain secondary to DJD - stable
.  PTSD - followed in MHC
lan:  1.  Cont on current meds.
.  Keep f/u in MHC
RTC:  6 months
C:  none

CLINICAL REMINDER ACTIVITY
 V9 Alcohol screening:
    Patient has had at least 1 drink in last year -
       Comment: 1-2 glasses per week
    CAGE (Mental Health Instrument)
       An alcohol screening test (CAGE) was negative (score=0).
 Learning Readiness Assessment:
    LEARNING READINESS ASSESSMENT
    New Assessment
    LEARNING BARRIERS
    No barriers to learning
    READING LIMITATIONS
    No reading limitations
    INTERESTED IN LEARNING (MOTIVATED)
    Yes, interested in learning what?
       Comment: About health
    PREFERRED METHODS FOR LEARNING
              ** THIS NOTE CONTINUED ON NEXT PAGE **
-------------------------------------------------------------------
HALL,TERRY D                 LEXINGTON-LD VAMC      Printed:12/18/2002 11:55
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 DOB:09/19/1964    Pt Loc: OUTPATIENT              Vice SF 509
-------------------------------------------------------------------
```

--------------------------------------------------------------------------
MEDICAL RECORD                                          Progress Notes
--------------------------------------------------------------------------
NOTE DATED: 08/06/2002 09:51   TELEPHONE CONTACT/PROGRESS NOTE
VISIT: 08/06/2002 09:51 TELEPHONE CARE/VA HELPS
PCP/PC GREEN/ROBERTS 12/6/02. PATIENT CALLED REQUESTING PROVIDER ORDER
CELEBREX OR ANOTHER MEDICATION FOR HIS ARTHRITIS. STATED THE MEDICATION HE
TAKES NOW CAUSES SIDE EFFECTS. PHONE NO 233-9491 (LOCAL NO). VA TO BETTIE
WALKER, RN.

                    Signed by: /es/ BLANCHE WARDLE
                             CLERK 08/06/2002 09:56
        Receipt Acknowledged By:
                        /es/ BETTIE WALKER, R.N.
                             STAFF NURSE OPC/LD 08/06/2002 14:57


08/06/2002 17:35       ADDENDUM
TALKED WITH PATIENT AND HIS WIFE. PATIENT IS C/O TYLENOL #3 CAUSING
DROWSINESS AND CONSTIPATION AND IS REQUESTING CELEBREX MEDICATION TO TAKE.
THEN WIFE GOT ON LINE AND WAS ANGRY AND STATED "WE DON'T WANT SOMETHING
JUST FOR THE PAIN, WE NEED SOMETHING TO TREAT THE ARTHRITIS. WE DON'T WANT
A NARCOTIC, JUST ARTHRITIS MEDICATION". ADVISED HER THAT CELEBREX WAS NOT
AVAILABLE FOR PC PROVIDER TO ORDER WITHOUT TRYING OTHER MEDICATIONS.
ADVISED THERE ARE SEVERAL OTHER NASID MEDICATIONS THAT CAN BE TRYED IF
PATIENT WANTS TO CHANGE. WHEN ASKED WHY PATEINT COULDN'T TAKE THE NAPROXEN
SHE STATED THAT MADE HIM DROWSY ALSO. ADVISED HER THAT PROVIDER WOULD BE
ALERTED WITH THE CONCERN ABOUT THE TYLENOL #3 MEDICATION. SHE THEN ABRUPTLY
HUNG UP PHONE.
                    Signed by: /es/ BETTIE WALKER, R.N.
                             STAFF NURSE OPC/LD 08/06/2002 17:39
        Receipt Acknowledged By:
                        /es/ RONALD E. ROBERTS, M.D.
                             PRIMARY CARE STAFF PHYSICIAN 08/07/2002 08:37


08/07/2002 08:38       ADDENDUM
Will d/c his tylenol #3 and try him on etodolac 400mg po tid with food prn
pain.
                    Signed by: /es/ RONALD E. ROBERTS, M.D.
                             PRIMARY CARE STAFF PHYSICIAN 08/07/2002 08:38
        Receipt Acknowledged By:
                        /es/ BETTIE WALKER, R.N.
                             STAFF NURSE OPC/LD 08/07/2002 09:00


08/07/2002 09:00       ADDENDUM
PATEINT HAS BEEN NOTIFIED OF CHANGE OF MEDICATION FOR ARTHRITIS.
                    Signed by: /es/ BETTIE WALKER, R.N.
                             STAFF NURSE OPC/LD 08/07/2002 09:01


--------------------------------------------------------------------------
HALL, TERRY D                  LEXINGTON-LD VAMC          Printed:12/18/2002 11:55
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 DOB:09/19/1964     Pt Loc: OUTPATIENT              Vice SF 509
--------------------------------------------------------------------------

                                                    MLS 000092

```
------------------------------------------------------------------
MEDICAL RECORD                                      Progress Notes
------------------------------------------------------------------
```

NOTE DATED: 09/05/2002 16:48   MHC FOLLOW-UP PROGRESS NOTE
VISIT: 09/05/2002 15:00 MHC/SOCIAL WORKER 1/LD

DATE OF SESSION: 09/05/02, @ 15:00

TIME INCREMENTS OF SESSION: 60 minutes

CPT CODE FOR SESSION: 90847, x's 2

PRIMARY DIAGNOSIS TREATED: 309.81, & 296.3

CONTENT OF SESSION: Seen with his two young sons, who were quite active in
the office. His wife is working a 12 hour shifts today as a nurse at a
local hospital. So, he is the supervising parent of these boys today.
"They (his sons) are a real hand full to keep up with physically," he
noted.

His young adult son from a prior marriage relocated from Texas to Pike
county KY as planned, with his hispanic fiance. This young man is
attending the local Prestonsburg, KY community college, where he is taking
pre-pharmacy. Mr. Hall's is arranging for this son to get individual
counseling to help him cope with his anxiety, and to help him deal with
his dysfunctional mom (Mr. Hall's abusive ex-wife).

THERAPEUTIC INTERVENTION: Supportive CBT focused psychotherapy.

PATIENT RESPONSE TO TREATMENT: Positive.

ASSESSMENT OF TREATMENT EFFECTIVENESS: Mood is stable. Affect is
reasonably bright. No s/h intent or plans. He is looking into possibly
relocating his nuclear family to Danville, KY where housing is cheaper,
the public school system is good, and the pace of life is a bit slower.

FUTURE PLAN: RTC to the next open appointment slot to see this theapist.

Pain:
Intensity:
Location:
Duration:
Characteristics:
No change in pain assessment from last visit.

37-037-5/99-T

                    Signed by: /es/ JOE STATES, ACSW, LCSW
                               CLINICAL SOCIAL WORKER 09/05/2002 17:03


```
------------------------------------------------------------------
```
HALL,TERRY D                    LEXINGTON-LD VAMC          Printed:12/18/2002 11:55
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 DOB:09/19/1964      Pt Loc: OUTPATIENT               Vice SF 509
```
------------------------------------------------------------------
```

MLS 000093

```
----------------------------------------------------------------
EDICAL RECORD                                    Progress Notes
----------------------------------------------------------------
OTE DATED: 04/03/2001 08:20   AEU 10-10M NURSING ASSESSMENT
ISIT: 04/03/2001 07:54 URGENT CARE UNIT/CDD
***********************************************
nitial Triage DISPOSITION:
   > UCU: Urgent
***********************************************
```

```
              < I N I T I A L     T R I A G E >
              -------------------------------------
   TRIAGE TIME: 04/03/2001@08:23:13 am
        D.O.B.: 09/19/1964        ARRIVAL: Ambulatory
          AGE: 36            DUE TO INJURY: No
          SEX: MALE             HOMELESS: No
RANSFER FROM: Home
```

`* CHIEF COMPLAINT: 1. CONSTANT HEADACHE X 4 DAYS. "?MUSCLE TENSION IN \ACK OF HEAD AND NECK. UNDER NORMAL STRESS". NO SENSITIVITY TO LIGHT. NO IAUSEA OR VOMITING. NO VISION PROBLEMS.   2. CHRONIC BACK PROBLEMS--OUT OF IEDS.`

```
   COMMENTS:
   No Data Reported
***********************************************
                 < V I T A L S >
                 -----------------
```

```
emp.:    97.7 F   (36.5 C)
(04/03/01@08:19)
ulse:     89
(04/03/01@08:19)
esp.:    18
(04/03/01@08:19)
/P:     154/74
(04/03/01@08:19)
t.:     5 ft 8 in (172.72 cm)
(04/03/01@08:19)
t.:     200 lb   (90.91 kg)
(04/03/01@08:19)
ain:     6
(04/03/01@08:19)
```

```
              < A L L E R G I E S >
              -------------------------
* Allergies Reviewed *
No Known Allergies Found...
```

```
         < P A S T   M E D I C A L   H I S T O R Y >
         ------------------------------------------------
Previous History:
Psychiatric
```

```
         ** THIS NOTE CONTINUED ON NEXT PAGE **
----------------------------------------------------------------
HALL,TERRY D            LEXINGTON, KY  (CONS)/CDD   Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT        Vice SF 509
----------------------------------------------------------------
```

MLS 000094

---

ᴮᴰICAL RECORD                                                    Progress Notes

---

4/03/2001 08:20        ** CONTINUED FROM PREVIOUS PAGE **

  PTSD
ther
  CHRONIC BACK PROBLEMS, HIGH CHOLESTEROL
---
obacco?  NO
lcohol
  OCCASIONALLY
  End Of Data...

                    < M E D I C A T I O N >
                    -------------------------------
ᴬ Medications Reviewed, But not included in Note...
Non-VA Prescribed Medications:
  CLARITIN D

< R E S P I R A T I O N / O X Y G E N A T I O N >
--------------------------------------------------------
Addressed, No Complaints Reported...

                    < C A R D I A C >
                    -----------------------
Addressed, No Complaints Reported...

        < M E N T A L   S T A T U S / N E U R O L O G I C A L >
        ------------------------------------------------------
Alert;
Oriented: (3)


Speech: Normal

EMV:
    Eye Opening (Spontaneous)
    Verbal Response (Oriented and Converses)
    Motor Response (Obeys)
    Score: 15

            < P S Y C H O S O C I A L >
            -----------------------------------
  Age Appropriate; Cooperative;

Hygiene: Normal,

PSYCHOLOGICAL SCREEN

  During the past month, have you been bothered by feeling down,
depressed, or hopeless?
    NO
                ** THIS NOTE CONTINUED ON NEXT PAGE **
------------------------------------------------------------------
HALL,TERRY D              LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT            Vice SF 509
------------------------------------------------------------------

MLS 000095

---
MEDICAL RECORD | Progress Notes
---

04/03/2001 08:20     ** CONTINUED FROM PREVIOUS PAGE **

   During the past month, have you often been bothered by little interest
or pleasure in doing things?
      NO
   Have you lost interest in your normal activities in the last 2-4 weeks?
      NO
   Have you ever tried to hurt or kill someone in the past?
      NO
   Have you had any thoughts about hurting or killing yourself or someone
else in the past 30 days?
      NO

ABUSE ASSESSMENT:

           < G A S T R O I N T E S T I N A L >
           -----------------------------------------
   Addressed, No Complaints Reported...

              < G E N I T O U R I N A R Y >
              -------------------------------------
   Addressed, No Complaints Reported...

                    < S K I N >
                    ---------------
   Addressed, No Complaints Reported...

           < M U S C U L O S K E L E T A L >
           ---------------------------------------
   Addressed, No Complaints Reported...

              < R E P R O D U C T I V E >
              ---------------------------------
   Addressed, No Complaints Reported...

                 < P A I N >
                 ---------------
   Addressed, No Complaints Reported...

      < H E P A T I T I S   R I S K   F A C T O R >
      ----------------------------------------------
   No Action Taken
-----------------------------------------------------------------
------
END OF NOTE...

              Signed by: /es/ DEBBIE RASSENFOSS,R.N.
                      STAFF NURSE 04/03/2001 08:25


---
HALL,TERRY D          LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT           Vice SF 509
---

MLS 000096

---

EDICAL RECORD                                                    Progress Notes

---

OTE DATED: 04/03/2001 08:51  NURSE PRACTITIONER PROGRESS NOTE
ISIT: 04/03/2001 07:54 URGENT CARE UNIT/CDD
r. Hall presents to UCU with c/o left post neck and ear pain for the past
 days. no fever or chills, no n,v,d or photophobia. Is congested and has
loody nasal discharge. left ear aching. Has chronic back pain and is
aking Lortab for pain, took one last night for this pain which did not
elp. No neck stiffness
XAM
ars right Tm inflammed, decreased reflex, left TM gray with reflex
ace right frontal sinus tenderness
harynx- no redness or exudate
eck supple, no adenopathy, mild point tenderness right cervical
araspinous muscles no tightness
N 2-12 grossly intact
ungs cta
- sinusitis
lan Augmentin 50o mg tid for 10days, increase fluids. Robaxin for neck
pasm

                    Signed by: /es/ MARCY G MOYNIHAN MSN,ARNP
                              NURSE PRACTITIONER 04/03/2001 08:59

---

HALL,TERRY D                 LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT              Vice SF 509

---

MLS 000097

```
------------------------------------------------------------
MEDICAL RECORD                                Progress Notes
------------------------------------------------------------
NOTE DATED: 04/03/2001 09:15  AEU 10-10M PT DISCHARGE INSTRUCTIONS
VISIT: 04/03/2001 07:54 URGENT CARE UNIT/CDD
PT NAME: HALL,TERRY D
   SSN: 400048401
   DATE: 04/03/2001@09:36:12 am


*****************************************************
         Patient Education Forms Issued
*****************************************************
    End of list...


*****************************************************
         Discharge Information
*****************************************************
Mode of Exit?: Walked
Condition at discharge?: No Change

Discharge instruction:
 > Performed return demonstration.  (see comments)
 > Verbalized understanding of discharge.
 > Verbalized understanding of take home medications.


*****************************************************
         Discharge Instructions
*****************************************************
Type of Discharge: Regular

-- PT Discharge Instruction... --

   AMBULATORY CARE
   PATIENT DISCHARGE INSTRUCTIONS

   PATIENT: HALL,TERRY D


   1. Date:  04/03/2001@09:36:12 am

   2. The Problem Identified Today:
      sinusitis

   3. Medication Changes:
      -Take new medication as directed on bottle.
      -Other:
       take augmentin with food

   4. Physical Activity Limitations:
      None

   5. Dietary Limitations/Discharge Dietary Instructions:
      drink 1-2 liters of fluid a day to loosen congestion
             ** THIS NOTE CONTINUED ON NEXT PAGE **
------------------------------------------------------------
HALL,TERRY D              LEXINGTON, KY  (CONS)/CDD   Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT
                                                     Vice SF 509
------------------------------------------------------------
```

MLS 000098

----------------------------------------------------------------
MEDICAL RECORD                                         Progress Notes
----------------------------------------------------------------
4/03/2001 09:15     ** CONTINUED FROM PREVIOUS PAGE **

   6. Special Instructions:
      moist heat to nceck for spasms

   7. Primary Care Provider:
      PC Team/

   8. The Clinic You Were Seen In Today/Provider
      UCU:moynihan

   >Patient or Significant Other Verbalizes Understanding of Instructions
    Given?  No

   >Copy Given to Patient?
       YES

       *** If your problem does not improve or you get worse, please
           call the VA for help. ***
----------------------------------------------------------------
--------
   DATA CARD IMPRINT: HALL,TERRY D; 400048401

   If you have medical problems, need an appointment or rescheduling:

   Call Monday-Friday, 8:00 a.m.- 4:30 p.m.
   Lexington Local                281-4949
   Within Kentucky (toll free)    1-888-VA HELPS (1-888-824-3577)
   Outside Kentucky               1-859-281-4949

            Signed by: /es/ MEGYN J DAWSON,R.N.,CEN
                       STAFF NURSE 04/03/2001 09:18

----------------------------------------------------------------
HALL,TERRY D              LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT                    Vice SF 509
----------------------------------------------------------------

MLS 000099



------------------------------------------------------------

MEDICAL RECORD                                                    Progress Notes
------------------------------------------------------------

NOTE DATED: 03/28/2001 18:07  MHC SOCIAL WORK NOTE
VISIT: 03/26/2001 14:00 ZZMHC/SOCIAL WORKER #1/LD

                One Hour Individual Psychotherapy Session

Mr. Hall was seen after he saw Dr. Larmore here earlier in the day. He
reported that things have not been going well for him of late.

His boss (the plant manager) gave him an unsatisfactory job performance
rating recently, and he is unhappy about this situation. This guy will not
talk with him about why he was given this bad rating. He feels "helpless,
and frustrated" about the situation. This week he handed in a lengthy
written appeal of his job rating to the boss. However, he realizes that
this appeal likely will not effect the outcome of what happens to him on
the job in the future. He worries about being fired from his job, and this
is a possible and a more likely scenario now.

Assessment / Plan: We discussed some other options that he could pursue in
the future relative to a job / career. He would really like to return to
college (grad school) and either study history or philosophy, get a
terminal academic doctoral degree, and teach in a college.

He was informed that as a 30% SC veteran he is eligible to apply for VA
Voc Rehab benefits through the regional office in order to pursue $
support for such graduate training. This is something that is new info for
him, and he will discuss it with his wife. She does not work, though she
is trained and licensed as an RN. They have small children and a mortgage.

He continues to try to cope with his chronic pain, as well as his PTSD
issues. Sometimes his mood is depresssed and irritable. These problems
sometimes interfere with his marriage, ie with positive communication with
his wife. He denies s/h ideation.

RTC in one month. He would like to come in more often, but fears doing so
because this alone might prompt termination from his job.

                Signed by: /es/ JOE STATES, ACSW, LCSW
                           CLINICAL SOCIAL WORKER 03/28/2001 18:21

------------------------------------------------------------
HALL,TERRY D              LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT             Vice SF 509
------------------------------------------------------------

MLS 000100

---

MEDICAL RECORD                                                    Progress Notes

---

NOTE DATED: 05/15/2001 18:21  MHC SOCIAL WORK NOTE
VISIT: 05/11/2001 08:00 ZZMHC/SCHEDULED OVERFLOW/LD

                MHC / 60 minute individual session

Mr. Hall called in for this appt stating that he was in a "crisis."
The plant manager had called a meeting with him essentially to inform him
that he would soon be fired from his job, within 2 weeks time period max.
This is not a totally unexpected event, though he is not prepared to deal
with it on an emotional level. Similar outcomes have occurred to him via
his last several jobs. Its always the same old story that its his
"attitude, seriousness, demeanor, etc." "I'm serious on the job, I don't
hunt or fish, or golf, so I just don't fit in with the good old boy
crowd," he stated.

We agreed that he needs to get into a different line of work. One problem
is that he is an engineering type of factory job, yet he is not a degreed
engineer. His PTSD symptoms are getting in the way in a big manner
relative to him being able to communicate with others on the job. The boss
told him that what he did on the job (task wise) was ok, it was just his
inadequate interpersonal skills that were the problem.

Assessment / Plan: He has decided that he cannot return to this job, to
only be fired in short order. So, Dr. Larmore and this therapist authored
a statement and gave it to him stating that due to health reasons he is
advised to NOT return to his current job. He will apply for reevaluation
of his SC PTSD condition. Also, he will consider applying for VA Voc Rehab
benefits in order to possibly train for a new career field, where he might
prepare himself to work in a more solitary type of job. He has a BA degree
in psychology from Pikeville college. His wife is supportive of him. She
has told him that he is what's important to her and the children, not
paying the mortgage or the car note, etc. He is glad to have his wife's
support. Mr. Hall denied any suicidal intent or plan. He may have to sell
his house and car.

RTC in 2 weeks.

                Signed by: /es/ JOE STATES, ACSW, LCSW
                           CLINICAL SOCIAL WORKER 05/15/2001 18:40
     Receipt Acknowledged By:
                           /es/ KIM SCOTT LARMORE,M.D.
                           PSYCHIATRIST 05/16/2001 11:40

---

HALL,TERRY D            LEXINGTON, KY  (CONS)/CDD     Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT                Vice SF 509

---

MLS 000101

```
---------------------------------------------------------------
```
MEDICAL RECORD
```
---------------------------------------------------------------
```
                                                    Progress Notes
```
---------------------------------------------------------------
```
NOTE DATED: 08/22/2001 15:56  PC PATIENT DISCHARGE PLAN/INSTRUCTIONS/LD


CLINIC DISCHARGE INSTRUCTIONS:

NAPROXEN 500MG ONE PILL TWICE A DAY, TAKE WITH MILK OR FOOD.

TYLENOL #3 ONE PILL Q4-6 HOURS AS NEEDED FOR SEVERE PAIN.

RETURN TO CLINIC 6 MONTHS WITH LABS ORDERED.

Teaching sheets given.        (X )Yes  ( )No   ( )NA
                              If yes, please list titles below:

                              NAPROXEN
                              TYLENOL #3

Patient and/or family verbalized understanding of instructions.
                              (X )Yes  ( )No   ( )NA

Patient consented to receive copy of this instruction sheet.
                              (X )Yes  ( )No   ( )NA

If you have questions or problems, please contact us at 1-877-823-6765, or
281-3860. If you have been referred to a speciality clinic, please allow
2-4 weeks to receive an appointment.  If any blood work or test results
are abnormal, we will contact you, please make certain we have your
correct address and phone number.


Your next appointment with DR.ROBERTS
          is scheduled for

                              58-056-5/99-T

          Signed by: /es/ BETTIE WALKER,R.N.
                     STAFF NURSE OPC/LD 08/22/2001 15:57

```
---------------------------------------------------------------
```
HALL,TERRY D            LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT              Vice SF 509
```
---------------------------------------------------------------
```

MLS 000102

---

MEDICAL RECORD                                                    Progress Notes

---

NOTE DATED: 08/22/2001 15:37  PC GREEN PROVIDER PROGRESS NOTE
VISIT: 08/22/2001 15:20 PC GREEN/ROBERTS/LD
ID:  36 yo MALE
CC:  f/u
HPI:  Pt presents to clinic for f/u.  He states that his back cont to
bother him.  He states that would like refills of his lortabs and robaxin
for his chronic low back pain.  He states that he takes 1/2 5mg lortab po
bid at the most and robaxin on a similar schedule.  His prior w/u
includes:
Report:
        MRI OF THE LUMBAR SPINE W/ & W/O CONTRAST:  MULTIPLANAR AND
        MULTISEQUENTIAL IMAGES OF THE LUMBAR SPINE WERE OBTAINED IN A
        HIGH FIELD STRENGTH MAGNET.  IMAGES WERE OBTAINED WITH AND
        WITHOUT CONTRAST ADMINISTRATION.  PHYSIOLOGIC LORDOSIS OF THE
        LUMBAR SPINE IS DISRUPTED AT THE L4-5 LEVEL WITH APPROXIMATELY
        4mm ANTEROLISTHESIS OF L5 WITH RESPECT TO L4.  THERE IS MAGNETIC
        FIELD INHOMOGENEITY AND DISTORTED IMAGES AT L5-S1 LEVEL DUE TO
        METALLIC ARTIFACTS.  THE PATIENT HAD A FUSION OF L5-S1 LEVEL AND
        THESE ARE THE SCREWS PLACED INTO THE S1 AND L5 VERTEBRAL BODIES.
        MULTIPLE SCHMORL HERNIATIONS ARE IDENTIFIED IN ALMOST ALL LUMBAR
        ENDPLATES.  THERE IS ABNORMAL SIGNAL OF THE INFERIOR ENDPLATE OF
        L2 AND L4 AND THE SUPERIOR ENDPLATE OF L3 CONSISTENT WITH
        ENDPLATE CHANGES.  THERE IS A LEFT PARACENTRAL DISC HERNIATION AT
        T11-12 LEVEL WITH EXTENSIVE SCARRING WHICH DEMONSTRATES CONTRAST
        ENHANCEMENT INDICATING CHRONIC NATURE OF THIS LESION.  DISC
        HERNIATION IS COMPRESSING THE CORD AND THECAL SAC FROM LEFT
        ANTERIOR DIRECTION.  THERE IS ALSO NARROWING OF THE LEFT NEURAL
        FORAMEN AT THIS LEVEL FOR THE SAME REASON.  THERE IS EVIDENCE OF
        LAMINECTOMY AT L5-S1 LEVEL WITH EXTENSIVE SCARRING.  SCAR
        DEMONSTRATES MINIMAL CONTRAST ENHANCEMENT.  ASSESSMENT OF
        POSSIBLE SAC COMPRESSION OR NEURAL FORAMINAL NARROWING CANNOT BE
        OBTAINED AT THIS LEVEL DUE TO THE METALLIC MAGNETIC FIELD
        DISTORTION.

 Impression:
     1.  S/P LAMINECTOMY AND FUSION AT L4-5 AND L5-S1.

     2.  LEFT PARACENTRAL CHRONIC DISC HERNIATION WITH ENHANCING SCAR
     AT T11-12 COMPRESSING THE THECAL SAC AND CORD AS WELL AS THE LEFT
     NEURAL FORAMINA.

     3.  5mm SPONDYLOLISTHESIS OF L5 WITH RESPECT TO L4.

     4.  ENDPLATE CHANGES AT L2, L3, AND L4.
He has also been followed in the neurosurgery clinic and the plan was to
cont on lortabs for pain control in addition to tylenol on a scheduled
basis.  He denies bowel and bladder incontinence.  He is also interested
in having skin tags removed from under his arms.

PE:
                    ** THIS NOTE CONTINUED ON NEXT PAGE **

---

HALL,TERRY D              LEXINGTON, KY  (CONS)/CDD      Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT
                                                           Vice SF 509

---

MLS 000103

---------------------------------------------------------
MEDICAL RECORD                                    Progress Notes
---------------------------------------------------------
08/22/2001 15:37      ** CONTINUED FROM PREVIOUS PAGE **

```
    VS:  Temperature:  97 F [36.1 C] (08/22/2001 15:21)
         Pulse:  71 (08/22/2001 15:21)
         Resp:  18 (08/22/2001 15:21)
         BP: 135/69 (08/22/2001 15:21)
         Ht:  68 in [172.7 cm] (08/22/2001 15:21)
         Wt:  201 lb [91.4 kg] (08/22/2001 15:21)
         Pain:  3 (08/22/2001 15:21)
    Gen:  Alert and oriented MALE in NAD
    Chest:  CTAB
    CV:  RRR w/o M, R, G
    Abd:  Soft, NT, ND, BS+, No HSM.
    Ext:  No C/C/E
    Musculoskeletal:  5/5 muscle strength bilat upper and lower
    extremities.
    Back:  Tender to palp over L4-L5 region in center of back.  Negative
    SLR bilat.
```
Labs:  pending (non-fasting)
Assessment:  1.  Chronic low back pain secondary to DJD
2.  Hyperlipidemia
3.  PTSD - followed in MHC
Plan:  1.  Cont on zocor until FLP obtained.
2.  Cont on robaxin.  Will try on tylenol #3 and naprosyn for his pain.
He states that he is in agreement with this.
RTC:  6 months w/ P1 and P2.
CC:  Today's labs.


CLINICAL REMINDER ACTIVITY
  V9 Alcohol screening:
    Patient has had at least 1 drink in last year -
      Comment: None in last month.  6-12 beers per week prior.
    CAGE (Mental Health Instrument)
    An alcohol screening test (CAGE) was negative (score=0).
  Exercise Education:
    "Helping you protect your health" pamphlet given to and reviewed with
      patient
    Patient had exercise screening at this encounter.
      Level of Understanding: Good
  Weight and Nutrition Screen:
    "Helping you protect your health" pamphlet given to and reviewed with
      patient
    Patient had nutrition/weight screening at this encounter.
      Level of Understanding: Good
  Hepatitis C Risk Assessment:
    HEPATITIS C RISK FACTORS:
    Patient has no risk factors for hepatatis c
  V9 Tobacco Education 1st Try:
    Patient was screened for tobacco use today.
    Patient has quit tobacco use.
                  ** THIS NOTE CONTINUED ON NEXT PAGE **
---------------------------------------------------------
HALL, TERRY D           LEXINGTON, KY  (CONS)/CDD      Printed:05/20/2002 11:06
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 DOB:09/19/1964      Pt Loc: OUTPATIENT            Vice SF 509
---------------------------------------------------------

MLS 000104

---
MEDICAL RECORD                                                    Progress Notes
---

08/22/2001 15:37        ** CONTINUED FROM PREVIOUS PAGE **

        Comment (Optional): Quit in 1996
    Tobacco cessation education is not applicable to this patient
        Comments (Required): Quit in 1996
Learning Readiness Assessment:
    LEARNING READINESS ASSESSMENT
    New Assessment
    LEARNING BARRIERS
    No barriers to learning
    READING LIMITATIONS
    No reading limitations
    INTERESTED IN LEARNING (MOTIVATED)
    Yes, interested in learning what?
        Comment: About health
    PREFERRED METHODS FOR LEARNING
    Written
    Oral
    WITH WHOM WOULD YOU LIKE TO SHARE THIS INFORMATION?
    Self

            Signed by: /es/ RONALD E. ROBERTS, M.D.
                    PRIMARY CARE STAFF PHYSICIAN 08/22/2001 15:58


08/23/2001 12:00        ADDENDUM
Pt's labs reviewed and were wnl.  His total chol was 129 and LDL 49.  Will
d/c his zocor and recheck a FLP on rtc.
            Signed by: /es/ RONALD E. ROBERTS, M.D.
                    PRIMARY CARE STAFF PHYSICIAN 08/23/2001 12:01


08/24/2001 15:18        ADDENDUM
UNABLE TO REACH PATIENT PER PHONE ABOUT CHANGE IN MEDICATION. INFORMATION
LETTER HAS BEEN MAILED TO PATEINT WITH INSTRUCTIONS TO STOP ZOCAR AND THAT
HE WILL BE HAVING FASTING LABS DONE ON NEXT RTC APPT TO RECHECK LIPID
PROFILE LEVEL.
            Signed by: /es/ BETTIE WALKER,R.N.
                    STAFF NURSE OPC/LD 08/24/2001 15:21


---
HALL,TERRY D                    LEXINGTON, KY  (CONS)/CDD     Printed:05/20/2002 11:06
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 DOB:09/19/1964      Pt Loc: OUTPATIENT                    Vice SF 509
---

MLS 000105

```
-----------------------------------------------------------------
MEDICAL RECORD                                      Progress Notes
-----------------------------------------------------------------
```

NOTE DATED: 11/06/2001 10:48  MHC FOLLOW-UP PROGRESS NOTE
VISIT: 11/05/2001 10:00 ZZMHC/SCHEDULED OVERFLOW/LD

DATE OF SESSION: 11/05/01, @ 1000.

TIME INCREMENTS OF SESSION: One hour.

CPT CODE FOR SESSION: 90808.

PRIMARY DIAGNOSIS(ES) TREATED: PTSD, Major Depression, and Chronic Pain
condition.

CONTENT OF SESSION: Mr. Hall was seen with his youngest son. We mostly
talked during this session about the severe marital strife that he and
his wife are dealing with right now. Things got so intense between
them this past Sunday that he informed her of his decision to leave her.
She thought about this confrontation from him for awhile, and informed him
that she does not want him to leave her and their two young sons, and that
she is ready to seek out help with him (individual and / or marital
therapy) to address their multiple underlying issues. He knows that he
needs personal space, and this upsets his wife at times. She is a very
enmeshed person (via her family of origin issues) and wants his attention
24 / 7, which is overwhelming to him emotionally.

THERAPEUTIC INTERVENTION: Cognitive Behavioral Psychotherapy.

PATIENT RESPONSE TO TREATMENT: Positive. He seems motivated for TX, and
he has a bright mind, which is a good assett to have for psychotherapy.

ASSESSMENT OF TREATMENT EFFECTIVENESS: Mr. Hall stated that he can cope
with his depression and pain fairly well most days. Sometimes s/i is on
his mind, but he denies s/h intent & / or plans. He wants to be hopeful
that he and his wife can resolve their differences, with appropriate
help.

FUTURE PLAN: He will call in for his next appointment. Also, he will ask
his wife to call this therapist for an individual appointment. We agreed
that it is a good idea for his wife to be seen for a few sessions here
individually, in order to address of her possible underlying personal
issues, before we begin to get into their relationship issues & problems.

Pain: 7, on the typical day anymore.
Intensity: Severe.
Location: Upper back primarily.
Duration: Always there, but worse at times, after he tries to do anything
that requires physical effort relative to upper body activity.
Characteristics: If he takes enough medication to control his pain, then
he cannot function effectively within the home in his roles as father to
his young children, and as a husband to his wife. So, he tries to not take
pain meds sometimes, unless he has to do so in order to cope.

              ** THIS NOTE CONTINUED ON NEXT PAGE **
```
-----------------------------------------------------------------
```
HALL,TERRY D              LEXINGTON, KY  (CONS)/CDD     Printed:05/20/2002 11:06
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 DOB:09/19/1964     Pt Loc: OUTPATIENT              Vice SF 509
```
-----------------------------------------------------------------
```

MLS 000106


02144 853437

```
-------------------------------------------------------------------------
MEDICAL RECORD                                              Progress Notes
-------------------------------------------------------------------------
11/06/2001 10:48      ** CONTINUED FROM PREVIOUS PAGE **


37-037-5/99-T

                 Signed by: /es/ JOE STATES, ACSW, LCSW
                            CLINICAL SOCIAL WORKER 11/06/2001 11:04


11/06/2001 11:05      ADDENDUM
GAF remains 50.
                 Signed by: /es/ JOE STATES, ACSW, LCSW
                            CLINICAL SOCIAL WORKER 11/06/2001 11:05
```

```
-------------------------------------------------------------------------
HALL,TERRY D              LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964      Pt Loc: OUTPATIENT           Vice SF 509
-------------------------------------------------------------------------
```

MLS 000107

---

MEDICAL RECORD                                                    Progress Notes

---

NOTE DATED: 01/10/2002 16:39  PC GREEN CARE MANAGEMENT
VISIT: 01/10/2002 16:39 PC GREEN/WALK-IN/LD
PATEINT PRESENTED AS WALK-IN TODAY WITH C/O HAVING NECK AND BACK PAIN.
PATEINT HAD BEEN REFERRED TO PT FROM LAST CLINIC VISIT 12/18 FOR
EVAULATION AND EXERCISE PROGRAM. PATIENT HAD APPT FOR 12/26 WITH NOTED NO-
SHOW. REVIEWED THIS WITH PATIENT AND HE STATED HE WAS NOT AWARE OF THIS
APPT. ADVISED HIM TO CONTACT PT TO GET NEW APPT SET AND GO FOR THAT
EVALUATION WHEN SCHEDULED AND HE STATED HE UNDERSTOOD AND WOULD TAKE CARE
OF THIS AS SOON AS POSSIBLE.

                    Signed by: /es/ BETTIE WALKER,R.N.
                               STAFF NURSE OPC/LD 01/10/2002 16:42

---

HALL,TERRY D                    LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT                      Vice SF 509

---

MLS 000108

---

EDICAL RECORD

Progress Notes

---

OTE DATED: 01/11/2002 16:22   COMPENSATION & PENSION EXAM
ISIT: 01/10/2002 13:00 C&P/WHORLEY/MENTAL HEALTH/LD

r. Terry D. Hall is a 38-year-old, white, male, Gulf War veteran
ho came to the interview alone.

EVIEW OF MEDICAL RECORDS: This report is based upon a review of
he veteran's C-file, medical chart review, computerized progress
otes for the past year, and an interview with the veteran.

EDICAL HISTORY SINCE LAST EXAM: The veteran reported no
ospitalization within the last year. He has been seen in the VA
ental Health Clinic in Lexington by both a clinical social
orker and a psychiatrist during the past year. In regard to
ost-traumatic stress disorder symptoms, the veteran reported
ositive symptoms with regard to persistent re-experiencing. He
eported nightmares one to two of the last seven days. He
eported reliving traumatic events three to four of the last
even days. He reported emotional upset and physical reactions
ncluding sweating and rapid heartbeat both in three to four of
he past seven days. In regard to persistent avoidance of
timuli that reminds the veteran of traumatic events, he reported
voidance of thinking about, talking about, or having feelings
bout traumatic events five to seven of the past seven days. He
lso reported avoiding activities, places, and people reminding
im of traumatic events five to seven of the past seven days. In
egard to memory loss, he reported loss of memory related to
mportant details related to his combat experienced one to two of
he past seven days. In regard to diminished interest, emotional
ut off, and inability to have positive feelings, all were
eported three to four of the past seven days. He reported an
xpectation of not having a normal family life or life span five
o seven of the past seven days. In regard to hyperarousal
ymptoms, the veteran indicated diminished sleep one to two of
he past seven days, irritability on a daily basis, difficulty
ith concentration three to four of the past seven days,
ypervigilance five to seven of the past seven days, and easy
tartle one to two of the past seven days. In comparison to his
xperience six months ago, the veteran stated that his symptoms
ave overall increased during the past six months, particularly
ince the occupance of the terrorist attack on 09-11-01.

The veteran was also evaluated for depressive symptoms. He was
administered the CES-Depression scale. His score of 40 indicated
the severe range. The veteran was positive for passive suicidal ideation
within the past thirty days. He was also positive for active suicidal
ideation five days prior to the interview. He denied any current suicidal
ideation within the past twenty-four hours. He indicated that during the
last occurance of suicidal ideation he considered running his car off the
road and making it appear that it was an accident. However, he stated

** THIS NOTE CONTINUED ON NEXT PAGE **

---

HALL,TERRY D              LEXINGTON, KY  (CONS)/CDD      Printed:05/20/2002 11:06
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 DOB:09/19/1964     Pt Loc: OUTPATIENT                Vice SF 509

---

MLS 000109

---
MEDICAL RECORD                                        Progress Notes
---

01/11/2002 16:22      ** CONTINUED FROM PREVIOUS PAGE **

that he would not act on suicidal thoughts due to concern for his
family and the fact that he still has hope that his life will
improve.  He admitted to having two rifles in his home.  The
interviewer recommended that he remove the rifles at this time to
reduce risk of harm to himself or others.  He was agreeable to
this and indicated that he would relocate the weapons to his
father's home.  The veteran denied any homicidal ideation within
the past thirty days.  He denied any previous homicidal attempt
in civilian life.  He indicated that a few years ago he became
very intoxicated from alcohol and looking back, wonders if this
was his attempt at suicidal, however, he had no intent at the
time to harm himself or take his own life.  The veteran currently
has been prescribed antidepressant medication.  He currently
takes Prozac 20 mg two capsules in the morning, and Oxazepam 10
mg q.i..

SUBJECTIVE COMPLAINTS:  When asked what was going best in his life at this
time, he stated that his claim for increased compensation is
progressing.  He also stated he has a positive relationship with his
father.  In regard to problems, the veteran reported headaches,
nervousness, depressed mood, difficulty concentrating, crying easily,
difficulty with sleep, diminished interest in activities, a lack of
energy, and a feeling that life is pointless and meaningless quite often.

PSYCHOSOCIAL ADJUSTMENT SINCE THE LAST EXAM-

LEGAL HISTORY:  The veteran denied any legal charges or
convictions.

EDUCATIONAL ACCOMPLISHMENTS:  The veteran has not been involved
in academic work in the last several years.

WORK:  The veteran is not working due to disability.  His last
employment was 05-10-01.

MARITAL AND FAMILY RELATIONSHIPS:  The veteran currently lives
with his wife and two children.  This is his second marriage.
His first marriage ended in divorce immediately after his return from
the Gulf War.  He has been married to his current wife for seven years.
They have had tension and some conflict recently due to the veteran's
perception that his wife does not understand post-traumatic stress
disorder.  He and his Mental Health Clinic therapist have planned to
involve the wife in counseling in the very near future.

SOCIAL RELATIONSHIPS:  The veteran has no outside contacts.  He
is considering returning to church involvement and has recently
attended a church in the area that he likes.  However, he is
still tentative about his plans for involvement.
             ** THIS NOTE CONTINUED ON NEXT PAGE **
---
HALL,TERRY D             LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT              Vice SF 509
---

MLS 000110

```
--------------------------------------------------------------------------
MEDICAL RECORD                                              Progress Notes
--------------------------------------------------------------------------
01/11/2002 16:22        ** CONTINUED FROM PREVIOUS PAGE **
```

ACTIVITIES AND LEISURE ACTIVITIES: The veteran spends most of
his time caring for his children and reading when he can. He
stated that he is unable to be active, particularly exercise due
to his physical limitations.

PROBLEMATIC SUBSTANCE ABUSE: The veteran stated that within the
past month he had consumed beer on ten to twelve occasions,
drinking two to four typically. However, he was somewhat vague
on an upper limit. He stated that he had some concern about his
drinking. He denied any family history of addiction. He indicated that
his wife has been concerned about his increased drinking. He
considers his drinking at this point likely to some degree
self-medication of PTSD, depressive, and chronic pain symptoms. He was
advised to avoid consumption of alcohol and to remove alcohol from the
home due to his increased risk of addiction, suicide potential, and
coping style negatively affecting management of chronic pain. He agreed to
abtain. On-going monitoring of alcohol/other non-prescribed drug use is
strongly indicated.

SIGNIFICANT MEDICAL DISORDERS: The veteran has experienced spinal disc
condition problems and skeletal system problems. He also suffers from
severe headaches. He currently is in treatment for chronic pain. Chronic
pain increases the risk of self-medication (particularly alcohol),
depression, and suicidal potential.

HISTORY OF VIOLENCE AND ASSAULTIVENESS: There is no indication
of violent or assaultive behavior within the last three years.

HISTORY OF SUICIDE ATTEMPTS: Negative.

SUMMARY: The veteran's psychosocial functioning has been
severely impaired due to both psychiatric and medical condition
resulting particularly in chronic pain. Post-traumatic stress
disorder symptoms are primary with secondary depressive symptoms.

In regard to the VARO question regarding unemployability,
the following criteria were used to determine the veteran's potential for
employability:

(1) Ability to adhere to a work structure,
(2) Ability to perform general problem solving in a work environment,
(3) Ability to cooperative with peers to perform work duties,
(4) Relationship with authority and ability to accept supervision,
(5) Ability to cooperate with customers and vendors.

(1) In regard to work structure, the veteran stated that when he was
employed he was tardy often. He attributed this to not wanting
                ** THIS NOTE CONTINUED ON NEXT PAGE **

```
--------------------------------------------------------------------------
HALL,TERRY D            LEXINGTON, KY  (CONS)/CDD    Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT              Vice SF 509
--------------------------------------------------------------------------
```

MLS 000111

------------------------------------------------------------------------
MEDICAL RECORD                                              Progress Notes
------------------------------------------------------------------------
01/11/2002 16:22      ** CONTINUED FROM PREVIOUS PAGE **

to get out of bed to face the world because even routine demands
appeared very stressful, and he also reacted with frustration and
irritability to small hassles.

(2)  Problem solving:  The veteran related several instances in
which he was unable to perform general problem solving due to a
very low frustration tolerance and a sense of helplessness.

(3)  Cooperation with peers:  The veteran stated that he had some
difficulty with peers due to his inability to "read people." He
frequently offended peers due to his irritability and low frustration
tolerance. He also felt suspicious of their intentions when working with
them, remaining hypervigilant and "on edge."

(4)  Relationship with authority figures:  The veteran stated that
he had generally negative relationships with supervisors.  He had
difficulty relating to office politics and to accomodating the
eccentricities of different managers.

(5)  Relationships with customers and vendors:  The veteran
related that he had not had difficulty dealing with customers and
vendors in his previous work. This was the only area that he enjoyed.

MENTAL STATUS EXAMINATION:  In regard to thought process and
communication, there appeared to be no delusions, hallucinations,
or obsessive thoughts, with the exception of occasional flashback
episodes as symptomatic of post-traumatic stress disorder.  The
veteran maintained contact during most of the interview but
avoided eye contact when speaking of traumatic events during his
Gulf War service, particularly when a group of soldiers were
killed due to an out-of-control missile.  There are no current suicidal or
homicidal thoughts.  He appears to be able to maintain adequate personal
hygiene.  The veteran was oriented to person, place, time and
situation.  He was administered the Blessed Orientation Memory
Concentration Test.  The veteran scored 0, indicating no
cognitive deficits in the interview situation. However, he stated that in
day to day life, when he is easily distracted by caring for his children,
he often does experience difficulty.  This is probably most attributable
to impaired concentration and failure to learn information rather than
inability to recall it.  In regard to obsessive and ritualistic
behavior, they were negative.  The veteran's rate and flow of
speech were within normal limits.  There was no indication of
panic attacks.  There were severe depressive symptoms evident.
There was no indication of impaired impulse control.  The veteran
reported sleep impairment on a regular basis primarily related to
post-traumatic stress disorder symptoms and depression.  Mood
disorder particularly interferes with the veteran's functioning.
Mood disorder is secondary to post-traumatic stress disorder.
                 ** THIS NOTE CONTINUED ON NEXT PAGE **
------------------------------------------------------------------------
HALL,TERRY D           LEXINGTON, KY  (CONS)/CDD     Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT              Vice SF 509
------------------------------------------------------------------------

MLS 000112

----------------------------------------------------------------
MEDICAL RECORD                                    Progress Notes
----------------------------------------------------------------
01/11/2002 16:22        ** CONTINUED FROM PREVIOUS PAGE **


ASSESSMENT OF POST-TRAUMATIC STRESS DISORDER:  The veteran meets
DSM-IV stressor criterion.  The veteran also meets DSM-IV
criteria for all symptom clusters (i.e., reexperiencing, avoidance, and
hyperarousal).

PSYCHOMETRIC TESTING RESULTS:  None.

DIAGNOSTIC STATUS:

AXIS I:      1.  Post-traumatic stress disorder, chronic.
             2.  Major depressive disorder, chronic.
             3.  Coping Style Affecting Management of Chronic Pain (Alcohol
                 Use)

AXIS II:   No Diagnosis

AXIS III:  Chronic pain

AXIS IV:   Problems with primary support group (marital discord).

AXIS V:    Current GAF 50; highest GAF past year 50.

ASSESSMENT OF INDIVIDUAL UNEMPLOYABILITY: The veteran is unemployable due
to substanial impairment in work skills (e.g., adherence to
work structure, problem-solving, and interaction with peers and
supervisors) due to PTSD.

DD:01-11-02
DT:01-12-02
JOB#5328
INFOPRO

$END


                Signed by: /es/ LARRY WHORLEY,DSW,LCSW
                           LICENSED CLINICAL SOCIAL WORKER
                           01/15/2002 09:22
              Cosigned by: /es/ GETULIO V TOVAR, MD
                           MEDICAL DOCTOR 01/15/2002 09:46




----------------------------------------------------------------
HALL,TERRY D            LEXINGTON, KY  (CONS)/CDD   Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT            Vice SF 509
----------------------------------------------------------------

MLS 000113

```
--------------------------------------------------------------------------
MEDICAL RECORD                                                Progress Notes
--------------------------------------------------------------------------
```

NOTE DATED: 01/14/2002 15:21  PHYSICAL THERAPY INITIAL NOTE/OUTPATIENT
VISIT: 01/14/2002 13:45 PHYSICAL THERAPY/OPT CDD
S:  Pt. referred with diagnosis of cervical strain, request for
exercises.  Pt. states that neck started hurting him about 2 years ago.
Pain just came on, does not report an associated injury, but does report
a history of MVA approx. one year before his onset of neck pain.  Pt.
also reports low back surgery in 1997.


O:  AROM of cervical spine limited in all planes. Lateral flexion and
right rotation limited to 10 degrees, left rotation to 15 degrees.
Flexion limited by 15 degrees at end-range.
    No sensory deficits noted in UE's.
    Strength of UE's WNL.
    Trigger points noted in bilateral levators and upper trapezius, right
cervical erector spinae.
    Pt. was treated with spray and stretch followed by moist heat x10
minutes and further stretching to the above muscles. AROM improved by 10
degrees bilaterally in side-bending and rotation.  Flexion WNL, though
performed slowly secondary to pain.
    Pt. was instructed in home stretching exercises for the bilateral
levator scapula and upper trapezius, demonstrating knowledge.
Stretching for 30 sec. each, x4 reps/set, 4x/day.
    Pt. does not work, but does spend some time on the computer at home.
Instructed in proper typing position, with support for elbows and wrist,
to minimize addional strain on the posterior neck and shoulders.  Pt.
voiced understanding.

A:  Myofascial cervical pain, with muscle guarding/tightness in levators,
traps, and erector spinae.

P:  HEP as instructed.  RTC on 1/23/02.

                    Signed by: /es/ BRAD C. RANTA,P.T.
                               ASSISTANT CHIEF, PHYSICAL THERAPY
                               01/15/2002 13:28










```
--------------------------------------------------------------------------
HALL,TERRY D                 LEXINGTON, KY  (CONS)/CDD     Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT               Vice SF 509
--------------------------------------------------------------------------
```

MLS 000114

---

MEDICAL RECORD                                                    Progress Notes

---

NOTE DATED: 01/29/2002 10:15  PHYSICAL THERAPY OUTPATIENT NOTE
VISIT: 01/28/2002 09:30 PHYSICAL THERAPY/OPT CDD
S:  Pt. referred with diagnosis of cervical strain, request for
exercises.  Pt. states that neck started hurting him about 2 years ago.
Pain just came on, does not report an associated injury, but does report
a history of MVA approx. one year before his onset of neck pain.  Pt.
also reports low back surgery in 1997.
    Pt. returns for follow-up, reports that neck is much better.  States
that he cannot believe how much the exercises have helped.


O:  AROM of cervical spine is now WNL in all planes except for limitation
in left rotation by 10 degrees.
    No sensory deficits noted in UE's.
    Strength of UE's WNL.
    Trigger points in bilateral levators and upper trapezius have
resolved.
    Pt. was treated with spray and stretch followed by moist heat x10
minutes and further stretching to the above muscles.  AROM improved to
normal limits in left rotation.
    Reviewed home stretching exercises for the bilateral levator scapula
and upper trapezius, pt. demonstrates knowledge. Stretching for 30 sec.
each, x4 reps/set, 4x/day.
    Pt. does not work, but does spend some time on the computer at home.
Instructed in proper typing position, with support for elbows and wrist,
to minimize addional strain on the posterior neck and shoulders.  Pt.
voiced understanding.

A:  Myofascial cervical pain essentially resolved with home exercise
program.

P:  D/c to continued home exercise program.

                Signed by: /es/ BRAD C. RANTA,P.T.
                           ASSISTANT CHIEF, PHYSICAL THERAPY
                           01/29/2002 10:43

---

HALL,TERRY D            LEXINGTON, KY  (CONS)/CDD      Printed:05/20/2002 11:06
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 DOB:09/19/1964    Pt Loc: OUTPATIENT                Vice SF 509

---

MLS 000115

12-16

Per Dr. Templin

he dictated on it just

rys. He's

Fax

859)226-7079

859) 224 - 1988

859) 224 - 0987

nas cone

once

be

Dr JAMES

TEMPLIN

-7083

(859-226)

Dr. direct line 859-224-0987

**CAL E**
**, INC.**
Mile Road
o
gan 4803
001

8) 356-67.

AGE SHE

$(859)$
$224-$
$0987$

Fax #

_____

_____

_____

_____

_____

**Message:**    **Here is the dictation directions, thanks!!**

_____

_____

**IF YOU DO NOT RECEIVE ALL PAGES OR HAVE PROBLEMS WITH THIS TRANSMISSION,**
**PLEASE CALL US AT (248) 945-9001**

**THANK YOU**

THE DOCUMENTS INSIDE THIS ELECTRONIC TRANSMISSION CONTAINS CONFIDENTIAL INFORMATION BELONGING TO THE SENDER THAT IS LEGALLY PRIVILEGED. THIS INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMES ABOVE. THE AUTHORIZED RECIPIENT OF THIS INFORMATION IS PROHIBITED FROM DISCLOSING THIS INFORMATION TO ANY OTHER PARTY AND IS REQUIRED TO DESTROY THE INFORMATION AFTER ITS STATED NEED HAS BEEN FULFILLED, UNLESS OTHERWISE REQUIRED BY LAW.

IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION, OR ACTION TAKEN IN RELIANCE ON THE CONTENTS OF THESE DOCUMENTS IS STRICTLY PROHIBITED. IF YOU RECEIVED THIS ELECTRONIC TRANSMISSION IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY TO ARRANGE FOR RETURN.

MLS 000116

# MLS National Medical Evaluations, Inc.

Corporate Office

25899 West Twelve Mile Road, Suite 220

Southfield, Michigan 48034

Tel: 248-945-9001

Fax: 248-356-6757

## DICTATION INSTRUCTIONS TO ACCESS THE

## CALL IN SYSTEM

1. Dial 866-946-8294 to access the dictation system
2. You will be prompted to enter a user ID – enter 555
3. Begin dictation after you hear the beep.
4. To dictate more than one report, touch 5 to end the report and begin dictating again after you hear the beep.
5. When finished, simply hang up.

**Keypad Functionality**

| | |
|---|---|
| 1 | Listen |
| 2 | Record |
| 3 | Short Rewind /Play |
| 4 | Pause |
| 5 | End Job, Dictate Next Job |
| 6 | (no function) |
| 7 | Fast Forward |
| 8 | Takes you to the end of the dictation |
| 9 | Disconnect |

*3 – Will rewind to the beginning of your dictation

*7 - Will mark a priority (you must hit *7 before you hang up to mark a report priority)

New Dictation Instructions

MLS 000117



## Sharon Walkaus

| | |
|---|---|
| **From:** | "Lorraine Prebeg" <Lorraine.Prebeg@WausauBenefits.Com> |
| **To:** | <swalkaus@mls-ime.com> |
| **Sent:** | Tuesday, January 06, 2004 3:25 PM |
| **Subject:** | Terry Hall |

Sharon, Mr. Hall called, he has taken the IME to Dr. Templin's office and spoke with Dr. Templin. Dr. Templin indicated the IME Mr. Hall has is the correct one and that is the one he dictated off of. Dr. Templin is looking at the two IME's and Mr. Hall will be calling his office in the AM for which one is the correct IME..    Have you spoken with Dr. Templin yet??    Mr. Hall is threatening legal action.    Just an FYI.

Lorraine Prebeg

This communication is intended only for the recipient(s) named above; may be confidential and/or legally privileged; and, must be treated as such in accordance with state and federal laws. If you are not the intended recipient, you are hereby notified that any use of this communication, or any of its contents, is prohibited. If you have received this communication in error, please return it to Lorraine Prebeg and delete the message from your computer system.


This communication is intended only for the recipient(s) named above; may be confidential and/or legally privileged; and, must be treated as such in accordance with state and federal laws. If you are not the intended recipient, you are hereby notified that any use of this communication, or any of its contents, is prohibited. If you have received this communication in error, please return it to Lorraine Prebeg and delete the message from your computer system.

1/6/04

MLS 000118

# MLS NATIONAL MEDICAL EVALUATION SERVICES, INC.

**25899 West 12 Mile Road**
**Suite 220**
**Southfield, Michigan 48034**
**248-945-9001**

## FAX NUMBER: (248) 356-6757

## FAX COVER/MESSAGE SHEET

**Message to:**   Dr. Templin

**Company:**

**Re:**

**# of Pages:**

**From:**   Joe

**Message:**   Here is the dictation directions, thanks!!

IF YOU DO NOT RECEIVE ALL PAGES OR HAVE PROBLEMS WITH THIS TRANSMISSION,
PLEASE CALL US AT (248) 945-9001

### THANK YOU

THE DOCUMENTS INSIDE THIS ELECTRONIC TRANSMISSION CONTAINS CONFIDENTIAL INFORMATION BELONGING TO THE SENDER THAT IS LEGALLY PRIVILEGED. THIS INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMES ABOVE. THE AUTHORIZED RECIPIENT OF THIS INFORMATION IS PROHIBITED FROM DISCLOSING THIS INFORMATION TO ANY OTHER PARTY AND IS REQUIRED TO DESTROY THE INFORMATION AFTER ITS STATED NEED HAS BEEN FULFILLED, UNLESS OTHERWISE REQUIRED BY LAW.

IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION, OR ACTION TAKEN IN RELIANCE ON THE CONTENTS OF THESE DOCUMENTS IS STRICTLY PROHIBITED. IF YOU RECEIVED THIS ELECTRONIC TRANSMISSION IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY TO ARRANGE FOR RETURN.



DEPOSITION
EXHIBIT
8   HLS
9-27-05   OC

Fax

(859) 224-7079
(859) 224-1988
(859) 224-0987

Dr JAMES
TEMPLIN

12-16
Re: Dr. Templin
he dictated on it just
the last cple days. He's
not sure if it has come
back from thome. Once
it does – it will be
sent to us.

Angela M asst.
226-7583
(859-226)
Dr. direct line 859-234-0987
Fax #

Fax # 0987

(859) 241-7220

# Exhibit 2

0001
1          IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF GEORGIA
2                  COLUMBUS DIVISION
3
4
5
     ------------------------------------)
6  CAROLYN KINSER                    )
         Plaintiff              )
7  VS                           )
   THE PLANS ADMINISTRATION COMMITTEE   )
8  OF CITIGROUP, INC. AS ADMINISTRATOR   )
   OF THE ASSOCIATES FIRST CAPITAL      )
9  CORPORATION LONG-TERM DISABILITY PLAN,)
   A WELFARE PROGRAM OF THE ASSOCIATES   )
10  WELFARE BENEFIT PLAN              )
         Defendant              )
11  ------------------------------------)
12
13
14
15          DEPOSITION OF:  MARK SCHOEDER
              DATE:  MAY 4, 2006
16  HELD AT:  BRANDON SMITH REPORTING
                44 CAPITOL AVENUE
17          HARTFORD, CONNECTICUT
18
19
20
21
22
23     Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221
              BRANDON SMITH REPORTING SERVICE
24          44 Capitol Avenue
              Hartford, CT 06106
25          Tel (860) 549-1850
0002
1  APPEARANCES:
2  REPRESENTING THE PLAINTIFF:
3  MICHAEL HOFRICHTER, ESQ.
   225 S. Glynn Street, Suite A
4  Fayetteville, GA  30214
   770-460-1118
5  mhofrichter@rhkpc.com

6

REPRESENTING THE DEFENDANT:

7

STEPHEN GREENBERG, ESQ.

8  HOLT, NEY, ZATCOFF & WASSERMAN, LLP
   100 Galleria Parkway, Suite 600
9  Atlanta, GA  30339
   770-661-1213
10  sgreenberg@hnzw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0003

1          I N D E X

2

WITNESS:                          PAGE:

3

Mark Schroeder

4    Direct Examination by Mr. Hofrichter        5

5

6

7

8

9

10

11

12

13

14

15

16

17

18
19
20
21
22
23
24
25
0004
 1                    S T I P U L A T I O N S
 2
 3           It is stipulated by counsel for the parties
 4     that all objections are reserved until the time of
 5     trial, except those objections as are directed to the
 6     form of the question.
 7
 8           It is stipulated and agreed between counsel
 9     for the parties that the proof of the authority of the
10     Commissioner before whom this deposition is taken is
11     waived.
12
13            It is further stipulated that any defects in
14     the notice are waived.
15
16            It is further stipulated that the reading and
17     signing of the deposition transcript by the witness
18     may be signed before any Notary Public.
19
20
21
22
23
24
25
0005
 1           (Deposition commenced at 10:00 a.m.)
 2
 3           MARK SCHOEDER, Deponent, having first
 4     been duly sworn, deposes and states as follows:
 5
 6           DIRECT EXAMINATION BY MR. HOFRICHTER:
 7
 8     Q   Dr. Schroeder, my name is Mike Hofrichter.  I
 9     represent Carolyn Kinser in her claim for disability
10     benefits from the Citigroup long-term disability

11  policy.  I'm here to ask you a series of questions
12  about your involvement in this claim.  Would you
13  please state your name for the record?
14  A    Mark, M-A-R-K, Schroeder, S-C-H-R-O-E-D-E-R,
15  M.D.
16        MR. HOFRICHTER:  And just so we can get
17  it on the record, unless I identify an exhibit by a
18  letter, all other exhibits should be identified in
19  accordance with the Bates stamping on the primary
20  claims file from MetLife, which is identified as CIT
21  00001 through CIT 000852.  Is that agreeable to you?
22        MR. GREENBERG:  That's agreeable, Mike.
23        MR. HOFRICHTER:  Okay.
24  BY MR. HOFRICHTER:
25  Q    Your address, please, Dr. Schroeder?
0006
1   A    My office address is 354 Warrenville Road,
2   Mansfield, Connecticut, 06250.
3   Q    An is that your work address or home address?
4   A    It is a work address.
5   Q    And why wasn't the deposition taken at your
6   office today?
7   A    It's a rental space, it's small, just wouldn't
8   be room.
9   Q    Do you share the space with other people?
10  A    At different times, yes.
11  Q    Is it an office with a desk that other people
12  have access to?
13  A    Yes.
14  Q    And how many days a week are you actually in
15  this office?
16  A    One day a week.  One half day a week.
17  Q    One and a half days per week?
18  A    I'm sorry, one half day per week.
19  Q    Do you have any other work address?
20  A    Yes.  I consult at MetLife, office in
21  Glastonbury, 628 Hebron Avenue, Glastonbury,
22  Connecticut.
23  Q    And how many days a week are you at the
24  MetLife Glastonbury office?
25  A    At this time I work there four days a week, a
0007
1   total of 24 hours per week.
2   Q    And those four days, are those full work days?
3   A    They're varying times, averaging about six

4  hours a day.
5    Q    Are you an employee of MetLife?
6    A    No.
7    Q    What are you considered, what is your
8  relationship with MetLife?
9    A    An independent consultant or contractor.
10   Q    And how long have you been working four days a
11 week at MetLife?
12   A    Since November of last year.
13   Q    2005?
14   A    Yes.
15   Q    And before that what was the frequency of your
16 trips to the Glastonbury office before that time?
17   A    Before that two days a week, eight to ten
18 hours per week.
19   Q    And how long a time period does that go back?
20   A    Since I started consulting there in May 2002.
21   Q    So from May 2002 until November 2005 you've
22 been working at MetLife, the Glastonbury office,
23 approximately two days per week averaging eight to ten
24 hours per week?
25   A    Correct.
0008
1    Q    I do a lot of disability cases in Georgia, and
2  I've seen your name come up on files on Aetna cases as
3  well.  Are you now or have you done work for Aetna in
4  the past?
5    A    Yes, I do now.
6    Q    And do you go into the Aetna office to do work
7  for them as well?
8    A    Yes.
9    Q    How many days a week do you do that?
10   A    Two days a week.  Two half days.
11   Q    And do you do the same type of work for Aetna
12 as you do for MetLife?
13   A    Yes.
14   Q    And that is, I guess they call it external
15 physician consultant?
16   A    It's called different things in different
17 places.  That seems accurate enough.
18   Q    What does Aetna call it?
19   A    Call it a consultant medical director.
20   Q    And you are not an employee of Aetna either?
21   A    Correct.
22   Q    How do you get paid from MetLife and Aetna?

23   A   How do you mean how?

24   Q   I'm sorry, that's a bad question.  Are you

25   paid by the case, by the hour, or have you agreed for

0009

1   a certain fee that you'll do a certain number of cases

2   over a certain period of time?

3   A   By the hour.

4   Q   And what is your per hour rate?

5   A   At MetLife 160 dollars per hour, at Aetna 150

6   dollars per hour.

7   Q   I'm assuming you receive a 1099 at the end of

8   the year from each company?

9   A   Yes.

10   Q   And what was your reported 1099 income from

11   MetLife for 2005?

12   A   I don't have the exact number here.

13   Q   Give me a ballpark.

14   A   Okay.  In the order of 100,000 dollars, but

15   that's an estimate.

16   Q   And what about Aetna for 2005?

17   A   Approximately 60,000 dollars, also an

18   estimate.

19   Q   And what was your overall gross income in

20   2005?

21   A   I wonder if I'm obligated to give that

22   information.

23   Q   Can you at least tell me the percentage that

24   your income from MetLife and Aetna encompassed your

25   overall gross salary for 2005?

0010

1   A   More than half.

2   Q   Closer to 75 percent?

3   A   It may be.  I can't be sure without looking at

4   the numbers.

5   Q   Somewhere between 50 and 75 percent?

6   A   Yes, that sounds right.

7   Q   Fair enough?

8   A   Yes.

9   Q   And I understand -- well, first of all, I'm

10   showing you what's marked Exhibit A.  Could you

11   identify that document, please?

12   A   It is my C.V.

13   Q   And is your C.V. current as of May 4th, 2006?

14   A   Yes.

15   Q   Now, you are no longer in a clinical practice,

16  correct?
17    A    No, I am.
18    Q    You are in clinical practice?
19    A    Yes.
20    Q    And so you see patients the half day per week
21  that you're in your office?
22    A    No.  The clinical work I do is treating
23  patients at nursing homes.
24    Q    And how often do you do that?
25    A    On the average of once a week.
0011
1    Q    And how many hours per week?
2    A    One to two.
3    Q    And how long have you been doing that for?
4    A    Many years.
5    Q    And is it a particular nursing facility?
6    A    There are three that I currently go to.
7    Q    Can you tell me what those are, please?
8    A    Yes.  Matulaitis Nursing Home, Pierce Home,
9  and Westview Nursing Home.
10    Q    Before we go much further, I probably ought to
11  ask you what your occupation is?
12    A    Psychiatrist.
13    Q    And are you board certified?
14    A    Yes.
15    Q    Are you a member of any professional
16  association such as the American Psychiatric
17  Association?
18    A    Yes.  I just joined the American Psychiatric
19  Association, so I don't think I had a chance to put it
20  on my resume.  That's incorrect.  I'm now a member for
21  I think a few weeks.
22    Q    2006?
23    A    Yes.
24    Q    Were you a member prior to 2006?
25    A    I was many years ago but haven't been for some
0012
1  time.
2    Q    Why did you drop out?
3    A    I don't recall.
4    Q    Were you disciplined or suspended for any
5  reason?
6    A    No.
7    Q    Have you ever had your license revoked or
8  suspended for any reason?

9    A    No.

10    Q    In which states are you utilized to practice

11  psychiatry?

12    A    Connecticut only.

13    Q    I'm not going to go into your educational

14  background, I'm assuming it's consistent with what's

15  on Exhibit A?

16    A    That's accurate, yes.

17    Q    The work that you do at the nursing homes, is

18  that a per hour basis only?

19    A    No.  I bill the insurance of the patients per

20  case, and the nursing homes pay me a stipend per month

21  for the work I do there.

22    Q    What's your stipend from the nursing home?

23    A    It varies from 100 to 150 dollars per month

24  depending on the home.

25    Q    And how much do you bill the patient's

0013

1  insurance for the work you do for them?

2    A    It depends on the nature of the particular

3  consultation.  I bill whatever -- most of them have

4  Medicare.  I bill whatever the appropriate Medicare

5  fee is.

6    Q    And what is that?

7    A    I think for an initial evaluation, it could be

8  130 dollars.  Follow-up evaluations it's less, but I'm

9  not sure what it is.

10    Q    I'm assuming you receive a 1099 from the

11  nursing homes as well?

12    A    Yes.

13    Q    And from the federal government for the

14  Medicare work?

15    A    Yes.

16    Q    What was the 1099 reported income for 2005

17  from the government through Medicare?

18    A    I believe it was around 11,000 dollars, but

19  again, that's an estimate, I'm just not sure without

20  seeing the numbers.

21    Q    What about the nursing home?

22    A    It would be on the average, for all of them,

23  perhaps about 7,000 dollars.

24    Q    And I see you also do consulting work for the

25  Social Security Administration?

0014

1    A    Yes.

2    Q    How long have you done that work for?
3    A    At least ten years.
4    Q    Do you do independent examination for the
5  Social Security, or do you show up at the hearings as
6  a medical examiner?
7    A    Independent exam.
8    Q    And for the purposes of deposition we'll
9  identify that as IME's.  Is that the term you use,
10  also?
11    A    Yes.
12    Q    Are you ever asked to appear at Social
13  Security hearings as a medical examiner for live
14  testimony?
15    A    I never have been.
16    Q    And have you been doing IME's for the Social
17  Security Administration for ten years?
18    A    At least, yeah.
19    Q    And when you do the IME's, do you actually do
20  in-person examination, or do you just do a file review
21  and render an opinion, or do you do both?
22    A    I review the file, but I do a direct
23  evaluation of the patient, with the client as well.
24    Q    In person?
25    A    In person.
0015
1    Q    And approximately how many of those are you
2  doing per month?
3    A    On the average about eight, but it varies.
4    Q    And the 11,000 dollars you said you receive
5  from Medicare, that was exclusive of the pay you
6  receive for your work for the Social Security
7  Administration, correct?
8    A    Correct.
9    Q    What was your 1099 income from the Social
10  Security Administration?
11    A    That I just don't recall.
12    Q    Give me a ballpark.
13    A    Perhaps 10,000.  It's only an estimate.  I'm
14  not sure.
15    Q    So we have 100,000 dollars from MetLife,
16  approximately 60,000 -- I'm not talking exact numbers,
17  we're just talking specifics.  100,000 MetLife for
18  2005, 60,000 from Aetna, 11,000 for Medicare, 10,000
19  from the Social Security Administration, and 7,000
20  from a couple nursing homes.

21   A   Yes.
22   Q   Any other income for your professional
23  services other than what we've just discussed?
24   A   For what period of time?
25   Q   2005.
0016
1   A   Yes.
2   Q   What else?
3   A   I had done similar consulting work for an
4  insurance company called Liberty Mutual from 5/04 to
5  10/05.
6    Q   Are you doing work for Liberty Mutual
7  presently?
8   A   No.
9    Q   Why did you stop doing work for Liberty
10  Mutual?
11   A   I was let go.
12   Q   Why were you let go?
13   A   They were not entirely clear, but there was
14  something I was doing or not doing that was not
15  agreeable to them.
16   Q   What did they tell you that reason was?
17   A   You know, they were never clear about it.  I'm
18  just not sure.
19   Q   Did you have a contract with them?
20   A   Yes.
21   Q   And did they break the contract?
22   A   It allowed them, in the contract allowed them
23  to terminate services at any time.
24   Q   Did your decision agreement with MetLife, I'm
25  sorry, Liberty Mutual arise out of one of your file
0017
1  reviews for them?
2   A   Not that I know of.  I'm not sure what the
3  true cause was.
4   Q   Did you have a disagreement or argument with
5  any Liberty Mutual employees that led to your release?
6   A   Not that I know of.
7   Q   Did they give you anything in writing as to
8  why they were not honoring the contract any longer?
9   A   No.
10   Q   How were you informed they were not honoring
11  the contract?
12   A   Well, technically, as I understand it, the
13  contract did permit them to do that.

14    Q    So how were you informed they weren't going to
15  use your services anymore?
16    A    The medical director there had just taken me
17  in one morning when I got to work and said that my
18  services would no longer be required.
19    Q    Who was the medical director there?
20    A    Name is David Berube.
21    Q    Is he a psychiatrist?
22    A    No.
23    Q    And what was your approximate 1099 income from
24  Liberty Mutual in 2005?
25    A    Perhaps 100,000 dollars.  Again, an estimate.
0018
1    Q    And you were doing the same type of work at
2  Liberty Mutual that you were doing at MetLife and
3  Aetna?
4    A    Yes.
5    Q    File reviews?
6    A    Yes.
7    Q    Did they ever ask you in 2005 to do any IME's?
8    A    No, that would not be part of the work I would
9  have done there.
10    Q    Let's go back to 2004.  I believe your report
11  in this case was in January of 2004, correct?
12    A    Correct.
13    Q    Was your 1099 income from MetLife
14  approximately the same in '04 as it was in '05?
15    A    Let me think.  It would be less in 2004
16  because I was working less hours over the course of
17  the year.
18    Q    And how much less would it have been?  Again,
19  I'm just looking for generalities.  Was it 10,000
20  dollars less, was it 20,000 dollars less.
21    A    I need to do a calculation here.  It was more
22  like -- it was likely more like 60,000 dollars to
23  70,000 dollars in 2004.
24    Q    What about your income from Aetna for that
25  year?
0019
1    A    It would have been about the same.
2    Q    So your income from Aetna for 2004 and 2005
3  was about the same?
4    A    Yes.
5    Q    And Liberty Mutual, 2004?
6    A    Guessing, 80,000 dollars.

7    Q    Did you do any other work for any other
8  disability insurance carrier in 2004 other than
9  MetLife, Aetna and Liberty Mutual?
10    A    No.
11    Q    And in 2004 did you also continue to see
12  nursing home patients?
13    A    Yes.
14    Q    And did you also continue to do independent
15  medical examinations for the Social Security
16  Administration?
17    A    Yes.
18    Q    And was your income from those sources about
19  the same in '04 as it was in '05?
20    A    Probably.
21    Q    What other income did you have for your
22  professional services in 2004 and 2005 other than what
23  we talked about now?
24    A    In both years I did some consulting for the
25  local probate court where I would do evaluations for
0020
1  them.
2    Q    What was your approximate income from that
3  source?
4    A    That would vary, but possibly two or 3,000 a
5  year at most.
6    Q    Any other sources of income for 2004/2005
7  professionally?
8    A    I would occasionally do independent medical
9  exams for other organizations, some organizations that
10  set up such exams.
11    Q    Such as?
12    A    There's one called PsyBar, P-S-Y-B-A-R, that I
13  would work with.  I did some fitness for duty
14  evaluations for SBC.  There were some others, too, I
15  can't recall.
16    Q    Is PsyBar a company that disability insurance
17  companies use for independent medical examinations?
18    A    I believe so.
19    Q    Have you ever done work, any work for NMR or
20  Elite Physicians?
21    A    I don't believe so, no.
22    Q    Have you ever heard of those groups?
23    A    I have heard.
24    Q    Are those groups the same type of company as
25  PsyBar is, as far as your understanding?

0021
1    A    Yes.
2    Q    You also did some work it looks like for
3    Disability Management Associates in 2006?
4    A    Correct.
5    Q    And Disability Management Associates is
6    similar to PsyBar and NMR and Elite Physicians?
7    A    No, it's more like the MetLife model.  I
8    actually go to their office and do the record reviews.
9    Q    When you go to MetLife --
10    A    I thought of one other source of income.
11    Q    Okay, go ahead.
12    A    Starting in the very end of 2005, I can't
13    remember the exact date, I did some record reviews for
14    a company called Read Review Service, approximately,
15    guessing, maybe varies 500 to 2,000 dollars a month,
16    for the last several months only.  That's how long I
17    worked for them.
18    Q    I do know that Read is similar to Elite
19    Physicians and NMR.
20    A    Yes.
21    Q    When you're doing the work for Read are you
22    doing independent medical examinations, or are you
23    doing file reviews or both?
24    A    File reviews only.
25    Q    For what particular insurance company?
0022
1    A    They seem to be for a disability management
2    company called Qwest, Q-W-E-S-T, but I don't know a
3    lot about the companies that ordered them.
4    Q    Going back five years, other than the
5    insurance companies which you've talked about, have
6    you ever done any work on behalf of any other
7    companies?
8    A    Let me review my C.V. here and see.
9    Q    While you're doing that let me tick off some
10    of the bigger ones.  UnumProvident?
11    A    No.
12    Q    Paul Revere?
13    A    If you're talking purely in terms of
14    disability companies, I know I haven't worked for any
15    more than the ones I've said.
16    Q    And when I'm talking work, I'm talking either
17    doing an independent medical examination, or a file
18    review as a physician consultant.

19    A    There may have been another company I've done
20    an independent medical exam for at some time, but...
21    Q    Have you ever worked for Hartford or CNA?
22    A    No.
23    Q    Travelers?
24    A    No.
25    Q    Reliance?
0023
1    A    No.
2    Q    Kemper?
3    A    No.
4    Q    Prudential?
5    A    No.
6    Q    John Hancock?
7    A    No.
8    Q    Have you ever done any work in the workers'
9    compensation context?
10    A    Yes.
11    Q    For which companies?
12    A    I was referred to them by the state.  I don't
13    remember.  I mean there were varying companies.  This
14    is some years ago.  I don't recall what they were.
15    Q    It seems at least the disability cases that
16    you've worked on have been almost exclusively at the
17    request of the disability insurance companies,
18    correct?
19    A    Correct.
20    Q    Have you ever done any independent medical
21    examinations at the request of a claimant or a
22    plaintiff in the last three years?
23    A    I don't recall.  Possibly not.
24    Q    And in terms of numbers of cases that you've
25    worked on at MetLife, let's start with 2004, can you
0024
1    give me a ballpark of how many file reviews,
2    approximately, you did?
3    A    I haven't got a clear idea.  It would be quite
4    a guess if I gave you a number.
5    Q    Just give me a ballpark.  You want to break it
6    down in terms of number of files per week or per
7    month, we can probably, you know, determine --
8    A    Back when I was working, say, eight hours a
9    week, that would vary greatly depending on the size of
10    the case, et cetera, I would guess 12 files.
11    Q    Per week?

12   A   Yes, for an eight hour week.
13   Q   Approximately 50 per month?
14   A   Yes.
15   Q   That would be about 600 per year?
16   A   Yes.  Very approximate.
17   Q   And you are doing more than that now?
18   A   Yes, in the proportion to the greater amount
19   of time that I'm working.
20   Q   What you're saying is that you're doing double
21   those reviews now?
22   A   At least, since I'm working at least twice as
23   much as I was at that time.
24   Q   The number of files at Aetna over the same
25   time period, about the same, 2004?
0025
1   A   About the same.
2   Q   And they're still about the same now?
3   A   Roughly, yes.
4   Q   So on an annual basis at least beginning 2005
5   because of the increased workload at MetLife you're
6   doing approximately 100 a month at MetLife and
7   approximately 50 a month at Aetna?
8   A   Let me just do a quick calculation there.
9      In that ballpark, but very approximate.
10   Q   The files that I've worked on where in the
11   Aetna claims I've also seen Dr. Andy Hopkins and Dr.
12   Taiwo oda-moody?  Am I pronouncing that right?
13   A   Oyebode, Taiwo.
14   Q   And you're familiar with these doctors?
15   A   Yes.
16   Q   Do you all work on claims together as a team?
17   A   No.
18   Q   How is it that the three of you appear in so
19   many Aetna files, reviewing the same file?
20   A   There were a limited number of doctors working
21   at Aetna.
22   Q   And are either Dr. Hopkins or Taiwo doing the
23   same type of work at MetLife as they're doing at
24   Aetna?
25   A   Not at this time, no.
0026
1   Q   Had they been in the past?
2   A   Dr. Hopkins had been at one point.  Dr. Taiwo
3   never worked for MetLife, to my knowledge.
4   Q   And what type of doctor is Dr. Hopkins?

5    A    He is a preventative medicine specialist.
6    Q    What about Dr. Taiwo?
7    A    Internist.
8    Q    And have you ever had occasions to consult
9    their opinion when you're working on a particular file
10   if you have a question as far as a medical issue that
11   they may be more knowledgeable than you?
12   A    Yes.
13   Q    How often does that happen?
14   A    At what time?
15   Q    During the time when you were doing file
16   reviews at Aetna, either in 2004, 2005, or presently.
17   A    All I can say is not often.
18   Q    Case by case basis?
19   A    Case by case, but not all cases by any means.
20   It did not happen often.
21   Q    Now, the office that you identified earlier,
22   354 Warrenville Road, you don't see any patients out
23   of that office, correct?
24   A    Not patients, no.
25   Q    What do you do out of that office?  You said
0027
1    you were there approximately a half day a week?
2    A    Yeah.  It's IME's through Social Security and
3    other IMM's when they're available.
4    Q    Other than IME's out of that office, do you
5    use that office for any other reason?
6    A    No.
7    Q    Are there any other psychiatrists or
8    psychologists that use that office in conjunction with
9    you?
10   A    Yes.
11   Q    Which doctors?
12   A    John Haney, H-A-N-E-Y, a psychiatrist, his
13   wife, Lynn Stanley Haney, is a psychotherapist, and
14   another therapist, I can't recall their name right
15   now.
16   Q    And do you all rent the same space together,
17   just share the expenses?
18   A    Dr. Haney charges me 150 dollars per month for
19   the time that I use it.
20   Q    Is it his office?
21   A    Yes.
22   Q    Is it more than one room in his office?
23   A    Yes.

24     Q    Now, at MetLife do you have your own office or
25   your own desk?
0028
1     A    My own desk.
2     Q    And did you have your own desk back in 2004?
3     A    Yes.
4     Q    And 2003?
5     A    Yes.  It may be shared with others at
6   different times of the week, but it was in some sense
7   my own desk.
8     Q    Do you have your own computer there?
9     A    Yes.
10     Q    And are you the only one who has access to
11   that computer?
12     A    No.
13     Q    Is this a MetLife computer, or a computer that
14   you brought yourself and plugged in?
15     A    MetLife.
16     Q    And from this computer do you have access to a
17   MetLife database?
18     A    I don't.
19     Q    What access do you have from this computer?
20   Let me ask it this way.  If the file is -- first of
21   all, does MetLife do their files electronically?
22     A    My part is not done electronically.  I'm not
23   sure how others do it.
24     Q    When you prepare your reports, do you use
25   MetLife personnel to transcribe the reports for you,
0029
1   or do you transcribe the reports yourself?
2     A    There's a private transcribing company.
3     Q    And do they come to the MetLife facility,
4   also?
5     A    No, it's dictated by phone.
6     Q    And we'll get into this in a second, but on
7   your report after your signature it's MS/DJM.  Who is
8   that?
9     A    That would presumably be the transcriptionist.
10     Q    And after the transcriptionist completes his
11   or her work, is the file then sent electronically to
12   the computer at MetLife?
13     A    It is at this time.
14     Q    What about back in 2004?
15     A    I think it was then, too.
16     Q    I think earlier you said that your workload at

17  MetLife from May of 2002 until November 2005 was about
18  the same?
19     A   Roughly.
20     Q   Can I assume, then, that your income in 2003
21  and 2004 from MetLife was approximately the same?
22     A   Approximately.
23     Q   As was the number of files that you handled
24  during that time as well?
25     A   Approximately.
0030
1     Q   Is there somebody at MetLife that you report
2  to?
3     A   No.
4     Q   Do you have a contract with MetLife?
5     A   Yes.
6     Q   Written or oral?
7     A   Written.
8     Q   You don't happen to have a copy of that with
9  you, do you?
10     A   I don't.
11     Q   And what is the term of that contract?
12     A   You know, I'm not sure.
13     Q   Is it for years, or one year, or is it at the
14  will of MetLife?
15     A   You know, I'm not sure.
16     Q   When was the last time you signed a contract
17  with MetLife?
18     A   I think it's been some time.
19     Q   Aetna, do you have a contract with Aetna?
20     A   Yes.
21     Q   When was the last time you signed a contract
22  with Aetna?
23     A   I'm not sure.  Not recently.
24     Q   Why did your workload essentially double from
25  2004 and beginning of November of 2005?
0031
1     A   Because I was working more hours there and had
2  more opportunity to do more files.
3     Q   Was there another consultant that they were no
4  longer using that created increased workload for you?
5     A   I don't think that was it.
6     Q   Did they just have more files?
7     A   It seemed to be the case.
8     Q   Is there anyone else with your specialty who
9  does what you do at the Glastonbury office?

10    A    There is now, yes.
11    Q    Who is it?
12    A    There is a psychiatrist, Dr. Richard Jackson.
13    Q    And when did Dr. Jackson start?
14    A    I'm guessing about six months ago.  That's
15  very approximate.
16    Q    Before that were you the only person that did
17  what you did out of the Glastonbury office in the
18  field of psychiatry?
19    A    There's another psychiatrist, Dr. Sugarman,
20  S-U-G-A-R-M-A-N, who has worked there for I believe
21  about eight months.  Before that I was the only
22  psychiatrist since I had started at that office.
23    Q    So eight months would put it back around
24  sometime last fall of 2005?
25    A    Approximately, yes.
0032
 1    Q    But from April of 2004 until the fall of 2005
 2  you're the only one that did what you did in your
 3  specialty at MetLife?
 4    A    I believe so, yeah.
 5    Q    And particularly during the time frame when
 6  you worked on Ms. Kinser's file?
 7    A    Yes.
 8    Q    You ever been a defendant in a malpractice
 9  case?
10    A    Yes.
11    Q    When, and how many times?
12    A    One time.  The suit was filed in 1992.
13    Q    And what was the outcome of that case?
14    A    I was dropped from proceeding without
15  settlement or a finding of wrongdoing.
16    Q    You were dismissed from the case?
17    A    Dismissed, yes.
18    Q    And I'm assuming you've given your deposition
19  before?
20    A    I have given a deposition before.
21    Q    Have you given a deposition in the context of
22  your work in a disability insurance case?
23    A    No.
24    Q    This is the first one?
25    A    Yes.
0033
 1    Q    No kidding.  And I'm assuming you don't have
 2  any associates or partners professionally?

3    A    Correct.
4    Q    Do you have any privileges at any hospitals?
5    A    Yes.  I have consulting privileges at Windham
6  Community Memorial Hospital.
7    Q    Where is that?
8    A    Willimantic, Connecticut.
9    Q    And how often do you do work out of that
10  hospital?
11    A    Very little.  Really nothing at all these
12  days.
13    Q    Is that associated with your treatment of the
14  nursing home patients?
15    A    No.
16    Q    And when was the last time you did any work
17  out of Windham Community Memorial Hospital?
18    A    More than a year.  I'm not sure.  Also at
19  Natchaug Hospital.
20    Q    In the last five years how much work?
21    A    I worked there half time from 1999 to 2004.
22  Since that I haven't done anything officially for
23  them, although I'm still among the medical staff.
24    Q    When you say half time, you worked there 20
25  hours a week?
0034
1    A    Yes.
2    Q    What type of work did you do for them?
3    A    Staff psychiatrist at a partial hospital
4  program.
5    Q    What's that mean?
6    A    It's a day program where patients will be
7  there for roughly four hours a day five days a week
8  for extensive mental health treatment.
9    Q    And do you specialize in any type of
10  psychiatric illness like an anxiety disorder,
11  depression, bipolar disorder, schizophrenia, any of
12  those areas, or do you treat them all?
13    A    Treat them all.
14    Q    So you're familiar with the disease of bipolar
15  disorder?
16    A    Yes.
17    Q    Looks like you also have had some privileges
18  at other hospitals, but this goes back more than ten
19  years, correct?
20    A    Correct.
21    Q    The type of work that you do at MetLife,

22  Aetna, and formerly Liberty Mutual, would that be
23  considered forensic psychiatry?
24    A   Depends on your definition of forensic.
25    Q   Tell me what your definition is.
0035
1     A   The broadest definition is psychiatry that's
2   used to serve some legal or administrative purpose.
3   In a broad sense it is.
4     Q   And that would also encompass independent
5   medical examinations that you do as well?
6     A   Yes.
7     Q   Including the work that you do for the Social
8   Security Administration?
9     A   Yes.
10    Q   Do you have a website or marketing materials?
11    A   No.
12    Q   Have you ever had a website or marketing
13  materials?
14    A   No.
15    Q   Have you ever reviewed files from MetLife
16  other than out of the Glastonbury office?
17    A   No.
18    Q   So just so I get it right, MetLife is now
19  using three external consultants in psychiatry now?
20    A   At the Glastonbury office, yes.
21    Q   Dr. Jackson and Dr. Sugarman?
22    A   Yes.
23    Q   Has MetLife acquired another disability
24  company where they all of a sudden have these large
25  number of claims?
0036
1     A   Not that I know of.  I'm not real
2   knowledgeable on the business aspect of it.
3     Q   Certainly you've seen your workload go up
4   there?
5     A   True.
6     Q   Do you know the workload that Dr. Jackson or
7   Dr. Sugarman have?
8     A   I just don't know.
9     Q   Are they there as frequently as you are?
10    A   Not as many hours per week.
11    Q   Do you recall what your fee was in this case,
12  in Ms. Kinser's case?
13    A   150 dollars an hour.
14    Q   And how many hours did you have involved?

15   A   I don't recall.
16   Q   What would be a typical amount of time on a
17 claim like this?  It didn't appear you reviewed that
18 many medical records.  How much time would you have
19 spent, approximately, on this file?
20   A   Total?
21   Q   Yes.
22   A   An hour.
23   Q   And would that include dictating your report
24 as well?
25   A   Yes.  This is an estimate.
0037
 1   Q   Just so I'm clear, it would include reviewing
 2 the materials, taking whatever notes you needed to
 3 take, and doing your dictation?
 4   A   Correct.
 5   Q   And was there any additional time involved
 6 after you got a draft of your dictation back?
 7   A   I presumably would have corrected it if there
 8 were any corrections.  I don't recall.
 9   Q   And how long would that take?
10   A   Five minutes.
11   Q   So a total time, on average, between an hour,
12 an hour and 15 minutes?
13   A   Approximately, yes.
14   Q   When you were asked to perform a file review
15 at MetLife, how is the file transferred to you?
16   A   Usually I get a paper copy of the file with a
17 referral page on my desk.
18   Q   Do you get the actual file, or do you get
19 copies of parts of the file?
20   A   Copies of parts of the file.
21   Q   And who determines what part the file to send
22 to you?
23   A   I don't know.
24   Q   Would that be the case manager?
25   A   It may be, but I'm not sure.
0038
 1   Q   Who else would it be if not the case manager?
 2   A   Some other administrator or manager, but I
 3 don't know.
 4   Q   Typically do you get involved during the
 5 appeal process, or do you get involved prior to
 6 benefit termination?
 7   A   At MetLife the majority of cases that I do are

8  appeals, but I do some pre-appeals as well.
9    Q   What percentage of time is pre-denial versus
10  post-denial?
11    A   Whether it's approved or denied is a separate
12  question that I'm not involved in. So pre-appeal?
13    Q   Yes, let's go back to that question.
14    A   Okay. All I can note, I would say the great
15  majority are appeal level files, but I simply don't
16  have the data on that.
17    Q   When we say appeal, we're talking an adverse
18  decision has been made against a person making a
19  claim, it goes into appeals, and that's when you get
20  involved?
21    A   Yes.
22    Q   So somebody at MetLife has made a decision
23  either to deny a claim or to cut off benefits before
24  you get involved?
25    A   In the appeal level, yes.
0039
1    Q   When a file is given to you, how do you know
2  whether you've received all the relevant portions of
3  that file?
4    A   There's no way I can know for sure.
5    Q   You don't control which documents MetLife asks
6  you to review, correct?
7    A   Correct.
8    Q   And is it typically the person in charge of
9  the case during the appeal process for MetLife that
10  refers the file to you?
11    A   Yes.
12    Q   I've done some depositions in the past with
13  Unum, and they have a procedure out there called a
14  round table where the main claims handler or the
15  adjustor gets together with their legal consultant and
16  with the doctor and they talk about a case. Is there
17  any similar procedure at MetLife that you are involved
18  in?
19    A   There has never been a discussion where a
20  legal representative has been involved, to my
21  recollection. There have occasionally been round
22  tables where different people involved in the case
23  would discuss it.
24    Q   And does that happen in every case?
25    A   No.
0040

1   Q   And how often would these meetings occur, on
2  average, in the context of the files that you review?
3  10 percent, 20 percent?
4   A   Of the total files?
5   Q   Yes.
6   A   Less than that.
7   Q   And do you recall whether Ms. Kinser's case
8  went to a round table?
9   A   I don't recall.
10   Q   Now, if you make any changes to your
11  preliminary draft, are the changes kept in the claims
12  file, or you discard the changes?
13   A   To my knowledge the changes are discarded.
14   Q   And who discards those, you or the claims
15  manager?
16   A   I'm not sure, really.
17   Q   Do you take written notes, either on a notepad
18  or otherwise, when you're reviewing a claim?
19   A   It depends.  Since I have a copy of the file
20  to work with, I often take notes on the pages.
21  Sometimes I will take notes on a separate sheet of
22  paper, but not typically.
23   Q   And if you make notes, when you say notes, you
24  make notes on the pages, you make notes on the pages
25  of the copies of the file that's sent to you?
0041
1   A   Correct.
2   Q   And is that kept in the file?
3   A   No.
4   Q   Do you discard those?
5   A   I don't.  I return it to the office manager.
6   Q   And would they discard those, then?
7   A   I believe so, but I'm not entirely sure.
8   Q   Have you on occasion made written notes of a
9  file review?
10   A   Yes.
11   Q   And would those notes be kept in the claims
12  file?
13   A   No.
14   Q   Are those notes discarded?
15   A   I would discard those after a short period of
16  time.
17   Q   Any reason why those notes would not be kept
18  in the claims file?
19   A   I don't know the reason that they're not.

20            MR. HOFRICHTER:  Let's go off the record
21  for a second.
22            (Off record discussion.)
23  BY MR. HOFRICHTER:
24    Q   I'm showing you what's been marked, and just
25  for this citation I'm going to use the full citation,
0042
 1  from hereafter I'm just going to use the number, CIT
 2  00029 and CIT 00030.  I'm going to ask you that you
 3  identify that document for us?
 4    A   This would appear to be the referral form for
 5  the case we're discussing.
 6    Q   And is this, does this form accurately
 7  represent the manner in which files are typically
 8  referred to you?
 9    A   Yes.
10    Q   Now, would it be that this document is
11  attached to the documents that they want you to
12  review?
13    A   Yes.
14    Q   And is it contained in the files, is it paper
15  clipped, is it stapled?  How is all this -- rubber
16  band?  How is it usually given to you?
17    A   Typically a metal clip.  It varies.
18    Q   Along with that are the stack of medical
19  documents or other claims information that they want
20  you to review?
21    A   Yes.
22    Q   And do you ever go outside that and say hey,
23  is there any other things in this claim file that I
24  need to be looking at, or do you just review the
25  information that they give you?
0043
 1    A   If I have reason to believe there's something
 2  missing, then I'll ask them for it.
 3    Q   And in this case other than the files that you
 4  reviewed, the documents that you reviewed that MetLife
 5  sent you, did you have any reason to believe that
 6  anything else was missing?
 7    A   Although I don't have a specific memory of
 8  what I had done at that time as it was some time ago,
 9  the file does not seem to indicate that I had done
10  that, but I'm not sure.
11    Q   Now, which person at MetLife referred this
12  file to you?

13   A   It's identified as Lisa Toulumjian,
14   T-O-U-L-U-M-J-I-A-N.
15   Q   And who is he?
16   A   She's a case manager.
17   Q   And would she have been the person in charge
18   of the appeal in this case?
19   A   All I know is she referred it to me.  I'm just
20   not sure.
21   Q   The markings on this paper, on page 29, are
22   those your markings?
23   A   They appear to be.
24   Q   And what would have been some of the things
25   you were looking for when you were making circles on
0044
1   this page?
2   A   Just the relevant information about the claim.
3   Q   And you had notice she had been disabled since
4   1994?
5   A   Yes.
6   Q   Were you ever provided any information that
7   MetLife was actually the third insurance disability
8   company who had been responsible for this claim since
9   1994?
10   A   The only information I know I saw was what was
11   listed on my report, so it would seem not.
12   Q   On page 2, this summary at the top, is that
13   your summary, or is that the summary that Lisa gave
14   you?
15   A   It is not mine.  It's presumably that of Lisa.
16   Q   And the specific questions are issues to be
17   addressed by IPC.  Is that Lisa's questions?
18   A   Presumably, yes.
19   Q   And that would be what you were focusing on
20   when you would respond to her questions or issues?
21   A   Yes.
22   Q   Now showing you two documents, one is 22
23   through 26, and the other one is 34 through 39, and I
24   would ask that you identify each of these documents,
25   please.
0045
1   A   Some other document in here.
2   Q   That document, you're referring to Exhibit 36?
3   A   Yes.
4   Q   If you look at the numerical order of those
5   documents, that was the way the file was transferred

6   to us.
7      A   Number 00022 is apparently an unsigned draft
8   of my report, and number 00034 is the signed copy of
9   my report.
10     Q   Is that your signature on page 39?
11     A   Yes.
12     Q   I know there's an additional page in the page
13  36, that probably was not contained in there when you
14  completed your report, correct?
15     A   Probably not.  I don't recognize it.
16     Q   Other than that, can you state that Exhibit 34
17  through 39 is your report?
18     A   Yes.
19     Q   And you prepared that report?
20     A   Yes.
21     Q   And that report contains your professional
22  opinion as a psychiatrist?
23     A   From the information available to me at that
24  time, yes.
25     Q   Now, if you look at page 22, you will see at
0046
1   the top something that looks like handwriting, CD 07.
2   I understand that MetLife has some identifying codes
3   for either the case managers or the adjustors.  Is
4   that an identifying code of a case manager and
5   adjustor that you're aware of?
6      A   It looks to be the forum that those codes are,
7   but I don't know if it is or not.
8      Q   And would that be, is the form, these two
9   letters and two numbers, is that consistent with how
10  MetLife identifies some of their employees?
11     A   Yes.
12     Q   And can I take it to mean that with this
13  number on here, that somebody reviewed this before?
14  Because this is the draft copy.  Somebody reviewed
15  this before you signed your final copy?
16     A   I don't know.
17     Q   Is there a requirement that MetLife asks you
18  to submit to them a draft copy before you make your
19  final copy?
20     A   No.
21     Q   Has that ever happened?
22     A   I don't recall that anyone specifically asked
23  me to send them a draft before I did my final copy,
24  no.

25     Q    Do you, as a matter of practice, without them
0047
1   asking, do you send them a copy of the draft before
2   you make a final copy?
3     A    No.
4     Q    Do you know an employee by the name of Eloise
5   Setzer or Susan Setzer?
6     A    No, I don't recall her.
7     Q    At MetLife?
8     A    I don't recognize it.
9     Q    The file review that you did in this case was
10  done at the Glastonbury office, correct?
11    A    Yes.
12    Q    Now, at the bottom of the page -- let's use
13  the final copy, which begins on page 34.  At the
14  bottom of that form it says "External physician
15  consultant review for MetLife disability."  Is that
16  your language, or is that a MetLife form?
17    A    It's a MetLife form.
18    Q    And this, the format that this is in is a
19  MetLife format, although the substance is your
20  substance?
21    A    Correct.
22    Q    And where did the template for this come from?
23    A    I was given it when I first started to work
24  there.
25    Q    Now, do you consider yourself an independent
0048
1   review physician, or do you consider yourself
2   affiliated with MetLife?
3     A    Independent.
4     Q    Why, then, if it's an independent report, is
5   your report not generated on your own letterhead with
6   your name at the top, your work address and all that
7   other stuff, as opposed to being on a MetLife form?
8     A    I believe it can be an independent review and
9   still be on a MetLife form.
10    Q    Does the same format system exist for your
11  reports at Aetna?
12    A    It's a different actual template, but the same
13  basic system is there.
14    Q    Same thing at Liberty Mutual?
15    A    Yes, it was.
16    Q    The top of page 34, you identify the date of
17  your review of January 29, 2004.  Would that also have

18   been the same day that you dictated your report?

19   A   Probably.

20   Q   The normal procedure is you get the file, you

21   review it, you did the dictation right then and there?

22   A   Usually, yes.

23   Q   When that's done you go on to another file?

24   A   Yes.

25   Q   About halfway down there's a line that says

0049

1   "Summary of activity /information received," and under

2   that is "Documents reviewed," and under these

3   documents you list seven things, correct?

4   A   Correct.

5   Q   I'm not going to get into the job description,

6   the job description is irrelevant because this isn't

7   an occupation case, so I'm not going to identify that,

8   but there was a job description attached, correct?

9   A   It says so, yes.

10   Q   The second thing that was attached, and I'm

11   showing you pages 192 through 203, you identify

12   MetLife diary entries from 12/21/01 to 12/31/03,

13   correct?

14   A   Yes.

15   Q   And can you certify that the documents I'm

16   showing you now would be the file entries during that

17   time period?

18   A   There are some additional entries from early

19   2004 at that point, but it seems to be largely the

20   same.

21   Q   The 2004 entries would not have been there at

22   the time when you made your review, so it would have

23   stopped in December 31, '03, correct?

24   A   It would seem so, yes.

25   Q   Other than that information on page 203, all

0050

1   the other information contained in the other documents

2   from 192 forward would be the information you would

3   have reviewed, correct?

4   A   I presume so, yes.

5   Q   And you certainly didn't have any input in

6   these file notes, correct?

7   A   Correct.

8   Q   The claims handler, the adjustor, or the

9   appeals consultant would have done that work

10   themselves, correct?

11    A    Some other MetLife staff, I presume, but I
12  don't know exactly who.
13    Q    You indicate in your report, these entries did
14  not contain additional relevant clinical information
15  not contained in the paper file and will not be
16  further referenced, correct?
17    A    Correct.
18    Q    Do I take that to mean you didn't put a whole
19  lot of weight in that?
20    A    I didn't find anything in there that seemed to
21  be important to my review that was not possibly
22  already present in the file.
23    Q    As an independent doctor, why are diary
24  entries relevant?
25    A    In some cases they do contain relevant
0051
1  information such as interviews that are not in the
2  claim file.
3    Q    Did you find any such interviews in this case
4  that were relevant to your opinion?
5    A    I did not, according to my note here.
6    Q    Number 3 on your letter is the September 3rd,
7  2003 letter from Gary Bruce.  I'm showing you what is
8  marked Exhibits 61 and 62.  Would that have been the
9  letter that you referenced in your report?
10    A    It would seem to be so, yes.
11    Q    The next thing is the opinion from the Social
12  Security Administration, page 82 to 86, and I'm
13  showing you those documents now.  Can you certify that
14  those are the documents that you reviewed when you did
15  your opinion in this case?
16    A    They certainly appear to be, yes.
17    Q    The next thing is the MetLife disability
18  letter dated 7/25/03, and I'm showing you Exhibit 88
19  and 89.  Can you certify that that is what you were
20  referring to?
21    A    It would appear to be so, yes.
22    Q    The next document is page 100 through 106,
23  which you identify in number 6 on page 2 of your
24  report as the personal profile of employee.  That
25  would be Carolyn Kinser, correct?
0052
1    A    Yes.
2    Q    And those seven pages would be what you were
3  referring to, correct?

4   A   It would seem to be, yes.

5   Q   And finally you identify three office visits

6   from the treating psychiatrist, Dr. Arvind Patel,

7   February 24, '03, 5/19/03 and 8/4/03, and the

8   psychological questionnaire 7/3/03, and attending

9   physician statement of 4/28/03.  Before I show you

10   these documents, I think 84 should be 814.

11   A   That's right, it's a typographical error.

12   Q   So you weren't referring to a different

13   document there?

14   A   No, I don't think so.

15   Q   And I'm showing you pages 95, 94, 70, 71, 72,

16   120, and 121, and if you will tell me that those are

17   the records that you were referring to under paragraph

18   number 7 of page 2 of your report?

19   A   They appear to be, yes.

20   Q   Now, there are no other documents identified

21   that MetLife forwarded to you, correct?

22   A   Correct.

23   Q   And what you have just seen and identified are

24   the only records that were sent to you by MetLife?

25   A   Yes.

0053

1   Q   Under the next section, telephone call, you

2   have NA listed?

3   A   Um-hmm.

4   Q   Does that mean you didn't speak to anybody, or

5   does that mean you didn't try to make any phone calls

6   to anybody?

7   A   It means it wasn't requested and I didn't make

8   a call.

9   Q   Who makes the decision as to whether to call

10   an individual, you or MetLife?

11   A   It depends.  I know sometimes it is, I believe

12   it is permitted under the rules of whatever particular

13   case, and sometimes it may not be permitted.  They can

14   request that I do it, in which case I will, or I can

15   do it if I believe that there's a need to do so.

16   Q   The most obvious person you would call would

17   be the treating physician?

18   A   Yes.

19   Q   Assuming there's a release in the file?

20   A   Yes.

21   Q   And in the claims that you review, what

22   percentage of the times are you calling the treating

23  physician?
24    A    A tenth.  That's a rough guess.
25    Q    And you didn't call the treating physician in
0054
1  this case, correct?
2    A    Correct.
3    Q    Did your involvement in this claim end after
4  January 29, 2004?
5    A    As far as I recall it did.
6    Q    Prior to your deposition today or whatever
7  preparation you may have done for this deposition, do
8  you recall doing any work at all from January 29,
9  2004, to present?
10    A    I don't.
11    Q    Did MetLife ask you to review any additional
12  medical information after January 29, 2004, prior to
13  your deposition today?
14    A    I have no recollection of that, but it was so
15  long ago that I may not.  I would only know if I had a
16  record saying that it had happened.  But I don't
17  recall it.
18    Q    Do you know whether MetLife sent you all
19  medical records that were in the file at the time when
20  they asked you to review this file?
21    A    I have no way of knowing that.
22    Q    Have you rendered any opinion in this case,
23  either written or orally, since January 29, 2004?
24    A    No, not that I recall.
25    Q    Just to be clear, all the information you
0055
1  received in preparation for your report is identified
2  in the first two pages of your report?
3    A    To my knowledge, yes.
4    Q    These are the obvious questions, but I need to
5  get them on the record anyways.  At any time did you
6  treat Ms. Kinser?
7    A    No.
8    Q    At any time did you do any tests on Ms.
9  Kinser?
10    A    No.
11    Q    Did MetLife ask you to perform any testing?
12    A    No.
13    Q    Did you ever examine Ms. Kinser?
14    A    No.
15    Q    Did you ever meet Ms. Kinser?

16   A   No.
17   Q   Did you ever call Ms. Kinser?
18   A   No.
19   Q   Did you ever speak with the treating
20   physician, Dr. Arvind Patel?
21   A   No.
22   Q   Dr. Patel's records go back to 1994.  At the
23   time you made your opinion in this case, did you have
24   any records from Dr. Patel from 19 -- sorry, 1995,
25   from 1995 to February 2003?
0056
1   A   The only records I saw were the ones listed in
2   the report.
3   Q   And those would have been the three office
4   visit notes in February, May, and August 2003?
5   A   Correct.
6   Q   Have you ever heard of Dr. Patel?
7   A   I don't think so, no.
8   Q   Do you have any opinion as to his reputation
9   as a psychiatrist, either good or bad?
10   A   No.
11   Q   At the time you made your report, were you
12   aware that Ms. Kinser treated with another
13   psychiatrist, Dr. Dixet, for six years?
14   A   According to this, I was not aware of that.
15   Q   And were any of Dr. Dixet's records ever given
16   to you at the time when you made your opinion, any of
17   his treatment records?
18   A   Not according to the file here, so I assume
19   no.
20   Q   Are you aware Ms. Kinser treated with a
21   psychiatrist by the name of Dr. Kishor Desai for one
22   point five years?
23   A   I was not aware according to the record here.
24   Q   And you never saw any of Dr. Desai's records,
25   correct?
0057
1   A   According to the record, yes.
2   Q   When you wrote your report were you aware that
3   Ms. Kinser has been hospitalized inpatient four times
4   for a psychiatric condition?
5   A   According to the records here I was not aware
6   of that.
7   Q   Did you ever receive or review any of the 142
8   pages of inpatient hospitalization records from the

9  Bradley Center of Saint Francis?

10   A   According to the record, I did not.

11   Q   Did you ever review the inpatient

12  hospitalization records from Doctors Hospital Mental

13  Health Center?

14   A   According to the record, I did not.

15      MR. GREENBERG:  Excuse me, I'm going to

16  object to the last question, as well as this line of

17  questioning, to the extent that it may imply that

18  MetLife had those records at the time of Dr.

19  Schroeder's review and did not turn them over, because

20  there's no foundation for that information, so this is

21  in the nature of an objection to the form of the

22  question.

23      MR. HOFRICHTER:  Okay.  All I'm asking is

24  whether he reviewed those records or not.

25  BY MR. HOFRICHTER:

0058

1   Q   If those records existed, would you agree that

2  you did not have Ms. Kinser's complete medical file

3  when you wrote your report in January 2004?

4   A   You say not the complete file.

5   Q   Assuming that there were six years of

6  treatment notes from Dr. Dixet, a year and a half

7  treatment records from Dr. Desai, 142 pages of

8  inpatient hospitalization records from Bradley Center,

9  hospitalization records from Doctors Hospital Mental

10  Health Center, is it safe to assume you didn't have

11  her complete medical file when you filed your report?

12   A   It would follow that was true, yes.

13   Q   You also did not review any medical records

14  after August 14th, 2003, correct?

15   A   According to the records here, yes, that's

16  true.

17   Q   Did any representative of MetLife ask you to

18  do a supplemental report at any time prior to today?

19   A   I don't recall.

20   Q   Now, I know these questions are based on the

21  three office visits of Dr. Patel that you reviewed,

22  but I'm going to ask these questions anyways.  Do you

23  accept Dr. Patel's diagnosis of bipolar disorder?

24   A   I didn't challenge it.

25   Q   If you would have seen the medical records

0059

1  going back to 1994, would you have been in a better

2  position to say this was the right diagnosis or wrong
3  diagnosis?
4     A   It may have helped.
5     Q   What factors must be present in an individual
6  to make a diagnosis of bipolar disorder?
7     A   Must be evidence over a period of time of
8  significant mood instability, including depressive
9  symptoms, a number of depressive symptoms, as well as,
10  at least at some point, symptoms of mania or
11  hypomania, which means essentially agitated higher
12  hyper state.
13     Q   How important are longitudinal treatment
14  records when determining whether somebody does or does
15  not have bipolar disorder?
16     A   Very important.
17     Q   Now, one of the bi's in bipolar disorder is
18  mania, correct?
19     A   Correct.
20     Q   The fact that somebody has a good day or two
21  is not inconsistent with somebody having a diagnosis
22  of bipolar disorder, correct?
23     A   Correct.
24     Q   And aren't there certain events that may
25  assist or trigger a mania such as beautiful weather in
0060
1  the springtime, a new relationship, or positive events
2  in somebody's life?
3     A   It's possible.
4     Q   When they're in a mania phase, it does not
5  mean they don't have the disease, correct?
6     A   Correct.
7     Q   Based on the treatment records that you
8  reviewed, did you find that Ms. Kinser was receiving
9  appropriate care from Dr. Patel, or do you have enough
10  information to make an opinion one way or the other?
11     A   I was not asked to address that question, so I
12  don't have an opinion.
13     Q   Based on the treatment records that you
14  reviewed, do you have an opinion?
15     A   It is my understanding that I would be really
16  explaining the finding of my report and not providing
17  additional assessments or opinions, since I didn't,
18  was not asked and did not give an opinion about that
19  in my report.  I have to say I don't have an opinion
20  about it now.

21   Q   Well, I mean your report speaks for itself,
22  and I'm assuming because it's been so long and you
23  spent about an hour on the file, that what's contained
24  in the report is probably more of an accurate
25  recollection of your opinion on this file versus any
0061
1  opinion now two years later, correct?
2   A   Correct.
3   Q   So I'm not going to, I'm not here to get into
4  the specifics of this at this point, your record does
5  speak for itself, but you did review the records from
6  Dr. Patel at this time?
7   A   Correct.
8   Q   Did you then or do you now have an opinion as
9  far as whether Ms. Kinser received appropriate care
10  from Dr. Patel?
11   A   I didn't have an opinion then or now.
12   Q   You're aware that she was taking Effexor,
13  Zyprexa and Xanax at that time?
14   A   The record did say that, yes.
15   Q   Are those medications appropriate for somebody
16  with a bipolar disorder with anxiety features?
17   A   They could be consistent with that diagnosis,
18  yes.
19   Q   Do you know what milligram doses of the
20  Effexor she was taking at the time you reviewed her
21  records?
22   A   I believe it was -- may I check the file?
23   Q   Yes, certainly.
24   A   150 milligrams per day.
25   Q   And she was taking that two times per day,
0062
1  correct?
2   A   Only says once per day here.  It says only
3  once per day in the record.
4   Q   After August of 2003 do you know whether that
5  medication went up or down?
6   A   I have no information about what happened to
7  her treatment after that date.
8   Q   If I were to tell you that back when she
9  started receiving treatment in the
10  mid-nineteen-nineties her he Effexor dosage was 37.5
11  milligrams that increased to the 150 milligrams, what
12  psychiatric features would need to be present in order
13  for a drug like Effexor to be increased from 37.5

14  milligrams up to 150?
15    A    Are you asking in terms of why do I think Dr.
16  Patel did that?
17    Q    No, generally.
18    A    Since it's an antidepressant medication, it
19  suggested that Dr. Patel believed there was more
20  depression.
21    Q    And the .5 milligrams dosages of Xanax, is
22  that a low dose, an average dose, or a high dose for
23  somebody with a panic disorder, or anxiety?
24    A    It would be a low to average dose.
25    Q    That dose in and of itself doesn't say this
0063
 1  lady was really sick based on the medication dosage
 2  she was receiving for that condition?
 3    A    Correct.
 4    Q    Now, what is Zyprexa used for?
 5    A    It's an atypical antipsychotic medication
 6  which also is used to treat the mood swings of bipolar
 7  disorder.
 8    Q    And the combination of Effexor and Zyprexa
 9  being used together, is that a common treatment
10  modality for somebody with bipolar disorder?
11    A    It would certainly be an accepted treatment in
12  some cases.  I don't know how common that particular
13  combination is used.
14    Q    Is it fair to say that something that's fairly
15  common in bipolar cases, it takes a while to get the
16  appropriate medication balance dosage for somebody
17  with bipolar disorder, is that fair to say?
18    A    That's often true.
19    Q    And in this case, had you had the medical
20  record early on, you will see that she was tried on
21  lamictal, wellbutrin, and various dosages of Effexor.
22  Is it uncommon for somebody to go through those drugs
23  before they finally get to an appropriate treatment
24  regimen?
25    A    There are often changes and adjustments in
0064
 1  treatment before an effective treatment regimen is
 2  found in bipolar disorder.
 3    Q    On page 4 of your report, Dr. Schroeder, page
 4  38?
 5    A    Yes.
 6    Q    At the top, the last sentence in that first

7  paragraph up there, you indicate that, "The office
8  notes in the claim file -- " we're talking about the
9  three office notes, correct?
10    A    Yes.
11    Q    "-- do not contain a comprehensive mental
12  health evaluation, nor a detailed formal mental status
13  exam."
14    A    Yes.
15    Q    How important are those examinations for the
16  treating physician in somebody who's treated somebody
17  over a ten year period?
18    A    It may be less important for them.
19    Q    So when you're saying the comprehensive mental
20  health evaluation or mental status exam, it would have
21  been important for you to see that?
22    A    Correct.
23    Q    But it was not important for the treating
24  physician as far as his care and treatment of Ms.
25  Kinser?
0065
1    A    I won't say it's not important.
2    Q    After somebody's been treating somebody over
3  this period of time, at what point in time does it
4  become necessary to do another one of these things?
5    A    It's a question of whether you mean does the
6  person do one, do they observe it.
7    Q    Right.
8    A    Versus do they write it down.  If you see
9  someone for a long time, doing a full comprehensive
10  formal examination certainly would not be necessary
11  every visit.
12    Q    And the fact that it is not included in the
13  notes does not mean he didn't at least make an
14  observation for those exams, correct?
15    A    Correct, I have no way of knowing whether he
16  did.
17    Q    Is it your opinion that these, the
18  comprehensive health evaluation and a formal mental
19  status exam, are objective tests, or subjective tests?
20    A    Some parts are subjective in that they report
21  what the patient claimant says about how they feel,
22  and some will be objective in that they will report
23  what the doctor observes or hears about it.
24    Q    What the doctor observes as far as mannerisms,
25  whether somebody's crying, shaking, whether they look

0066
1  depressed?
2      A    And other observations as well.
3      Q    So when you say objective, you're talking the
4  observation that the psychiatrist makes when looking
5  at the claimant, or the patient?
6      A    In a broader sense, and I could use objective
7  in this sense as well, it may refer to information
8  which is beyond the employee's own subjective
9  self-report and may contain other information beyond
10  the mental status examination, but a mental status
11  examination should contain some observed objective
12  findings.
13      Q    What other objective findings?  You're not
14  talking about the employee actually taking pen and
15  paper test when you were talking about these two
16  examinations, are you?
17      A    That is an example of another form of
18  objective information.
19      Q    But you're not referring to that when you're
20  talking about the comprehensive health evaluation?
21      A    No.
22      Q    You're talking about a neuropsychological
23  testing, MMPI and other type of testing?
24      A    I'm talking about, how do you mean I'm talking
25  about it?
0067
1      Q    When you're talking about the comprehensive
2  health evaluation, or a formal mental health exam,
3  you're not talking about a claimant's response to
4  written questions?
5      A    Correct.
6      Q    Would you agree or disagree that a
7  psychologist or psychiatrist having the benefit of
8  prolonged or lengthy treatment and examination of a
9  patient with bipolar disorder would be in a better
10  position to more accurately diagnose the patient's
11  illness?
12      A    Yes, sir.
13      Q    You would agree with that?
14      A    Yes.
15      Q    And the second part of the question is, and be
16  in a better position to more accurately recommend the
17  appropriate treatment regimen?
18      A    Generally, yes.

19    Q    And the third part of that question is, and
20  assess the cognitive and psychological functional
21  capacity of that person?
22    A    I'm not sure I'd agree with that.
23    Q    Why don't you agree with that?
24    A    Assessing the functional capacity is a
25  specialized technique or approach which is not
0068
1  necessarily widely known among treating doctors and is
2  not the focus of their work with patients.  They would
3  not necessarily do a good job at that aspect of it.
4    Q    So is it your opinion, then, that your one
5  hour of file review of three records is a better
6  indicator of Ms. Kinser's psychological functional
7  capacity than the treating physician that's treated
8  her more than 34 times over a ten year period?
9    A    I never put it in terms of a competition which
10  were better.  I use my specialized knowledge during
11  the time that I review the file and give an opinion
12  based on the evidence, and my specialized knowledge
13  and experience in the area.
14    Q    Does the American Psychiatric Association, of
15  which you are now a member, have any guidelines as to
16  rendering a professional opinion without conducting an
17  examination?
18    A    I'm not sure.
19    Q    As a general rule, does the American
20  Psychiatric Association discourage or frown on giving
21  professional opinions without conducting an
22  examination?
23    A    When you say examination, what do you mean?
24    Q    An examination of the individual that you're
25  giving an opinion on.
0069
1    A    I don't know that that's true.
2    Q    If there are guidelines on that, would you
3  have any reason to dispute those guidelines?
4    A    I would need to read them, and give my own
5  opinion.
6    Q    Are you aware of any ethical standards
7  regarding rendering a professional opinion without
8  conducting an examination, without speaking with the
9  claimant, without reviewing complete medical records,
10  or without speaking with the treating physician?
11    A    Every examination would have some limitations

12  depending on what information was available to the
13  examiner.  I am not aware of any ethical guidelines
14  that say that performing this kind of record review is
15  not ethical.
16      Q    Is it fair to say in this case that the three
17  records that you did review may not have accurately
18  painted a picture of this lady's true condition as it
19  existed over the prior ten years?
20      A    That's possible.
21      Q    And particularly in cases like bipolar
22  disorder where lengthy treatment records are very
23  important?
24      A    It's possible.
25      Q    Would you agree with that?
0070
1      A    It's possible, yes.
2          MR. HOFRICHTER:  Let go off the record.
3              (Off record discussion.)
4  BY MR. HOFRICHTER:
5      Q    Doctor, would you agree or disagree that an
6  individual's medical history and treatment records are
7  vitally important when you perform a consultative file
8  review?
9      A    Yes, they're important.
10     Q    And that your opinion is as good as the
11  records that you were provided, correct?
12     A    I was limited by that, yes.
13          MR. HOFRICHTER:  That's all the questions
14  I have.
15          MR. GREENBERG:  I don't have any further
16  questions.
17  BY MR. HOFRICHTER:
18     Q    Before we conclude, did you understand all the
19  questions I asked you today?
20     A    Yes.
21     Q    Are there any questions you want to amend or
22  change at this time?
23     A    No.
24     Q    You'll have an opportunity to do that.
25          MR. HOFRICHTER:  I'm sure you want to
0071
1  reserve?
2          MR. GREENBERG:  Yes, we'd like to reserve
3  the right to read and sign the deposition, please.
4          (Deposition concluded at 11:24 a.m.)

```
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0072
 1                    JURAT
 2
 3
 4        I, MARK SCHOEDER, do hereby certify that
 5  the foregoing testimony given by me on May 4, 2006, is
 6  true and accurate, including any corrections noted on
 7  the corrections page, to the best of my knowledge and
 8  belief.
 9
10
11
12                    _____
13                    MARK SCHOEDER
14
15
16
17    At            in said County of
18  , this        day of           , 2006,
19  personally appeared MARK SCHOEDER, and he/she made
20  oath to the truth of the foregoing corrections by
21  him/her subscribed.
22
23  Before me,                  , Notary Public
```

24
25        My Commission Expires:
0073
1        TRANSCRIPT CORRECTIONS
2

        REPORTER:  WENDY ALLEN
3

  CASE STYLE:  CAROLYN KINSER
4          VS
        THE PLANS ADMINISTRATION COMMITTEE OF
5        CITIGROUP, INC. AS ADMINISTRATOR OF THE
        ASSOCIATES FIRST CAPITAL
6
7  PAGE      LINE        CORRECTION
8

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

NAME:_____

25

0074

1            CERTIFICATE OF REPORTER

2

3     I, WENDY J. ALLEN, a Registered Professional
   Reporter/Commissioner within and for the State of

4   Connecticut, do hereby certify that I took the
   deposition of MARK SCHOEDER, on May 4, 2006, who was

5   by me duly sworn to testify to the truth and nothing
   but the truth; that he was thereupon carefully

6   examined upon his oath and his examination reduced to
   writing under my direction by means of Computer

7   Assisted Transcription, and that this deposition is a
   true record of the testimony given by the witness.

8     I further certify that I am neither attorney nor
   counsel for, nor related to, nor employed by any of

9   the parties to the action in which this deposition was
   taken; and further, that I am not a relative or

10   employee of any attorney or counsel employed by the
   parties hereto, nor financially interested in the

11   outcome of the action.
     WITNESS my hand and seal this 18th day of

12   May, 2006.

13

14   _____
         Wendy J. Allen, RPR
   My commission expires:

15   April 30, 2010

16

17

18

19

20

21

22

23

24

25

0075

1

2

3   May 18, 2006

4  Stephen Greenberg, Esq.
Holt, Ney, Zatcoff & Wasserman, LLP
5  100 Galleria Parkway, Suite 600
Atlanta, GA  30339
6
7
8  Dear Attorney Greenberg:
9  Enclosed please find your copy of the deposition of
Mark Schroeder, taken on May 4, 2006.
10
The original jurat and errata sheets are also
11  enclosed.  Please note that the witness is allowed 30
days to read and sign the deposition as the rules
12  provide.
13  Please return only the original notarized jurat and
errata sheets to Attorney Hofrichter for filing.
14  Thank you for your prompt attention to this matter.
15  If you have any questions please call me.
16  Sincerely yours,
17
18  Wendy J. Allen, RMR, CRR, 00221
Court Reporter
19
20
21
22
23
24
25

Kinser v. The Plans Administration Committee of Citigroup

5/4/2006

Mark Schroeder

Page 73

1                    TRANSCRIPT CORRECTIONS

2

3              REPORTER:   WENDY ALLEN

4    CASE STYLE:   CAROLYN KINSER
                        VS

5              THE PLANS ADMINISTRATION COMMITTEE OF
               CITIGROUP, INC. AS ADMINISTRATOR OF THE

6              ASSOCIATES FIRST CAPITAL

7    PAGE         LINE            CORRECTION

| PAGE | LINE | CORRECTION |
|---|---|---|
| 1 | (lines not indicated on pg. 1) | SCHOEDER → SCHROEDER |
| 5 | 3 | SCHOEDER → SCHROEDER |
| 12 | 14, 18, 21 | READ → REED |
| 26 | 5 | He → She |
| 27 | 3 | IMM → IME |
| 31 | 19, 20 | SUGARMAN → SUGERMAN |
| 35 | 14 | No → Yes (I apparently misunderstood the question. I did have marketing materials years ago). |
| 35 | 21 | Sugarman → Sugerman |
| 36 | 7 | Sugarman → Sugerman |
| 52 | 10 | 84 → 8/04, 814 → 8/14 |
| 59 | 11 | higher → hyper |
| 72 | 4, 13, 19 | SCHOEDER → SCHROEDER |

NAME: _____

14eb3f98-9e54-452b-a588-f0dc76ba186c

Kinser v. The Plans Administration Committee of Citigroup

5/4/2006

Mark Schroeder

Page 72

```
1                          JURAT

2

3

                    SCHROEDER
4          I, MARK SCHOEDER, do hereby certify that

5    the foregoing testimony given by me on May 4, 2006, is

6    true and accurate, including any corrections noted on

7    the corrections page, to the best of my knowledge and

8    belief.

9

10

11

12          _____

13          MARK SCHOEDER
                 SCHROEDER
14

15

16

17     At HARTFORD        in said County of HARTFORD

18   , this 19th  day of JUNE        , 2006,
                            SCHROEDER
19   personally appeared MARK SCHOEDER, and he/she made

20   oath to the truth of the foregoing corrections by

21   him/her subscribed.

22

23   Before me, Danna A. Dulieth, Notary Public

24

25          My Commission Expires: 7/31/2007.
```

Brandon Smith Reporting Service, LLC

14eb3f98-9e54-452b-a588-f0dc76ba186c

# Exhibit 3



# Harvard Health Publications
## HARVARD MEDICAL SCHOOL

SEARCH

Powered by **Google**

▸ HOME
▸ SIGN IN   ▸ SIGN OUT
▸ BROWSE BACK ISSUES

🛒 MY CART
MY ACCOUNT
▸ HELP
▸ ABOUT US

Subscriber Access

## Welcome Newsweek readers



SIGN UP FOR
HEALTHBEAT
OUR **FREE**
E-NEWSLETTER

Home  >  Welcome Newsweek readers  >  Depression and pain

# Depression and pain

**Hurting bodies and suffering minds often require the same treatment.**

*(This article was first printed in the September 2004 issue of the Harvard Mental Health Letter. For more information or to order, please go to [http://www.health.harvard.edu/mental](http://www.health.harvard.edu/mental).)*

Pain, especially chronic pain, is an emotional condition as well as a physical sensation. It is a complex experience that affects thought, mood, and behavior and can lead to isolation, immobility, and drug dependence.

In those ways, it resembles depression, and the relationship is intimate. Pain is depressing, and depression causes and intensifies pain. People with chronic pain have three times the average risk of developing psychiatric symptoms — usually mood or anxiety disorders — and depressed patients have three times the average risk of developing chronic pain.

## Medicating pain and depression

Almost every drug used in psychiatry can also serve as a pain medication. Relieving anxiety, fatigue, depression, or insomnia with mood stabilizers, benzodiazepines, or anticonvulsants will also ease any related pain. The most versatile of all psychiatric drugs, the antidepressants have an analgesic effect that may be at least partly independent of their effect on depression since it seems to occur at a lower dose.

The two major types of antidepressants, tricyclics and selective serotonin reuptake inhibitors (SSRIs), may have different roles in the treatment of pain. Amitriptyline (Elavil), a tricyclic, is one of the antidepressants most often recommended as an analgesic, partly because its sedative qualities can be helpful for people in pain. SSRIs such as fluoxetine (Prozac) and sertraline (Zoloft) may not be quite so effective as pain relievers, but their side effects are usually better tolerated, and they are less risky than tricyclic drugs. Some physicians prescribe an SSRI during the day and amitriptyline at bedtime for pain patients.

Both drug classes act in brain pathways that regulate mood and the perception of pain. Tricyclics heighten the activity of the neurotransmitters norepinephrine and serotonin; SSRIs act more selectively on serotonin. Some researchers and



Harvard Medical School
Online health information library
PremiumAccess
LEARN MORE

🛒 **Bookstore**

## Newsletters

▸ Harvard Health Letter
▸ Harvard Women's Health
  Watch
▸ Harvard Men's Health Watch
▸ Harvard Heart Letter
▸ Harvard Mental Health Letter
▸ Perspectives on Prostate
  Disease
▸ <u>Premium Access</u>

## Special Reports

▸ Exercise
▸ Vitamins
▸ Skin Care
▸ Stress Management
▸ Foot Care
▸ <u>See All Titles</u>

## Books

▸ Your Developing Baby
▸ The Fertility Diet

clinicians believe that a newer antidepressant which acts strongly on both neurotransmitters, the so-called dual-action drug venlafaxine (Effexor), is superior to both tricyclics and SSRIs for treating pain. So far, the evidence is inconclusive.

Physicians and psychiatrists are also considering the uncertain potential of the anticonvulsant drug gabapentin (Neurontin) and drugs that block the activity of substance P, another neurotransmitter involved in the regulation of both pain and depression. Electroconvulsive therapy, a standard treatment for severe depression, may have independent analgesic effects.

The association of depression with migraine headaches, which affect more than 10% of Americans, is especially close. One study found that over a two-year period, a person with a history of major depression was three times more likely than average to have a first migraine attack, and a person with a history of migraine was five times more likely than average to have a first episode of depression.

In somatoform disorders, including hypochondria, according to one theory, depression and anxiety are converted into physical symptoms. But often, when low energy, insomnia, and hopelessness resulting from depression and anxiety perpetuate and aggravate physical pain, it becomes almost impossible to tell which came first or where one leaves off and the other begins. In a statement by the International Association for the Study of Pain, pain is defined as "an unpleasant sensory or *emotional* experience associated with actual or potential tissue damage or *described in terms of such damage.*"

## Brain pathways

The convergence of depression and pain is reflected in the circuitry of the nervous system. In the experience of pain, communication between body and brain goes both ways. Normally, the brain diverts signals of physical discomfort so that we can concentrate on the external world. When this shutoff mechanism is impaired, physical sensations, including pain, are more likely to become the center of attention. Brain pathways that handle the reception of pain signals, including the seat of emotions in the limbic region, use some of the same neurotransmitters involved in the regulation of mood, especially serotonin and norepinephrine. When regulation fails, pain is intensified along with sadness, hopelessness, and anxiety. And chronic pain, like chronic depression, can alter the functioning of the nervous system and perpetuate itself.

The mysterious disorder known as fibromyalgia may illustrate these biological links between pain and depression. Its symptoms include widespread muscle pain and tenderness at certain pressure points, with no evidence of tissue damage. Brain scans of people with fibromyalgia show highly active pain centers, and the disorder is more closely associated with depression than most other medical conditions. Fibromyalgia could be caused by a brain malfunction that heightens sensitivity to both physical discomfort and mood changes.

## Depression, disability, and pain

Depression contributes greatly to the disability caused by headaches, backaches, or arthritis. People in pain who are also depressed become extremely heavy consumers of medical services, even if they have no severe underlying illness. But that doesn't mean they receive better treatment; studies show that they actually use fewer mental health services than other patients with mood disorders. According to some estimates, more than 50% of depressed patients who visit general practitioners complain only of physical symptoms, and in most cases the symptoms include pain. Some studies suggest that if physicians tested all pain patients for depression, they might discover 60% of currently undetected depression.

Eat, Drink, and Be Healthy
Beating Diabetes
The Harvard Medical School Family Health Guide
See All Titles

## Browse

Common Medical Conditions
Wellness & Prevention
Emotional Well Being & Mental Health
Women's Health
Men's Health
Heart & Circulatory Health

## Tools

Guide to Diagnostic Tests

Pain slows recovery from depression, and depression makes pain more difficult to treat; for example, it may cause patients to drop out of pain rehabilitation programs. Worse, both pain and depression feed on themselves, by changing both brain function and behavior. Depression leads to isolation and isolation leads to further depression; pain causes fear of movement, and immobility creates the conditions for further pain. When depression is treated, pain often fades into the background, and when pain goes away, so does much of the suffering that causes depression.

## Treating pain and depression in combination

In pain rehabilitation centers, specialists treat both problems together, often with the same techniques, including progressive muscle relaxation, hypnosis, and meditation. Physicians prescribe standard analgesics — acetaminophen, aspirin and other nonsteroidal anti-inflammatory drugs, and in severe cases, opiates — along with a variety of psychiatric drugs (*see* "Medicating pain and depression" *box above*).

Physical therapists provide exercises not only to break the vicious cycle of pain and immobility but also to help relieve depression. Cognitive and behavioral therapies teach pain patients how to avoid fearful anticipation, banish discouraging thoughts, and adjust everyday routines to ward off physical and emotional suffering. Psychotherapy helps demoralized patients and their families tell their stories and describe the experience of pain in its relation to other problems in their lives.

Pain specialists can improve their practice by learning more about the interactions among psychological, neurological, and hormonal influences that link pain and depression. Why do some people recover from injuries without pain while others develop chronic symptoms, and how is that process related to depression and anxiety? How do psychotherapy and antidepressant drugs affect brain function in depressed people with chronic pain? What kinds of psychotherapy are helpful for them, and how long should psychotherapy continue? In investigating these questions, and in all treatment of both pain and depression, the goal is not just comfort or the absence of symptoms but restoring the capacity to lead a productive life.

**Resources**

American Academy of Pain Management
www.aapainmanage.org
209-533-9744

An organization for professionals working with people in pain. It provides accreditation, continuing education, publications, and other services.

National Foundation for the Treatment of Pain
www.paincare.org
916-725-5669

Provides comprehensive information and referrals to pain specialists.

American Chronic Pain Association
www.theacpa.org
800-533-3231

American Pain Foundation
www.painfoundation.org
888-665-PAIN (7246)

These organizations provide information, advocacy, and support for chronic pain sufferers and their families.

### References

**Bair MJ, et al.** "Depression and Pain Comorbidity: A Literature Review," *Archives of Internal Medicine* ( Nov. 10, 2003): Vol. 163, No. 20, pp. 2433–45.

**Bao Y, et al.** "A National Study of the Effect of Chronic Pain on the Use of Health Care by Depressed Persons," *Psychiatric Services* (May 2003): Vol. 54, No. 5, pp. 693–97.

**Lesho EP.** "When the Spirit Hurts: An Approach to the Suffering Patient," *Archives of Internal Medicine* ( Nov. 10, 2003): Vol. 163, No. 20, pp. 2429–32.

**Ohayon MM, et al.** "Using Chronic Pain to Predict Depressive Morbidity in the General Population," *Archives of General Psychiatry* (Jan. 2003): Vol. 60, No. 1, pp. 39–47.

**Parker JC, et al.** "Management of Depression and Rheumatoid Arthritis: A Combined Pharmacologic and Cognitive-Behavioral Approach," *Arthritis and Rheumatism* ( Dec. 15, 2003): Vol. 49, No. 6, pp. 766–77.

**Turk DC, et al.** "Psychological Factors in Chronic Pain: Evolution and Revolution," *Journal of Consulting and Clinical Psychology* (June 2002): Vol. 70, No. 3, pp. 678–90.

*(This article was first printed in the September 2004 issue of the Harvard Mental Health Letter. For more information or to order, please go to http://www.health.harvard.edu/mental.)*



### Harvard Mental Health Letter

The **Harvard Mental Health Letter** is a unique resource that covers a wide range of mental health issues and concerns. It presents the latest thinking, treatment options, therapies and debate of interest to both mental health care professionals and the concerned public. ▶ Read more

SUBSCRIBE NOW 🛒 12 monthly issues (Print+Electronic) $59.00
SUBSCRIBE NOW 🛒 12 monthly issues (Electronic Only) $55.00

Click to enlarge

**BACK TO TOP** | **HOME**

**CONTACT US:** Media | Technical Support | Corporate Sales | Licensing

© 2000–2008 Harvard University. All rights reserved.

**HARVARD MEDICAL SCHOOL**

Privacy Policy | Health News | Site Map